**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff Timothy M. Weis,*
*Additional Plaintiff Angelo Federico and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM FARRAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WORKHORSE GROUP, INC., DUANE HUGHES, STEVE SCHRADER, ROBERT WILLISON, and GREGORY ACKERSON<br><br>Defendants. | Case No. 2:21-cv-02072-CJC-PVC<br><br>**AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW** |

1.      Lead Plaintiff Timothy M. Weis ("Lead Plaintiff"), together with additional Plaintiff Angelo Federico (collectively, "Plaintiffs"), and on behalf of all other persons similarly situated, by and through Plaintiffs' undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiffs' and Plaintiffs' own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of Workhorse Group, Inc. ("Workhorse" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Workhorse's press releases; (v) analyst reports and independent media reports regarding Workhorse, its stock price movement, pricing and volume data; (vi) videos of interviews with Workhorse executives, as well as videos produced by Workhorse, on YouTube; (vii) other publicly available material and data; and (viii) interviews of persons with knowledge of the allegations contained herein, including former employees of Workhorse and relevant third parties. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by defendants and/or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

2.      Plaintiffs bring this securities class action on behalf of persons who purchased the securities of Workhorse between March 10, 2020 and May 10, 2021, inclusive (the "Class Period"), against Workhorse, Chief Executive Officer Duane Hughes ("Hughes"), Chief Financial Officer Steve Schrader ("Schrader"), Chief Operating Officer Robert Willison ("Willison"), and Corporate Controller (Principal Accounting Officer) Gregory Ackerson ("Ackerson"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

1

## **OVERVIEW**

2      3.      In a public podcast on August 17, 2020, Defendant Willison stated:

3   "One of my favorite phrases is 'when all is said and done, there's more said than

4   done.'" Willison's statement sums up the fraud perpetrated by Defendants in this

5   case – a lot was said but almost nothing was actually done. During the course of the

6   Class Period, Defendants perpetrated a scheme to fraudulently inflate the price of

7   Workhorse securities, by (1) participating in (and not withdrawing from) the bidding

8   process for a $6.3 billion contract to manufacture the new fleet of 165,000 United

9   States Postal Service ("USPS") next generation delivery vehicles ("NGDV") despite

10  failing to meet basic criteria for manufacturing capacity, design, and safety, which

11  the USPS repeatedly told Workhorse were deficiencies in their proposal; (2)

12  materially misrepresented the manufacturing capabilities of the Company,

13  repeatedly emphasizing its ability to produce hundreds of vehicles a year when in

14  reality they struggled to manufacture even a handful; and (3) materially

15  misrepresenting nonbinding interest in the Company's vehicles as a purported

16  "backlog" of orders.   Through this scheme and through their material

17  misrepresentations, Defendants misled the market to believe that Workhorse had

18  moved beyond the research and development phase of the Company and into mass

19  production, that the Company had a steady backlog and demand for their product,

20  and that there was a strong possibility Workhorse would be granted all or part of the

21  USPS contract.

22      4.      Based on this positive portrait of the Company, and despite the

23  Workhorse's meager revenue stream, unyielding cash burn, snail-like pace of

24  production, unproven business model, and unproven product line, the stock price

25  soared from around $2.50/share at the start of the Class Period to a high of over

26  $40/share, *a more than 1500% increase*.

27

28  AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

5.       With the stock price artificially inflated, the Individual Defendants, as well as members of the Workhorse Board of Directors, sold huge quantities of Workhorse stock for their personal profit.  These massive stock sales, which involved over 850,000 shares and exceeded $21.5 million in aggregate proceeds, stood in stark contrast to the Individual Defendants' Pre-Class Period trading practices, as none of them sold a single share before the start of the Class Period. Moreover, all of these sales took place during an approximately 6-month period when the stock price was over $15/share, and none of the Individual Defendants sold any stock from the time the price crashed in late February 2021, when the USPS announced a competitor won the NGDV contract, to the end of the Class Period.

6.       Unbeknownst to investors, Workhorse was nowhere near able to mass produce trucks, as the facility where the trucks were being assembled was understaffed, had no automation, and trucks were assembled one at a time on wooden work benches. Workhorse's backlog consisted of highly conditional agreements with entities who had no obligation to ever take delivery of the trucks. Additionally, by Workhorse's own admission, USPS decided early on, based on factors which Defendants were fully aware of, that the NGDV contract would not be awarded to Workhorse.

7.       The market learned these true material facts, previously concealed through Defendants' scheme and misrepresentations, through a series of revelations that eroded the artificial inflation extant in Workhorse's stock.

8.       First, on October 8, 2020, Fuzzy Panda Research published a report prior to the opening of the market, entitled "The 'Brakes' Fall Off The USPS Story: Workhorse's USPS Bid has Numerous Critical Failures." The report revealed numerous true, non-public facts, that contradicted Defendants' statements, and partially revealed Defendants' scheme.  For example, Fuzzy Panda revealed, through its own non-public conversations with sources, that Workhorse's initial partner to

the NGDV bid, VT Hackney, dropped out and sold their rights to Workhorse because of, among other things, "Numerous Critical Failures" during the prototype testing, including motors breaking, safety belt problems, constant door problems, problems with the performance of the chassis, suspension problems, range problems, power problems, and "most notably," the "notorious parking brake failure resulting in a USPS employee being hospitalized." Fuzzy Panda revealed based on its own investigator's visits to Workhorse facilities that employees were not working on producing vehicles as the Company represented, and could not manufacture vehicles at scale. Additionally, Fuzzy Panda revealed the fictitious nature of the purported "backlog" of UPS orders, and that all the vehicles Workhorse had produced for them were simply prototypes. Finally, the Report revealed that Workhorse had a history of connections to illegally paid stock promoters who were hired to "publish dozens of bullish articles on its clients, which appeared to be independent research pieces."

9.      While the Fuzzy Panda Report's revelations had an immediate negative impact on Workhorse's stock, the Company's stock price bounced back as news and media outlets discounted the report as influenced by Fuzzy Panda's short position. For example, Bloomberg published an article that same day, entitled "Workhorse Shares Shrug Off Short-Seller Report's Allegations," reporting on the Fuzzy Panda piece, attributing a sharp price decline in Workhorse's stock to the revelations in the report, stating "[s]hares of Workhorse declined 1.2% to $23.91 at 1:08 p.m. in New York after paring an earlier decline of as much as 6.1%."

10.     Second, on February 23, 2021, USPS announced that it was awarding the entirety of the 10-year, multi-billion dollar NGDV contract to competing bidder Oshkosh Defense (partnered with Ford). Analysts following Workhorse were "shocked" by the announcement. For example, Wolfe Research issued a note that same day explaining that "[g]iven recent indications from the Postal Service that the contract could be split between multiple OEMs, and given President Biden's new

EV [electric vehicle] mandate for the Federal Fleet, investors were clearly surprised by this outcome." In other words, because the stars seemed aligned to favor an all-EV bid, yet Workhorse failed to receive even a miniscule portion of the contract, Wolfe Research underscored that the revelation "raise[d] questions about underlying issues with WKHS's product/technology." Moreover, although Wolfe had just been singing praises of increases to Workhorse's backlog less than two months earlier, Wolfe became "cautious on valuation," highlighting risks with manufacturing.

11.    While Defendants Hughes, Willison, and multiple board members suspiciously unloaded hundreds of thousands of Workhorse shares in the month before the USPS announcement when the stock was surging above $30 per share, unwitting investors were pummeled by the revelation, as Workhorse's stock plummeted from $31.34 per share at close on February 22, to $16.47 per close on February 23, a decline of over 47%.

12.    Even though investors were shocked by the USPS contract outcome and began questioning Defendants' representations regarding Workhorse's capabilities, the Company's stock price remained artificially buoyed, as market participants such as BTIG, Colliers International, and Roth Capital continued to emphasize the strength of Workhorse's fictitious "backlog" of vehicle orders, believing (erroneously) that "There is still a real company here."

13.    The third revelation came on May 10, 2021, when, despite continuously emphasizing the Company's plans to "ramp-up" production, Defendants revealed Workhorse had only delivered 6 trucks in the First Quarter of Fiscal 2021 ("1Q:21") and had only produced 38 trucks total year to date, making it clear that Workhorse simply did not have the capability to manufacture vehicles at any scale, that the Company's supposed manufacturing ramp-up remained "elusive," that there was not path to achieving the Company's stated target of 1,800 trucks in 2021. Once again,

Workhorse stock fell precipitously when the truth was revealed, falling to $8.20 at close on May 10, 2021, a 15% decrease from the prior trading day close of $9.64.

14.     Company admissions from Post-Class Period filings in *Workhorse Group Inc. v. United States*, No. 1:21-cv-01484, the United States Court of Federal Claims litigation between Workhorse and USPS in (the "Federal Claims Action"), confirm Defendants' scheme and the falsity of Defendants' misrepresentations and support the research in the Fuzzy Panda Report. Workhorse's complaint in the Federal Claims Action (the "Fed. Claims Complaint") acknowledges that USPS cited numerous reasons that USPS "would never have selected [Workhorse's NGDV] for its flagship vehicle," the "posterchild" of which was a "roll-away incident," in which "a flaw in Workhorse's parking brake system caused Workhorse's prototype vehicle to roll down an incline and into a ditch," resulting in the hospitalization of a union USPS driver who was forced to jump from the runaway vehicle. Fed. Claims Complaint at ¶ 11. The Fed. Claims Complaint concedes that on at least two occasions during the Class Period, USPS informed Workhorse of various "areas of deficiency," and provided a "Deficiency List" that "identified issues" with Workhorse's proposal, including questions regarding the Company's "prior performance," "Workhorse's ability to manufacture efficient and sustainable all-electric vehicles for large-scale commercial delivery," the "production capabilities of Workhorse's leadership and partners," and "Workhorse's cost breakdown." *Id*. at ¶¶ 63, 65, 93, 95, 101-164.

15.     The bulk of these issues, as well as the "roll-away incident," bore directly on the "Technical Evaluation Factors" of the USPS assessment ("Design Quality and Technical Approach, Supplier Capability, and Past Performance"), which the USPS' Solicitation explained to Workhorse "would be more important than Total Cost of Ownership in ultimately calculating the best value to the USPS."

*Id*. at ¶¶ 36-37. Thus, as would be expected, Workhorse scored dead last among its competitors in Technical Ranking and Best Value Ranking. *Id*. at ¶ 81.

16.     When Workhorse submitted its "disagreement" to the USPS award decision, the USPS responded with what Workhorse characterized as "a lengthy screed aggressively attacking Workhorse," and its "lack of credibility and candor with the Federal government." *Id*. at ¶¶ 75-76, 88. In addition to recounting the numerous "'critical' deficiencies in Workhorse's proposal," the USPS "castigated Workhorse" for its public statements related to Workhorse's "participation in the NGDV program" despite the Company having signed a strict non-disclosure agreement. *Id*. ¶¶ 77, 89. As the letter "made clear" in what Workhorse described as a "remarkably hostile tone," the USPS had "closely policed Workhorse's public statements," and referenced securities fraud – indeed, the very allegations of this litigation – as one of many reasons USPS denied Workhorse's proposal, and would have denied it "even if the USPS had rated its proposal the best value." *Id*. at ¶ 89. That the USPS itself came to such a striking conclusion firmly corroborates Plaintiffs' allegations of fraud.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

21.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this district, and Defendants solicited purchasers of Workhorse securities in this district.

## PARTIES

22.      Lead Plaintiff Timothy M. Weis, as set forth in his accompanying Certification attached hereto as Exhibit A, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the previously concealed true material facts.

23.      Additional Plaintiff Angelo Federico, as set forth in his accompanying Certification attached hereto as Exhibit B, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the previously concealed true material facts.

24.      Defendant Workhorse is a technology company that engaged primarily in the development of electric delivery vehicles. Workhorse is incorporated in Nevada and maintains its principal executive offices at 100 Commerce Drive, Loveland, Ohio 45140. The Company's shares are listed on NASDAQ under the ticker symbol "WKHS."

25.      Defendant Duane Hughes served as the Chief Executive Officer ("CEO"), President and Director of the Company throughout the Class Period. From January 2015 until he became CEO in February 2019, Hughes was Workhorse's

President and Chief Operating Officer ("COO") under the leadership of former CEO Steve Burns. As COO, Hughes participated in quarterly earnings calls and signed contracts, such as a 2018 agreement between Workhorse and UPS. During the Class Period, Hughes sold 615,195 shares of his Workhorse stock for proceeds of approximately $15,275,000.[1]

26.     Defendant Steve Schrader served as the Chief Financial Officer ("CFO") of the Company throughout the Class Period. He became CFO of Workhorse in December, 2019, having resigned from his former position as CFO of automotive glass manufacturer Fuyao Glass America Inc. after Netflix picked up the documentary film American Factory, which filmed Fuyao executives illegally discussing firing workers for trying to unionize. During the Class Period, Schrader sold 19,589 shares of his Workhorse stock for proceeds of approximately $417,000.[2]

27.     Defendant Robert Willison served as the COO of the Company throughout the Class Period. Willison acted as the Director of Research and Development at Workhorse from July 2016-June 2018, during which time he managed all development engineering efforts and was the Chief Engineer for the USPS effort. Willison left the Company for several years, but was rehired in February of 2019, shortly after Hughes became CEO. During the class period, Willison sold 176,023 shares of his Workhorse stock for proceeds of approximately $5 million.[3]

28.     Defendant Gregory Ackerson served as the Corporate Controller (Principal Accounting Officer) of the Company throughout the Class Period.

[1] Approximately 7.5% of these sales were "Code F" dispositions, representing shares of common stock relinquished to the Company to cover estimated tax withholding for restricted shares previously granted subject to vesting. Defendants still benefitted from these relinquishments, as they were not required to pay the taxes with ready money. None of the Defendants made any "Code F" dispositions prior to the start of the Class Period.

[2] Approximately 22% of these sales were "Code F" dispositions, see Footnote 1 above.

[3] Approximately 3.5% of these sales were "Code F" dispositions, see Footnote 1 above.

Ackerman joined Workhorse in April, 2018 and he began signing Workhorse's 10-Ks and 10-Qs starting in March, 2020. During the Class Period, Ackerson sold 39,850 shares of Workhorse stock for proceeds of approximately $965,000.[4]

29.     Defendants Hughes, Schrader, Willison and Ackerson are collectively referred to herein as the "Individual Defendants."

30.     Throughout the Class Period, the Individual Defendants engaged in a scheme and course of conduct to conceal the truth about Workhorse's business practices and operations. Each of the Individual Defendants made misleading statements and/or omissions which artificially inflated the price of Workhorse securities. Hughes, Schrader, and Willison each participated in all of the Company's earnings calls throughout the Class Period, and Hughes, Schrader, and Ackerman each signed all of Workhorse's quarterly and annual reports during the Class Period. Schrader additionally conducted numerous interviews with the media, including interviews with several financial influencers on YouTube.

31.     Each of the Individual Defendants:

   (a) directly participated in the management of the Company;

   (b) was directly involved in the day-to-day operations of the Company at the highest levels;

   (c) was privy to confidential proprietary information concerning the Company and its business and operations;

   (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; and/or

---

[4] Approximately 48% of these sales were "Code F" dispositions, see Footnote 1 above.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

> (f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company.

32.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

34.     Workhorse and the Individual Defendants are referred to collectively as the "Defendants."

## **SUBSTANTIVE ALLEGATIONS[5]**

35.     Workhorse is a company that purports to develop and manufacture all-electric "last mile" delivery trucks, in other words, small or medium sized trucks that deliver items the relatively short distance from a warehouse or fulfillment center to the end customer.

36.     Workhorse was originally a custom chassis manufacturer, formerly owned by Navistar International. In March 2015, AMP Holdings, Inc. took over the Company, changing the company name to Workhorse Group Incorporated, and began offering a range of electric vehicles under the leadership of CEO Steve Burns ("Burns").

37.     Workhorse is headquartered in Loveland, Ohio. The Company also operates a facility in Union City, Indiana, where Navistar previously assembled chassis for trucks and mobile homes. Workhorse sometimes refers to this facility as

---

[5] Unless otherwise noted, all emphasis to quotations is added.

a "factory"[6] but, during the Class Period and still to this day, the facility has no automation or assembly line capabilities that one would traditionally expect to find in a factory.

**A. Workhorse Pursues Futile Bid for the USPS NGDV Contract**

38.     In January 2015, the United States Postal Service ("USPS") publicly announced the Next Generation Delivery Vehicle ("NGDV") project, a competitive multiyear acquisition process for replacing approximately 165,000 aging package delivery vehicles. On October 16, 2015, USPS issued a Prototype Request for Proposal ("RFP") to fifteen prequalified suppliers, and out of these proposals six suppliers were chosen to create prototypes. Numerous media sources reported the contract was worth approximately $6.3 billion, though some outlets reported the value could be closer to $8 billion, or even higher.

39.     The NGDV program included two phases: the Prototype Phase and the Production Phase.   Workhorse predecessor AMP Holdings, Inc. submitted a proposal to create a prototype, listing Defendant Hughes as the main point of contact, but the bid was rejected because Workhorse's engineers were unable to use the design software USPS required all bidders to use. This was a very early indication that Workhorse was not equipped to design or produce vehicles to the standard required for such a large and significant contract. However, instead of dropping out (as several initial bidders did), Defendants engaged in a scheme to futilely pursue the USPS contract in order to raise the price of Workhorse stock, resulting in Workhorse's executives and board members making tens of millions of dollars in insider trading profits.

40.     After failing to present a viable proposal on its own, Workhorse partnered with well-established engineering company VT Hackney, which, along

---

[6] For example, in the caption to this April, 2020 video on Workhorse's YouTube channel: https://www.youtube.com/watch?v=nwJYbM1tntY

with five other prime contractors, had been selected as manufacturers for award of a prototype contract, and received a share of approximately $37 million to design and build a working mail truck prototype for testing. These six suppliers were contracted to design and manufacture fully functioning NGDV prototypes in accordance with USPS's requirements and objectives, after which USPS would take delivery of the prototypes and test them extensively for six months.

41.     VT Hackney subsequently realized the venture would not be profitable enough to continue, and decided to drop out. Instead of bowing out along with their much more experienced partner, on November 6, 2019, Workhorse announced it had purchased VT Hackney's right to bid on the contract for approximately $7 million.

42.     According to the USPS's Solicitation sent to Workhorse and other contract bidders, USPS evaluated the proposals weighing its "total cost of ownership, technical evaluation results, and risk," to determine the "best value" to USPS.  Fed. Claims Complaint at ¶ 34.

43.     "Total Cost of Ownership," included consideration of factors such as acquisition costs, maintenance costs, fuel costs, etc. *Id*. at ¶ 35.

44.     The "Technical Evaluation Factors" "were (in descending order of importance): Design Quality and Technical Approach, Supplier Capability, and Past Performance, each of which comprised multiple subfactors." *Id*. at ¶ 36.

45.     With regard to Design Quality, the most important Technical Evaluation Factor, USPS evaluated the proposals' (i) Reliability, (ii) Maintainability, (iii) Fuel Economy and Emissions, and (iv) Safety and Ergonomics. *Id*. at ¶ 39. Reliability was assessed based on the "clarity, completeness, and merit of the [NGDV's] specific features, materials, assembly techniques, sourcing, and quality control strategies." *Id*. at ¶ 40. Maintainability was assessed based on "[t]he completeness and quality of the offeror's description of how specific design features, materials, assembly and/or operating characteristics will lead to reduced

maintenance." *Id*. at ¶ 41.  Fuel Economy and Emissions was assessed based on "[t]he completeness of description and projected value of [the] offeror's features that focus on improving fuel economy and reducing emissions." *Id*. at ¶ 42.  Safety and Ergonomics was assessed based on "[t]he completeness, feasibility, and potential safety value of [the] offeror's various design features, systems, and components that focus on improving safety of operations and minimizing carrier accidents," including "features that increase the efficiency of loading, unloading, curbside delivery, package delivery and delivery activities." *Id*. at ¶ 43.

46.      As for the second most important Technical Evaluation Factor, "Supplier Capability," USPS evaluated (i) Engineering Capability, (ii) Production and Delivery, (iii) Service and Parts, and (iv) Quality. *Id*. at ¶ 44. Engineering Capability was assessed based on "[a]vailable resources, qualified personnel, and facilities for production design, development, and warranty support."  *Id*. at ¶ 45. Production and Delivery was assessed based on the "[a]bility to produce NGDVs in accordance with [its] proposed production schedule, including a focus on the offeror's production facilities and ability to effectively scale into production." *Id*. at ¶ 46. Service and Parts was assessed based on "[p]resent and future capability to provide consistent service support and parts during the NGDV lifecycle." *Id*. at ¶ 47. Quality was assessed based on "[e]xperience with and evidence of [offeror's] quality management system and the quality management system of [their] key partners/subcontractor(s)." *Id*. at ¶ 48.

47.      In evaluating the third Technical Evaluation Factor, "Past Performance," the USPS considered "Prototype Performance and Prior Performance, with the former carrying greater importance."  *Id*. at ¶ 49.  USPS assessed Prototype Performance "as demonstrated by the Postal Service's testing and observations during the NGDV Prototype Phase, including validation of the subsystem reliability, vehicle safety, fuel economy, acceptance testing validation,

break-in resistance, cold weather adaptability, and any other relevant performance tests performed by the Postal Service." *Id*. at ¶ 50.  Prior Performance was assessed based on the "[e]xtent and quality of offeror and key partners/subcontractor(s)['] past performance in both research/development and design production of vehicles[,]" including performance on prior government and commercial contracts of similar size and scope. *Id*. at ¶ 51.

48.     The Solicitation made clear that "the technical evaluation tak[es] priority" and "would be more important than Total Cost of Ownership in ultimately calculating the best value to the USPS." *Id*. at ¶¶ 34, 37.  Thus, the Solicitation indicated that USPS would not award a contract based on long-term fuel cost savings at the expense of safety, quality, manufacturing capabilities, and experience. *Id*.

49.     In September 2017, the Workhorse/VT Hackney team delivered six vehicles for prototype testing under the NGDV Acquisition Program in compliance with the terms set forth in their USPS prototype contract. The prototype vehicles would be tested for emissions and fuel economy, ergonomics, aesthetics, handling, and durability.

50.     Workhorse neither built the prototype itself (it was built by a Detroit company called Prefix) nor was it capable of producing other trucks like the prototype. From January 2020 through June 2020, Confidential Witness ("CW") 1 was a Workhorse employee on a team assigned to identify parts and components needed for production of the USPS vehicles and to estimate their costs. According to CW1, "The prototype was nice to look at, but had very little merit for production." CW1 stated that when he joined the company, he had "very little to go on," as there was no detailed design behind the prototype. Key documentation – for example, a description of how the suspension attached to the cab of the truck – was missing. CW1 was "quite surprised" by how little information Workhorse had regarding the USPS NGDV prototype it submitted, and concluded that the prototype was "just a

way for Workhorse to demonstrate to the USPS that they had a vehicle that could fulfill the USPS requirements." While the prototype could technically fulfill the USPS requirements, the design deficiencies outlined by CW1 were precisely the issues USPS was concerned with in evaluating the most important Technical Evaluation factor, the "Reliability" of its "Design Quality."

51.     Further, the prototype submitted by Workhorse experienced numerous critical failures during testing. For example, a report by Fuzzy Panda Research on October 8, 2020, entitled "The 'Brakes' Fall off the USPS Story: Workhorse's USPS Bit has Numerous Critical Failures" (the "Fuzzy Panda Report"),[7] described the following incident in Spring 2018, which Fuzzy Panda attributed to an inside source:

> Workhorse rolled a USPS prototype truck down a hill accidently after their parking brake failed causing a union USPS driver to be hospitalized after jumping out of the runaway vehicle. We think this debacle as well as the numerous other "critical failures" we will lay out, destroyed Workhorse's chances of ever landing the USPS NGDV award.

Both Workhorse and USPS declined to comment on the Fuzzy Panda Report.

52.     However, Workhorse later corroborated Fuzzy Panda's description of the critical failures discovered during testing. Workhorse's Fed. Claims Complaint against USPS, filed on June 16, 2021, revealed to the public for the first time the myriad reasons why USPS rejected Workhorse's bid. The "posterchild" reason, which is remarkably similar to the story provided to Fuzzy Panda Research by its "inside source," was an incident where "a flaw in Workhorse's parking brake system caused Workhorse's prototype vehicle to roll down an incline and into a ditch, injuring a test track driver." Fed. Claims Complaint at ¶ 11. The "roll-away" incident

---

[7] The Fuzzy Panda Report can be downloaded here: https://fuzzypandaresearch.com/category/workhorse-group/

negatively impacted both the "Design Quality" and "Past Performance" evaluation factors in the USPS review, which both involved safety performance.

53.     After the prototype testing phase completed in December 2019, USPS commenced the Production Phase by publishing a Request for Proposals for the production of the NGDV vehicles. All contractors who had completed prototype testing – regardless of the results of that testing – were eligible to submit proposals, which were due on July 14, 2020. At this point, the Prefix prototype had suffered numerous failures during testing, and Even if Workhorse had been granted all or part of the USPS contract, it would not have been capable of mass producing the truck designed by Prefix. However, in order to maintain and inflate the price of their stock, Defendants nonetheless submitted a proposal. The week their proposal was due, Hughes, Willison, and several members of Workhorse's board of directors sold large quantities of Workhorse stock at artificially inflated prices.

54.     On September 3, 2020, less than two months Workhorse submitted its proposal, USPS Contracting Officer Delores B. Waters sent Workhorse a "Deficiency List" identifying various "weaknesses" in Workhorse's proposal, but acknowledged that the list was only representative of the problems, as it "indicated there were additional, unstated issues." Fed. Claims Complaint at ¶ 62.  The USPS' Deficiency list required Workhorse to submit a 99-page Deficiency Response, which it sent on September 25, 2020.

55.     On October 21, 2020, Ms. Waters sent another email to Workhorse containing yet another list of issues related to Workhorse's cost breakdown and maintenance.  The USPS inquiry required Workhorse to again submit a response on October 28, 2020 to attempt to address these issues.

56.     As part of the bidding process, Workhorse was subject to a non-disclosure agreement with the USPS (the "NDA") which prevented it from sharing any non-public information regarding the contract or the bidding process. Rather

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

than simply not discussing the contract, Hughes announced, in every earnings call from the start of the Class Period until the time the winner of the award was announced, that Workhorse was under an NDA and was only able to provide information which was already in the public domain. This statement suggested to the public that Workhorse was still in the running for the contract.

57.      Workhorse executives used the NDA as a shield to protect them from discussing unfavorable information, even if it was only tangentially related to the USPS Contract. For example, during the May 6, 2020 earnings call, an analyst inquired further about the supply chain, namely, about the ability of Workhorse's suppliers to meet the needs of the USPS NGDV contract, in the event Workhorse to secure all or part of it. Schrader stated that he could not comment because of the USPS NDA. The analyst asked, "So you can't talk about the capabilities of a supply chain to serve the post office? Is that off-limits?" Schrader replied, "I would think it's a similar supply chain that would supply the current trucks that would supply a post office vehicle."

58.      On January 25, 2021, just days after being sworn in, President Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States. Workhorse stock jumped from $23.62 per share at open on January 25, 2021 to $27.04 per share at open on January 26, 2021 – an increase of almost 14%.

59.      In the following days, Schrader conducted several interviews in which he made materially mislead the market to believe that President Biden's announcement was an indication that Workhorse would be awarded the USPS NGDV contract. For example, on January 27, 2021, in an interview with Simranpal Singh on Singh's YouTube channel[8], Schrader stated:

---

[8] *See* https://www.youtube.com/watch?v=dUiv6-BC1J8

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW             Case No. 2:21-CV-02072-CJC-PVC

> It's positive what we're seeing from the administration. President Biden, you know, just five days into his presidency has kind of pushed electric vehicles for all government agencies.

And on January 28, 2021, in an interview with Jack Spencer on Spencer's YouTube channel[9], Schrader stated:

> I think the President's announcement was huge, uh, for several reasons, right, it's 1. supportive of the EV market. It's 2. All-American, like he said, uh, all-American product buy, and I think he also said a lot about small businesses and purchasing, whether it be parts or final products from small businesses too, so I think that's huge. I think it's meaningful that he did this the fifth day into his presidency, right? He did it quickly, he didn't really wait, and so I think that putting a move on that is very quick too.

60.     As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021 – an increase of over $10 per share in a one-week time period.

61.     Despite Schrader's positive public statements on the USPS NGDV contract in these interviews, on January 26, 2021, just one day after Biden's announcement, Hughes, Willison, Ackerson, and multiple board members ***sold large quantities of their Workhorse stock***. Willison exercised an option to purchase 150,000 shares of Workhorse at $0.932/share, then sold those 150,000 shares for $30/share for ***overall proceeds of $4,360,000***. The 150,000 shares represented ***approximately 45% of the stock owned by Willison***. Similarly, on January 26, 2021 Hughes exercised options to acquire 200,000 shares of Workhorse stock at $5.28/share, then sold 100,000 shares for $28/share and 100,000 shares for

---

[9] *See* https://www.youtube.com/watch?v=rY7g15hOMrA

$30/share, for **total one-day proceeds of $4,744,000**. The 200,000 shares represented **approximately 40% of the stock owned by Hughes**. Then, just a few days later, on February 1, 2021, Hughes exercised options to buy a further 25,000 shares of Workhorse stock at $0.97/share, then sold those shares for $35.97/share, for proceeds of $875,000.   On January 27, 2021 Ackerson sold 3,222 shares of Workhorse stock for $40/share and 3,223 shares for $35/share, for proceeds of over $241,000. While the 6,445 shares only represent approximately 6.5% of the stock owned by Ackerson, the Form 4 reporting the sale contains no statement that the sale was made pursuant to a Rule 10b-5 Plan.

62.     Additionally, on January 26, 2021, Board Member Gerald Budde sold 10,000 shares of Workhorse stock for proceeds of over $300,000 and Board Member H. Benjamin Samuels and his related entities sold almost 300,000 shares of Workhorse stock for proceeds of approximately $9 million.

63.     If Hughes and Willison had been confident Workhorse would be awarded the USPS NGDV contract – a catalyst that would no doubt cause the price of the stock to skyrocket –they would not each sell nearly half the stock they owned in the company just days before the award was to be announced. Given that Hughes and Willison were in possession of the material, non-public information that Workhorse would not be granted the contract, and utilized this information for their own personal profit, these facts strongly support the inference of scienter.

64.     On February 23, 2021, USPS announced via press release that it was rewarding the entirety of the 10-year, multi-billion dollar NGDV contract to Oshkosh Defense ("Oshkosh"). The press release stated that "[t]he vehicles will be equipped with either fuel-efficient internal combustion engines **or battery electric powertrains** and can be **retrofitted to keep pace with advances in electric vehicle technologies**." The press release did not mention Workhorse at all.

65.     On this news, the price of Workhorse stock plummeted, from opening at $28.29 per share all the way down to an intra-day low of $12.50 per share, closing around $16.43 per share.

66.     The next day, February 24, 2021, Workhorse published a press release (not filed on SEC Form 8-K, despite the clear materiality of the subject matter[10]), titled "Workhorse Provides Corporate Update." The press release stated:

> On February 23, 2021 the USPS issued a press release announcing that it has made an award under the NGDV contract to a competing finalist…. After being informed of the USPS decision, the Company has requested, pursuant to the bid process rules, additional information from the USPS and is awaiting a response at this time. ***The Company intends to explore all avenues that are available to non-awarded finalists in a government bidding process.***

67.     On February 25, 2021, Workhorse granted massive stock awards to the Individual Defendants, other executives, and the Workhorse Board members. The purported value of this stock was $15.13/share, the closing price on February 24, 2021. From this time until the end of the Class Period, the Individual Defendants did not sell any further stock.

68.     On March 3, 2021 Workhorse met with USPS representatives to discuss the award and further specifics of the USPS selection process. The details of the March 3 meeting were not publicly disclosed at the time, however the Fed. Claims Complaint indicates that USPS debriefed Workhorse on the weaknesses USPS identified in their proposal, and explained that despite Workhorse's touted price

---

[10] 69 FR 15594 states that "A report on this form is **required** to be filed or furnished, as applicable, upon the occurrence of any one or more of the events specified in the items in Sections 1-6 and 9 of this form." (emphasis added). The events include Entry into a Material Definitive Agreement, Termination of a Material Definitive Agreement, Completion of Acquisition or Disposition of Assets, and Results of Operations and Financial Condition. Additionally, registrants may file Form 8-Ks to disclose any other information that the registrant deems of importance to security holders.

savings with its EVs, Workhorse still came in "second" with regard to Total Cost of Ownership. Fed. Claims Complaint at ¶ 74.

69.     According to Workhorse's Fed. Claims Complaint, shortly after the March 3, 2021 debriefing, Workhorse submitted a "'disagreement to the USPS in accordance with 39 CFR § 601.107." *Id*. at ¶ 75.

70.     Ten days later, on March 22, 2021, USPS responded to Workhorse's "disagreement" with a strongly worded letter, which Workhorse characterized as a "lengthy screed aggressively attacking Workhorse…." *Id*. at ¶ 76.  In addition to pointing out the "'critical' deficiencies in Workhorse's proposal," some of which had already been specifically raised to Workhorse, the USPS clarified that Workhorse was ranked last among the competing proposals in Technical Ranking, the most important part of the USPS valuation. *Id*. at ¶¶ 77, 81. In fact, the Technical Score (although conveniently redacted from Workhorse's Complaint) was so low that it caused Workhorse to also rank last in Best Value Ranking, despite ranking second in Total Cost of Ownership. *Id*. at ¶ 81.

71.     Although heavily redacted, Workhorse's Fed. Claims Complaint indicates the USPS identified "major" and "significant weaknesses" in Workhorse's Design Quality and Technical Approach, the most important analysis in the Technical Evaluation Factors, and "faulted Workhorse multiple times" for the "rollaway accident" attributable to a defective parking brake design.  *Id*. at ¶¶ 101-109. While Workhorse complains that "double-counting" this negative incident against the Company was unfair, clearly the incident affected multiple different categories of evaluation including Reliability, Safety, and Prototype Performance. *Id*. at ¶¶ 136. Among the many subcategories evaluated during the process, the USPS identified deficiencies in Reliability, Maintainability, Safety & Ergonomics, Supplier Capability, Production & Delivery, Service & Parts, Quality, Past Performance, Prototype Performance, and Prior Performance. *Id*. at ¶¶ 101-145. In

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

addition to safety and quality concerns, the USPS was clearly concerned with Workhorse's "scale-up capability to deliver the vehicles on schedule," as its "analysis of Workhorse's Production & Delivery capabilities [was] devoid of any mention of Workhorse's manufacturing plant in Union City, Indiana," and its picnic table production line, and instead "focused on Workhorse's partnership," which it also found inadequate to perform the contract. *Id*. at ¶¶ 123. The USPS also criticized Workhorse's lack of experience, ignoring Workhorse's touted "purchase orders" with "blue-chip customers," and highlighting that Workhorse had "buil[t] fewer than 1,000 vehicles." *Id*. at ¶ 144. By Workhorse's own characterization, the USPS considered "Workhorse as a 'startup' company without the experience or capability to produce the NGDV." *Id*. at ¶ 185.

72.     The USPS also stated that Workhorse displayed a "lack of credibility with the Federal government," and "castigated Workhorse" for their public statements regarding the NGDV program. *Id*. at ¶¶ 88-89. In fact, the USPS, who had reviewed Workhorse's proposal, tested its prototype, and conferred with Workhorse regarding deficiencies in its proposal – all non-public information not available to investors – accused Workhorse with not only violating the NDA with respect to Defendants' public statements, but also cited the USPS's support of *this very litigation* as a reason that it could have rejected Workhorse's proposal "even if the USPS had rated its proposal the best value." *Id*. at ¶ 89.

**B. Workhorse Creates a Fictitious 'Backlog' of Vehicle Orders**

73.     On May 30, 2018, Workhorse announced via 8-K that it had entered into an agreement with United Parcel Service, Inc. ("UPS") for 1,000 all-electric package delivery vehicles (the "UPS Agreement").

74.     The UPS Agreement, which was attached to Workhorse's May 30, 2018 8-K, provided for delivery of the vehicles in two phases. In phase 1, Workhorse would provide UPS with 50 prototype vehicles as a test fleet, which would be tested

across multiple geographic regions for durability. In phase 2, UPS would take delivery of the remaining 950 vehicles.

75.     The UPS Agreement stated:

   (a)  Phase 2 "will be *on a timeframe decided by Buyer at Buyer's sole discretion.*"

   (b)  "Buyer will determine, at its sole discretion, the level of success of the 50 Vehicle test."

   (c)  "Buyer may reduce the quantity of the balance of the Order (*or cancel the balance of the Order*) depending on the level of success achieved during the phase 1 testing, as determined in Buyer's sole discretion."

76.     Defendant Hughes, who was COO of the Company at the time, signed the UPS Agreement on behalf of Workhorse, so he was intimately familiar with the details of the deal.

77.     While it appears UPS took delivery of the 50 prototype vehicles, to date UPS has not requested delivery of the remaining 950 vehicles. In fact, in its 2019 Sustainability Report[11], UPS announced it had placed an order for 10,000 EVs from "U.K.-based startup Arrival." Workhorse was not mentioned in the sustainability report at all.

78.     Despite the lack of assurance that UPS would ever take delivery of these vehicles, from May 2018 onward Defendants used the 950 number to inflate Workhorse's purported "backlog." During the Class Period, Defendants repeatedly represented to investors that the UPS order was on the precipice of being fulfilled, for example:

---

[11] The UPS 2019 Sustainability Report can be found at this link: https://sustainability.ups.com/media/2019-progress-report.pdf

- May 6, 2020 earnings call, Schrader states: "we have the backlog out there in the first place with UPS… we're seeing customers very positive about our trucks and it's more, how soon can we get them.

- August 10, 2020 earnings call, in response to a question about the UPS order, Hughes states: "We are continuing to make sure that the trucks that we do deliver to UPS knock it out of the park if you will. So rather than having the first few vehicles go to them, *we're working with their implementation schedule across the different depots where they're going to place these vehicles* starting in the California marketplace as we understand it today."

- November 9, 2020 earnings call, Hughes states: "UPS remains our premier customer, if you will, because they have been along with us for the longest time, they collaborated with us on this C-Series design… So *we feel strong. We are happy where we are with UPS. We will be delivering new vehicles*. And the real key for them is us deliver us a high-quality vehicle over and over again, right?... So the first vehicle we deliver them, we want to hit it out of the park, and we want to make sure it is right."

- March 1, 2021 earnings call, Hughes states: "UPS, it's a combination, obviously, we haven't got production now, but also is when and where UPS would love to take their vehicles first. They have a depot in California and San Diego that's already with infrastructure. They love to get the voucher program too. So ideally, I think their first trucks would ideally go to California."

79.     Including the UPS order in its purported backlog allowed the small startup, which had only previously produced a handful of prototype trucks, to appear legitimate and stable.

80.     The UPS order was not the only suspicious order in Workhorse's backlog. On July 23, 2020, Workhorse published a press release (not filed on SEC

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

Form 8-K, despite the materiality of the announcement) stating that it had secured an order of 20 trucks from a new electronic vehicle start-up, eTrucks. In the press release Hughes stated "Bill [Hamilton, Managing Partner of eTrucks] and his partner Brian Carr are building a valuable sales and distribution platform for an underserved market. The SMB fleet operator represents a major opportunity for additional sales."

81.     eTrucks articles of organization, signed by Carr (not Hamilton), were filed with the Ohio Secretary of State on June 22, 2020 – about one month prior to the July 23, 2020 press release. CW2, an Executive Director of Human Resources, stated that Brian Carr was an associate of Defendant Willison.

82.     The eTrucks website, https://etrucks.webflow.io/, is registered to a British Indian Ocean Territory domain. The website does not contain a business address, headquarters, information on the history of the company, or any links other than a generic "contact us" form. Instead, it appears to be a promotional site advertising Workhorse trucks, with banners advertising "Drive a Workhorse truck!" eTrucks has no other online presence.

83.     To date, eTrucks has not taken delivery of or paid for the 20 trucks mentioned in the July 23, 2020 press release.

84.     Based on these facts, it appears that the entity eTrucks was created solely for the purpose of placing an order of Workhorse trucks, making it appear the backlog was larger and customer base was broader than in reality.

85.     On November 9, 2020, Defendants announced via a press release (not filed on SEC Form 8-K, despite the materiality of the announcement) that it had received a new purchase order of 500 trucks from Pritchard Companies. In the press release, Hughes is quoted as saying "With this significant order and agreement from Pritchard, we can build upon our nationwide distribution network and expand the number of potential fleet customers that will be able to operate and own a Workhorse

delivery truck." The press release did not indicate when or where Pritchard would take delivery of or pay for the trucks.

86.     To this day, it is unclear how many of the 500 vehicles have already been sold to end customers, how many Pritchard intends to take delivery of in 2021, or whether Pritchard has experienced any user demand at all for the Workhorse trucks. When asked about this in the May 10, 2021 earnings call, Schrader simply stated, "So I don't think they want us to announce exactly kind of what they are doing with their customers and how they are approaching or how they are going to deliver them."

87.     On January 4, 2021, Workhorse published a press release (not filed with the SEC on Form 8-K, despite the materiality of the announcement) announcing that it had "received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises." The press release warned that the order was subject to various production and delivery conditions, but also contained an upbeat statement from Hughes: "Our new agreement with Pride marks our largest individual order to-date and expands our sales channel internationally into Canada for the first time… This large order solidifies our first-mover advantage and indicates the heightened interest in our last mile delivery products."

88.     The Pride Group did not create its own press release regarding the acquisition of the trucks, nor did it post Workhorse's press release on its website. In fact, Workhorse is not mentioned anywhere on Pride's website. Pride's sales website, PrideTruckSales.com, only shows heavy trucks and transport trailers, and there is no information about how one could acquire a Workhorse last-mile delivery truck. These facts indicate that, similar to the UPS contract, there is no assurance Pride will take delivery of the full order of 6,000+ trucks.

89.     Workhorse currently claims its backlog is approximately 8,000 trucks, however, in truth, all the orders that make up Workhorse's backlog are highly

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

conditional, cancellable, and, in some cases, dependent on non-existent customer demand.

## C.    Like its Sister Company Lordstown Motors, Workhorse Has No Ability to Manufacture Vehicles at Scale

90.     In February 2019, Burns resigned from Workhorse and Hughes was promoted from COO to CEO. A few months later, Burns went on to found Lordstown Motors Corporation ("Lordstown"). On November 7, 2019, Workhorse announced an intellectual property licensing agreement under which Workhorse granted Lordstown an intellectual property license related the W-15, an electric pick-up truck, in exchange for a 10% non-dilutive equity stake in the company. Workhorse was also entitled to a license fee equal to 1% of the gross sales on the first 200,000 trucks sold. Workhorse included a note describing this agreement with Lordstown in each of its earnings releases during the Class Period and often discussed the agreement in earnings calls.

91.     Just as he began doing at Workhorse with the UPS backlog, Burns inflated the backlog at Lordstown using conditional and uncertain pre-orders of this electric truck, re-christened as the Endurance, to make the company appear stable and viable. Burns conducted a high-profile media campaign promoting the Endurance, even bringing a prototype truck to the White House for a photo opportunity with former president Donald Trump. At the initial unveiling of the Endurance in June, 2020 Burns stated that Lordstown already had 27,000 pre-orders for the truck. In November, 2020, Burns said there were 50,000 "serious" orders, and in January, 2021 the number shot up to 100,000. Workhorse often parroted these false statements about the Endurance pre-sales, for example, in an earnings call on August 10, 2020 Defendant Hughes stated: "To date [Lordstown] has disclosed that it has received over 27,000 pre orders for the vehicles representing over $1.4 billion of potential revenue."

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

92.     As the number of purported pre-orders increased, Lordstown announced that they had entered into a definitive merger agreement with DiamondPeak, through which the combined company would be listed on the NASDAQ stock exchange under the new ticker symbol "RIDE." According to an article in The New York Times, DiamondPeak was a special purpose acquisition company ("SPAC") created by David Hamamoto, a former Goldman Sachs executive who had raised $250 million from big Wall Street investors, which he would have had to return if he could not find a company to merge with.[12] The article states Mr. Hamamoto conducted very little due diligence on Lordstown or Steve Burns, and "the deal came together in weeks." Workhorse maintained its 10% stake in Lordstown, which, after the merger, Workhorse claimed was valued at nearly $285 million. In an earnings call on March 1, 2021, Hughes reported that the stake in LMC was valued at $330 million as of December 31, 2020.

93.     However, the Lordstown scheme was exposed, and is now considered one of the "biggest electric vehicle scams in history."[13] Burns resigned from Lordstown on June 14, 2021, after admitting that the pre-sales were fraudulent and Lordstown did not have enough money to begin producing the Endurance.[14] Lordstown is now being investigated by both the Justice Department and the SEC with regards to the DiamondPeak merger and the fictitious pre-sales of the Endurance.[15] A Class Action Securities lawsuit is also pending against Lordstown,

---

[12] *See* https://www.nytimes.com/2021/07/13/business/lordstown-motors-dealmaker.html

[13] *See* https://techstartups.com/2021/OS/08/biggest-electric-vehicle-scam-history-lordstown-motors-ev-startup-valued-5-3-billion-now-sec-investigation-alleged-100000-fake-preorders-zero-car-delivery

[14] *See* https://www.nytimes.com/2021/06/14/business/lordstown-motors-steve-burns-julio-rodriguez.html

[15] *See* https://www.wsj.com/articles/justice-department-is-probing-lordstown-motors-11625239730?mod=article_inline; https://www.wsj.com/articles/electric-truck-startup-lordstown-motors-discloses-justice-department-investigation-11626443066

Burns, and other LMC executives in the Northern District of Ohio.[16] Lordstown has yet to produce a single non-prototype truck.

94.     Just as Lordstown did not have the capacity to mass produce the Endurance, Workhorse did not, and does not currently, have the capacity to mass produce delivery trucks.

95.     CW3, a Materials Manager who left the Company in February 2021, stated that as of the end of 2020 there was not an assembly production in place, and that each vehicle had to be made individually. At the time of CW3's departure, there were still some basic design issues, such as parts not fitting together correctly, and workers were "struggling to finish vehicles." Additionally, CW3 stated "a lot of parts still required engineering approval."

96.     CW2, an Executive Director of Human Resources from December 2019 through June 2020, who reported directly to Defendant Schrader, stated that Workhorse "never had" an actual manufacturing facility to produce vehicles at the Union City, Indiana facility because there was "no automation, zero automation." CW2 stated that workers assembled vehicles – which he believed were mostly just prototype vehicles – on wooden workshop tables. Further, during his tenure, there were only 12 employees in the plant, including engineers. At least four engineers left Workhorse during CW2's tenure. When asked if there was a timeline for hiring the workers necessary to increase production, CW2 said, "Hell no," and even if there had been, the Company had "no cash flow" by which to go forward with such hiring.

97.     In order to remedy this situation, CW2 stated COO Rob Willison and an associate of his, Brian Carr, formed a staffing company called Electric Vehicle Fleet Services ("EVFS") that had "no history" but was retained by Workhorse to provide temporary staffing for everything from engineers to sanitation services. Carr

---

[16] *See* Rico V. Lordstown Motors Corp. Et Al., Case No. 4:21-cv-616 (N.D. Ohio).

is also a partner in eTrucks – a fictitious company which placed an order of 20 Workhorse trucks in July, 2020. According to CW2, EVFS billed Workhorse upwards of 60% to 70% more than the hourly rate mark-up for temporary staffing. While the EVFS website was disabled at some point in June, 2021, a cached version of the website lists Brian Carr as CEO of the company.

98.     When CW2 reported his concerns over the high mark-ups being charged by EVFS to the Company's controller, he began to feel that Workhorse was "looking to get rid of me." Even though CW2 "didn't do payroll" he was terminated soon after expressing his concerns for "payroll discrepancies."

99.     The Fuzzy Panda Report, published on October 8, 2020, revealed that Fuzzy Panda had sent investigators to the Union City facility and Workhorse's Loveland, Ohio headquarters several times during the month of September, 2020. The investors corroborated the statements made by the confidential witnesses in this case. On one weekday visit, the investigators discovered "~6 people in [an] otherwise empty R&D/production facility." There was no automation: "[a]ll production at the facility still occurs MANUALLY without a sophisticated assembly line or any automation in place." Workhorse employees invited the investigators into "both Union City Assembly Plant and the 'secure' area of their Loveland R&D facility," and even let them take photographs of an old engine – which Fuzzy Panda points out was predominantly assembled from Chinese parts, not all-American as Workhorse often claimed.

100.     The Fuzzy Panda investigators also had the following conversations with Workhorse employees:

> **Union City, Indiana–September 2020 Investigator invited inside Assembly Line Plant**
>
> Investigator: **Are those trucks for a particular customer**?
>
> Employee: **No, those are just <u>show units</u>**

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

Investigator: What does that mean like **they are prototypes**?

Employee: Yeah, they're not production

Investigator: **Are <u>you making any production units for customers right now</u>**?

Employee: <u>**No, not right now**</u>

Investigator: **Is this the only facility where you make units or if there's another one on site?**

Employee: <u>**No, this is the only production line**</u>

Investigator: How many of them they do make in a week or a month?

Employee: <u>**These are just the show units so they're not really doing that**</u>

*Loveland, Ohio – September 2020 Investigator Conversation within R&D facility:*

Employee: … <u>**really most of the production line is in Union City**</u>.

Investigator: **Is it manual or automated**? Here looks like everything is manual?

Employee: **Here** [Loveland] **it's all manual, but there** [Union City] **it's all in a production line**.

Investigator: **So there's automation there**?

Employee: <u>**No, it's still manual**</u>**, but it's more of a process there**, here is more R&D.

Fuzzy Panda Report at 12 (emphasis in original).

101.     An April 8, 2020 video published on Workhorse's YouTube channel, in which Schrader touts the efficacy of Workhorse's safety practices during the COVID-19 pandemic, further corroborates the fact that there was no automation at the Union City facility[17]. In the video, a handful of workers are shown assembling pieces of electric motors on simple wooden benches:






102.     The confidential witnesses in this case and the investigators from Fuzzy Panda Research make clear that the wooden benches in the empty warehouse shown in this video are the full extent of Workhorse's production capability.

103.     Despite the lack of automation, assembly lines, and proper staffing, From March 2020 through the end of October, 2020 Workhorse maintained guidance that it could produce 300-400 trucks by the end of the fourth quarter, 2020 ("Q420"). The Individual Defendants repeatedly assured investors Workhorse was on the

[17]*See* https://www.youtube.com/watch?v=Efdt5kZL86E

precipice of ramping up production, and that soon the Union City facility would be capable of producing 5 trucks per day, 10 trucks per day, 100 trucks per month, and so on.  Specific statements made by Defendants will be discussed in more detail below.

104.    When asked about Workhorse's claims that it would be able to produce 300-400 trucks by the end of 2020, CW2 stated this was an "absolute lie," that there was "no way" Workhorse would have been able to meet this target because there was "no automation."

105.    CW4, a Buyer/Planner employed at Workhorse from March 2020 through October 2020, similarly did not believe Workhorse had the capacity to produce 300-400 trucks by the end of 2020, stating that the Company "booked numbers they didn't have." However, CW4 was hesitant to speak more on this issue because she had signed a non-disclosure agreement with Workhorse at the time she left the company.

106.    On November 9, 2020, Defendants revealed that Workhorse would not be making 300-400 trucks in 2020, in fact, it had only produced 7 trucks in the whole third quarter of 2020. Instead of admitting that the company had never had the capacity to make 300-400 trucks in two months, Defendants blamed the delay on supplier constraints and employee absences due to COVID-19. However, Schrader assured analysts that Workhorse would be "getting to *100 trucks per month by the - no little later than the first quarter of 2021* and then getting to *200 trucks a month by no later than the second quarter of 2021.*" Based on Defendants' assurances that the delays were only temporary, as well as the prospect of the USPS announcing an awardee in the first quarter of 2021, the stock price began to steadily rise.

107.     Below is a visual timeline of events in this case:



TIMELINE OF EVENTS

**RULE 10b-5(a) AND (c) SCHEME LIABILITY**

108.     Throughout the Class Period, Defendants engaged in a scheme and course of conduct to defraud Plaintiffs and others similarly situated through its involvement in the USPS NGDV contract, its false impression that the Company was capable of mass production, its fictitious "backlog" of vehicle orders, as well as its related material misrepresentations.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

**A. The USPS Contract**

109.     From the time its original bid was rejected in 2016, Defendants knew or should have known that it did not have the skill and production capacity necessary to design and manufacture a 165,000-truck order from the USPS. Workhorse's engineers did not even have the knowledge to use the software required for the bidding process. However, in an attempt to give their fledgling company an air of legitimacy, Workhorse partnered with an established company, VT Hackney, whose bid had been accepted. When VT Hackney dropped out, instead of acknowledging that a start-up with no manufacturing capacity would be unlikely to secure such a large contract on its own, Workhorse purchased its partner's right to bid for just $7 million. If VT Hackney truly believed it had a chance of securing a contract worth over $6 billion, it is highly unlikely it would sell the rights for a mere $7 million.

110.     Despite Workhorse's later claims to the contrary, the prototype submitted by Workhorse was designed and manufactured by a Detroit company, Prefix. According to CW1, as of June 2020, Workhorse did not even have a complete list of the parts needed to produce the prototype, which he stated "was nice to look at, but had very little merit for production" and was "just a way for Workhorse to demonstrate to the USPS that they had a vehicle that could fulfill the USPS requirements." Creating the impression that this prototype was viable for mass production and a frontrunner for the USPS NGDV contract was false and fraudulent, especially given that the Reliability of the design and Prototype Performance were critical factors in the USPS' evaluation of any proposal.

111.     The prototype submitted by Workhorse suffered numerous critical failures during testing. During one incident, the parking brake on a Workhorse truck failed, causing the truck to roll down a hill. The USPS driver testing the truck was seriously injured and sent to the hospital.  By Workhorse's own admission, USPS knew from this time forward that it would not select the Workhorse prototype, and

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW            Case No. 2:21-CV-02072-CJC-PVC

it repeatedly listed the "roll-away incident" among the top reasons that it "would never have selected [Workhorse's NGDV] for its flagship vehicle." Workhorse was aware of the roll-away incident and the other critical failures during testing, and therefore, by the end of testing, Defendants knew or should have known that Workhorse was no longer in the running for the contract. However, Defendants continued to fraudulently represent that Workhorse was a frontrunner for the award.

112.    Of the six contractors who had submitted prototypes, only four submitted proposals in July, 2020. The other two contractors knew, after the results of the testing, their models would not be likely to secure the contract, and withdrew. Even though Workhorse also knew or should have known that it was unlikely the Workhorse model would be chosen for the award, admitting this publicly would have sunk the stock price, which was steadily rising at the time. Instead, Defendants forged ahead and submitted a futile proposal that could not win the contract given the USPS' evaluation factors. The same week the proposal was due, several Individual Defendants and members of the Board of Directors sold large amounts of Workhorse stock while the price was artificially inflated.

113.    As part of the bidding process, Workhorse was subject to an NDA which was supposed to prevented it from discussing the contract or the bidding process. Rather than simply not discussing the contract, Hughes announced, in every earnings call until the time the winner of the award was announced, that Workhorse was under an NDA and was only able to provide information which was already in the public domain. This statement falsely implied that Workhorse was still in the running for the contract. Moreover, Defendants, particularly Defendant Schrader, repeatedly discussed the reasons Workhorse was purportedly well-positioned to win the contract award (*i.e.*, Biden's goal to electrify federal vehicles discussed below), while omitting that USPS' evaluation focused on factors related to reliability,

manufacturing, safety, and experience that precluded Workhorse from winning the contract, despite the fact that its proposal was all-electric.

114.      Similarly, Workhorse used the NDA as a tool in its fraudulent scheme to mislead investors by stating that the NDA prevented it from revealing unfavorable information, even information that was negative information about the Company generally that applied to its business notwithstanding the NGDV contract. For example, during the May 6, 2020 earnings call, an analyst inquired further about the supply chain, namely, about the ability of Workhorse's suppliers to meet the needs of the USPS NGDV contract, were Workhorse to secure all or part of it. Schrader stated that he could not comment because of the USPS NDA. The analyst asked, "So you can't talk about the capabilities of a supply chain to serve the post office? Is that off-limits?" Schrader replied, "I would think it's a similar supply chain that would supply the current trucks that would supply a post office vehicle." In truth, Workhorse's suppliers barely had the capacity to support Workhorse's production at the time, which ended up being less than 20 trucks for the whole year 2020. Defendant Schrader used the USPS NDA to avoid discussing these issues, thereby continuing to perpetuate Defendants' fraudulent scheme.

115.      On January 25, 2021, just days after being sworn in, newly elected President Biden announced his goal to replace the government's vehicle fleet with electric vehicles. President Biden did not say anything specifically about the USPS NGDV contract or in any way endorse Workhorse electric vehicles. However, after this announcement, Workhorse stock jumped from $23.62 per share at open on January 25, 2021 to $27.04 per share at open on January 26, 2021 – an increase of almost 14%.

116.      In the following days, Defendant Schrader did several interviews strongly hinting that President Biden's announcement was an indication that Workhorse would be awarded the USPS NGDV contract, making statements such

as "*I think the President's announcement was huge*, uh, for several reasons, right, it's 1. supportive of the EV market. It's 2. All-American, like he said, uh, all-American product buy, and I think he also said a lot about small businesses and purchasing, whether it be parts or final products from small businesses too, so I think that's huge." Schrader also told one interviewer that Workhorse would be adding a "government division" to its business portfolio. As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021 – an increase of over $10 per share in a one-week time period.

117.    Schrader's positive statements on the USPS NGDV contract in these interviews are undermined by the fact that, on January 26, 2021, Hughes, Willison, Ackerson, and multiple board members *sold large quantities of their Workhorse stock*. For example, Willison exercised an option to purchase 150,000 shares of Workhorse at $0.932/share, then sold those 150,000 shares for $30/share for proceeds of $4,360,000. The 150,000 shares represented approximately 45% of the stock owned by Willison. Similarly, Hughes exercised options to acquire 200,000 shares of Workhorse stock at $5.28/share, then sold 100,000 shares for $28/share and 100,000 shares for $30/share, for proceeds of $4,744,000. The 200,000 shares represented approximately 40% of the stock owned by Hughes. Then, a few days later, on February 1, 2021, Hughes exercised options to acquire a further 25,000 shares of Workhorse stock at $0.97 per share and sold them at $35.97 per share, for proceeds of $875,000. Had Defendants believed Workhorse would be awarded the USPS NGDV contract – which Defendant Schrader stated would be "transformative" for the Company and stock analysts roundly agreed would cause a surge in Workhorse's stock price – they would not have sold nearly half the stock they owned in the company just days before the award was to be announced. Defendants made these trades because they were in possession of the material, non-public information that the prototype submitted by Workhorse had suffered

numerous critical failures in testing, and therefore it was unlikely Workhorse would secure the award. Their continued insistence to the contrary was a fraudulent scheme to inflate the stock price, earning them millions of dollars in personal profit.

118.    On February 23, 2021, USPS announced via press release that it was rewarding the entirety of the 10-year, multi-billion dollar NGDV contract to established contractor Oshkosh Defense, who had partnered with Ford Motors. The USPS press release stated that "[t]he vehicles will be equipped with either fuel-efficient internal combustion engines or battery electric powertrains and can be retrofitted to keep pace with advances in electric vehicle technologies." The press release did not mention Workhorse at all.

119.    On this news, the price of Workhorse stock plummeted, from opening at $28.29 per share on February 23, 2021 all the way down to an intra-day low of $12.50 per share, closing around $16.43 per share.

120.    Rather than accepting the USPS decision, Defendants opted to continue their fraudulent scheme. The next day, February 24, 2021, Workhorse published a press release which stated, "The Company intends to explore all avenues that are available to non-awarded finalists in a government bidding process." On March 3, 2021, Workhorse met with representatives of the USPS, purportedly to request further information about why that Workhorse's proposal was rejected. In the meeting, Workhorse representatives were told that their prototype was rated less favorably than Oshkosh's vehicle on the Technical Evaluation Factors. However, rather than revealing this simple and understandable explanation to investors, Defendants continued to use the NDA as a convenient vehicle for flouting securities laws, repeatedly stating they could not reveal what happened in the March 3 meeting but: "[w]e are continuing to evaluate our options and intend to continue to explore all avenues that are available to us."

121.     On June 16, 2021, Workhorse filed a complaint with the United States Federal Court of Claims protesting the award of the NGDV contract to Oshkosh. The complaint confirmed that USPS had decided early in the NGDV Program that Workhorse would not be the awardee based on a variety of factors, including: 1) The prototype submitted by Workhorse suffered numerous critical issues during testing, including an incident where the parking break on the prototype failed, sending the USPS test driver to the hospital; 2) USPS was concerned that Workhorse was "a 'startup' company without the experience or capability to produce the NGDV"; 3) USPS had identified numerous "critical" deficiencies in Workhorse's proposal, including missing information about the warranty on various parts and an "unacceptable" service plan; and 4) After testing, Workhorse's proposal ranked dead last in both its Technical Ranking and its Best Value Ranking, while Oshkosh's vehicle was ranked first in both the technical evaluation and total cost of ownership evaluation, making Workhorse the clear and logical loser and Oshkosh the winner of the bid.

122.     Additionally, Workhorse admits to being told by USPS in September, 2020 that its proposal had numerous deficiencies, many of which (including the "roll-away incident," the fact that the Company has never mass produced trucks, and the fact that it did not (and does not) have the capacity to do so) were self-evident. Defendants knew or should have known that, given the priority USPS placed on safety, design and manufacturing capabilities, these deficiencies would have disqualified Workhorse from winning the bid.

123.     Thus, Defendants used the USPS NGDV contract as a fraudulent vehicle for driving up the price of Workhorse stock, which was further propelled by their representations as to why the Company was a frontrunner for the USPS NGDV contract, but shielded by the NDA from disclosing material information from shareholders that would preclude the Company from winning the contract. This

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

course of conduct allowed Defendants Hughes, Willison, Ackerman, and members of the Workhorse board of directors to make tens of millions of dollars of personal profit through suspiciously timed stock sales while the stock was artificially inflated, at the expense of Plaintiffs, and those similarly situated, who suffered losses and were damaged thereby.

## B. Production Targets

124.     In furtherance of this scheme, throughout the Class Period, Defendants fraudulently created the impression to investors that Workhorse was capable of mass production – and therefore a viable competitor for the USPS contract – by setting production targets far beyond Workhorse's capability, and repeatedly insisting that Workhorse could meet the target. When it became apparent that Workhorse could not meet the target for 2020, rather than admit the Company was not yet at a stage where mass production was possible, Defendants blamed the failure on the COVID-19 pandemic. Defendants then set a new, equally impossible production target for 2021. Eventually, nearly halfway through the year, Defendants revealed that Workhorse had only accomplished approximately 2% of the target. At this point, the public finally caught on to Defendants' scheme, and the stock price declined.

125.     Defendants first set a production target of 300-400 trucks in a press release on March 10, 2020. Hughes reiterated this number during an earnings call on the same day, stating, "Our intent is to produce and deliver a limited number of vehicles to our customers in the second quarter and then move to higher volumes and deliveries with a target of delivering roughly 300 to 400 delivery trucks in 2020." Schrader further elaborated on this statement, saying "[Y]ou have to kind of ramp it up slowly; so I think you expect the -- the first quarter and the second quarter will be a lot smaller quantities and will be back loaded towards the fourth quarter in the 300 to 400."

126.     In every earnings call and media interview over the next seven months, Defendants affirmed the 300-400 vehicle target. For example:

- On an earnings call on May 6, 2020, noting challenges imposed by the COVID-19 pandemic, an analyst stated: "I was impressed that you maintained your guide of 300 to 400 units this. Other EV truck companies are saying that, customers don't have the right number of people in the office… You guys are very straightforward, 300 to 400 was your original guidance, you're reiterating." Hughes replied: "***we can reiterate our guidance and we can meet what we're saying we're going to do***."

- In an interview with Benzinga on July 24, 2020, Schrader stated: "We are actually making, um, actually making trucks right now at our Union City, Indiana plant, um, and, uh, and we plan to make 300-400 this year."

- A press release published by Workhorse on August 10, 2020 states that the Company "Reaffirmed previous production and delivery target of 300-400 vehicles in 2020."

- In an earnings call on August 10, 2020, Schrader stated "the vast majority of our 300 to 400 vehicle production target would be manufactured and delivered by the end of the fourth quarter of this year" and Hughes stated that the Company was developing an assembly plan in order to "deliver our target vehicle production of 300 to 400 units later, with a vast majority coming in the fourth quarter."

- In an August 14, 2020 interview with Jack Spencer, Schrader stated: "We've got a prototype started on that, so it's not only just engineering and production right now, ***how to get to kind of our three to four***

*hundred this year, uh, in the fourth quarter*, but also thinking about what we're going to do next."

- On October 15, 2020, in an interview on TD Ameritrade Live, Schrader stated: "Right now we've delivered, you know, a handful of vehicles out there but *we have a plan to build and manufacture and deliver 300-400 this year*, and most of those will come in this quarter right now, and then continue that to maybe 200 a month or so next year."

- In an October 29, 2020 interview with Benzinga, Schrader stated: "we've got everything in place right now, so we've got the labor and materials coming in, and from our standpoint *we've still have the 300-400 that we have out there, and that's our goal*."

127.    These statements regarding the 2020 production target were part of a fraudulent scheme to raise the stock price by representing Workhorse as an established company, capable of mass production. However, in truth, as Fuzzy Panda reported and the Confidential Witnesses in this case confirmed, Workhorse was incapable of meeting these production targets based on their facilities and personnel.  Workers assembled vehicles one at a time on wooden workbenches using basic hand tools that could be purchased at any hardware store. When asked if there was a timeline for hiring the workers necessary to increase production, CW2 said, "Hell no," and even if there had been, the Company had "no cash flow" by which to go forward with such hiring. This facility was only capable of producing a handful of trucks per quarter – nowhere near the 100 trucks/quarter promised by defendants.

128.    Analysts covering Workhorse seized on the 300-400 truck production target, citing the target as a factor in their valuations. For example:

- In a March 10, 2020 note, an analyst from BTIG stated: "Management provided a *2020 vehicle production guidance target of 300-400 units* with initial customer deliveries expected to commence in April… the

company has now transitioned to the C-Series line and is geared (production line and staffed) up for initial production."

- In a March 10, 2020 note, an analyst from Cowen Equity Research stated: "Workhorse *looks to deliver between 300 and 400 C-Series vehicles in 2020*… We now expect production to ramp up to ~300 in 1Q21, which should drive gross margin to positive levels… Given that outlook we see the potential for profitability in late 2H21."

- On May 6, 2020, an analyst from Cowen Equity Research stated: "Workhorse has thus far successfully managed through the COVID-19 pandemic… Production has resumed in April and the company has staffing to produce 2 trucks per day and *continues to target 300-400 for the year*."

- In a May 7, 2020 note, an analyst from Roth Capital Partners wrote: "Workhorse is making strong progress towards production of its C-650 and C-1000 all electric trucks… Mgmt maintained guidance for 300-400 units delivered in 2020, based on a healthy backlog and customers waiting for vehicle delivery."

- On May 28, 2020, an analyst from Dougherty and Company wrote that, based on discussions with Workhorse management, it was projecting 340 vehicles would be produced in 2020, "in-line with the company's outlook for 300-400 vehicles."

- In a note published on June 3, 2020, an analyst from Roth Capital Partners stated: "We hosted Workhorse CEO Duane Hughes and CFO Steve Schrader for a day of virtual investor meetings that reaffirmed our bullish investment thesis. We continue to expect a start to C-1000 electric truck production by the end of 2Q20 with a significant ramp in volumes into the end of the year."

- On June 25, 2020, an analyst from Colliers International wrote: "Yesterday, we hosted investor calls with the management of WKHS, including CEO Duane Hughes and CFO Steve Schrader… *The outlook for 300-400 units this year was reiterated multiple times.*"

- The same day, June 25, 2020, an analyst from Roth Capital Partners stated: "We met with WKHS CFO Steve Schrader and COO Robert Wilson for investor meetings at the ROTH Virtual London Conference and came away excited about the long-term growth potential. Initial deliveries of the updated C-1000 truck are on track for 2Q20, with *good visibility on a steep ramp into year-end*."

- On August 10, 2020, the day of the Q220 earnings call, an analyst from BTIG gave Workhorse stock a target price of $26/share, stating: "WKHS *reaffirmed its 300-400 unit production target for 2020* (management expects to get to a 100 unit/month run-rate in 4Q20)."

- On the same day, an analyst from Colliers International wrote: "*The outlook for the shipment of 300-400 units in 2020 was maintained*… the significant ramp-up expectations for the second half were unchanged."

- Cowen Equity Research published a note on this same day, stating: "The 2H ramp remains on track and management *continues to target 300-400 vehicles by the end of the year*. After a tough few quarters, we see greener pastures ahead."

- The next day, August 11, 2020, an analyst from Roth Capital Partners stated: "Workhorse's 2Q20 update affirmed the company is on a path for ramping production in 2H20, and mgmt reiterated it expects to produce 100 trucks per month before the end of the year. *The 2020 deliveries guide remains 300-400 units*."

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

- On September 11, 2020, Colliers International published a note which stated: "The management team of WKHS participated in the Colliers 2020 Investor Conference on 9/10… ***There was no change to the outlook for delivering 300-400 units this year***."

- On October 13, 2020, an analyst from Colliers International wrote: "***WKHS plans to produce 300 vehicles in Q4***, and substantially more after that."

- And on November 4, 2020, an analyst from Colliers International wrote a report in anticipation of Workhorse's Q320 guidance, noting that "Investors will be eager to hear WKHS' progress on ramping-up production during Q4, to meet its 300-400 unit guidance for the year."

129.     When, on November 9, 2020, Workhorse released its Third Quarter Fiscal 2020 ("3Q:20") financial guidance, Defendants were forced to finally admit Workhorse could not produce 300-400 trucks by the end of 2020, Defendants blamed a convenient scapegoat – the COVID-19 pandemic – in order to maintain the fraudulent scheme.

130.     Defendants revealed that, at one point in early October, 36% of its employees were unable to work due to contracting or exposure to the virus. Additionally, Defendants explained Workhorse's battery supplier also had pandemic-related struggles and was not able to produce sufficient batteries to meet the order. Yet, even if there had not been a pandemic, Workhorse would not have been able to produce 300-400 trucks in its unautomated and understaffed Union City facility.

131.     Additionally, Defendants state that they became aware of both the battery supply issues and work force issues by early October. Defendant Schrader conducted two interviews in mid-late October, one with TD Ameritrade on October 15, 2020 and one with Benzinga on October 29, 2020, in which he continued to

fraudulently represent Workhorse expected to meet its production target for the year. By Defendants' own admissions, Schrader knew, at the time he conducted these interviews, that Workhorse would not be able to meet the target.

132. Moreover, in the earnings call on November 9, 2020, Defendants doubled down on their scheme, setting a new production target of 1,800 trucks in 2021. Hughes stated: "we would anticipate producing 1,800 units in 2021" and Schrader elaborated: "I think you could look at it as getting to 100 trucks per month by the - no little later than the first quarter of 2021 and then getting to 200 trucks a month by no later than the second quarter of 2021."   However, Defendants did not disclose any plans to spend any further capital on automating the Union City facility. A few days later, on November 14, 2020, Schrader revealed to Jack Spencer Workhorse's production plan: "you start one a day then two a day and hopefully we'd ramp up to eight a day or so toward the end."

133. Defendants reiterated the 1,800 truck target multiple times, for example:

- On November 14, 2020, in an interview with Jack Spencer, Schrader stated that, if the backlog were to increase, Workhorse may be able to produce even more than 1800 trucks in 2021 – "certainly we'll look at ways to speed it up."

- On January 27, 2021, in an interview with Simranpal Singh, Schrader stated: "we're at the stage right now, just actually producing in mass, which is the hardest thing to do for any manufacturer, you know, to go from zero to producing five or ten or fifteen a day eventually. So that's kind of where we're at…. this year's milestone is five a day, you know, maybe by March, by the end of March, then 10 a day by the end of June."

- On January 28, 2021, in another interview with Jack Spencer, Schrader stated: "our goal, our milestone still is to try to have, you know, try to get to 5 a day sometime in March, by the end of the first quarter, okay? Um, and then ten a day sometime by the end of the second quarter. You know, so those are our milestones, and hopefully we hit those, um, but that's again if we hit those then we should be on target for our 1,800 for this year."

134.     By March 1, 2021, Hughes, knowing that the public would not be fooled for much longer, used slightly more cautionary language when describing the 1,800 unit target. He stated:

> While we believe this is a feasible goal, it's a stretch. Given our backlog, we cannot sacrifice future build volume for current year production, and scaling up manufacturing properly has to take precedence.

However, Schrader did not back down from his assertions that Workhorse was ready and able to scale up their production capabilities. He stated:

> [W]e're trying to get to a target of three a day, sometime here at this month. And then also, we kind of will continue to keep out our 10 a day by the end of sometime in June or by the end of the second quarter. So, that's kind of our goal.

135.     On May 10, 2021, the truth about was revealed when they announced that Workhorse had only delivered 6 trucks in the first quarter 2021 and had only produced 38 trucks so far that year – approximately 2% of the 1,800 truck target. On this news, the price of Workhorse stock dropped to a low of $8.20/share. As Defendants' fraudulent scheme was gradually exposed, Plaintiffs, and those similarly situated, suffered economic losses.

**C. The Purported "Backlog"**

136.    Defendants also used Workhorse's purported "backlog" of orders as an artifice to support their fraudulent scheme that Workhorse was a legitimate contender for the USPS contract and capable of delivering large scale production of vehicles.  For example, Defendants represented that they had a stable backlog of over 1,100 trucks, consisting mainly of a 1,000+ truck order from package delivery company UPS. The purported backlog grew to over 8,000 trucks by the end of the Class Period. In truth, the orders that made up Workhorse's backlog were highly conditional, cancellable, and, in some cases, were dependent on non-existent customer demand. Defendants' assertions about Workhorse's backlog were part of a scheme to make the Company appear to be stable and established, thereby fraudulently inflating the price of Workhorse stock, allowing the Individual Defendants to make tens of millions of dollars in personal profit.

137.    On May 30, 2018, Workhorse announced via 8-K that it had entered into an agreement with UPS for 1,000 all-electric package delivery vehicles. The UPS Agreement, provided for delivery of the vehicles in two phases. In phase 1, Workhorse would provide UPS with 50 proto-type vehicles as a test fleet, which would be tested across multiple geographic regions for durability. In phase 2, UPS would take delivery of the remaining 950 vehicles.

138.    The UPS Agreement stated:

(d) Phase 2 "will be *on a timeframe decided by Buyer at Buyer's sole discretion.*"

(e) "Buyer will determine, at its sole discretion, the level of success of the 50 Vehicle test."

(f) "Buyer may reduce the quantity of the balance of the Order (*or cancel the balance of the Order*) depending on the level of

1    success achieved during the phase 1 testing, as determined in

2    Buyer's sole discretion."

3    139.    Defendant Hughes, who was COO of the Company at the time, signed

4    the UPS Agreement on behalf of Workhorse, so was intimately familiar with the

5    details of the deal.

6    140.    In their 2020 10-K, Workhorse stated: "To date, we have received six

7    separate orders totaling up to 1,405 vehicles from UPS. The sixth and most recent

8    order is from the first quarter of 2018."

9    141.    To date UPS has not requested delivery of the 950 non-prototype

10   vehicles in the contract. In fact, in its 2019 Sustainability Report, UPS announced it

11   had placed an order for 10,000 EVs from "U.K.-based startup Arrival." Workhorse

12   was not mentioned in the sustainability report at all.

13   142.    Despite the lack of assurance that UPS would ever take delivery of

14   these vehicles, and UPS' commitment to Arrival, Defendants used the UPS order to

15   inflate Workhorse's purported backlog. During the Class Period, Defendants

16   repeatedly represented to investors that UPS was their premier customer, and that

17   the UPS order was on the precipice of being fulfilled, for example:

18   • March 10, 2020 earnings call, Hughes states: "so as you know, UPS being our

19     customer of record for the last several years, they have 1,060 units on order

20     that *we are beginning to deliver in anticipation in late Q2 or Q3 this year*…

21     UPS is clearly still, an all important customer to us because they have the

22     highest volume currently, and we expect that they will continue to be excited

23     by the trucks that we're delivering."

24   • May 6, 2020 earnings call, Schrader states: "we have the backlog out there in

25     the first place with UPS… we're seeing customers very positive about our

26     trucks and it's more, how soon can we get them."

27

28   AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

- July 24, 2020 Schrader interview on Benzinga: "we also have a backorder of 1100, uh, vehicles so we've already got sales out there from UPS and DHL."

- August 10, 2020 earnings call, in response to a question about the UPS order, Hughes states: "We are continuing to make sure that the trucks that we do deliver to UPS knock it out of the park if you will. So rather than having the first few vehicles go to them, *we're working with their implementation schedule across the different depots where they're going to place these vehicles* starting in the California marketplace as we understand it today."

- August 17, 2020 Willison interview on the Supply Chain Innovation podcast: "Because of our progress in the EV field, because of our associations with UPS and things, we're finally, not only getting the volume of funding, but at rates that are sustainable."

- November 9, 2020 earnings call, Hughes states: "UPS remains our premier customer, if you will, because they have been along with us for the longest time, they collaborated with us on this C-Series design... So *we feel strong. We are happy where we are with UPS. We will be delivering new vehicles*. And the real key for them is us deliver us a high-quality vehicle over and over again, right?... So the first vehicle we deliver them, we want to hit it out of the park, and we want to make sure it is right."

- March 1, 2021 earnings call, Hughes states: "UPS, it's a combination, obviously, we haven't got production now, but also is when and where UPS would love to take their vehicles first. They have a depot in California and San Diego that's already with infrastructure. They love to get the voucher program too. So *ideally, I think their first trucks would ideally go to California*."

143.     Including the UPS order in its purported backlog allowed the small startup, which had only previously produced a handful of trucks, to appear legitimate and stable. This fraudulent scheme deceived many sophisticated financial analysts:

- In each of its reports dated March 10, 2020, May 6, 2020, August 10, 2020, November 9, 2020, February 23, 2021, and March 1, 2021, Cowen Equity Research stated that its base case assumption when creating a valuation model for Workhorse was "***UPS contract generates stable revenue.***"

- On May 28, 2020, an analyst from Dougherty & Company stated: "Certain large, national customers such as UPS engage directly with WKHS for larger orders; these large fleets typically have their own set of depots and staff for service functions… ***Our <u>discussions with WKHS's management</u> suggest that the company has approximately 1,200 vehicle orders in its backlog; most are for the C1000 model and are intended for delivery to UPS***."

- On June 3, 2020, an analyst from Roth Capital Partners stated: "Major customers including UPS, DHL, and Ryder are likely to take trucks this year, which should support improving order book visibility."

- On July 13, 2020, Roth Capital Partners raised its target price for Workhorse stock from $12 to $27, stating: "Workhorse… had a backlog of 1,200 units (incl. 1,060 with UPS) at the end of 1Q20."

- On August 10, 2020 an analyst from BTIG stated: "We expect UPS deliveries to start later this year."

- On November 9, 2020, an analyst from Cowen Equity Research, reporting on a recent earnings call, stated: "Management highlighted that the backlog stands at ~1,700 vehicles which ***includes the ~1,000 unit order backlog with UPS***." The report later stated, "The majority of the company's revenue is currently generated through a contract with UPS," which was not true at all,

as none of the reported revenue during the Class Period appears to have been generated by the UPS contract.

- On December 9, 2020, an analyst from Wolfe Research stated "We believe Workhorse can become a winner in the electric last mile delivery vehicle space regardless of the Postal Service award outcome... they received a 1,000-vehicle anchor order from UPS."

- On December 10, 2020, an analyst from Cowen Equity Research stated: "***Management remained upbeat*** on the company's 1800 delivery target for FY21 and highlighted its 1700 vehicle backlog, which is primarily composed of a 500 vehicle order from Pritchard and a ~1000 vehicle order from UPS. ***Workhorse anticipates UPS deliveries could begin in earnest exiting 1Q21*** as it works to incorporate feedback on previously delivered vehicles and ***the relationship with UPS seems positive.***"

- On December 14, 2020, an analyst from BTIG wrote: "Last week we hosted investor meetings with WKHS management... ... UPS at ~50% of backlog is a key customer... ***We expect UPS to start taking trucks in 1H21***."

- On March 1, 2021, after USPS announced it would not be awarding the NGDV contract to Workhorse, an analyst from Cowen Equity Research wrote: "We remain constructive on shares given the visibility for C-Series deliveries to UPS."

- On March 19, 2021, an analyst from Roth Capital Partners stated: "WKHS has ~1,100 in outstanding orders with UPS, and ***mgmt disclosed HVIP funding for UPS will likely be available in April***, an important catalyst to start delivering vehicles into CA."

144.    If management had not concealed the true, adverse facts regarding the status of the purported UPS backlog, and UPS's lack of commitment to Workhorse, these analysts would not have adjusted their expectations regarding those purported

orders and would have adjusted their target share prices accordingly. However, instead, Defendants used the UPS Agreement to continue perpetrating their fraudulent scheme.

145.     The backlog scheme did not stop with UPS, however. Workhorse entered into several other conditional agreements throughout the Class Period, each of which Defendants claimed would certainly be fulfilled.

146.     On July 23, 2020, Workhorse published a press release (not filed on SEC Form 8-K, despite the materiality of the news) that it had secured an order of 20 trucks from a new electronic vehicle start-up, eTrucks. eTrucks did not exist prior to June, 2020, and appears to have been created by an associate of Defendant Willison for the sole purpose of placing an order of Workhorse trucks to increase the backlog. To date, eTrucks has not taken delivery of or paid for the 20 trucks mentioned in the July 23, 2020 press release.

147.     On November 9, 2020, Defendants announced via a press release (not filed on SEC Form 8-K, despite the materiality of the announcement) that it had received a new purchase order of 500 trucks from Pritchard Companies. In the press release, Hughes is quoted as saying: "With this significant order and agreement from Pritchard, we can build upon our nationwide distribution network and expand the number of potential fleet customers that will be able to operate and own a Workhorse delivery truck." The press release did not indicate when or where Pritchard would take delivery of or pay for the trucks.

148.     In an earnings call on the same day, an analyst stated:

> I'm a little confused about what Pritchard's role in all is. Are these orders spoken for with end users? Or are they just really an inventory stock up for Pritchard?

To which Hughes replied:

So they will find their own end-user customers as they always do. I mean they already have a group. They sell many trucks to FedEx ground contractors as well as beyond that. So that 500 number is a pretty small number in their mind in terms of number of units to sell.

149.   To this day, it is unclear how many of the 500 vehicles have already been sold to end customers, how many Pritchard intends to take delivery of in 2021, or whether Pritchard has experienced any user demand at all  for the Workhorse trucks. When asked about this in the May 10, 2021 earnings call, Schrader simply stated, "So I don't think they want us to announce exactly kind of what they are doing with their customers and how they are approaching or how they are going to deliver them."

150.   Defendants' announcement of the 500 truck order as if it was certain Pritchard would take delivery of the 500 trucks and inclusion of the potential 500 truck order in their purported backlog made the company appear to be growing and stable. Many analysts found this news encouraging, especially as it was announced on the same day Workhorse announced it would not be meeting its 300-400 truck target for 2020. For example:

- In an 11/9/2020 note, BTIG called the order from Pritchard a "Needle Mover," stating "the company's announcement of a 500 vehicle order (~40% increase to backlog) this morning looks to be driving the stock higher";

- In an 11/9/2020 note, Cowen Equity Research stated: "We are encouraged by Workhorse's new 500-unit truck order announced this morning with Pritchard";

- In an 11/9/2020 note, Oppenheimer stated: "We are encouraged by the Pritchard vehicle announcement and augmentation of the balance sheet as we wait for further detail on the USPS order"; and

- In an 11/11/2020 note, Colliers International stated: "There was much to like in management's commentary, including a new 500-unit order with a commercial vehicle distributor, progress on the Hitachi manufacturing improvements, and a strong production outlook for 2021."

151.     The additional "backlog" created by the Pritchard orders further contributed to Defendants' scheme to create the impression of a growing, capable vehicle manufacturer.

152.     On January 4, 2021, Workhorse published a press release (not filed with the SEC on Form 8-K, despite the materiality of the announcement) announcing that it had "received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises." The press release warned that the order was subject to various production and delivery conditions, but also contained an upbeat statement from Hughes: "Our new agreement with Pride marks our largest individual order to-date and expands our sales channel internationally into Canada for the first time… This large order solidifies our first-mover advantage and indicates the heightened interest in our last mile delivery products."

153.     The Pride Group did not create its own press release regarding the acquisition of the trucks, nor did it post Workhorse's press release on its website. In fact, Workhorse is not mentioned anywhere on Pride's website. Pride's sales website, PrideTruckSales.com, only shows heavy trucks and transport trailers, and there is no information about how one could acquire a Workhorse last-mile delivery truck. These facts indicate that, similar to the UPS contract, there is no assurance Pride will take delivery of the full order of 6,000+ trucks.

154.     Some analysts met this announcement with skepticism. For example, a reporter from automotive news site Freightwaves.com reached out to Workhorse management requesting information about the "conditions" mentioned in the press

release but was never contacted back. In a report published on January 4, 2021, an
analyst from Colliers noted:

> Incremental interest in WKHS' products is a positive, in our view, but
> we would caution investors not to count all 6,320 units as binding just
> yet, as Pride will have to ultimately find end-users for the vehicles.
> Pride Group is not currently a final-mile delivery-truck dealer and while
> there may be some overlap with some long-haul customers, a new set
> of relationships must be developed.

Similarly, in a January 4, 2021 report published by Roth Capital Management, an
analyst expressed hesitation about whether Pride would actually take delivery of the
trucks, noting: "Workhorse PO with Pride Group seems like it could more closely
resemble a sales and distribution agreement."

155.    However, other analysts viewed the purchase order from Pride as a
positive catalyst. For example, in a note dated January 5, 2021, Wolfe Research
stated:

> Outside of the obvious positive from significant backlog growth, this
> announcement demonstrates that Workhorse's partnership with Hitachi
> (Hitachi is advising WKHS on the expansion of their factory and
> helping WKHS build a dealership network) is starting to bear fruit.

Similarly, on January 4, 2021, BTIG published a report stating:

> [T]his morning before the market open, WKHS announced it had
> received an order for 6,320 orders for its C-Series truck (order is split
> between the C-650 and C-1000) which boosts the company's backlog
> by almost 400%. WKHS opened up 3%-4% this morning.

156.    The price of Workhorse's stock rose sharply the week of this
announcement. The stock price closed at $19.78/share on December 31, 2020 (the
last trading day before the announcement of the Pride order) to an intra-day high of

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

$27.99 on January 8, 2021. The Individual Defendants and members of Workhorse's Board of Directors took advantage of this raise and sold hundreds of thousands of shares of Workhorse stock. Hughes sold a total of 143,515 shares between January 4, 2021 and January 8, 2021 for total proceeds of approximately $3.4 million. Schrader sold 4,437 shares of Workhorse stock for proceeds of approximately $85,000. Willison sold 6,103 shares of Workhorse stock on January 8, 2021 for proceeds of approximately $117,000. Ackerson sold over 10,000 shares of Workhorse stock for proceeds of approximately 229,000. Additionally, board member H. Benjamin Samuels and his related entities sold approximately 200,000 shares of Workhorse stock for $4,673,000 and board member Raymond Chess sold 10,000 shares for $247,700.

157.    Defendants used the USPS contract, production targets, and the Company's "backlog" of fictitious purchase orders, together in a scheme to mislead the market regarding Workhorse's business and manufacturing capabilities and facilitate insider trading at artificially inflated prices at the expense of Class Period purchasers of Workhorse stock.

158.    In furtherance of this scheme, Defendants used appearances in YouTube video interviews with extremely enthusiastic Workhorse supporters in a grassroots campaign to encourage the dissemination of misinformation related to the USPS NGDV Contract among the individual investor community. Fuzzy Panda reported on the backgrounds of some of these "YouTube Investors" (most of whom had no experience with investments), and uncovered striking parallels to the promotion of Lordstown and former Workhorse CEO Steve Burns, who has since resigned from Lordstown amid investigations of securities fraud and similar overstated claims about truck orders.  In fact, Fuzzy Panda revealed that Workhorse had a history of partnering with companies such as CSIR Group, who was charged with fraud by the SEC in a "fraudulent stock promotion scheme" "hir[ing]

writers…to publish dozens of bullish articles on its clients, which appeared to be independent research pieces," for "investor relations" services.

159.     With this backdrop, it comes as no surprise that, after not selling shares for months following the USPS NGDV Contract grant to Oshkosh, Defendants Ackerson, Willison, Hughes and Schrader all suddenly sold shares on July 1, 2021, just days after the Reddit community targeted Workhorse and surged the Company's stock price.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. March 10, 2020

160.     On March 10, 2020, the first day of the Class Period, Workhorse issued a Press Release filed on Form 8-K announcing its fourth quarter ("4Q:19") and full year 2019 financial results. The Press Release states, for the first time publicly, that Workhorse had "[e]stablished a production and delivery target of 300-400 vehicles in 2020." In the Press Release, Defendant Hughes is quoted as saying:

> We also made *meaningful progress* in our transition from a development-stage company *to a production-focused enterprise*… While our intent had been to deliver initial vehicles in the first quarter of 2020, we were impeded by material supply disruptions related to the global outbreak of the novel coronavirus. Despite these near-term headwinds, *we are setting a 2020 production target of 300-400 vehicles* and are looking forward to delivering our state-of-the-art truck to our customers.

161.     The foregoing statements were materially false and misleading when made, because Workhorse was still very much a "development-stage company," and had made no "meaningful progress" into a "production-focused enterprise," as it had no automation, no assembly lines, and only 12 employees who assembled trucks one

at a time by hand. While Defendants blamed the coronavirus-related supply disruptions as preemptory excuses as to why the Company would fail to deliver vehicles in the upcoming quarter, in truth, and as supported by CWs and inside sources credited in the Fuzzy Panda report, Workhorse did not have sufficient personnel or the manufacturing facilities to manufacture vehicles at any scale at this time, notwithstanding the coronavirus.

162.    On the same day, Workhorse held a call with investors, in which Hughes, Schrader, and Willison each participated. In the call, Hughes stated:

> As of today… we have the internal capacity to produce two C Series trucks per day at our Union City assembly complex. As training continues and substation assembly processes are completed, we can quickly move to five trucks per day with the ability to scale to as many as 10 trucks per day before we consider additional automation upgrades.
>
> …
>
> Our intent is to produce and deliver a limited number of vehicles to our customers in the second quarter and then move to higher volumes and deliveries with a target of delivering roughly 300 to 400 delivery trucks in 2020.

Schrader elaborated on Hughes' statements:

> [Y]ou have to kind of ramp it up slowly; so I think you expect the -- the first quarter and the second quarter will be a lot smaller quantities and will be back loaded towards the fourth quarter in the 300 to 400. And then, thinking about steady state; I think what we see from a standpoint to and -- is we have basically -- we think 200 a month, it will be kind of steady state production, that kind of gets us to gross margins that you would expect an OEM to have and also profitable state.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

163.     The foregoing statements attributable to Defendants Hughes and Schrader were materially false and misleading when made because Workhorse did not have the capability to manufacture the vehicles in the quantities they described. At this time, Workhorse could not manufacture two vehicles a day, much less five or ten as Defendant Hughes stated.  Accordingly, because Defendants did not expect to – and indeed, did not – deliver many vehicles in the second quarter of 2020, meeting the production target of 300 to 400 vehicles for 2020 based primarily on the production in the second half of 2020, as Defendant Schrader stated, was impossible. Moreover, Even if Workhorse had been able to produce 300-400 trucks in 2020, as of March 2020, there were no customers to take delivery of the trucks.  As discussed herein, UPS's contract did not bind UPS to take delivery of any trucks beyond the 50 prototypes, and still has chosen to take delivery of the remaining conditional trucks of the order.

164.     In answer to a question from an analyst, asking "what the CapEx needs are of the company to move from 2 to 5 to 10 per week? It sounds like there is some costs involved, so I didn't know what the CapEx budget was for the guidance that you just provided?" Willison responded that "it's only above 10 that we actually would need CapEx. So I think from that standpoint, we don't need to really any [sic] additional CapEx this year, regarding that the [sic] assembly plant."

165.     Defendant Willison's statement was materially false and misleading to insofar as it indicated that Workhorse did not need to add any automation to the Union City facility until workers were producing over ten trucks per day, as any type of automation would have required capital expenditure. The Union City facility could not have – nor has it ever – produced ten trucks per day, given Workhorse's personnel, production techniques, and facility capabilities.

166.     Another analyst asked: "can you give us a sense of the UPS order book where that stands?" Hughes replied: "so as you know, UPS being our customer of

record for the last several years, they have 1,060 units on order that we are beginning to deliver in anticipation in late Q2 or Q3 this year… this all goes towards building out to that 100 to 200 units a month where we have a consistent run rate going into 2021 so that we can reach those gross margin positive numbers as well as maintain and increase the run rate from month to month."

167.     Defendant Hughes statements regarding UPS were materially false and misleading when made. First, Hughes' characterization of UPS as Workhorse's "customer of record for the last several years," was materially false and misleading as UPS had, in 2019, abandoned Workhorse for Arrival, and entered into a 10,000 EV purchase order from them instead.  Beyond UPS' commitment to purchase prototype trucks, UPS did not have any binding obligation to take delivery of the remaining trucks in the order; rather, those deliveries would be fulfilled, if at all, "on a timeframe decided by [UPS] at [UPS]'s sole discretion." Hughes stated Workhorse anticipated delivering trucks to UPS in "late Q2 or Q3" of 2020, but in truth, UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2020 – or ever. Thus, Defendant Hughes knew or should have known that, even if Workhorse had the capacity to meet the 300-400 truck target, the Company was not going to deliver 300-400 trucks in 2020.

168.     Additionally, in his prepared remarks, Hughes stated:

I'll provide a brief comment as we always do with respect to the United States Postal Service next generation delivery vehicle program. As many of you are well aware, under our NDA Workhorse is only able to provide information which is already in the public domain. As has been the case throughout this process, any further information or announcements will be issued by the United States Postal Service. We appreciate the continued interest we receive, and we will provide

updates to the market as we are able, however, we do not have any updates to share at this time.

169.     These statements were materially misleading, as they implied that Workhorse was still in the running to secure all or part of the USPS NGDV contract. However, Defendants knew or should have known from the critical failures discovered in the testing of the Prefix prototype submitted by Workhorse, including the 2018 "roll-away incident" which resulted in the hospitalization of a USPS test driver, paired with Workhorse's complete lack of capability to mass-produce trucks, that the Company would not be securing the contract.

170.     On the materially misleading positive news in the foregoing statements, the share price of Workhouse stock rose from $2.50 at closing on March 9, 2020 to a high of $2.76 on March 10, 2020, a rise of approximately 10%.

171.     Based on these false and misleading statements, analysts BTIG and Cowen Equity Research both set stock price targets of $6/share, more than double the current price of the stock. BTIG stated:

> Management provided a 2020 vehicle production **guidance target of 300-400 units** with initial customer deliveries expected to commence in April… the company has now transitioned to the C-Series line and is **geared (production line and staffed) up for initial production of up to 2 trucks/day** which management expects to gradually ramp into the mid-cycle digits by year-end as the supply chain is stream-lined… Our base case scenario assumes that Workhorse does not secure the USPS contract. **We assume that WKHS is able to produce ~6 trucks/day in 2021 growing to 18 per day by 2023 expanding the union city factory to exit 2025 ~42 per day**.

Similarly, Cowen Equity Research stated:

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW            Case No. 2:21-CV-02072-CJC-PVC

Management now anticipates the C-series ramp to start in April as the Company begins to produce and deliver vehicles in earnest… ***Management noted that they would ramp up to 10 trucks per day before the need for additional capex to enable higher levels of automation***… The largest near-term binary event for the company is the outcome of the U.S. Postal Service contract. In our view, a positive outcome for the U.S. Postal Service contract would comfortably lead the company to profitability.

172.     Three days later, on March 13, 2021, Workhorse filed its Annual Report on Form 10-K for the year 2019 ("2019 10-K").

173.     The report stated:

Workhorse was one of the five participants that the United States Postal Service ("USPS") selected to build prototype vehicles for the USPS Next Generation Delivery Vehicle ("NGDV") project. The USPS has publicly stated that approximately 165,000 vehicles are to be replaced. In September 2017, Workhorse delivered six vehicles for prototype testing under the NGDV Acquisition Program in compliance with the terms set forth in their USPS prototype contract. In 2019, the vehicles completed the required testing protocol as specified by the USPS. The USPS published a Request for Proposals in December 2019 for the Production Program.

174.     This statement is false and misleading because Workhorse was not selected as one of the five participants to build a prototype for the USPS NGDV contract, they purchased the right to bid on the project from former partner VT Hackney. Additionally, the statement implies that Workhorse was still in the running to secure all or part of the USPS NGDV contract. However, Defendants knew or should have known from the critical failures discovered in the testing of the Prefix

prototype submitted by Workhorse, including the 2018 "roll-away incident" which landed a USPS test driver in the hospital, paired with Workhorse's complete lack of capability to mass-produce trucks, that the Company would not be securing the contract. Because of the complete failure to meet safety standards during testing, it was also materially misleading to state that Workhorse's prototype vehicles "completed" the testing protocol, without also mentioning the accident that USPS indicated was so severe that it would never have granted Workhorse the contract.

## B. May 6, 2020

175. On May 6, 2020, Workhorse issued a Press Release filed on Form 8-K announcing their first quarter 2020 ("1Q:20") financial results. Included as a "Highlight" was Defendants' statement that they "[r]eaffirmed previous production and delivery target of 300-400 vehicles in 2020." The press release contained a statement from Defendant Hughes:

> We will be delivering our C-Series vehicles to customers in the second quarter, and ***we remain on schedule to achieve our target of delivering 300 to 400 vehicles by the end of this year***. To that end, we're in the final stage of preparing a detailed production plan of when we can deploy vehicles into Ryder Systems' sales channel starting in 2020 and into 2021.

176. The foregoing statements from Workhorse's May 6, 2020 Press Release were materially false and misleading when made because, given Workhorse's personnel and manufacturing facilities, Workhorse could not even produce one vehicle a day and therefore had no possibly ability to hit the target of 300-400 vehicles by the end of the year in three quarters of production.

177. On the same day, May 6, 2020, Workhorse held an earnings call with investors, in which Hughes, Schrader, and Willison each participated. In his prepared remarks, Hughes stated: "***I'm reiterating our guidance of 300 to 400***

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

*delivery trucks produced in 2020.*" An analyst later asked about which customers would be receiving the trucks, stating: "You guys are very straightforward, 300 to 400 was your original guidance, you're reiterating. Obviously, you're hearing something from your customers that gives you confidence." Hughes replied: "we have the backlog out there in the first place with UPS and DHL… if anything, we're seeing customers very positive about our trucks and it's more, *how soon can we get them*."

178.     Defendant Hughes' foregoing statements were materially false and misleading when made because Workhorse did not have actual purchase orders to fill with 300 to 400 delivery trucks, even if Workhorse could manage to produce that number of trucks by the end of the year, which it could not.  As stated herein, the purported "backlog" did not consist of actual orders, but rather, with regard to UPS, was based on a non-binding agreement that UPS had already abandoned in favor of Arrival, which indicated that UPS was not "very positive about [Workhorse's] trucks." As of May 2020, UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2020 – or ever.[18]

179.     With regard to production disruptions caused by the coronavirus, Hughes also stated: "at the outset of the COVID-19 pandemic we experienced a series of supply chain disruptions and pushed back our expected initial delivery date from Q1 to our current quarter… [a]t this point, *we feel cautiously optimistic that we are moving past the disruptions to our supply chain*." Schrader further elaborated on this point, stating: "you can't know exactly what the future will hold

---

[18] The number of trucks ordered by DHL is unclear, as Workhorse merely announced in March 2019 that they had "Secured [a] purchase order from DHL." However, Workhorse reported its backlog was 1100 trucks, approximately 1000 of which were for UPS, so at most DHL would have ordered 100 trucks. One news source reported that DHL had ordered 63 Workhorse trucks. https://newatlas.com/dhl-greener-workhorse-delivery-trucks/58332/

exactly with the virus or even with some of the state orders and stuff like that. ***I think we feel pretty comfortable with our vendors and where they're at. They seem to have weathered the storm.***"

180.     The foregoing statements made by Defendants Hughes and Schrader were materially false and misleading when made. First, Workhorse's inability to deliver trucks in sufficient numbers was not a result of the coronavirus, but because Workhorse did not have the personnel or the manufacturing capabilities to produce trucks on any sort of large scale.  Second, contrary to Hughes and Schrader's statements that Workhorse was "moving past the disruptions to our supply chain" and that Workhorse suppliers had "weathered the storm" of COVID-19, Workhorse continued blame issues with suppliers for the rest of 2020. Later in the year, supply chain issues would be cited as a main reason Workhorse was not able to produce 300-400 trucks in 2020.

181.     When analyst Jeff Osborne asked: "I think the last call as of a month ago or so there was a discussion from Duane [Hughes] about having the capability of producing two trucks a day. I didn't know if you could just update us on Union City. Do you have the staff to do that?" Hughes responded: "we're fully staffed with the current staff that could still meet that two units per day."

182.     Defendant Hughes' statement were materially false and misleading because, at the time the statement was made, 1) the Union City, Indiana facility had no automation, no assembly lines, and only 12 employees who assembled trucks one at a time by hand; and 2) Workhorse reported 1Q:20 sales of $84,000, the equivalent of approximately one truck for the quarter, so it was not producing two trucks per day as implied by Hughes.

183.     On the earnings call, Craig Irwin, an analyst from Roth Capital, inquired further about the supply chain, namely, about the ability of Workhorse's suppliers to meet the needs of the USPS NGDV contract, were Workhorse to secure

all or part of it. Schrader used the NDA as a shield and stated that he could not comment, to which Irwin asked, "So you can't talk about the capabilities of a supply chain to serve the post office? Is that off-limits?" Schrader replied, "I would think it's a similar supply chain that would supply the current trucks that would supply a post office vehicle."

184.     This response was materially false and misleading because, in truth, Workhorse had not considered whether its supply chain could handle the 165,000 vehicle USPS NGDV Contract, as the 2018 "roll-away incident" which landed a USPS test driver in the hospital, paired with Workhorse's complete lack of capability to mass-produce trucks, meant that the Company would not be securing the contract. Additionally, as CW1 explained, as of May 2020 Workhorse did not have an accurate view of the parts and components of their prototype vehicle, which was designed by Detroit-based company Prefix. CW1 wanted to develop a more detailed list of parts and components in order to improve the vehicle's eventual cost and performance, however, he was told in June 2020 that his project would be put on hold.  Because Defendants had sufficiently spoke on the topics of the feasibility of USPS NGDV Contract and of the supply chain generally as it related to the Company's business vehicle output, Defendants were obligated to address these issues, such that their failure to do so was a material omission.

185.     On the same day, May 6, 2020, Workhorse filed its quarterly report on Form 10-Q for Q120. The Form 10-Q was signed by Defendants Hughes, Schrader, and Ackerman. The Q120 Form 10-Q discussed Workhorse's participation in the Paycheck Protection Program ("PPP"), stating "[t]he Company received total proceeds of $1.4 million from the PNC Note. In accordance with the requirements of the CARES Act, the Company will use proceeds from the PNC Note primarily for payroll costs."

186.    The foregoing statement was materially false and misleading when made because CW2, an Executive Director of Human Resources from December 2019 through June 2020, stated that the PPP funds were not primarily used for payroll costs, but to pay executive bonuses.

187.    Analysts responded favorably to Defendants' false and misleading statements. For example, on May 6, 2020, a report from Cowen Equity Research stated:

> After a tough few quarters, we see greener pastures ahead and a potential binary outcome with USPS… Workhorse has thus far *successfully managed through the COVID-19 pandemic*. The company still has a *1,000+ unit order backlog with UPS and DHL* and is actively engaged with Ryder to penetrate their channel with the new C1000 electric step van. Production has resumed in April and the company has staffing to produce 2 trucks per day and *continues to target 300-400 for the year*… We remain constructive on shares given the visibility for C-Series deliveries to UPS, W-15 royalties, and optionality of the U.S. Postal Service contract…

And on May 7, 2020, a note by Roth Capital Partners stated:

> Workhorse is making strong progress towards production of its C-650 and C-1000 all electric trucks, where commercial production should start in 2Q20. Mgmt maintained guidance for 300-400 units delivered in 2020, based on a healthy backlog and customers waiting for vehicle delivery. (Our 2020 model conservatively factors 150 C-Series deliveries)… *Mgmt maintained guide for 300-400 vehicles delivered in FY20.* Workhorse has been deemed an essential business, and has kept its workforce intact during the COVID-19 pandemic. *Deliveries are still on track to commence in 2Q20.*

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

188.     Based in part on Defendants' false and misleading statements, Workhorse began fundraising, securing $70 million in new financing by the end of June, 2020. The stock price began skyrocketing, surging from an opening price of $3.19/share on May 6, 2020 to $17.02/share by the end of June, 2020.

### C. July 23, 2020

189.     On July 23, 2020, Workhorse published a press release (not filed on SEC Form 8-K, despite the materiality of the news) that it had secured an order of 20 trucks from a new electronic vehicle start-up, eTrucks. In the press release Hughes stated "Bill [Hamilton, Managing Partner of eTrucks] and his partner **Brian Carr** are building a valuable sales and distribution platform for an underserved market. The SMB fleet operator represents a major opportunity for additional sales."

190.     The foregoing statement materially misled the market into believing that Workhorse had a flow of legitimate purchase orders for their vehicles, as this "order" came from a business created one month prior with no footprint for a "valuable sales and distribution platform." As discussed above, Brian Carr was the CEO of EVFS, a temporary staffing company CW2 stated had ties to Defendant Willison, which Workhorse used to fill myriad positions from engineers to sanitation workers at a 60-70% markup. eTrucks' articles of organization, signed by Carr (not Hamilton), were filed with the Ohio Secretary of State on June 22, 2020 – about one month prior to the July 23, 2020 press release. The eTrucks website, https://etrucks.webflow.io/, is registered to a British Indian Ocean Territory domain. The website very simplistic and does not contain a business address, headquarters, information on the history of the company, or any links other than a generic "contact us" form. Instead, it appears to be a promotional site advertising Workhorse trucks, with banners advertising "Drive a Workhorse truck" and "We make owning a Workhorse truck easy!"

191.     Other than this website, eTrucks has no other online presence, and to date, eTrucks has not taken delivery of or paid for the 20 trucks mentioned in the July 23, 2020 press release. Based on these facts, it appears that the entity eTrucks was created solely for the purpose of placing an order of Workhorse trucks, making it appear the backlog was larger and customer base was broader than in reality.

**D. July 24, 2020**

192.     On July 24, 2020, Schrader conducted an interview with online financial news outlet Benzinga. When asked about the status of the Company, Schrader responded:

> We are actually making, um, actually making trucks right now at our Union City, Indiana plant, um, and, uh, and ***we plan to make 300-400 this year***. Um, most of those will be at the very end of the year, in the last quarter. Um, and we also have a backorder of 1,100, uh, vehicles so we've already got sales out there from UPS and DHL.

When asked:

> What happens, say hypothetically you don't get the post office contract, um, you've talked about some of your other businesses, where, um, obviously, is your focus going to go from that?

Schrader responded:

> I think it's on the C-Series and the drone. Again, the post office to me, I always refer to as the cake on the icing, because it's so big, but from a standpoint of uh, ***the actual business what I'll call is the non-post-office business we think is great***.

193.     These statements were materially false and misleading because: 1) Schrader knew or should have known that Workhorse would not be able to produce 300-400 trucks in 2020 at the Union City facility, as the facility had no automation, was understaffed, and workers could only assemble trucks one at a time on wooden

benches; 2) Schrader omitted that the UPS order, the majority of the backlog he touted, was to be delivered "on a timeframe decided by [UPS] at [UPS]'s sole discretion," and the order could be cancelled by UPS in its entirety; and 3) For 1Q:20, sales of C-Series trucks was $84,000 and cost of goods sold was $1.7 million– so the business was not doing "great."

**E. August 10, 2020**

194.     On August 10, 2020, Workhorse issued a Press Release filed on Form 8-K announcing their second quarter 2020 ("2Q:20") financial results. Included as a "Highlight" was "[r]eaffirmed previous production and delivery target of 300-400 vehicles in 2020." A "Recent Operational Highlight" was "Delivered two C-1000 electric step vans for initial use through Ryder System, Inc.'s ChoiceLease and SelectCare product lines."

195.     The foregoing statements from Workhorse's August 10, 2020 Press Release were materially false and misleading when made because Workhorse had no capability to manufacture 300-400 trucks by the end of 2020.  Through the first two quarters of 2020, Workhorse had manufactured few trucks (and only two in the recent quarter), and their personnel, facility and manufacturing limitations prevented the Company from coming anywhere near their target by the end of the year.

196.     On the same day, August 10, 2020, Workhorse held an earnings call, in which Hughes, Schrader, and Willison each participated. In his prepared remarks, Schrader stated:

> In addition, and to be clear, expectation should be, ***the vast majority of our 300 to 400 vehicle production target would be manufactured and delivered by the end of the fourth quarter of this year***.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

Hughes stated:

> The goal… is to considerably shorten timeframes to assemble a C-Series vehicle and ***deliver our target vehicle production of 300 to 400 units*** later, with a vast majority coming in the fourth quarter.

When Colliers analyst Mike Shilsky asked:

> I know you want to get to 100 vehicles a month for the fourth quarter. So is there any sense as to where you might start the quarter? Where you might end the quarter? Whether that ending exit rate is kind of a good place to start for 2021?

Willison responded:

> Really the ramp starts from here and goes up. And ***what we're really looking at is fourth quarter to do 100 a month***. But beginning next year, really taking that up a good bit past that, 150 up to 200 a month as the market allows.

197.    The foregoing statements from Defendants Hughes, Schrader and Willison regarding meeting Workhorse's production targets largely with trucks produced in the fourth quarter were materially false and misleading when made. Workhorse had no ability to manufacture approximately 100 trucks a month (over 3 a day).  Their Union City, Indiana facility had no automation, no assembly lines, and their handful of workers assembled trucks one at a time by hand on wooden benches, which took weeks, not hours to produce. The only plan Workhorse had to "considerably shorten timeframes to assemble a C-Series vehicle" at the Union City facility was to offer further training to its employees, but training alone would not allow workers to go from building two trucks per quarter to the 100 trucks per month promised by Willison, much less the 150-200 trucks per month he stated would be produced in 2021.

198.       When BTIG analyst Greg Lewis asked where the vehicles would be produced if Workhorse were to secure all or a portion of the USPS contract, Schrader responded: "As you know, we can't say anything about the post office," but he continued "So let me say it this way. Is that Union City certainly has the ability and the history that can be really any capacity level as it done 60,000 chassis, I think in its history."

199.       These statements were materially false and misleading because the Union City facility was entirely incapable of producing the approximately 165,000 vehicles involved in the USPS contract.  Indeed, Schrader often cited the fact that Navistar had previously produced "60,000 chassis" in the Union City facility as proof that Workhorse would be able to produce 165,000 vehicles were Workhorse to secure the USPS NGDV contract, and analysts took Schrader's representations about the 60,000 chassis produced by Navistar as an indication of how many trucks Workhorse could produce in a year, for example, on May 28, 2020 an analyst from Dougherty & Company wrote, "WKHS's Union City plant has *the ability to produce over 60,000 vehicles per year* when fully ramped up, so the company certainly has the space to build the vehicles if it received a sole-source award." And on September 2, 2020, an analyst from Oppenheimer wrote "Workhorse manufactures these vehicles at its 265,000 sq ft plant in Union City, Indiana. *The facility has the capacity to produce up to 60,000 vehicles per year*."

200.       However, this analogy is misleading, because 1) The 60,000 chassis were produced over a period of 7 years; 2) Navistar factories have automation, but the machines at the Union City facility were moved to Navistar's Springfield, Ohio plant when Navistar vacated Union City; and 3) The chassis produced by Workhorse/Navistar were just metal frames with a diesel engine attached, and had far fewer components than Workhorse's fully assembled electric trucks. Thus, the fact that Navistar was able to produce 60,000 chassis in the Union City facility was,

in no way, indicative that Workhorse would be able to produce 165,000 trucks for the USPS NGDV contract at the Union City facility.

201.    Further, even if Workhorse had been able to produce 300 trucks in 2020, as of August 2020 there was no customer to take delivery of the trucks. Hughes stated in the August 10, 2020 call that Workhorse's backlog was 1,200 trucks, approximately 1,000 of which were designated for "anchor customer" UPS. When an analyst asked if there was any update on when UPS would take delivery of the trucks, Hughes stated: "Nothing really. Except that – that order is still out there." In reality, UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2020 – or ever. Thus, Defendants knew or should have known that, even if Workhorse had the capacity to meet the 300-400 truck target, the Company was not going to deliver 300-400 trucks in 2020.

202.    The August 10, 2020 press release also stated that a highlight of the quarter was that Workhorse "[r]eceived initial purchase order for 20 C-1000 trucks from eTrucks LLC." Schrader also stated during the August 10, 2020 earnings call:

> Speaking of orders in July, a Cincinnati-based company eTrucks placed an initial order for 20 C-1000 vehicles. eTrucks is a buyer, reseller and financier of trucking solutions for small to medium sized delivery businesses or SMBs. The SMB fleet operator represents an opportunity for additional sales. And we're looking forward to growing our partnership with another Ohio-based organization to improve last-mile delivery for everyone.

203.    As discussed above, these statements are false and misleading because eTrucks was a company founded by an associate of Willison for the sole purpose of placing a purchase order of Workhorse trucks.  Thus, the 20 vehicle "order" by eTrucks was not a "highlight" of the quarter, but rather a fiction created to inflate

the Company's purported "backlog," impress the investing market, and drive up the Workhorse's stock price.

204.     Additionally, in his prepared remarks, Defendant Hughes stated:

I'll provide a brief comment, as we always do with respect to the U.S. Postal Service, next-generation delivery vehicle program. As many of you are well aware under our NDA, Workhorse is only able to provide information which is already in the public domain. As has been the case throughout this process, any further information or announcements will be issued by the U.S. Postal Service. We appreciate the continued interest that we are receiving and will provide updates to the market as we are able. We do not have any updates to share at this time.

205.     This statement was materially false and misleading, as it implied that Workhorse was still in the running to secure all or part of the USPS NGDV contract. However, Defendants knew or should have known from the critical failures discovered in the testing of the Prefix prototype submitted by Workhorse, including the 2018 "roll-away incident" which landed a USPS test driver in the hospital, paired with Workhorse's complete lack of capability to mass-produce trucks, that the Company would not be securing the contract.

206.     On the same day, August 10, 2020, Workhorse filed its quarterly report on Form 10-Q for 2Q:20. The Form 10-Q was signed by Defendants Hughes, Schrader, and Ackerman. The 2Q:20 Form 10-Q discussed Workhorse's participation in the PPP, stating "[t]he Company received total proceeds of $1.4 million from the PNC Note. In accordance with the requirements of the CARES Act, the Company will use proceeds from the PNC Note primarily for payroll costs."

207.     However, this statement was materially false and misleading. CW2, an Executive Director of Human Resources from December 2019 through June 2020,

1    stated that the PPP funds were not primarily used for payroll costs, but to pay
2    executive bonuses.
3        208.        Analysts covering Workhorse reacted favorably to these statements by
4    Defendants. For example, an analyst from BTIG stated:
5            WKHS released Q2 earnings (BMO), with our key takeaways being 1)
6            WKHS *reaffirmed its 300-400 unit production target for 2020*
7            (management expects to get to a 100 unit/month run-rate in 4Q20, 2)
8            Cash stands at $105M (following the $70M convertible issuance and
9            exercise of warrants), and 3) While the USPS update was boilerplate, it
10           was reported this week Mahindra Motors (Not Rated) has backed out
11           of the ongoing USPS tender *leaving just 3 finalists including WKHS*…
12           Also in July WKHS secured a 20 unit order with eTrucks, a newly
13           launched buyer/ reseller which is also viewed as testing ground for
14           customers… *We expect UPS deliveries to start later this year*…
15   Likewise, a report from Colliers International stated:
16           *The outlook for the shipment of 300-400 units in 2020 was*
17           *maintained*… All eyes will be on Q3, however, as we believe WKHS
18           intends to ship *material numbers of units to its initial customers*…
19   And Cowen Equity Research published a note stating:
20           WKHS delivered its first three C1000 electric step vans in July,
21           including two to Ryder, after the truck received final certification in
22           2Q. The 2H ramp remains on track and management *continues to target*
23           *300-400 vehicles by the end of the year*. After a tough few quarters, we
24           see greener pastures ahead and a potential binary outcome with USPS.
25           10% stake in LMC valued at $160mn after SPAC closes… *The*
26           *company still has a 1,000+ unit order backlog with UPS and DHL* and
27
28   AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

last month received a purchase order for **20 C1000 trucks from eTrucks**. **Management continues to target 300-400 for the yea**r…

209.     The same day, August 10, 2020, the price of Workhorse stock rose from $15.96 per share to an intra-day high of $17.00 per share on unusually high trading volume.

### F. August 14, 2020

210.     On August 14, 2020, Defendant Schrader was interviewed by Jack Spencer on the YouTube channel, Jack Spencer Investing[19]. This video has about 41,500 views on YouTube, and about 3,500 likes. There is no safe-harbor warning or cautionary language of any kind in this video, except for Spencer stating (and wearing a t-shirt which stated) that he was not a financial advisor.

211.     In the interview, Defendant Schrader stated that Workhorse had hired 115 new employees, mainly in engineering and production positions, and that the Company had begun work on a refrigeration truck to deliver groceries. Schrader stated, "We've got a prototype started on that, so it's not only just engineering and production right now, ***how to get to kind of our three to four hundred this year, uh, in the fourth quarter***, but also thinking about what we're going to do next."

212.     Later, Spencer asked:

> Obviously you guys have your own plant, and ***it's a fairly massive plant for the stage we're[20] at right now***, do you plan on ever having to outsource to Lordstown motors in order to hit those targets or would that not even really have to be a thought process as of right now?

---

[19] *See* https://www.youtube.com/watch?v=vediWHBsMC0

[20] Spencer often used the pronouns "we" and "our" when referring to Workhorse.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

Schrader replied:

> Well I don't want to use the word 'we'd have to,' I would say it's a great option for us. ***So like you said Union City, Indiana, our factory right there, that used to put out 60,000 chassis in the Navistar days and stuff like that so it has – it can do probably a very similar amount from the standpoint of trucks.*** I think, uh, what we would look at, um, would be would we have to spend capital ***to <u>maybe</u> automate it a little bit more*** to get the volumes eventually we would want to be.

213.     Spencer also asked for an update on the USPS NGDV contract, but Schrader replied with a smile that he could not comment due to the NDA.

214.     These statements were materially false and misleading because Schrader knew or should have known that Workhorse would not be able to produce 300-400 trucks in 2020 at the Union City facility, as the facility had no automation and workers could only assemble trucks one at a time on wooden benches. While Schrader proclaimed that Workhorse had hired 115 new employees, when Fuzzy Panda Research investigators visited the facility in September, 2020, they found just six employees standing around on the production floor; thus, even if Workhorse had hired 115 new employees, they were not involved in "engineering and production" as Schrader represented. Additionally, as discussed above, the fact that Navistar was able to produce 60,000 chassis in the Union City facility was, in no way, indicative that Workhorse would be able to produce 165,000 trucks for the USPS NGDV contract at the Union City facility, because 1) The 60,000 chassis were produced over a period of 7 years; 2) Navistar factories have automation, but the machines at the Union City facility were moved to Navistar's Springfield, Ohio plant when Navistar vacated Union City; and 3) The chassis produced by Workhorse/Navistar were just metal frames with a diesel engine attached, and had far fewer components than Workhorse's fully assembled electric trucks.

215.     Further, the 2018 "roll-away incident" which landed a USPS test driver in the hospital, paired with Workhorse's complete lack of capability to mass-produce trucks and meet the basic Technical evaluation criteria under the USPS Solicitation, meant that the Company would not be securing the USPS NGDV contract.

216.     Many commenters on this video, relying on Schrader's positive outlook on the company, stated that they would be purchasing shares of Workhorse. For example, User Jamador 135990 stated "Literally just increased my shares to 100 for WKHS…let's go!!!" User Graham Morgan stated: "£8000 just added to my position off the back of that. Interesting chat about refrigeration and Walmart. That would be massive. Good effort with that Jack!" User it's HONEY commented "Im going to wake up tomorrow with workhorse stock skyrocketing because of this video."

217.     Additionally, the consensus among many commenters was that Schrader knew more than he was saying about the USPS NGDV contract. For example, user Joseph Kennedy stated: "As someone that's worked for the US government. I can tell you it's a waiting process. Even if he knows the final result it's pretty much classified until the release date. ***Judging from his demeanor I think he knows some positive news!***" Neither Spencer nor Defendant Schrader replied to this comment to clarify the misunderstanding, despite the ability to do so.

218.     This was the first of several appearances Defendant Schrader made on Spencer's YouTube channel. The video has the most views of any of the videos on Spencer's channel and is featured on the channel's home page to this day.

219.     Prior to mid-2020, Spencer's videos did not all focus on investing, for example, many focused on fitness (such as a February 22, 2020 video titled "Clothes, Cereal, and Squats" which garnered 180 views) and videos of Spencer hanging out with his girlfriend (such as a March 7, 2020 video titled "Why you SHOULD go to BUDAPEST" which garnered 134 views). However, shortly before the interview with Defendant Schrader, Spencer began producing videos with tips about stocks

and investing. Many of his videos focus on Workhorse and Lordstown, hyping the stocks even when they are at low points.

220.     Jack Spencer Investing is not the only YouTube channel promoting Workhorse stock – the Fuzzy Panda Report identified 80 individuals who regularly promoted Workhorse, in a total of nearly 420 videos from June 2020 to October 2020. Similar to Spencer, many of the individuals made videos about various subjects, then, around mid-2020, suddenly switched to only posting videos about investing. Fuzzy Panda speculated, based on this odd pattern and the immense amount of coverage of this smaller company, that Workhorse illegally paid these individuals to promote their stock.

221.     After the Fuzzy Panda Report was published, dozens of individuals, including Spencer, posted videos disparaging the report and claiming that they had never received any payment from Workhorse. Many of the individuals continued posting regular videos about the Company. In fact, on June 3, 2021, Spencer posted a video proclaiming "WKHS up 75%? Short Squeeze - Am I Buying?" The video opens with Spencer, distorted through a filter, mockingly saying "Ugh, why are you still speaking about Workhorse, I'm upset!" Then removing the filter and joyfully proclaiming "If you don't like it, get out of here baby!"

**G. August 17, 2020**

222.     On August 17, 2020, Defendant Willison appeared on Supply Chain Innovation podcast, hosted by William Crane. Regarding Workhorse's recent $70M fundraising, Willison stated: "Because of our progress in the EV field, ***because of our associations with UPS*** and things, we're finally, not only getting the volume of funding, but at rates that are sustainable."

223.     This statement was materially false and misleading because Workhorse's purported "association[]" with UPS was highly conditional and cancellable, and not at all indicative of future volume and funding. Additionally,

according to UPS' 2019 sustainability report, UPS had abandoned Workhorse for an affiliation with Arrival, a competing electric truck manufacturer, and had ordered 10,000 EVs from them instead.

224.    In the interview, Crane asked:

> What do you think led to the company's ability to deliver, not just to deliver some additional mule vehicles or deliver that first couple of production vehicles, but to ***consistently ship product*** to the riders of the world? What led to that?

Willison replied:

> Well, you know, we, we follow, and there's you know, a zillion different design methodologies, but we somewhat follow the Department of Defense preliminary design and review, critical design review, stage gates, and that seems to work well for us. We've really – you know, vernacular we talk in engineering about design freeze… ***no, it's good enough, you know, release it, let's get it purchased, get on with things***. And so that's one of the principles that's allowed us to say, okay, we'll save those ideas for the next version, but we're going to release these now.

225.    This response was materially false and misleading because Willison neglected to inform Crane that Workhorse had, in fact, only produced "that first couple of production vehicles" and did not "consistently ship product to the riders of the world." In fact, Willison's comments about design freeze imply that trucks were getting purchased on a regular basis, and that Workhorse was consistently creating new versions of the C-series trucks. However, in truth, Workhorse only produced two trucks in Q220.

**H. August 31, 2020**

226.     On August 31, 2020, Workhorse announce via press release (not filed on SEC Form 8-K, despite the materiality of the announcement), that it had formed a "strategic relationship" with Hitachi and Hitachi Capital America. The press release stated, "Under these agreements, Hitachi…will provide an operational assessment of Workhorse's manufacturing, operational and supply chain capabilities, benchmark to best-in-class standards and provide recommendations to Workhorse that support the Company's increased production requirements." The press release quotes Hughes stating, "This alliance with Hitachi comes at an ideal time for Workhorse as we value their best in class innovation and experience in ramping up production and enabling us in providing a complete solution to our customers."

227.     For the next several months, Defendants represented that the agreement with Hitachi would facilitate the "ramp up" of production at the Union City facility. For example, on October 29, 2020, in an interview with Benzinga, Schrader stated that the Hitachi agreement would "let us go from maybe 5, 10/day to 40 or 50 a day."

228.     However, these statements were materially false and misleading. What defendants described as a "strategic agreement" was merely an agreement for consulting services. As the Fuzzy Panda Report explained:

> Workhorse is paying Hitachi a consulting fee to assess the improvements it needs to make at Union City and Loveland in order to produce trucks (perhaps this is a premonition into Worhorse's reliance on Lordstown for manufacturing moving forward). After our recent visit, we (Fuzzy Panda Research) are happy to provide our assessment for free – YOU NEED TO BUY ROBOTS TO BUILD TRUCKS. Your competitors started doing this in the 1940s & 1950s.

Defendants also omitted the plain truth – they were unwilling or unable to put any capital expenditure into automating the Union City facility, and without such automation, Workhorse would not even be able to produce 5 to 10 trucks per day, much less 40 or 50 per day.

229.     Additionally, due to the COVID-19 pandemic – which was already widespread in the United States as of August 2020 – Hitachi was never even able to visit the Union City facility to provide the much-hyped consulting services. In a January 28, 2021 interview with Jack Spencer, Schrader revealed: "at one point, probably 30-40% of our production crew out, um, all the way through December – early December… we couldn't have Hitachi and/or Belkin in to help us out, because you really can't expose more people to that."

## I.  October 15, 2020

230.     On October 15, 2020, Schrader appeared on TD Ameritrade Morning Trade Live. Schrader stated: "Right now we've delivered, you know, a handful of vehicles out there but **we have a plan to build and manufacture and deliver 300-400 this year**, and most of those will come in this quarter right now, and then continue that to maybe 200 a month or so next year." He also told the reporter that Workhorse had a 1,100-1,200 vehicle backlog worth $70M, which would be coming forward "probably sometime in the next 12 months."

231.     This statement was false and misleading because Defendants knew or should have known that Workhorse would not be able to produce 300-400 trucks in the 10 remaining weeks of 2020 at the Union City facility, as the facility had no automation and workers could only assemble trucks one at a time on wooden benches. Beginning in early October, 2020, Workhorse had a major labor shortage, as, according to later statements of the Company, nearly 40% of workers contracted or were exposed to COVID-19, and were unable to work. Assuming the factory was open every day, taking no breaks for weekends or the winter holidays, Workhorse

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

would have had to produce approximately 5 trucks per day to meet the 400 truck target. At the time, the facility was not even producing one truck per day. It was also later revealed that, around October 1, Workhorse's battery manufacturer told Workhorse they would not be able to produce 300 batteries before the end of the year, so even if Workhorse had the capacity to build the trucks, they would not have been able to complete and deliver them. Defendant Schrader knew or should have known, at the time he made this statement, that it was not feasible for Workhorse to produce anywhere near 300-400 trucks in 2020.

232.     Additionally, the statement was materially false and misleading because the majority of the purported backlog was approximately 1,000 trucks from a 2019 agreement with UPS. The UPS Agreement stated that delivery of the trucks would be "on a timeframe decided by [UPS] at [UPS]'s sole discretion," and UPS had the ability to "reduce the quantity of the balance of the Order (or cancel the balance of the Order)." As of October 2020, UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2020. Schrader knew or should have known that the referenced $70 million was conditioned on UPS requesting delivery of the balance of their order, and that there was no guarantee that this request would ever occur, much less within 12 months of the interview.

233.     This interview helped maintain the price of the stock, which opened at $22.39 per share and closed at $22.30 per share.

234.     The next day, October 16, 2020, Defendant Hughes exercised his option to buy 50,000 shares of Workhorse stock at $5.28 per share, then sold them at $23 per share, for a profit of $886,000.

**J.  October 29, 2020**

235.       On October 29, 2020, Schrader was interviewed once again by online financial news outlet Benzinga. Regarding the 300-400 vehicle target for 2020, Schrader stated:

> we've got everything in place right now, so we've got the labor and materials coming in, and from our standpoint ***we still have the 300-400 that we have out there, and that's our goal***. Right now we have two facilities, our Union City and our Lordstown location, so yeah, as far as we are going right now, we're good on that.

236.       This statement was materially false and misleading. At the time it was made, there were only about two months left in the year 2020. The Union City facility still had no automation, no assembly lines, and a massive shortage of workers. As was later revealed by the Company, around early October, 2020, nearly 40% of Workhorse's employees contracted or were exposed to COVID-19, and were unable to work. Assuming the factory was open every day, taking no breaks for weekends or the winter holidays, Workhorse would have had to produce approximately six trucks per day to meet the 400 truck target. At the time, they were not even making one truck per day. Further, Workhorse was not producing trucks in the Lordstown facility as of October 2020, which was run by Lordstown Motors and not, as Defendant Schrader implies, Workhorse. It was also later revealed that, around October 1, Workhorse's battery manufacturer told Workhorse they would not be able to produce 300 batteries before the end of the year, so even if Workhorse had the capacity to build the trucks, they would not have been able to complete and deliver them. Schrader knew or should have known, at the time he made this statement, that it was not feasible for Workhorse to produce anywhere near 300-400 trucks in 2020, especially because, less than two weeks later, the Company would say that they expected "substantially less" than their 300-400 truck guidance.  It is

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

simply not plausible that the Company would go from meeting this guidance to "substantially" underperforming in less than two weeks.

237.    When asked about the status of the USPS NGDV Contract, Defendant Schrader, after explaining he was limited by the NDA, stated, "the Post Office is bidding out 165,000 vehicles, so it's a huge fleet opportunity, and I think from our standpoint it would be transformative, right?"

238.    The foregoing statement was materially false and misleading when made, because, Defendants knew or should have known that Workhorse would not win the USPS contract bid, and that it would not "transform[]" the Company.  In addition to the roll-away incident, the USPS had informed Workhorse less than two months before, on September 3, 2020, of significant "questions and weaknesses" in a "List of Deficiencies," that focused on the Technical Evaluation Factors considered by the USPS, which prompted a 99-page response from Workhorse, as well as follow-up discussions on October 8-9, 2020, and an additional request for information on October 21, 2020, just over a week before this interview.

239.    The price of Workhorse stock rose, intra-day, from $16.90 to a high of $18.04, or approximately 7%.

**K. November 9, 2020**

240.    On November 9, 2020, Workhorse issued a Press Release filed on Form 8-K announcing their third quarter 2020 ("3Q:20") financial results. In the Press Release, Hughes is quoted as saying:

> Previously, we projected 300-400 vehicles to be produced by the end of 2020, mostly in the fourth quarter. Although we will still manufacture and deliver vehicles in Q4, it will be a substantially lower amount than our previous guidance… While we cannot predict the full impact from COVID right now, let alone in 2021, when conditions improve and the coronavirus is no longer a business issue for us and

our suppliers, ***then we would anticipate producing approximately 1,800 units in 2021.***

241.     This statement was materially false and misleading because, regardless of the global pandemic, Defendants did not actually anticipate producing 1,800 trucks in 2021. 1,800 trucks in a year – or approximately 7 trucks per day assuming workers would take weekends off – would require adding employees and automation to the Union City facility, actions which Workhorse announced no plans to take.

242.     On the same day, November 9, 2020, Workhorse held an earnings call with investors, in which Hughes, Schrader, and Willison each participated. Regarding the reasons Workhorse would not meet its 300-400 truck per month guidance, Hughes stated:

> We are currently experiencing new positive cases on a daily basis and having ***more than 36% of our production-related staff currently out***, we must protect our employees health, which requires us to modify the assembly process and limit production support and access to our facilities from the third-party sources. Second is the ***inability of our primary battery supplier to meet our volumes*** due to capacity issues and COVID-related slowdowns."

Regarding the battery supply issues, Willison stated:

> ***We always have a backup supplier***. We have had very good luck with our primary and it is certainly not a performance issue. But we are looking because of ***our volume and increased orders*** for secondary suppliers.

243.     The foregoing statements were materially false and misleading because Defendants erroneously blamed the fact that Workhorse would not be producing 300-400 vehicles in 2020 – a number Schrader had ***publicly confirmed just <u>two weeks prior</u>*** – on the COVID-19 pandemic. In truth, Defendants knew from the time

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                     Case No. 2:21-CV-02072-CJC-PVC

they set the target in March, 2020 that – pandemic or not – it would be impossible for Workhorse to produce 400 trucks in a facility with no automation and no assembly line, where vehicles were produced one at a time on wooden workbenches.

244.     It was also misleading that Defendants blamed their battery supplier, Ener-Del, for the failure to meet their target. Defendants knew or should have known that the small, independent supplier may not have been capable of such a large order. As an analyst from Roth Capital Partners pointed out, "Mgmt has repetitively defended its use of EnerDel as a supplier, ***despite broad market knowledge that the manufacturer has had challenges delivering product***." If Defendants had truly anticipated producing 300-400 units in 2020, they would have had a back-up supplier in place far earlier. However, Defendants knew from the time they set the 300-400 unit target, that the capacity of the supplier did not matter, as Workhorse was not capable of meeting the target regardless of the availability of the batteries.

245.     Rather than erring on the side of caution, Defendants created a new misleading and impossible target: 1,800 units in 2021.

Hughes stated:

> If conditions improve, and the virus is not a issue for us or our suppliers going forward, then ***we would anticipate producing 1,800 units in 2021***.

Schrader added:

> I think you could look at it as getting to ***100 trucks per month by the - no little later than the first quarter of 2021*** and then getting to ***200 trucks a month by no later than the second quarter of 2021***.

246.     This new target was materially false and misleading because Defendants did not, in fact, anticipate producing 1,800 units in 2021. The new target was especially confusing as, at the time, there was no indication of when the COVID-19 pandemic, which Defendants blamed for their failure to meet their 2020

target, would be over. Workhorse announced no plans to improve their manufacturing capabilities, such as adding automation or new employees, except for reiterating that Workhorse would be "benefiting from [Hitachi's] manufacturing expertise." As discussed above, unless Workhorse is willing to spend capital to automate their facility, it is unclear how a paid consulting agreement with Hitachi could improve the Company's virtually non-existent production capability.

247.    Even if Workhorse were able to produce 1,800 trucks in 2020, as of November 2020, there was no customer to take delivery of the trucks. Defendant Schrader stated in the November 9, 2020 call that Workhorse's backlog was 1700 trucks, approximately 1,000 of which were designated for UPS. When an analyst asked if there was any update on when UPS would take delivery of the trucks, Hughes stated "UPS remains our premier customer… We are happy where we are with UPS. We will be delivering new vehicles." As of November, 2020, UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2021 – or ever. Thus, Defendants knew or should have known that, even if Workhorse had the capacity to meet the 1800 truck target, at the time the target was set there would not have been any customers to take delivery of those vehicles.

248.    When asked exactly how many vehicle had been delivered in the third quarter, Defendant Schrader replied: "**we had <u>seven deliveries</u>**." Five of these trucks went to new customer Pritchard and two were delivered to distributor Ryder. The small sizes of these orders indicate the trucks were meant to be prototype units for testing and/or promotional purposes, not deliveries to end users. Zero vehicles were delivered to UPS or DHL.

249.    Defendants further cushioned the blow of their missed target by announcing via a separate press release (not filed on SEC Form 8-K, despite the materiality of the announcement) that it had received a new order of 500 trucks from

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

Pritchard Companies. The press release did not indicate when or where Pritchard would take delivery of or pay for the trucks. In the earnings call, an analyst stated:

> I'm a little confused about what Pritchard's role in all is. Are these orders spoken for with end users? Or are they just really an inventory stock up for Pritchard? And if they are a job to actually fund the end users from there?

To which Hughes replied:

> So they will find their own end-user customers as they always do. I mean they already have a group. They sell many trucks to FedEx ground contractors as well as beyond that. So that 500 number is a pretty small number in their mind in terms of number of units to sell.

250.     To this day, it is unclear how many of the 500 vehicles have already been sold to end customers, how many Pritchard intends to take delivery of in 2021, or whether Pritchard has experienced any user demand at all  for the Workhorse trucks. When asked about this in the May 10, 2021 earnings call, Schrader simply stated, "So I don't think they want us to announce exactly kind of what they are doing with their customers and how they are approaching or how they are going to deliver them."

251.     In his prepared remarks, Defendant Hughes stated:

> I will provide a brief comment as we always do with respect to our ongoing participation in the U.S. Postal Service's next-generation delivery vehicle program. As many of you are well aware, under our NDA, Workhorse is only able to provide information, which is already in the public domain. As has been the case throughout this process, any further information or announcements will be issued by the U.S. Postal Service. We appreciate the continued interest we receive, and we will

provide updates to the market as we are able. At this time, we do not have any updates to share.

252.     This statement was misleading, as it implied that Workhorse was still in the running to secure all or part of the USPS NGDV contract. However, Defendants knew or should have known from the critical failures discovered in the testing of the Prefix prototype submitted by Workhorse, including the 2018 "roll-away incident" which landed a USPS test driver in the hospital, paired with Workhorse's complete lack of capability to mass-produce trucks, that the Company would not be securing the contract. Moreover, the USPS had informed Workhorse approximately two months before, on September 3, 2020, of significant "questions and weaknesses" in a "List of Deficiencies," that focused on the Technical Evaluation Factors considered by the USPS, which prompted a 99-page response from Workhorse, as well as follow-up discussions on October 8-9, 2020, and an additional request for information on October 21, 2020.  Indeed, the USPS, who Workhorse acknowledged had been "policing" the Company's public statements, cited securities fraud litigation in "castigating" Workhorse for making such statements to the public in reference to the contract.

253.     On the same day, November 9, 2020, Workhorse filed its quarterly report on Form 10-Q for Q320. The Form 10-Q was signed by Defendants Hughes, Schrader, and Ackerman. The Q320 10-Q discussed Workhorse's participation in the PPP, stating "[t]he Company received total proceeds of $1.4 million from the PNC Note. In accordance with the requirements of the CARES Act, the Company will use proceeds from the PNC Note primarily for payroll costs." However, CW2, an Executive Director of Human Resources from December 2019 through June 2020, stated that the PPP funds were not primarily used for payroll costs, but to pay executive bonuses. In the Q320 10-Q revealed that "[a]s of October 30, 2020, the Company applied for forgiveness of the full amount due on the Note."

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

254.        Due to the positive announcements of the Pritchard agreement and the new 1,800 truck target for 2021, and defendants blaming COVID-19 for missing their 2020 guidance, the stock price continued to rise on November 9, 2020, rising from an opening price of $17.88 per share to an intra-day high of $20.08 per share.

**L. November 14, 2020**

255.        On November 14, 2020, Schrader was interviewed again by Jack Spencer on his YouTube channel, Jack Spencer Investing[21]. There was no safe harbor or cautionary language included in this video, except for Spencer's statement that he is not a financial advisor. Spencer and Schrader discussed the November 9, 2020 earnings call in further depth.

256.        For example, Spencer asked:

> In regards to those 1,800 vehicles for next year, I know you were saying, you know, hopefully you want to be at 100/month within the first quarter then 200 a month in the second quarter. Is that based off, you know, the existing backlog of orders we have, is that, you know, what we would deem to be best case scenario, or could that potentially go up if there are to be more orders?

Schrader replied:

> Well let me say first, the goal was to get like 100/month in Q4, in this year, and I – I think, you know, we articulated both the battery constraint issue and the COVID issues we've had, and we're not going to do that, but we kind of view that more as ***just a slight delay and hiccup*** and it moved that more to the first quarter, so yeah, ***by the end of the first quarter we'd like to have 100 per month***, 100 per month at least, and the same thing ***by the end of the second quarter 200 per***

---

[21] *See* https://www.youtube.com/watch?v=TsEvrSQaBsE

1
2
3
4
5
6

***month***… So right now the 1,800 is our goal for the year and let's, let's shoot for that, and uh, you know, if we get more orders that's beyond the 1,700 – because ***if we did 1,800 that would satisfy the backlog, correct?*** – but if we get more beyond that then certainly we'll look at ways to speed it up, or, you know, they can at least get on the list for 2022.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

257.     These statements were materially false and misleading when made because, contrary to Schrader's assertion, it was not the "slight hiccup" of 40% of Workhorse's workforce contracting/being exposed to a deadly virus that what caused Workhorse to miss its production targets. Workhorse missed the targets because the facility at which it planned to make the vehicles had no automation or assembly line, and workers could only assemble trucks one at a time on wooden benches. Despite repeated assertions by executives that they had a plan to increase production, Workhorse did not and never planned to spend any capital on modernizing the factory or adding automation. After missing the 2020 target, nothing changed. There was no reason for Defendant Schrader to believe that the Union City facility was capable of producing 100-200 trucks per month in 2020, or that there was any way to "speed up" production on top of that. Even if it was feasible for Workhorse to produce 1,800 trucks in 2021, at the time Schrader made this statement there would not have been a customer to take delivery of the majority of the vehicles, as UPS (purported buyer of 1,000 of the 1,700 trucks in the backlog) had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2021. Shrader knew or should have known that these statements were materially false and misleading.

25
26
27

258.     Defendant Schrader also elaborated on the battery supply issues described by Hughes in the November 9, 2020 earnings call. He stated that around October 1, "our battery manufacturer basically said – you know – ***we can't hit that***

28

*three to four hundred*...” Despite the fact that Schrader became aware of the battery issues around October 1, he still made two media appearances – one on October 15, 2020 and one on October 29, 2020 – in which he told the public that Workhorse would be able to produce 300-400 trucks by the end of the quarter.

259.     YouTube users reacted favorably to this video, which has nearly 32,000 views and over 2,400 likes. User True Boxing Kings stated “I get a good vibe from this guy. I love when the ‘top dogs’ are accessible to the public. ***I’m actually going to buy in at open today***.” User Star Bright commented, “I was going to sell my workhorse but now I am keeping it long run.” User Brian P stated “Definitely got the usps contract.” User Richard Metzger replied to this comment, “USPS definitely. 100% of the award would be amazing!” Neither Defendant Schrader nor Spencer corrected the misunderstanding that Schrader’s demeanor indicated Workhorse would be getting the USPS, even though Spencer replied to numerous other comments on the video.

**M. January 27-28, 2021**

260.     On January 25, 2021, just days after being sworn in, newly elected President Biden announced plans to replace the government’s vehicle fleet with electric vehicles assembled in the United States. President Biden did not say anything specifically about the USPS NGDV contract or endorse Workhorse electric vehicles specifically. However, after this announcement, Workhorse stock jumped from $23.62 per share at open on January 25, 2021 to $27.04 per share at open on January 26, 2021 – an increase of almost 14%.

261.     In the following days, Defendant Schrader participated in several interviews in which he misled the market to believe that President Biden’s announcement was an indication that Workhorse would be awarded the USPS

NGDV contract. For example, on January 27, 2021, in an interview with Simranpal Singh on Singh's YouTube channel[22], Schrader stated:

> It's positive what we're seeing from the administration. President Biden, you know, just five days into his presidency has kind of pushed electric vehicles for all government agencies.

Later, when discussing what the future would look like for Workhorse, Schrader stated he wanted Workhorse to have several divisions: "a drone division, a truck division, um, you know, *maybe a governmental division of some sort*." YouTube user K.T. picked up on this phrase, assuming it was a hint about the status of the USPS contract, commenting: "Did anyone catch that? He said around 14:20, the different divisions 'drone division, truck division, maybe a governmental division of some sort.'" Singh replied, "Yea I thought that was interesting too!"

262.     These statements were materially false and misleading when made as Schrader knew or should have known from the 2018 "roll-away incident," which landed a USPS test driver in the hospital, paired with Workhorse's complete lack of capability to mass-produce trucks, that the Company would not be securing the contract. Moreover, the USPS had informed Workhorse approximately two months before, on September 3, 2020, of significant "questions and weaknesses" in a "List of Deficiencies," that focused on the Technical Evaluation Factors considered by the USPS, which prompted a 99-page response from Workhorse, as well as follow-up discussions on October 8-9, 2020, and an additional request for information on October 21, 2020.

263.     January 28, 2021, in an interview with Jack Spencer on Spencer's YouTube channel[23], Schrader stated:

---

[22] *See* https://www.youtube.com/watch?v=dUiv6-BC1J8

[23] *See* https://www.youtube.com/watch?v=rY7g15hOMrA

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

> ***I think the President's announcement was huge***, uh, for several reasons, right, it's 1. supportive of the EV market. It's 2. All-American, like he said, uh, all-American product buy, and I think he also said a lot about small businesses and purchasing, whether it be parts or final products from small businesses too, so I think that's huge. ***I think it's meaningful that he did this the fifth day into his presidency, right?*** He did it quickly, he didn't really wait, and so I think that putting a move on that is very quick too.

264.     These statements were materially false and misleading when made as Schrader knew or should have known from the 2018 "roll-away incident," Workhorse's complete lack of capability to mass-produce trucks, and the correspondence with the USPS in September – October, 2020 outlining Workhorse's deficiencies, that the Company would not be securing the contract.

265.     Furthermore, several commenters on the YouTube videos assumed, based on Defendant Schrader's statements, that he knew Workhorse would get the contract. For example, user Onat Ozyurt commented on the Spencer video "I am 80% sure that Jack talked with him about Usps and now he knows the result. Jack wouldnt share this video that proudly if he didnt know that Wkhs didnt have the contract. ;) Jack?" Spencer never replied to this comment to correct the misunderstanding, even though he replied to numerous other comments on the video.

266.     When Spencer asked if there was any continuing effect of COVID-19 at the Union City facility, Schrader stated there was not, but:

> it cost us, basically, five weeks… So you know, it – it really just kind of ***killed the fourth quarter***, you know… ***I had a virus, I was out for four or five days***. Never had COVID, but you know, it just shows kind of how it is, you know, and I'm not, you know, I'm not meaningful for

production so they can spare me… ***but when it's production people out, you know, that's just the killer***."

267.     Not only are these comments insensitive to the hundreds of thousands of Americans who died as a result of COVID-19– the real "killer" in this situation– they were materially false and misleading because it was not the fact that nearly 40% of Workhorse's workforce contracted/were exposed to a deadly virus that caused Workhorse to miss its production targets. Workhorse missed the targets because the facility at which it planned to make the vehicles had no automation or assembly line, and workers could only assemble trucks one at a time on wooden benches.

268.     Neither the Spencer interview nor the Singh interview contained any safe-harbor or other cautionary language, except for the YouTube personalities explaining that they were not financial advisors.

269.     As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021 – an increase of over $10 per share in a one-week time period.

270.     Despite Schrader's positive outlook on the USPS NGDV contract in these interviews, on January 26, 2021, Hughes, Willison, and multiple board members ***sold large quantities of their Workhorse stock***. Willison exercised an option to purchase 150,000 shares of Workhorse at $0.932/share, then sold those 150,000 shares for $30/share for an overall profit of $4,360,000. The 150,000 shares represented approximately 45% of the stock owned by Willison. Similarly Hughes exercised options to acquire 200,000 shares of Workhorse stock at $5.28/share, then sold 100,000 shares for $28/share and 100,000 shares for $30/share, for a total one-day profit of $4,744,000. The 200,000 shares represented approximately 40% of the stock owned by Hughes. Then, a few days later, on February 1, 2021, Hughes exercised options to acquire a further 25,000 shares of Workhorse stock at $0.97 per share and sold them at $35.97 per share, for a profit of $875,000.

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

**N. February 24, 2021**

271.     On February 23, 2021, USPS announced via press release that it was rewarding the entirety of the 10-year, multi-billion dollar NGDV contract to Oshkosh Defense. The press release did not mention Workhorse at all. On this news, the price of Workhorse stock plummeted, from opening at $28.29 per share all the way down to an intra-day low of $12.50 per share, closing around $16.43 per share.

272.     The next day, February 24, 2021, Workhorse published a press release (not filed on SEC Form 8-K, despite the materiality of the subject matter to investors), titled "Workhorse Provides Corporate Update." The press release stated:

> On February 23, 2021 the USPS issued a press release announcing that it has made an award under the NGDV contract to a competing finalist…. After being informed of the USPS decision, the Company has requested, pursuant to the bid process rules, additional information from the USPS and is awaiting a response at this time. ***The Company intends to explore all avenues that are available to non-awarded finalists in a government bidding process.***

273.     These statements were materially false and misleading, as Defendants knew or should have known that Workhorse would not be securing the USPS NGDV contract. As demonstrated by the facts above, Workhorse was completely unable to mass-produce trucks, and therefore could never have met USPS's need for 165,000 trucks. Additionally, critical failures during the 2018 testing of the Prefix prototype submitted by Workhorse, including the "roll-away incident" which landed a USPS test driver in the hospital, indicated the submitted vehicle was not suitable for the contract and was unlikely to be chosen, which was supported by the correspondence with the USPS in September – October, 2020 outlining Workhorse's deficiencies.

274.     While analysts following Workhorse were "shocked" at the announcement, they remained upbeat about Workhorse's future prospects. For

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

example, Cowen Equity Research set a target price of $18 per share. An analyst stated:

> ***Our Reaction: Shocked***. While we were not modeling success in the USPS, we had anticipated Workhorse would play a role, especially given the administration's stance around government fleets being zero emission… The loss of the contract ***does not impact our estimates*** as we had elected not to model the USPS NGDV program. . .

BTIG set their target price to $24 per share, stating that their valuation included "$20/share for the core business which includes the C-Series delivery truck (existing backlog of ~8,000 vehicles)." Likewise Colliers International stated : "**There is still a real company here.** As we do with all un-signed contracts, un-closed mergers, and so on, we never included the USPS contract in our WKHS model or valuation. As such, our estimates are not changing at this time." (emphasis in original). Roth Capital Partners stated that, while they "view the unsuccessful Workhorse bid for the USPS NGDV as a surprise outcome" they were "[l]eaving forecasts unchanged at this time as the NGDV was never in our revenue or earnings forecast."

275.     Workhorse's statements caused the stock price to rise slightly back up again; it opened at $14.07 per share on February 24, 2021 and closed at $15.13 per share, rising further to close at $18.87 per share on February 25, 2021.

**O. March 1, 2020**

276.     On March 1, 2020, Workhorse issued a Press Release filed on Form 8-K announcing their fourth quarter ("4Q:20") and full year 2020 financial results. The press release did not state that Workhorse had an 1,800 truck target for 2021. However, Hughes is quoted as saying:

> Our management team and expanded production workforce are continuing to collaborate closely with our strategic partners, Hitachi and Belcan. We are currently faced with various supply chain

challenges, both internal and external, in the ramp-up to our stretch production goal for 2021. While we focus on our near term targets we are preparing the Company for quality needed in the scaling forecasted in our multi-year growth plan.

277.     In an earnings call on the same day, Hughes addressed the 1,800 truck target for 2021, stating, "we are facing various supply chain challenges, both internal and external, and the ramp up to that goal. While we believe this is a feasible goal, it's a stretch." Schrader elaborated, "we're ***trying to get to a target of three a day, sometime here at this month***. And then also, we kind of will continue to ***keep out our 10 a day by the end of sometime in June or by the end of the second quarter***. So, that's kind of our goal."

278.     These statements were materially false and misleading, as Defendants knew or should have known that their target of 1,800 trucks in 2021 was not "a stretch" – it was impossible. The Union City facility where the trucks were being produced continued to have no automation, no assembly lines, and the trucks continued to be assembled one at a time on wooden work benches. Workhorse announced no plans to spend additional capital to automate the Union City facility in order to get to the ten truck per day target proclaimed by Defendant Schrader. Defendants delivered a total of 18 trucks[24] in 2020 – a drastic miss from their misleadingly overambitious target of 300-400 trucks. Defendants made no changes or updates to their production facility, so, at the very least, they recklessly disregarded the truth when claiming that the facility could produce 1,800 trucks in 2021.

279.     Additionally, when asked about the status of the UPS order in the March 1, 2021 earnings call, Schrader stated "UPS, it's a combination, obviously,

---

[24] When an analyst asked: "can you disclose what the deliveries were for Q4 in aggregate?" Schrader replied: "Yes. We had I believe ***seven deliveries in Q4***."

we haven't got production now, but also is ***when and where UPS would love to take their vehicles first***… ideally, I think their first trucks would ideally go to California."

280.    These statements were materially false and misleading because UPS had neither requested delivery of the trucks, to California or elsewhere, nor had UPS given Workhorse any indication that it would request the trucks in 2021 – or ever.

281.    The March 1, 2021 press release also states that Workhorse "[r]eceived a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises" and that, as a result of this order, the backlog had grown to 8,000 vehicles.

282.    Similarly, in the earnings call, Hughes stated that the backlog had grown to 8,000 trucks after "Pride Group… placed a 6,320-unit order that includes both C-1000 and C-650 electric vehicles."

283.    However, these statements were materially false and misleading, as Workhorse itself admitted in a previous press release that the Pride order was "subject to various production and delivery conditions." A reporter from automotive news site Freightwaves.com reached out to Workhorse management requesting information about these conditions but was never contacted back. The Pride Group did not create their own press release regarding the acquisition of the trucks, nor did it post Workhorse's press release on its website, in fact, Workhorse is not mentioned anywhere on Pride's website. Pride's sales website, PrideTruckSales.com, only shows heavy trucks and transport trailers, and there is no information about how one could acquire a Workhorse last-mile delivery truck. These facts indicate that, similar to the UPS contract, there is no assurance Pride will take delivery of the full order of 6,000+ trucks. Workhorse management knew or should have known this and included appropriate cautionary language when making statements about the Pride Group order.

284.     Defendants' upbeat assurances that production was continuing to ramp up, along with their statements regarding the Pride Group order, bolstered the price of the stock, which rose from $15.95 per share at opening on March 1, 2021 to $17.34 per share at closing, a rise of approximately 9%, on unusually heavy volume.

## LOSS CAUSATION

285.     During the Class Period, Defendants engaged in a scheme to defraud the market into believing Workhorse was a stable business with a steady backlog and mass production capability, and was a frontrunner for the USPS NGDV contract. Defendants also made a series of materially false and misleading statements regarding the status of Workhorse's business, including its backlog, production capabilities, and its potential to be awarded all or part of the USPS NGDV contract. This scheme and Defendants' misstatements artificially inflated and maintained the price of Workhorse's stock.

286.     Plaintiffs and other members of the Class suffered economic losses when the truth was revealed, through a series of partial disclosures, that Workhorse would not be able to produce 300-400 vehicles in 2020 or 1800 vehicles in 2021 and that Workhorse would not be awarded any part of the USPS NGDV contract. When the truth was fully revealed, the artificial inflation was removed from the stock and investors were harmed.

287.     As alleged herein, Defendants continually implied that Workhorse was a frontrunner for the USPS NGDV award, despite the facts: 1) Workhorse neither designed nor produced the prototype vehicle it submitted for USPS testing, and had neither the knowledge nor ability to mass produce the prototype vehicle; 2) The USPS had decided early on in the process that Workhorse would not be awarded the contract due to numerous critical failures during prototype testing, including an incident where the parking break on the prototype truck submitted by Workhorse failed, causing the truck to roll down a hill and seriously injure a USPS test driver;

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

3) USPS was concerned because Workhorse was a start-up, with no demonstrated ability to mass produce trucks; and 4) Workhorse's July, 2020 proposal contained multiple deficiencies, which Workhorse was informed of in September, 2020 but was not able to remedy.

288.    Additionally, Defendants repeatedly stated, first, that Workhorse would be able to manufacture 300-400 trucks in 2020, and second, when it failed to make that target, that Workhorse would be able to manufacture 1,800 trucks in 2021. However, Workhorse's Union City, Indiana facility was understaffed and had no automation or production line. Workers at the facility assembled trucks one at a time of wooden benches. While Defendants attempted to blame their missed target on the COVID-19 pandemic, the truth is, without an injection of capital, the Union City facility would never be able to mass produce trucks to meet Workhorse's production targets.

289.    Further, Defendants represented that Workhorse had a steady backlog, indicating that there was high demand for Workhorse electric trucks. However, each of the orders which made up the backlog came with significant conditions. The 1,000 truck order from UPS, often touted by Defendants and considered by analysts to be the backbone of the Company, was entirely cancellable and contingent on UPS's request to take delivery of the trucks. In 2019, UPS announced it had partnered with Arrival, a rival electronic vehicle manufacturer. The 500 truck Pritchard order and 6,300 truck Pride order were conditioned, among other factors, on undemonstrated customer demand. Nevertheless, Defendants insinuated that Workhorse's backlog gave the company legitimacy and stability.

290.    The truth was first partially revealed on October 8, 2020, when Fuzzy Panda Research published a report prior to market open, entitled "The 'Brakes' Fall Off The USPS Story: Workhorse's USPS Bid has Numerous **Critical Failures.**" While Fuzzy Panda acknowledged that it carried a short position on Workhorse's

stock, the report revealed numerous true, non-public facts, that contradicted Defendants' statements, and partially revealed Defendants' scheme.

291.     First, Fuzzy Panda revealed, through its own non-public conversations with sources, that VT Hackney dropped out of the NGDV bid and sold their rights to Workhorse because of, among other things, "Numerous Critical Failures" during the prototype testing, including motors breaking, safety belt problems, constant door problems, problems with the performance of the chassis, suspension problems, range problems, power problems, and "most notably," the "notorious parking brake failure resulting in a USPS employee being hospitalized."  Moreover, Fuzzy Panda revealed that "Workhorse has a very strained relationship with the USPS," given that they failed their initial bid for failing to use the proper design software, and also "became increasingly strained from Workhorse 'not telling the post office the 100% truth' and 'misinforming [the USPS] over and over again," a fact later confirmed by Workhorse itself in its Fed. Claims Complaint. Indeed, just as Workhorse stated in the Complaint, Fuzzy Panda stated that "Workhorse was in fact eliminated from the process 'early on.'"  Moreover, Fuzzy Panda revealed that Workhorse had taken out a PPP loan from the government and refused to return it, providing an additional reason the USPS would not award them the contract.

292.     Second, Fuzzy Panda revealed that its investigators went to Workhorse's facilities in Union City, Indiana and Loveland, Ohio, and found "NO Active purchase orders being worked on," and that "[e]mployees told us that no purchase orders were currently in production for customers."  The investigators found "NO Automation," consistent with CW reports, and that "All truck production and assembly occurs exclusively in Union City," and that it is done manually on wooden tables.

293.     Third, Fuzzy Panda partially revealed the fictitious nature of the UPS "backlog" of orders. Fuzzy Panda's investigator visited the facility to find that the

only four UPS trucks that had been produced were located behind dumpsters and an employee told them they were merely "Show-Units" or "prototypes."

294.     Fourth, Fuzzy Panda revealed that Workhorse had a history of connections to illegal paid stock promoters who were hired to "publish dozens of bullish articles on its clients, which appeared to be independent research pieces."

295.     While the Fuzzy Panda Report's revelations had an immediate negative impact on Workhorse's stock, the Company's stock price bounced back as news and media outlets discounted the report as influenced by Fuzzy Panda's short position. For example, Bloomberg published an article that same day, entitled "Workhorse Shares Shrug Off Short-Seller Report's Allegations," reporting on the Fuzzy Panda piece, attributing a sharp price decline in Workhorse's stock to the revelations in the report, stating "[s]hares of Workhorse declined 1.2% to $23.91 at 1:08 p.m. in New York after paring an earlier decline of as much as 6.1%.  The stock had declined as much as 9% in premarket trading." Yahoo Finance published a similar piece that day, entitled "Workhorse Short Seller Says USPS Bid Unlikely to Pan Out," noting that "Shares of Workhorse were down in premarket trading Thursday as the report was released," and that "[t]he stock was trading down 2.27% at $23.65 at the time of publication."

296.     The next day, Roth Capital, who advocated a bullish position on Workhorse, issued a report that reversed the losses, stating that "We expect Workhorse to be the recipient of the Post Office's $8.1bn NGDV contract, where a decision is due Tuesday, October 13th."  News outlets such as Barron's and Motley Fool attributed the "almost 13%" increase on October 13 to the Roth Capital report.

297.     After the October 8, 2020 partial revelation, Defendants continued their scheme to inflate Workhorse's stock price for personal gain (including numerous stock sales between January 26-February 1, 2020), and continued to issue false and misleading statements in furtherance of that scheme.

298.     The truth was further partially revealed on February 23, 2021, when the USPS announced Workhorse would not be awarded any part of the NGDV Contract. The failure to any portion of the Contract, despite President Biden's stated goal to electrify the federal government's fleet of vehicles, partially revealed to the market that, contrary to Defendants' representations and continued participation in the bidding process, Workhorse was not a viable contender for this contract, did not have the capabilities to meet the government's requirements, and confirmed assertions in the Fuzzy Panda report that USPS had grave concerns with Workhorse because they could have awarded at least a portion of the contract to the Company, but did not.

299.     Stock analysts echoed this sentiment.  For example, Wolfe Research published a report on February 24, 2021, entitled "How the Postal Service Loss Changes the Story," noting that "[g]iven recent indications from the Postal Service that the contract could be split between multiple OEMs, and given President Biden's new EV mandate for the Federal Fleet, investors were clearly surprised by this outcome.  This will likely raise questions about underlying issues with WKHS's product/technology."  The research note also displayed new skepticism about the Company's representations regarding its manufacturing capabilities, noting "WKHS does not have any track record of manufacturing at scale….this remains a key risk."

300.     Workhorse's stock plummeted upon the revelations from $31.34/share at close on February 22, to $16.47/share close on February 23, a decline of over 47%.

301.     Even though investors were shocked by the USPS contract outcome and began questioning Defendants' representations regarding Workhorse's capabilities, the Company's stock price remained artificially buoyed, as market participants such as BTIG, Colliers International, and Roth Capital continued to emphasize the strength of Workhorse's fictitious "backlog" of vehicle orders, believing (erroneously) that "There is still a real company here."

302.     Defendants maintained Workhorse's artificially inflated stock price by reinforcing the market's erroneous perception and maintaining their scheme by continuing to issue false and misleading statements regarding the Company's backlog and manufacturing capabilities, as well as renewed guidance to deliver 1,800 trucks in 2021.

303.     Finally, on May 10, 2021, Defendants revealed Workhorse had only delivered 6 trucks in 1Q:21 and had only produced 38 trucks total year to date, making it clear to the market that the Company would not be able to hit its 1,800 truck target for 2021, that Workhorse did not have the manufacturing capabilities or purchase orders it touted and that their excuses for not producing more trucks over the course of the Class Period were a scheme to keep the Company's stock price inflated.

304.     Numerous analysts reduced their price targets for Workhorse, with Colliers issuing a report the next day, pointedly stating "Still Waiting for that Elusive Ramp-Up."  Once again, Workhorse stock fell precipitously when the truth was revealed, falling to $8.20 at close on May 10, 2021, a 15% decrease from the prior trading day close of $9.64.

305.     Defendants' misstatements caused the price of the stock to rise from $2.64 per share on March 10, 2020 to a high of $42.96 per share on February 4, 2021, just days before the announcement of the USPS NGDV contract awardee. By May 10, 2021, the end of the Class Period, when true, previously concealed, adverse facts were revealed and the artificial inflation was removed, the stock price closed at a mere $8.20/share.

306.     The timing and magnitude of Workhorse's stock price rise and decline, as well as the timing of Defendants' stock sales, negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changes in market conditions, macroeconomic or industry factors or Company-specific facts unrelated

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

to Defendants' fraudulent conduct. The economic loss suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Workhorse's stock. The economic loss, i.e., damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

## DEFENDANTS ACTED WITH SCIENTER

307.     The Individual Defendants' suspiciously timed stock sales of over $21.5 million dollars while in possession of material inside information about Workhorse, performance bonuses for Defendants Hughes and Willison tied to the Company's stock price and the number of trucks delivered and produced, in conjunction with corroborating evidence, including CW statements, demonstrating that Workhorse did not have the capability to produce or deliver the number of trucks it was touting and that Defendants were aware that the NGDV contract would not be awarded to Workhorse, support the inference that Defendants acted with scienter, in that each Individual Defendant knew and/or recklessly disregarded facts available to them that demonstrated that the public documents and statements issued or disseminated by them individually or in the name of the Company were materially false and misleading.

**A. Insider Trading by the Individual Defendants Supports a Strong Inference of Scienter**

308.     During the Class Period, the Individual Defendants sold massive amounts of their personal holdings of Workhorse stock while in possession of material, non-public information. Indeed, the majority of the Individual Defendants' insider sales took place between September 14, 2020 to February 1, 2021, when, in addition to possessing material non-public information regarding the Company's

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

110

manufacturing capabilities, the fictitious "backlog" of orders, and the "roll-away" incident, Defendants had already received notice from the USPS on September 3, 2020, outlining the major deficiencies in their bid proposal. Furthermore, the Individual Defendants' stock sales were not only suspiciously large in quantity, but were suspiciously timed to take advantage of spikes in the stock price prior to anticipated negative news, and inconsistent with their pre- and post-Class Period trading practices, thereby supporting a strong inference of scienter.

309.    Collectively, the Individual Defendants sold over 850,000 shares of Workhorse stock over the course of the Class Period for proceeds of over $21.5 million.[25] Yet, in the nearly three months since the Class Period ended and the artificial inflation was removed from Workhorse's common stock, the only time any of the Individual Defendants sold any other shares was when the stock price rose above $15/share after Workhorse stock was targeted by the Reddit community. Likewise, the Individual Defendants sold no Workhorse common stock at any time before the start of the Class Period.

**B. The Amount and Percentage of Shares the Individual Defendants Sold During the Class Period Was Extraordinary and Inconsistent with Pre- and Post-Class Period Trading Practices**

310.    To evaluate the Individual Defendants' trading activity, Plaintiffs used the publicly-available trading data that is required to be reported to the SEC on Form 4s. Plaintiffs analyzed the trading by the Individual Defendants that occurred during the Class Period, as well as their transactions both before and after the Class Period (excluding the Individual Defendants' recent trades on July 1, 2021 that were plainly timed to take advantage of the surge in Workhorse's stock price as a result of Reddit

---

[25] During the Class Period, Hughes sold 615,195 Workhorse shares for proceeds of $15,274,479; Ackerson sold 39,850 Workhorse shares for proceeds of $965,508; Willison sold 176,023 Workhorse shares for proceeds of $4,942,548; and Schrader sold 19,589 Workhorse shares for proceeds of $417,233.

trading).[26] The Workhorse Form 4s relating to sales of stock by the Individual Defendants are incorporated herein by reference.

311.      Plaintiffs calculated the total sales by the Individual Defendants, together with the cash proceeds from such sales, during and outside the Class Period. Those figures were then compared to identify whether the Individual Defendants' sales during the Class Period were consistent with their sales outside the Class Period.

312.      During the Class Period, Defendant Ackerson sold 39,850 shares of Workhorse stock for $965,508, which represented between 38% (based on the beginning of the Class Period) and 34% (based on the end of the Class Period) of the total shares he had available.[27]   Outside the Class Period, excluding his suspicious July 1, 2021 Reddit-related insider trading, Ackerson sold 0 shares.

313.      During the Class Period, Defendant Hughes sold 615,195 shares of Workhorse for $15,274,479, representing between 257% (based on the beginning of the Class Period) and 162 % (based on the end of the Class Period) of the total shares he had available.[28]   Outside the Class Period, excluding his suspicious July 1, 2021 Reddit-related insider trading, Hughes sold 0 shares.

314.      Similarly, during the Class Period, Defendant Schrader sold 19,589 Workhorse shares for $ 417,233, representing between 19% (based on the beginning

[26] *See* June 29, 2021 Yahoo Finance article entitled "Workhorse Jumps As Reddit Gang is Talking About it Again," available at https://finance.yahoo.com/news/workhorse-jumps-reddit-gang-talking-093509708.html

[27] Ackerson held 104,166 shares at the beginning of the Class Period and 117,163 shares at the end of the Class Period. Ackerson sold 39,850 shares, and acquired 52,847 shares, during the Class Period. Ackerson's sale of 39,850 shares corresponds to 38% (39,850 / 104,166) of his holdings at the beginning of the Class Period, and 34% (39,850 / 117,163) of his holdings at the end of the Class Period.

[28] Hughes held 239,044 shares at the beginning of the Class Period and 379,569 shares at the end of the Class Period. Hughes sold 615,195 shares, and acquired 772,974 shares, during the Class Period. Hughes' sale of 615,195 shares corresponds to 257% (615,195 / 239,044) of his holdings at the beginning of the Class Period, and 162% (615,195 / 379,569) of his holdings at the end of the Class Period.

of the Class Period) and 10% (based on the end of the Class Period) of the total shares he had available.[29]  Outside the Class Period, excluding his suspicious July 1, 2021 Reddit-related insider trading, Schrader sold 0 shares.

315.    And Willison sold 176,023 Workhorse shares for $4,942,548 during the Class Period, representing between 147% (based on the beginning of the Class Period) and 92% (based on the end of the Class Period) of the total shares he had available.[30]  Outside the Class Period, excluding his suspicious July 1, 2021 Reddit-related insider trading, Willison sold 0 shares.

316.    These analyses reveal that the Individual Defendants' Class Period sales of Workhorse stock were not only large in absolute terms, but also inconsistent with the Individual Defendants' selling activity outside of the Class Period.  Indeed, all of the Individual Defendants' sales took place during a short window when the stock price was over $15/share, and none of the individual defendants sold any stock from the time the price crashed in late February 2021 to the end of the Class Period. In fact, Defendants' only stock sales since February, 2021 have been on a single day, July 1, 2021, when the stock price rose due to the Reddit community targeting Workhorse.

---

[29] Schrader held 102,120 shares at the beginning of the Class Period and 191,786 shares at the end of the Class Period. Schrader sold 19,589 shares, and acquired 109,225 shares, during the Class Period. Schrader's sale of 19,589 shares corresponds to 19% (19,589 / 102,120) of his holdings at the beginning of the Class Period, and 10% (19,589 / 191,786) of his holdings at the end of the Class Period.

[30] Willison held 119,522 shares at the beginning of the Class Period and 189,499 shares at the end of the Class Period. Willison sold 176,023 shares, and acquired 254,734 shares, during the Class Period. Willison's sale of 176,012 shares corresponds to 147% (176,023 / 119,522) of his holdings at the beginning of the Class Period, and 92% (176,023 / 189,499) of his holdings at the end of the Class Period.

317.     The chart below shows the price of Workhorse's stock compared with the timing of Defendants' stock sales during the Class Period.



**C. Workhorse's Executive Compensation Plan Provided Substantial Additional Incentives for Defendants Hughes and Willison to Mislead Investors and Withhold Material Adverse Information**

318.     Defendants Hughes and Willison's compensation structure emphasizes incentives-based payouts. Total compensation consists of three components: 1) base

salary; 2) incentives-based cash bonuses; and 3) long-term incentives-based equity compensation.

319.     The incentives-based cash bonuses are awarded based on the following quantitative and qualitative performance metrics: (i) 30% based on adjusted EBITDA and Gross Margin; (ii) 40% based on "individual performance objectives"; (iii) 25% based on targets for trucks produced and delivered; and (iv) 5% based on the Company's safety record. (2020 10-K at 46.)   The purpose of the long-term incentive program is "to both motivate executive performance and retention, as well as to align executive officer performance to shareholder value creation." (*Id.* at 47.)

320.     For example, in 2020, Defendant Hughes' salary was $475,000 and Defendant Willison's salary was $300,000.   Hughes also received a cash bonus of $384,750 and Willison received a cash bonus of $67,500.[31] (2020 10-K at 46-49.) Hughes and Willison thus received incentive-based cash bonuses of 81% and 22.5% of what they made, respectively, in salary for that year.   In addition, pursuant to the long-term incentive grant program, Hughes received a grant of 179,245 restricted shares with a grant date fair value of $475,000, and Willison received a grant of 84,906 restricted shares with a grant date fair value of $225,000.[32] Hughes and Willison thus received incentive-based stock bonuses of 100% and 75% of what they made, respectively, in salary for that year.   In total, Hughes and Willison received cash and stock bonuses equivalent to 191% and 97.5% of what they made,

---

[31] While performance for adjusted EBITDA, gross margin, and trucks delivered and produced fell below threshold levels, the Compensation Committee determined that because the "executives performed at a very high level" and in light of "how well the stock performed in 2020," the individual performance component should pay at or above target. 2020 10-K at 47. Thus, Hughes received a 2020 cash bonus of 81% of his Target Bonus (which was set at 100% of his base salary of $475,000), and Willison received a 2020 cash bonus of 45% of his Target Bonus (which was set at 50% of his base salary of $300,000). (2020 10-K at 46-47.)

[32] Hughes' target LTI award was set at 100% of his base salary of $475,000, and Willison's target LTI award was set at 75% of his base salary of $300,000. For 2020, they both received their target LTI awards. (2020 10-K at 46.)

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                     Case No. 2:21-CV-02072-CJC-PVC

respectively, in salary for that year, for total compensation for Hughes of $1.33 million, and Willison of $626,250.

321.     Hughes and Willison's bonuses incentivized them to make false and misleading statements about Workhorse's production and delivery capabilities. While Hughes and Willison's bonuses (and salaries) paled in comparison to the millions of dollars in insider sales proceeds they improperly obtained during the Class Period, their performance bonuses tied to the Company's stock price and number of trucks delivered and produced – along with corroborating evidence, including CW statements, demonstrating that Workhorse did not have the capability to produce or deliver the number of trucks it represented it did, and that Defendants were aware that the NGDV contract would not be awarded to Workhorse – provide substantial indicia of scienter.

322.     Additionally, despite falsely representing throughout the Class Period that "the Company will use proceeds from the PNC Note primarily for payroll costs," Defendants used those proceeds to pay executive bonuses, according to CW2.  That Defendants would defraud the government to enrich themselves – and then issue materially false and misleading statements about it in their financial filings – further supports the inference of scienter.

**D. Additional Indicia of Scienter**

323.     Throughout the Class Period, Defendants purported to have extensive knowledge about the finances and operations of the Company. Defendants Hughes, Schrader, and Willison participated in all earnings calls during the Class Period, providing both prepared remarks and detailed answers to questions posed by analysts related to, among other things, the Company's manufacturing capabilities. Hughes provided lengthy quotations for every Workhorse press release described herein. Hughes and Willison have a long history with the Company and were involved in the pre-Class Period events that gave rise to many of the facts alleged herein.

Willison was the Chief Engineer for the USPS effort back in the prototype phase and Hughes was listed as the USPS main point of contact for the initial proposal submitted by AMP Holdings. Additionally, Hughes, in his capacity as COO, signed the 2018 agreement with UPS.

324.     Defendants also had a history of partnering with companies such as CSIR Group, who was charged with fraud by the SEC in a "fraudulent stock promotion scheme" "hir[ing] writers…to publish dozens of bullish articles on its clients, which appeared to be independent research pieces," for "investor relations" services. This history supports an inference of scienter, and supports Plaintiffs' allegations that, in furtherance of their scheme, Defendants used appearances in Youtube video interviews with rabid Workhorse supporters in a grassroots campaign to encourage the dissemination of misinformation related to the USPS NGDV Contract among the individual investor community. Such tactics bear striking resemblance to former Workhorse CEO Steve Burns' promotion of Lordstown, who is also under investigation for securities fraud related to similar overstated claims about truck orders.

325.     Defendants Hughes, Schrader, and Ackerson each signed all of the 10 K and 10-Q filings throughout the Class Period. Defendants Hughes and Schrader each signed certifications, pursuant to the Sarbanes-Oxley Act of 2002, attached to the 10-K and 10-Q filings. These certifications stated that Hughes and Schrader reviewed the financial statements; that to the best of their knowledge the reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," that the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant," and that the financial statements disclosed "[a]ll significant deficiencies and material

weaknesses in the design or operation of internal controls over financial reporting" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting."

326.    Workhorse was a small company, employing at its largest less than 200 employees. In such companies, executives, such as the Individual Defendants, tend to be very "hands-on." This is supported by the fact that both CW1 and CW2 described meeting with Hughes and Schrader personally on at least one occasion.

## PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

327.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly materially false and misleading statements pleaded in this complaint. Many of the specific statements pleaded herein, including but not limited to all statements made by Defendant Schrader in YouTube interviews, were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

328.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Workhorse who knew that those statements were false when made.

1

**CLASS ACTION ALLEGATIONS**

2   329.     Plaintiffs bring this action as a class action pursuant to Federal Rule of

3   Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other

4   than Defendants who purchased publicly traded Workhorse securities on the

5   NASDAQ during the Class Period, and who were damaged thereby (the "Class").

6   Excluded from the Class are Defendants, the officers and directors of Workhorse

7   and its subsidiaries, members of the Individual Defendants' immediate families and

8   their legal representatives, heirs, successors or assigns and any entity in which

9   Defendants have or had a controlling interest.

10   330.     The members of the Class are so numerous that joinder of all members

11   is impracticable. Throughout the Class Period, Workhorse securities were actively

12   traded on the NASDAQ. While the exact number of Class members is unknown to

13   Plaintiffs at this time and can be ascertained only through appropriate discovery,

14   Plaintiffs believe that there are hundreds, if not thousands of members in the

15   proposed Class.

16   331.     Plaintiffs' claims are typical of the claims of the members of the Class

17   as all members of the Class are similarly affected by Defendants' wrongful conduct

18   in violation of federal law that is complained of herein.

19   332.     Plaintiffs will fairly and adequately protect the interests of the members

20   of the Class and has retained counsel competent and experienced in class and

21   securities litigation. Plaintiffs have no interests antagonistic to or in conflict with

22   those of the Class.

23   333.     Common questions of law and fact exist as to all members of the Class

24   and predominate over any questions solely affecting individual members of the

25   Class. Among the questions of law and fact common to the Class are:

26       a) whether the Exchange Act was violated by Defendants' acts as alleged

27          herein;

28   AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

119

b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

c) whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d) whether the Defendants caused the Company to issue materially false and misleading filings during the Class Period;

e) whether Defendants acted knowingly or recklessly in issuing materially false and misleading filings;

f) whether the prices of Workhorse securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

334.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

335.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a) Workhorse shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

b) As a public issuer, the Company filed periodic public reports;

c) Workhorse regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d) Workhorse's securities were liquid and traded with moderate to heavy volume during the Class Period; and

e) The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

336.    Based on the foregoing, the market for Workhorse securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

337.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(b) Promulgated Thereunder
### Against All Defendants

338.    Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

339.     During the Class Period, Defendants, individually and in concert, directly or indirectly, violated Rule 10b-5(b) in that they disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

340.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Workhorse's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

341.     Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Workhorse personnel to members of the investing public, including Plaintiffs and the Class.

342.     As a result of the foregoing, the market price of Workhorse securities was artificially inflated during the Class Period. Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market

price of Workhorse securities during the Class Period in purchasing Workhorse securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

343.     Had Plaintiffs and the other members of the Class been aware that the market price of Workhorse's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Workhorse's securities at the artificially inflated prices that they did, or at all.

344.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

345.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Workhorse's securities during the Class Period.

## COUNT II

**For Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a) & (c) Promulgated Thereunder**
**Against All Defendants**

346.     Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

347.     During the Class Period, Defendants violated Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Workhorse securities during the Class Period as alleged herein.

348.     During the Class Period, Defendants participated in a scheme and course of conduct, which included, but was not reliant upon, the preparation of

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

and/or disseminated or approved the false statements specified above, and that Defendants knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

349.    Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business practices, operations and financial position of Workhorse as specified herein.

350.    Defendants acted with scienter in that they participated in this scheme knowing or with deliberate recklessness that it would artificially inflate Workhorse's stock price; that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Workhorse's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

351.    Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the scheme, material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                Case No. 2:21-CV-02072-CJC-PVC

facts in the statements made by them or other Workhorse personnel to members of the investing public, including Plaintiffs and the Class.

352.     As a result of the foregoing, the market price of Workhorse securities was artificially inflated during the Class Period. Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Workhorse securities during the Class Period in purchasing Workhorse securities at prices that were artificially inflated as a result of Defendants' scheme and false and misleading statements and omissions.

353.     Had Plaintiffs and the other members of the Class been aware that the market price of Workhorse's securities had been artificially and falsely inflated by Defendants' scheme and by the material adverse information which Defendants did not disclose, they would not have purchased Workhorse's securities at the artificially inflated prices that they did, or at all.

354.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

355.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Workhorse's securities during the Class Period.

## COUNT III

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

356.     Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

357.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Workhorse's business affairs. Because of their

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

senior positions, they knew the adverse non-public information about the Company's false financial statements.

358.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Workhorse's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

359.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, statements to the media, and public filings which Workhorse disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Workhorse securities.

360.    While Workhorse securities traded at artificially inflated prices, the Individual Defendants personally profited by selling approximately 850,000 shares of Workhorse securities, collectively, while in possession of adverse, material non-public information about Workhorse, acquiring a total of more than $21.5 million in illegal insider trading proceeds between them.

361.    Plaintiffs purchased Workhorse securities contemporaneously with the Individual Defendants' sales.

362.    By virtue of the Individual Defendants' participation in the scheme to defraud investors described herein and/or their trades in securities while in possession of material, non-public information about the adverse information

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW                    Case No. 2:21-CV-02072-CJC-PVC

detailed herein, Hughes, Schrader, Willison, and Ackerman violated the Exchange Act and applicable rules and regulations thereunder.

363.     Due to the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 16, 2021                 **KAHN SWICK & FOTI, LLC**

/s/ Kim E. Miller
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

*Counsel for Lead Plaintiff Timothy M. Weis*
*and Additional Plaintiff Angelo Federico*
*and Lead Counsel for the Class*

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW          Case No. 2:21-CV-02072-CJC-PVC

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on July 16, 2021, I authorized the electronic filing of the foregoing Amended Complaint for Violation of Federal Securities Law with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing (NEF) to all parties to all counsel of record.


*/s/ Kim E. Miller*

Kim E. Miller