1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   JOHN P. STIGI III, Cal. Bar No. 208342
3 | BRIDGET J. RUSSELL, Cal. Bar. No. 288107
   GIAN A. RYAN, Cal. Bar. No. 334599
4 | jstigi@sheppardmullin.com
   brussell@sheppardmullin.com
5 | gryan@sheppardmullin.com
   1901 Avenue for the Stars, Suite 1600
6 | Los Angeles, California 90067
   Telephone:  310.228.3700
7 | Facsimile:   310.228.3701

8 | Attorneys for Defendants WORKHORSE
   GROUP INC., DUANE HUGHES, STEVE
9 | SCHRADER, ROBERT WILLISON and
   GREGORY ACKERSON

10

11 |                UNITED STATES DISTRICT COURT

12 |                CENTRAL DISTRICT OF CALIFORNIA

13

14 | SAM FARRAR, Individually and on          Case No. 2:21-cv-02072-CJC-PVC
   Behalf of All Others Similarly Situated,
15 |                                          **DEFENDANTS' NOTICE OF**
                 Plaintiff,                   **MOTION TO DISMISS LEAD**
16 |                                          **PLAINTIFF'S AMENDED**
         v.                                   **COMPLAINT FOR VIOLATION**
17 |                                          **OF THE FEDERAL SECURITIES**
   WORKHORSE GROUP, INC.,                     **LAWS**
18 | DUANE HUGHES, STEVE
   SCHRADER, ROBERT WILLISON               Complaint filed:  March 8, 2021
19 | and GREGORY ACKERSON,
                                            Date:      December 6, 2021
20 |             Defendants.                 Time:      1:30 p.m.
                                            Crtrm.:  9B
21

22 |                                         The Hon. Cormac J. Carney

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS LEAD
                                            PLAINTIFF'S CLASS ACTION COMPLAINT

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 6, 2021, at 1:30 p.m., or as soon thereafter as counsel may be heard in the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California, in the courtroom of the Honorable Cormac J. Carney (Courtroom 9B), defendants Workhorse Group Inc., Duane Hughes, Steve Schrader, Robert Willison and Gregory Ackerson will and hereby do move the Court pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4, *et seq.*, for an order dismissing lead plaintiff's Amended Class Action Complaint for Violation of the Federal Securities Laws.

This motion is brought on the grounds that lead plaintiff's failure to: (1) meet the PSLRA and Rule 9(b) heightened requirements for pleading a claim for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities & Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, due to lead plaintiff's failure to (a) specify actionable misstatements, (b) allege sufficient facts demonstrating the reasons defendants' statements were false or misleading and (c) allege particularized facts giving rise to a strong inference that defendants' made the allegedly false or misleading statements with scienter; as well as (2) plead sufficient facts supporting the element of loss causation. Lead plaintiff's claim for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), falls with lead plaintiff's Section 10(b) claims.

This motion is made following the conference of counsel pursuant to Central District of California Local Rule 7-3, which took place on August 30, 2021 (due to counsel's prior unavailability). This motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, defendants' Request for Judicial Notice and the pleadings and papers on file in this action, as well as such other oral

-1-

DEFENDANTS' MOTION TO DISMISS LEAD
PLAINTIFF'S CLASS ACTION COMPLAINT

1 | and/or documentary evidence or argument as may be presented to the Court at or
2 | before the time of the hearing.

3 | Dated: September 3, 2021          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

4

5 | By_____    /s/ John P. Stigi III
                                              JOHN P. STIGI III
6 |                                           BRIDGET J. RUSSEL
                                              GIAN A. RYAN
7 |                                           Attorneys for Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................. 1

II.   RELEVANT ALLEGATIONS ............................................................ 3

    A.   Workhorse and the USPS NGDV Project ................................. 3

    B.   Workhorse's Production Capabilities and Production Targets .............. 5

    C.   Workhorse's References to New and Outstanding Orders .................... 5

III.  LEGAL STANDARDS ....................................................................... 6

    A.   Motions to Dismiss ..................................................................... 6

    B.   Elements of Lead Plaintiff's Claims .......................................... 7

    C.   Heightened Pleading Standards in Securities Fraud Actions ................. 8

IV.   ARGUMENT ..................................................................................... 11

    A.   Lead Plaintiff Fails to State a Primary Claim for Violation of
        Section 10(b) and Rule 10b-5 ................................................... 11

        1.   The AC Asserts Claims as to Non-Actionable Statements
            of Optimism ................................................................... 12

        2.   The AC Asserts Claims as to Protected Forward-Looking
            Statements ...................................................................... 13

        3.   The AC Fails to Plead Sufficient Facts Supporting Why
            Defendants' Public Statements Were False or Misleading ........ 17

        4.   The AC Fails to Plead Particularized Facts Giving Rise to
            a Strong Inference That Defendants Acted With Scienter ........ 23

        5.   The AC Fails to Plead Loss Causation ...................................... 24

V.    CONCLUSION ................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

<u>Cases</u>

4

*In re Amgen Inc. Sec. Litig.*
  544 F. Supp. 2d 1009 (C.D. Cal. 2008)..................................................8

5

6

*Barron v. Reich*
  13 F.3d 1370 (9th Cir. 1994) ...............................................................7

7

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007) ...........................................................................6, 7

8

9

*In re BofI Holding, Inc. Sec. Litig.*
  977 F.3d 781 (9th Cir. 2020)..............................................................25

10

*Branch v. Tunnell*
  14 F.3d 449 (9th Cir. 1994), *overruled in part on other grounds*, *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) .........................7

11

12

*Brody v. Transitional Hospitals Corp.*
  280 F.3d 997 (9th Cir. 2002)..........................................................8, 18

13

*Brown v. InnerWorkings, Inc.*
  2019 WL 4187385 (C.D. Cal. Mar. 27, 2019) ................................8, 9

14

15

*Buttonwood Tree Value Partners, LP v. Sweeney*
  910 F. Supp. 2d 1199 (C.D. Cal. 2012) ...............................................8

16

*City of Philadelphia v. Fleming Cos.*
  264 F.3d 1245 (10th Cir. 2001) .........................................................10

17

18

*In re Cutera Sec. Litig.*
  610 F.3d 1103 (9th Cir. 2010) .....................................................12, 13

19

20

*Dura Pharmaceuticals, Inc. v. Broudo*
  544 U.S. 336 (2005) .....................................................................3, 7, 25

21

*Ernst & Ernst v. Hochfelder*
  425 U.S. 185 (1976) ..............................................................................9

22

23

*ESG Capital Partners, LP v. Stratos*
  2013 WL 12131355 (C.D. Cal. June 26, 2013)..................................23

24

*Glazer Cap. Mgmt., LP v. Magistri*
  549 F.3d 736 (9th Cir. 2008) ..............................................................10

25

26

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*
  554 F. Supp. 2d 1083 (C.D. Cal. 2008)..................................11, 13, 15

27

*Kmiec v. Powerwave Techs. Inc.*
  2013 WL 12113411 (C.D. Cal. Jan. 25, 2013)..............................13, 14

28

-i-

*Kmiec v. Powerwave Techs. Inc.*
   2013 WL 12114821 (C.D. Cal. May 16, 2013) ............................................ 10, 11

*Lloyd v. CVB Fin. Corp.*
   811 F.3d 1200 (9th Cir. 2016) ......................................................................... 24

*Lorenzo v. Sec. & Exch. Comm'n*
   139 S. Ct. 1094 (2019) ....................................................................................... 8

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*
   540 F.3d 1049 (9th Cir. 2008) .................................................................. 8, 9, 25

*Miller v. PCM, Inc.*
   2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) .................................................... 21

*Mineworkers' Pension Scheme v. First Solar Inc.*
   881 F.3d 750 (9th Cir. 2018) ........................................................................... 24

*Moyo v. Gomez*
   32 F.3d 1382 (9th Cir. 1994) ............................................................................. 6

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*
   380 F.3d 1226 (9th Cir. 2004) ......................................................................... 20

*In re NVIDIA Corp. Sec. Litig.*
   768 F.3d 1046 (9th Cir. 2014) ......................................................................... 25

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*
   774 F.3d 598 (9th Cir. 2014) ............................................................... 11, 23, 24

*In re Pixar Sec. Litig.*
   450 F. Supp. 2d 1096 (N.D. Cal. 2006) ........................................................... 24

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*
   759 F.3d 1051 (9th Cir. 2014) .................................................................... 10, 12

*Prodanova v. H.C. Wainwright & Co., LLC*
   993 F.3d 1097 (9th Cir. 2021) ......................................................................... 10

*Ronconi v. Larkin*
   253 F.3d 423 (9th Cir. 2001) ..................................................................... 11, 24

*Santa Fe Indus., Inc. v. Green*
   430 U.S. 462 (1977) ........................................................................................... 8

*Semegen v. Weidner*
   780 F.2d 727 (9th Cir. 1985) ............................................................................. 8

*In re Silicon Graphics Inc. Sec. Litig.*
   183 F.3d 970 (9th Cir. 1999) ............................................................................. 3

*South Ferry LP, No. 2 v. Killinger*
   542 F.3d 776 (9th Cir. 2008) ........................................................................... 23

-ii-

DEFENDANTS' MOTION TO DISMISS LEAD
PLAINTIFF'S CLASS ACTION COMPLAINT

*Stoneridge Inv. Partners v. Scientific-Atlanta*
  552 U.S. 148 (2008) ....................................................................... 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  551 U.S. 308 (2007) .................................................................... 9, 10

*In re Vantive Corp. Sec. Litig.*
  283 F.3d 1079 (9th Cir. 2002) ................................................. 11, 18

*In re VeriFone Sec. Litig.*
  11 F.3d 865 (9th Cir. 1993) ........................................................... 7

*Williams v. WMX Technologies, Inc.*
  112 F.3d 175 (5th Cir. 1997) ....................................................... 11

*Zucco Partners, LLC v. Digimarc Corp.*
  552 F.3d 981 (9th Cir. 2009) ................................. 9, 10, 19, 20, 23

Statutes

Securities Exchange Act of 1934, Section 10(b)
  15 U.S.C. § 78j(b) ............................................................... *passim*

Securities Exchange Act of 1934, Section 20(a)
  15 U.S.C. § 78t(a) ....................................................................... 25

Private Securities Litigation Reform Act of 1995
  15 U.S.C. § 78u-4, *et seq* .................................................... *passim*

Rules

Securities & Exchange Commission Rule 10b-5
  17 C.F.R. § 240.10b-5 ......................................................... *passim*

Federal Rules of Civil Procedure
  9(b) ................................................................................... 8, 9, 24
  12(b)(6) ....................................................................................... 6

SMRH:4818-9331-5826.12

DEFENDANTS' MOTION TO DISMISS LEAD
PLAINTIFF'S CLASS ACTION COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Defendant Workhorse Group Inc. ("Workhorse" or the "Company") is an Ohio-based manufacturer of electric trucks.  It was among five final bidders for a contract to deliver trucks to the United States Postal Service ("USPS").  Investors in Workhorse stock pinned their hopes on the Company winning that contract.  Their hopes were buoyed when, on January 25, 2021, President Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States.  The President's announcement drove Workhorse's stock price up further.  On February 23, 2021, however, the USPS announced that it was awarding the contract to another company.  Workhorse stock dropped.  Investors sued.

The Amended Class Action Complaint ("AC") attempts to concoct a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities & Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, from this disappointing news.  Critically, Workhorse and its management *never* represented to investors that Workhorse was likely to win the bid.  In fact, they were scrupulous in never making any comment regarding the substantive merits of the Company's bid or the likelihood of success in landing the contract.  Recognizing that he cannot state a claim based upon representations touting the strength of Workhorse's bid, lead plaintiff instead alleges that the bid itself was a fraud, a hopeless exercise known to management from the very start.  This attempt to reverse-engineer a securities fraud claim by alleging what occurred later must have been known earlier is a classic case of "fraud by hindsight."

The prolix AC purports to identify dozens of alleged false or misleading statements during the putative class period.  They fall into three main categories:  (1) statements confirming the Company's continued inclusion in the USPS Next Generation Delivery Vehicle ("NGDV") bid process; (2) statements about the Company's projections as to future production goals and capabilities; and (3) statements discussing

-1-

1  the Company's order backlog and plans to fulfill them.  The statements, however, on

2  the whole are not actionable.  Many are mere "puffery" or aspirational statements that

3  cannot form the basis for a securities fraud claim as a matter of law.  Whether progress

4  made by a company toward its goals was "meaningful," whether it has "weathered

5  the storm" of previously disclosed issues or whether it is rightfully "optimistic" about

6  the future is not actionable.  Many also are forward-looking predictions about future

7  business operations that are protected under the safe harbor established by the Private

8  Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4, *et seq*.

9         The challenged statements also lack the particularized factual support required

10  by the heightened pleading standards of the PSLRA to (a) sufficiently explain how

11  and why the statements were false or misleading when made and (b) give rise to a

12  strong inference that the makers of the statements knew or were deliberately reckless

13  in not knowing at the time the statements were made that the statements were likely

14  to mislead investors.  The AC's conclusory allegations of falsity and scienter as to a

15  year's worth of public statements about nearly every aspect of the Company's busi-

16  ness are based upon sources that are either generally irrelevant, unreliable based upon

17  the facts alleged, temporally limited or temporally disconnected.  In addition, the

18  AC's allegations of supposedly suspicious stock sales by some of the defendants —

19  the majority immediately following the run-up of Workhorse's stock price prompted

20  by President Biden's decision to tout American electronic vehicle manufacturers mere

21  days into his presidency — do not meaningfully add to any strong inference that

22  defendants knew the USPS bid would fail and the Company could not meet its longer

23  term production goals during the COVID-19 pandemic.

24         The AC fails to state a claim for a wholly separate and independent reason.  An

25  essential element of a claim under Section 10(b) and Rule 10b-5 is loss causation.  To

26  plead the requisite causal link between a plaintiff's alleged loss and an alleged fraudu-

27  lent statement a plaintiff must plead a "corrective disclosure" that revealed the fraud

28  and impacted the stock price.  Here, the AC alleges that the decline in Workhorse's

-2-

DEFENDANTS' MOTION TO DISMISS LEAD
                                          PLAINTIFF'S CLASS ACTION COMPLAINT

stock price occurred in response to Workhorse's failure to be selected by the USPS for the NGDV contract — a sorely disappointing business development for sure, but not any revelation of fraud.

Congress enacted the PSLRA to deter securities litigation commenced reflexively "whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 978 (9th Cir. 1999) (quoting H.R. Conf. Rep. 104-369, at 31). Private securities actions are "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005). This opportunistic "stock drop case" is precisely the kind of securities lawsuit Congress and Supreme Court have criticized. This Court should grant defendants' motion to dismiss.

## II.    RELEVANT ALLEGATIONS[1]

### A.    Workhorse and the USPS NGDV Project

Workhorse develops and manufactures all-electric small or medium sized trucks that deliver items the relatively short distance from a warehouse or fulfillment center to the end customer. (AC ¶ 35.) In January 2015, the USPS announced its plan to embark on a competitive, multi-year acquisition process to replace approximately 165,000 aging package delivery vehicles — the NGDV Project — and solicited bids. (*Id.* ¶ 38.) Workhorse partnered with well-established engineering company VT Hackney to design and manufacture a NGDV prototype for the USPS to test. (*Id.* ¶ 40.) On November 6, 2019, Workhorse acquired VT Hackney's right to bid on the contract in its own right. (*Id.* ¶ 41.) As part of the bidding process, Workhorse was

---

[1] These allegations are taken from lead plaintiff's AC or other public sources of information subject to judicial notice. Workhorse does not concede the accuracy of the allegations in the AC, but must assume their truth solely for the purposes of this motion to dismiss.

DEFENDANTS' MOTION TO DISMISS LEAD
PLAINTIFF'S CLASS ACTION COMPLAINT

subject to a non-disclosure agreement with the USPS, which prevented the Company from sharing any non-public information regarding the contract or the bidding process. (*Id.* ¶ 56.) In September 2017, the Workhorse and VT Hackney team delivered six vehicles for prototype testing. (*Id.* ¶ 49.) On July 14, 2020, Workhorse submitted its bid proposal, and worked with the USPS regarding the particulars of its bid over the next several months. (*Id.* ¶¶ 53-55.)

On January 25, 2021, President Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States. (*Id.* ¶ 58.) After this announcement by President Biden (not Workhorse), investor optimism sparked an immediate 14% jump in Workhorse's stock price — the largest single day increase in monetary value alleged in the AC — and contributed to a continued uptick in Workhorse's stock price over the coming days. (*Id.* ¶¶ 58, 269.)[2]

On February 23, 2021, the USPS announced that it was awarding the entirety of the NGDV contract to another company, Oshkosh Defense, after which Workhorse's stock price declined sharply. (*Id.* ¶¶ 64-65.) On February 24, 2021, Workhorse announced that it had requested additional information from USPS regarding its decision and intended to explore all available avenues to contest the contract award. (*Id.* ¶ 66.) On March 3, 2021, Workhorse met with the USPS and the USPS told Workhorse that certain aspects of its proposal were not as strong as those of the other bidders. (*Id.* ¶ 68.) Thereafter, Workhorse continued to dispute the government's bid award, culminating in Workhorse's June 16, 2021 filing of a federal claim complaint against the USPS. (*Id.* ¶¶ 52, 69.)

The AC does not allege that defendants made any representations about the strength of Workhorse's bid or the likelihood of it being successful. Instead the only statements alleged in the AC relate to Workhorse's updates that it remained in the

---

[2] The only other significant increase in stock price alleged in the AC is the steady increase from early May to late June 2020 that lead plaintiff admits was attributable to Workhorse securing $70 million in new financing. (*See* AC ¶ 188.)

-4-

DEFENDANTS' MOTION TO DISMISS LEAD
PLAINTIFF'S CLASS ACTION COMPLAINT

1    bidding process but could not comment substantively, believed it had the capability

2    to perform on the contract if awarded and was hopeful for a positive outcome.  (*See*

3    *id.* ¶¶ 168, 173, 183, 198, 204, 213, 237, 251, 261, 263, 272.)  The AC alleges that

4    these comments were misleading because Workhorse "should have known" from the

5    outset that it would not be awarded the contract due to alleged deficiencies in its pro-

6    totype, proposal and production capabilities.  (*See*, *e.g.*, *id.* ¶ 273.)

7    **B.    Workhorse's Production Capabilities and Production Targets**

8              In order to portray Workhorse's innocuous comments about its participation in

9    the USPS bid process as somehow fraudulent, the AC shifts focus to Workhorse's

10   alleged lack of mass production capabilities.  The AC alleges that Workhorse did not

11   and does not currently have the capacity to mass produce its trucks.  (AC ¶ 94.)  While

12   this assertion is repeated *ad infinitum* in the AC, the only "facts" alleged in support

13   are the allegations of unnamed former employees (referred to as confidential wit-

14   nesses or "CWs") and an anonymous short-selling blogger, "Fuzzy Panda."  (*Id.*

15   ¶¶ 95-105.)  Putting aside the facial unreliability of these sources, their allegations

16   relate at most to mere snapshots in time (*id.* ¶¶ 50, 81, 99), and yet lead plaintiff relies

17   upon them to support its speculation that from March 2020 through March 2021

18   Workhorse management knowingly projected production targets during the COVID-

19   19 pandemic that were unattainable.  (*See*, *e.g.*, *id.* ¶¶ 161, 246, 278.)[3]

20   **C.    Workhorse's References to New and Outstanding Orders**

21             Finally, the AC alleges that vehicle orders that Workhorse announced publicly

22   were false or misleading.  (AC ¶¶ 73-89, 166, 177, 189, 192, 201, 202, 222, 230, 256,

23

24   _____

     [3] The AC includes allegations regarding the production capabilities of another electric
25   vehicle manufacturer, Lordstown Motors Corp. ("Lordstown"), playing up that Lord-
     stown was founded by a former CEO of Workhorse.  (*See* AC ¶¶ 90-93.)  Beyond
26   this, lead plaintiff includes no other allegations that support its reference to Lordstown
     as a "sister company" or support its attempt to paint Workhorse with the same brush
27   as Lordstown. (*See id.* ¶¶ 90, 91, 94.)  The mere fact that a former executive of Work-
     horse allegedly is involved in bad acts at another company should have no bearing as
28   to whether the AC sufficiently alleges that defendants here engaged in fraudulent
     conduct at Workhorse.

DEFENDANTS' MOTION TO DISMISS LEAD
                                                PLAINTIFF'S CLASS ACTION COMPLAINT

279, 281-282.)  For example, lead plaintiff alleges that the Company announced an agreement with the United Parcel Service, Inc. ("UPS") in a May 30, 2018 Form 8-K, and that later references to the contract were misleading because UPS had a contractual right to cancel the order.  (*Id.* ¶¶ 73, 78.)  The Form 8-K, though, attached the actual contract containing the very term supposedly concealed.  (*Id.* ¶¶ 74-75.)  Lead plaintiff alleges further that UPS placed an order for electric trucks with a "U.K.-based startup Arrival."  (*Id.* ¶ 77.)  Lead plaintiff, however, does not allege facts supporting that UPS has canceled its order with Workhorse in favor of the U.K.-based startup, or that UPS has not requested delivery of vehicles under the contract.  The same holds true with the other orders referenced in the AC.  (*See id.* ¶¶ 80-89.)[4]

## III.  LEGAL STANDARDS

### A.  Motions to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes dismissal of a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party.  *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).  The court need not, however, accept as true "[c]onclusory allegations of law and unwarranted inferences."  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th

---

[4] Apart from these three core groups of alleged misstatements, the AC alleges that Workhorse falsely stated that it obtained federal Payroll Protection Plan funds it planned to use for payroll, but instead used for executive compensation.  (*See, e.g.*, AC ¶¶ 185, 186.)  The CW upon whom this allegation is based was terminated (as a result of his embezzlement of Company funds) in June 2020, and is specifically alleged *not* to have knowledge regarding Workhorse's payroll or accounting practices (*id.* ¶¶ 96, 98); thus, there is an insufficient factual basis under the PSLRA for the AC's allegation that PPP funds were not used for payroll.  In any event, this is a red herring.  Cash is fungible and the CW does not and cannot allege that Workhorse's payroll expenditure was not equal to or greater than the amount of its PPP loan (the PPP program does not require segregation or tracing of funds).  Lead plaintiff also alleges no corrective disclosure relating to any alleged PPP program misstatement.

Cir. 1993) (citations omitted).  The court is not bound by a complaint's legal conclu-

sions, deductions and opinions couched as facts.  *See Bell Atlantic*, 550 U.S. at 545

("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements

of a cause of action will not do").[5]

## B.    Elements of Lead Plaintiff's Claims

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o

use or employ, in connection with the purchase or sale of any security . . . any mani-

pulative or deceptive device or contrivance in contravention of such rules and regu-

lations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5 in turn

provides that:

> It shall be unlawful for any person . . .
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) and Rule 10b-5 create a private right of action

"which resembles, but is not identical to, common-law tort actions for deceit and mis-

representation." *Dura*, 544 U.S. at 341.  To state a claim for violation of Section 10(b)

and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission

by the defendant; (2) scienter; (3) a connection between the misrepresentation or omis-

sion and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation. *Buttonwood Tree Value Partners,*

---

[5] The court also may consider additional facts in materials of which the district court may take judicial notice, *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled in part on other grounds*, *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

-7-

1   *LP v. Sweeney*, 910 F. Supp. 2d 1199, 1204 (C.D. Cal. 2012) (Carney, J.) (citing *Stone-*

2   *ridge Inv. Partners v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)), *aff'd*, 667 F.

3   App'x 238 (9th Cir. 2016)).[6]  A statement or omission is actionably misleading where

4   it "affirmatively create[s] an impression of a state of affairs that differs in a material

5   way from the one that actually exists." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d

6   1009, 1030 (C.D. Cal. 2008) (citing *Brody v. Transitional Hospitals Corp.*, 280 F.3d

7   997, 1006 (9th Cir. 2002)).  "Often, a statement will not mislead even if it is incom-

8   plete or does not include all relevant facts."  *Brody*, 280 F.3d at 1006.

9   **C.    Heightened Pleading Standards in Securities Fraud Actions**

10           Claims under Section 10(b) and Rule 10b-5 must meet the heightened pleading

11   requirements in Rule 9(b) and the PSLRA.  *Brown v. InnerWorkings, Inc.*, 2019 WL

12   4187385, at *3 (C.D. Cal. Mar. 27, 2019) (Carney, J.) (citing 15 U.S.C. § 78u-

13   4(b)(2)(A); *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985)).  Rule

14   9(b) of the Federal Rules of Civil Procedure provides that the "circumstances consti-

15   tuting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  A

16   securities fraud claim cannot survive a motion to dismiss under Rule 9(b) merely by

17   generally alleging that certain statements were false.    *Metzler Inv. GMBH v.*

18   *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  Rather, the plaintiff

19   must specify "the reason or reasons why the statement is misleading."  15 U.S.C.

20   § 78u–4(b)(1).

21   _____

22   [6] The AC asserts claims under all three subsections of Rule 10b-5.  However, as the
     "scheme to defraud" alleged in the AC under Rule 10b-5(a) and (c) does not involve

23   any of the traditional bases for "scheme" liability, *i.e.*, "practices, such as wash sales,
     matched orders, or rigged prices, that are intended to mislead investors by artificially

24   affecting market activity" (*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)),
     and is instead based entirely upon defendants' alleged misstatements, it is properly

25   analyzed under the same framework as a Rule 10b-5(b) claim.  The Supreme Court's
     decision in *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1099 (2019), should

26   not be read to alter this conclusion.  *Lorenzo* was an SEC enforcement action, where
     the elements of a Rule 10b-5 violation are narrower than those in a private right of

27   action (*e.g.*, the SEC need not prove reliance or causation).  Although *Lorenzo* held
     that non-statement makers *could* be held liable under a scheme liability claim, it did

28   not alter the requirements for pleading falsity and scienter under the PSLRA with
     respect to the makers of false statements recharacterized as part of a "scheme."

-8-

In enacting the PSLRA, "Congress impose[d] heightened pleading require-ments in actions brought pursuant to §10(b) and Rule 10b-5." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (citations and internal quotation marks omitted). Among other things, the PSLRA enhanced Rule 9(b)'s particularity require-ment, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is mis-leading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The statute also requires, with respect to pleading that each allegedly misleading state-ment or omission was made with scienter, that plaintiff "state with particularity" as to each defendant "facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.* scienter. 15 U.S.C. § 78u-4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u-4(b)(3)(A). These requirements "prevent[] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explana-tion stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

"Scienter" refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Brown*, 2019 WL 4187385 at *3. A defendant acts with scienter only if he makes false or misleading statements either intentionally or with deliberate recklessness. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). The requisite state of mind must be a "departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Id.* (citation omitted). "[A]lle-gations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is *not* sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the impor-tance of those facts to, a company's shareholders in order to deceive, manipulate, or

-9-

defraud." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (emphasis added). "The question is not merely whether the [defendant] had knowledge of undisclosed facts; rather, it is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Id.* (citation omitted).

To meet the PSLRA's high burden for pleading scienter, a complaint cannot rely on "mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021) (citing *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008)). Allegations of mere negligence are insufficient. *See Glazer*, 549 F.3d at 748 ("At most, it creates the inference that he should have known of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA."). A plaintiff also must allege facts "linking specific reports and their contents to the executives" and linking "the witnesses and the executives" allegedly responsible for the false and misleading statements. *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (citing *Zucco*, 552 F.3d at 1000) ("[A]llegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter . . . , and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).

To qualify as 'strong' within the intendment of . . . the PSLRA . . . an inference of scienter must be more than merely plausible or reasonable — it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Kmiec v. Powerwave Techs. Inc.*, 2013 WL 12114821, at *2 (C.D. Cal. May 16, 2013) (Carney, J.) (quoting *Tellabs*, 551 U.S. at 314). Any alleged "contemporaneous statements or conditions" must be necessarily inconsistent with the alleged misrepresentations. *See Ronconi v. Larkin*, 253 F.3d 423, 432-34 (9th Cir. 2001). To plead a strong inference of scienter against a corporate defendant, a plaintiff must plead a strong

-10-

inference of scienter with respect to the executives responsible for making the alleg-edly false or misleading statements. *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

"The stricter standard for pleading scienter naturally results in a stricter stan-dard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (noting that the Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts.") (citation omitted); *accord Kmiec*, 2013 WL 12114821, at *4. Thus, a plaintiff is "required to allege, with particularity, sufficient facts to raise a strong inference that the statements made by [a company's officers] were actually false or misleading at the time they were made and that [the company's] officers acted with the requisite level of intent." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1091 (C.D. Cal. 2008) (Carney, J.).

## IV.    ARGUMENT

### A.    Lead Plaintiff Fails to State a Primary Claim for Violation of Section 10(b) and Rule 10b-5

The AC totals 127 pages and 363 paragraphs. Length, however, should not be mistaken for substance. *See Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) ("A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail."). Here, despite pages and pages of allegations, the AC contains little of substance. The AC suffers from the following key flaws: (1) it asserts claims regard-ing vague aspirational statements of optimism or "puffery"; (2) it asserts claims pre-dicated upon protected forward-looking statements; (3) it fails to support its conclu-sory claims as to why statements are false with sufficient, reliable facts; (4) it fails to

-11-

allege a strong inference of scienter as to any individual defendant with particularity; and (5) it fails to allege a cognizable corrective disclosure.

**1.     The AC Asserts Claims as to Non-Actionable Statements of Optimism**

Vague, generalized assertions of corporate optimism or statements of "mere puffing" are not actionable under the federal securities laws. *See*, *e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."); *see also Intuitive Surgical*, 759 F.3d at 1060 ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.").

Here, the AC identifies as false or misleading statements regarding Workhorse's "meaningful progress," that it "appreciat[ed] the continued interest" it received as a bid participant, that it was "seeing customers very positive about our trucks," that it felt "cautiously optimistic" and "pretty comfortable" that vendors had "weathered the storm," that the order from eTrucks was a "highlight" of the quarter and an "opportunity for additional sales," that Workhorse thought business was "great," that it had formed a "strategic partnership," that it sought to "ramp up" production, that it had "associations with UPS," not disputing that it "consistently ship[s] products," that the NGDV contract was "a huge fleet opportunity," that it was "happy where [it was] with UPS," that President Biden's comments regarding electric vehicles were "positive" and "meaningful," that in the future Workhorse might have "a governmental division of some sort" and that as a result of its losing the NGDV bid it would "explore all avenues that are available." (*See* AC ¶¶ 160, 168, 177, 179, 189, 192, 202, 204, 223, 224, 226, 227, 237, 247, 251, 261, 263, 272, 276.)

These statements do not offer any "specific details or forecasts regarding [the Company's] performance." *See Kmiec v. Powerwave Techs. Inc.*, 2013 WL 12113411, at *4 (C.D. Cal. Jan. 25, 2013) (Carney, J.). Courts do not hold such

-12-

generalized statements of corporate optimism to be actionable.  *See*, *e.g.*, *id.* (statements such as "Powerwave [is] highly competitive" and "we have positioned Powerwave to be in an excellent position from which to build upon and capture both the short-term and long-term growth opportunities that are in the global wireless infrastructure marketplace," held to be puffery); *see also Impac*, 554 F. Supp. at 1096 (statements such as, "We continue to expect solid loan acquisitions and originations," "We remain optimistic for continued solid loan production for 2005" and "We continue to believe our fundamentals are solid," held to be nonactionable puffery).  The AC's claims based upon these types of statements must be dismissed.

### 2. The AC Asserts Claims as to Protected Forward-Looking Statements

Forward-looking statements also are not actionable under the federal securities laws to the extent protected by the PSLRA's safe harbor.  15 U.S.C. § 78u-5(c).  Forward-looking statements are those that contain a projection of revenues, income, earnings per share, management's plans or objectives for future operations or a prediction of future economic performance.  *Impac*, 554 F. Supp. at 1098 (citing 15 U.S.C. § 78u–5(i)(1)(A)-(C)).  Any statement of "the assumptions underlying or relating to" these sorts of statements also falls within the definition of a forward-looking statement.  *Id.* (citing 15 U.S.C. § 78u–5(i)(D)).  The PSLRA safe harbor applies if the forward-looking statement is (1) identified as such and accompanied by meaningful cautionary language *or* (2) was made without actual knowledge of its falsity.  *Kmiec*, 2013 WL 12113411, at *5 (citing 15 U.S.C. § 78u–5(c)(1)); *see also Cutera*, 610 F.3d at 1113.  Because the two prongs of the safe harbor are "alternative means by which forward-looking statements may qualify for the safe harbor," (*Impac*, 554 F. Supp. 2d at 1098 (citation omitted)),  a defendant need only establish that it meets one of the prongs to be protected.

The AC identifies as false or misleading a variety of statements regarding Workhorse's plans or objectives for future production, orders and order fulfillment,

-13-

or Workhorse's assumptions underlying said plans or objectives. (*See*, *e.g.*, AC ¶ 160 ("we are setting a 2020 production target of 300-400 vehicles"); *id.* ¶ 162 ("intent is to produce and deliver a limited number of vehicles to our customers in the second quarter and then move to higher volumes and deliveries with a target of delivering roughly 30-400 delivery trucks in 2020"); *id.* ¶ 164 ("it's only above 10 that we actually would need CapEx"); *id.* ¶ 166 (statement that they anticipate delivering UPS trucks in late Q2 or Q3); *id.* ¶ 175 ("target of delivering 300-400 vehicles by the end of the year"); *id.* ¶ 177 ("reiterating out guidance of 300-400 delivery trucks produced in 2020"; 181 ("staff . . . could still meet that two units per day"); *id.* ¶ 183 ("I would think it's a similar supply chain that would supply the current trucks that would supply a post office vehicle"); *id.* ¶ 192 ("we plan to make 300-400 this year"); *id.* ¶ 196 ("goal . . . is to considerably shorten timeframes to assemble a C-Series vehicle and deliver our target vehicle production of 300-400 units"); *id.* ¶ 198 (statement that Union City would have the ability to fulfill USPS contract because in its history it made 60,000 chassis); *id.* ¶ 211 ("how to get to kind of our three to four hundred this year, uh, in the fourth quarter"); *id.* ¶ 212 ("can probably do a very similar amount from the standpoint of trucks"); *id.* ¶ 230 ("we have a plan to build and manufacture and deliver 300-400 this year"); *id.* ¶ 235 ("we still have the 300-400 that we have out there, and that's our goal"); *id.* ¶ 245 ("we would anticipate producing 1,800 units in 2021"); *id.* ¶ 256 ("by the end of the first quarter we'd like to have 100 per month . . . by the end of the second quarter 200 per month); *id.* ¶ 277 ("we're trying to get to a target of three a day . . . keep out our 10 a day by the end of sometime in June or by the end of the second quarter"); *id.* ¶ 279 ("I think their first trucks would ideally go to California"). All of these and numerous similar statements identified in the AC are "forward-looking" within the meaning of the PSLRA. *See*, *e.g.*, *Kmiec*, 2013 WL 12113411 (statements setting a revenue target and confirming that the company was on track to meet that goal protected as forward-looking even "[t]hough the individual Defendants were clearly wrong in their projections").

-14-

At least one or both of the prongs of the safe harbor apply to these statements. First, as the AC concedes, the majority of the challenged statements are found in SEC filings, which include a section entitled "Forward-Looking Statements" that notifies investors that the filing contains forward-looking statements and sets forth meaningful cautionary language. Others are in investor/analyst calls which also contain similar warnings and references to the cautionary language in Workhorse's SEC filings as a preface to the call. For example, Workhorse's March 10, 2020 Form 8-K noted under the title "Forward-Looking Statements" that that any statements that were not historical facts qualified as forward-looking statements that might not come true due to, among other things, "limited operations and need to expand in the near future," "risks associated with obtaining orders and executing upon such orders," the potential "lack of market acceptance" of products, and the "inability to raise additional capital to fund operations and business plan." (*See* Request for Judicial Notice ("RJN"), at Ex. A.) This "Forward-Looking Statement" language was maintained in Workhorse's SEC filings throughout the class period. (*Id.* at Exs. B-R.) Thus, investors were specifically cautioned of the risk that Workhorse might not be able to ramp up production as intended due to a variety of issues, as well as that the market — such as USPS, UPS or anyone else — might not accept Workhorse's prototypes. *See generally Impac*, 554 F. Supp. 2d at 1099 (statements protected where company "used meaningful language that specifically cautioned shareholders that . . . predictive value was undermined" by relevant risks).

Second, the AC fails to allege sufficient facts supporting the speculative allegation that the individual defendants had actual knowledge that the alleged statements were false when made. While this holds true for all of the statements at issue, as detailed below, it is specifically true for those handful of forward-looking statements that allegedly were made without meaningful cautionary language. Specifically implicated are statements made in Schrader's YouTube interviews (1) on July 24, 2020 and October 29, 2020 that the 300-400 target was still Workhorse's "plan" and

-15-

"goal" for 2020; (2) on November 14, 2020, that Workhorse would like to be pro-ducing 100 vehicles a month by the end of the Q1 2021; and (3) on January 27, 2021, that in the future Workhorse might have a "governmental division of some sort."  (AC ¶¶ 192, 235, 256, 261.)

Nowhere does the AC allege facts supporting that these statements are actually false, let alone that Schrader knew they were false when made.  Cleared of its rhetoric, the AC alleges at most that Schrader *should have known* that Workhorse could not meet his quoted FY 2020 and Q1 2021 production guidance because of the alleged state of the Company's production capabilities during the pandemic.  (*Id.* ¶¶ 193, 236, 257.)  However, the AC contains no reliable allegations from CWs that as of the dates of Schrader's statements Workhorse did not intend or have plans to implement changes in the factory or staffing to permit it to reach its Q1 2021 guidance, let alone facts supporting that Schrader *actually knew* (not merely "should have known") that Workhorse had no such intention or plans (or could not implement them because of COVID and supplier shortages).  The AC's conclusion that Workhorse did not intend to implement changes to permit it to meet its guidance is thus based solely on the fact that, as it turned out, Workhorse was not able to ramp up to meet its guidance — the very definition of a "fraud by hindsight."

The AC's allegations regarding the alleged deficiencies with Workhorse's USPS prototype/proposal also do not support a strong inference that Schrader knew his comment regarding a future governmental division "of some sort" would mislead investors.  (*See id.* ¶ 262.)  Even if Schrader knew by then it was likely Workhorse would not be chosen by the USPS in any capacity (speculation unsupported by particularized factual allegations in the AC), that does not mean he *knew* investors would take his reference to a governmental division as somehow hinting of positive news with respect to the USPS bid.

-16-

### 3. The AC Fails to Plead Sufficient Facts Supporting Why Defendants' Public Statements Were False or Misleading

As detailed above, the alleged false and misleading statements in the AC fall into three categories: (1) those confirming the Company's continued inclusion in the USPS NGDV bid process; (2) those including the Company's projections as to future productivity; and (3) those discussing the Company's order backlog and plans to fulfill them. The AC's allegations regarding how and why each statement in said categories are false or misleading are the same, and, in fact, the why frequently over-laps from one category to another.

*The USPS Contract Bid.* The AC attempts to mischaracterize the statements Workhorse actually made about the USPS contract bid. It cannot be emphasized enough what Workhorse did *not* say publicly about the USPS contract bid. Work-horse *never* stated that it was a "frontrunner" for the USPS contract. (*See* AC ¶ 285). Rather, Workhorse made several non-specific statements that the Company remained a bidder for the USPS contract (which was true) and that it could not discuss any non-public information regarding the bid process. (*Id.* ¶¶ 168, 172, 183, 198, 204, 213, 251.) The only other statements regarding the bid process identified in the AC (all non-actionable as discussed above) are that Schrader believed (1) if Workhorse were to secure all or a portion of the USPS contract Workhorse's facilities and suppliers would be able to fulfill it; (2) that securing the contract would be a "huge fleet opportunity" and "transformative"; and (3) that President Biden's remarks were "positive" and "meaningful." (*Id.* ¶¶ 237, 261, 263) This of course is why the AC misleadingly and confusingly intersperses its recitation of defendants' statements with how certain outside analysts and YouTube commentators purported to interpret the statements and promote them for their own self-interest. Self-interested specu-lation by outside market participants cannot be the basis for a claim for securities fraud. The question instead is objectively whether a *reasonable* investor would be misled into thinking that Workhorse was a frontrunner for the USPS contract based

-17-

1  upon the defendants' anodyne statements about the bid.  *See generally Brody*, 280

2  F.3d at 1007 (dismissing securities claim in part because the plaintiff's interpretation

3  of statements was not objectively reasonable).[7]

4          Putting aside the AC's self-serving mischaracterization of Workhorse's actual

5  statements on the subject, the AC alleges that defendants' status updates were mis-

6  leading because (1) in Spring 2018 there was a roll-away incident with the Workhorse

7  prototype; (2) on September 3, 2020, the USPS sent Workhorse a "Deficiency List"

8  identifying various alleged "weaknesses"; (3) on October 21, 2020 USPS sent

9  Workhorse another email containing a list of purported issues; and (4) Workhorse

10  allegedly was not capable of producing trucks on the scale required to win the

11  contract.  (*See, e.g.*, AC ¶¶ 51, 54-55, 169, 252.)

12          As to the first three assertions, the AC's allegations have glaring temporal

13  problems.  For example, the USPS' list of alleged deficiencies in September 2020

14  cannot be deemed to render a statement four months earlier in May 2020 deliberately

15  false or misleading.  Lead plaintiff makes no effort to tie each USPS bid status update

16  over a twelve-month period to the specific circumstances that existed at the time of

17  each statement.  *See Vantive*, 283 F.3d at 1086 (dismissal warranted where plaintiff

18  fails to allege specific facts indicating why a statement would have been misleading

19  "at the several points at which it was alleged to have been made").  Even assuming

20  the prototype and proposal had issues to be addressed, these allegations do not support

21  a strong inference that Workhorse knew it was no longer a legitimate candidate for

22  the USPS contract when those statements were made.[8]  Lead plaintiff admits that the

23

24  ─────────────────────

25  [7] Some viewers of YouTube interviews in which Schrader made no comments with
    respect to the USPS contract commented that Workhorse surely got the bid based on
    his "demeanor" (he smiled) and the mere fact that the YouTube host had shared the

26  video.  (AC ¶¶ 217, 259, 261, 265.)

27  [8] The AC relies heavily upon statements made by the USPS *after* it did not select
    Workhorse for the contract to imply that Workhorse knew months earlier that it would

28  not be selected.  (*See* AC ¶ 16.)  Lead plaintiff offers no allegation, however, that
    Workhorse was aware of these aspects of the USPS' internal decision making process.

DEFENDANTS' MOTION TO DISMISS LEAD
                                        PLAINTIFF'S CLASS ACTION COMPLAINT

1   USPS permitted Workhorse to submit a proposal after the alleged issues with its pro-
2   totype were raised by the USPS, and that Workhorse submitted detailed responses to
3   the claimed deficiencies with Workhorse's proposal identified by the USPS.  (*Id.*
4   ¶¶ 53-55.)   Thus, the mere existence of these purported issues does not support a
5   strong inference that Workhorse knew it was not in the running for all or part of the
6   USPS contract.  Tellingly, the AC contains no allegations indicating that Oshkosh and
7   the other bidders were not provided similar deficiency lists by the USPS.

8       Finally, lead plaintiff's assertion that Workhorse needed an existing manufac-
9   turing facility capable of manufacturing a bespoke USPS vehicle in order to render its
10  participation in the bidding process non-fraudulent is a red herring.  Oshkosh Defense,
11  the winner of the bid, also did not have existing manufacturing facilities sufficient to
12  build its NGDV prototype, and instead intends to invest $155 million to convert a
13  large warehouse facility into a manufacturing plant.  (RJN, Exs. S-U.)  The AC does
14  not allege facts supporting that Workhorse's proposal to the USPS did not similarly
15  include a proposal relating to future production.

16      *Production Capabilities/Projections*.  As detailed above, lead plaintiff's allega-
17  tions regarding the Company's production capabilities are uniformly forward-looking
18  statements that are protected under the PSLRA's safe harbor.  Lead plaintiff also fails
19  to allege sufficient facts demonstrating the falsity of those statements at the times they
20  were made.  His allegations of falsity are based entirely upon CW allegations and the
21  anonymous "Fuzzy Panda" blog.  Neither is sufficiently reliable to provide a basis
22  under the PSLRA to support falsity or scienter.

23      Under the PSLRA, "a complaint relying on statements from confidential wit-
24  nesses must pass two hurdles to satisfy the PSLRA requirements."  *Zucco*, 552 F.3d
25  at 995.  First, the source of the statements "must be described with sufficient particu-
26  larity to establish their reliability and personal knowledge."  *Id.*  The first prong of
27  this two-part CW test analyzes whether the complaint has provided sufficient detail
28  about a CW's position and responsibilities within the company to provide a basis for

-19-

attributing the facts reported by that witness to the witness' personal knowledge. *Id.* The statements may only be relied upon where the source is described "with sufficient particularity to support that probability that the person in the position occupied by the source would possess the information alleged." *Id.*; *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (citation omitted). Second, the statements "must themselves be indicative of scienter." *Id.*

Here, the CW allegations in the AC pass neither hurdle. CW4 is described as a "Buyer/Planner" employed from March 2020 to October 2020 — and nothing else. (*See* AC ¶ 105.) A buyer/planner of what? The AC is silent. CW2 is identified as an "Executive Director of Human Resources," without any explanation of the job responsibilities associated with this position. (*Id.* ¶ 81.) CW3 is similarly described as a "materials manager," without any more detail. (*Id.* ¶ 95.) CW1 is not given a title at all; he or she is simply noted to be an "employee" on a USPS-related team. (*Id.* ¶ 50.) These cryptic descriptions are nowhere near sufficient to meet the PSLRA's exacting standards. *Zucco*, 552 F.3d at 995 (holding that to rely on CW allegations a complaint must not contain detailed allegations regarding what the CW specifically worked on and how they personally obtained knowledge regarding the allegations attributed to them). This failure to describe the CWs and the basis for their knowledge sufficiently is particularly troubling in the case of CW2 because this individual is alleged to be in the human resources group, but then is attributed with information regarding Workhorse's production/engineering capabilities. (*Id.* ¶¶ 96, 104.) Lead plaintiff offers no explanation as to how a human resources employee would have reliable first-hand knowledge of production capabilities.[9]

As to the second prong, the statements themselves are not indicative of scienter. Allegations that Workhorse continued to have issues with its production capabilities

---

[9] As noted above, CW2 was terminated for embezzlement and is currently being sued by the Company for that reason, placing even further doubt on the reliability of the allegations attributed to him.

DEFENDANTS' MOTION TO DISMISS LEAD
PLAINTIFF'S CLASS ACTION COMPLAINT

do not support a cogent and compelling inference of scienter on the part of Workhorse's senior management, especially as, at best, only two of the CWs ever met with one of the individual defendants, and only one time at that.  (*Id.* ¶ 326.)

The "Fuzzy Panda" blog post fails for essentially the same reason.  The post is predicated upon alleged interviews with anonymous, non-descript "employees."  (*See e.g.*, *id.* ¶ 100.)  Lead plaintiff cannot skirt the Ninth Circuit's standard regarding CWs by pointing to similarly insufficient alleged employee descriptions provided by an anonymous blogger.  *See Miller v. PCM, Inc.*, 2018 WL 5099722, at *9 n.6 (C.D. Cal. Jan. 3, 2018) (applying Ninth Circuit standard for CWs to anonymous blog posts).  Here, lead plaintiff admits that even analysts found "Fuzzy Panda" unreliable.  (AC ¶ 295.)[10]

The CWs and "Fuzzy Panda" also do not offer factual information that supports the AC's broad conclusions.  Even accepting the AC's allegations that a lack of automation and insufficient workers at Workhorse's Union City factory during the COVID-19 pandemic caused Workhorse not to meet its 300-400 production target for 2020, the AC does not allege facts showing that it was not Workhorse's actual plan and intention to meet its target when the target was made.  Workhorse never claimed its production was fully automated or that certain changes would not need to be implemented to ramp up production to meet its target for 2020.  As the AC admits, Workhorse proudly aired a YouTube video of its production line, which did not show (or claim) automation, but rather trucks being assembled on worktables.  (*Id.* ¶ 101.)  Indeed, Workhorse repeatedly warned investors it would need to ramp up production to meet its targets.  (*See*, *e.g.*, *id.* ¶¶ 162, 192, 196, 230.)  Although lead plaintiff posits this could be done only with automation, the AC pleads no facts supporting this assertion.  Finally, the AC alleges no facts to support lead plaintiff's accusation that

---

[10] These sources also suffer from severe temporal problems.  CW1 and CW2 left Workhorse in June 2020, mere months into the class period, and the "Fuzzy Panda" blog post was based upon visits allegedly made in September 2020.  (AC ¶¶ 50, 96, 99.)

1    COVID-19 was not, as Workhorse represented, a significant cause of Workhorse's

2    inability to meet its production targets.  Again, the Court need not accept the AC's

3    conclusory allegations (*see id.* ¶¶ 160, 179, 242, 256, 266) where there are no particu-

4    larized factual allegations to supporting them.  Stripped of hyperbole, the AC's claim

5    regarding production targets reflects nothing more than fraud by hindsight.[11]

6        *Workhorse's New and Outstanding Orders*.  The AC alleges that defendants'

7    statements regarding backlog orders were false or misleading when made because

8    those orders were all conditional or cancellable by the customer.  (*See, e.g., id.* ¶¶ 167,

9    201, 232, 247, 250, 257, 280, 283.)[12]  As noted above, the AC's other allegations

10   show that Workhorse disclosed the fact that the backlog orders were not guaranteed,

11   as they were subject to conditions.  (*See id.* ¶¶ 137, 283.)  For example, the AC admits

12   that Workhorse attached the UPS agreement to its Form 8-K, which states in plain

13   language that UPS could cancel the balance of the order.  (*Id.* ¶ 138.)  Similarly, the

14   AC admits that Workhorse informed the public that another order was "subject to

15   various production and delivery conditions."  (*Id.* ¶ 283.)  The AC fails to plead that

16   the challenged statements were false or misleading when made.  Moreover, the AC

17   alleges no facts supporting that any of these contracts actually has been canceled or

18   will not be fulfilled by Workhorse in the ordinary course.

19

20

21

22

_____

23   [11] The allegations in the AC more strongly support the inference that Workhorse
     intended to meet those targets and was laying groundwork to make that possible.  For
24   example, lead plaintiff admits that from May to June 2020, immediately after setting
     the 2020 target, Workhorse secured $70 million in new financing (AC ¶ 188), and in
25   August 2020, it hired Hitachi as a consultant to assist with ramping up production.
     (*Id.* ¶ 226).

26   [12] Lead plaintiff's allegations with respect to eTrucks are pure speculation.  Work-
     horse fully disclosed that eTrucks was a startup, and there is nothing suspicious about
27   an employee of Workhorse knowing another individual that decided to launch a
     complementary electric truck leasing company.  And here, too, lead plaintiff alleges
28   no relevant corrective disclosure for purposes of pleading loss causation.

4.    **The AC Fails to Plead Particularized Facts Giving Rise to a Strong Inference That Defendants Acted With Scienter**

In order to meet the exacting standards of the PSLRA, lead plaintiff is required to "allege scienter with respect to *each* of the individual defendants." *See Oregon*, 774 F.3d at 607 (emphasis added).  Where a complaint instead "relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short" of the PSLRA standard.  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware.  *Id.*; *see also ESG Capital Partners, LP v. Stratos*, 2013 WL 12131355, at *5 (C.D. Cal. June 26, 2013) (conclusory allegations that defendant "knew about" the alleged misconduct insufficient to allege scienter).

The AC makes no attempt to connect a statement-maker's knowledge of falsity at the time the statement was made to any individual statement alleged.  Instead, the AC's scienter allegations are focused on the important roles of the individual defendants at Workhorse, their compensation structure, and stock sales.  Compensation-based scienter arguments that the defendants would generally benefit from fraud are not indicative of scienter.  *See Zucco*, 552 F.3d at 1005 (to support inference of scienter based on compensation-based motive and opportunity a complaint "must include[e] comparisons to previous years' [compensation]").  The fact that certain of Workhorse's officers (and particularly one officer) exercised stock options, including after the market exhibited outsized reaction to President Biden's January 2021 announcement or when the Reddit community targeted the Company with a stock run-up, also is not indicative of scienter of the individual defendants as a whole.  If everyone was "in on the fraud," why did the other individual defendants not sell

1   more at more opportune times?[13]   The failure of insiders to take advantage of an

2   alleged fraud "undermines any inference of scienter."   *In re Pixar Sec. Litig.*, 450 F.

3   Supp. 2d 1096, 1105-06 (N.D. Cal. 2006); *see also Ronconi*, 253 F.3d at 435 ("One

4   insider's well timed sales do not support the 'strong inference' required by the statute

5   where the rest of the equally knowledgeable insiders act in a way inconsistent with

6   the inference that the favorable characterizations of the company's affairs were known

7   to be false when made.").

8          In sum, the facts alleged in the AC more strongly support an inference that

9   Workhorse fought hard to be awarded the USPS contract (and continues to protest the

10  USPS' decision), and that management worked to ramp up production of their trucks

11  in the face of a once-in-a-century global pandemic.  As the Ninth Circuit has observed,

12  "[p]roblems and difficulties are the daily work of business people.  That they exist

13  does not make a lie out of any of the alleged false statements." *Id.* at 434.

14         **5.     The AC Fails to Plead Loss Causation**

15         "Loss causation is shorthand for the requirement that 'investors must demon-

16  strate that the defendant's deceptive conduct caused their claimed economic loss.'"

17  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (citations omitted).

18  "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some

19  other fact, foreseeably caused the plaintiff's loss." *Id.* at 1210.  In the Ninth Circuit,

20  a plaintiff must plead loss causation with particularity under Rule 9(b).  *Oregon*, 774

21  F.3d at 605.  A plaintiff satisfies its loss causation pleading burden by alleging that a

22  "corrective disclosure" revealed the fraud and thereby "caused the company's stock

23

24  [13] For example, Schrader sold twice during the putative class period, on December 14,
25  2020 and January 8, 2021, which do not immediately proceed or follow any state-
    ments by him or anyone else.  (RJN, Exs. U-V.)  In fact, he sold after Workhorse
26  announced that it was not meeting its 2020 target, causing the stock to go down, and
    before the President's statements that buoyed Workhorse's stock.  Ackerson and Wil-
27  lison similarly sold during this "dead zone" of allegedly false or misleading state-
    ments identified in the AC, as well as during a similar mid-summer 2020 "dead zone"
28  of alleged misstatements.  (*Id.* at Exs. W-BB.)  Ackerson and Willison only otherwise
    sold in response to the President's statements.  (*Id.* at Exs. CC-DD.)

-24-

1  price to drop and investors to lose money." *Lloyd*, 811 F.3d at 1209 (citation omitted).

2  Plaintiff must plead facts "tracing the loss back to 'the very facts about which the

3  defendant [allegedly] lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881

4  F.3d 750, 753 (9th Cir. 2018) (citation omitted).  The alleged facts must show the

5  market "learned of and reacted to th[e] fraud, as opposed to merely reacting to reports

6  of the defendants' poor financial health generally." *Metzler*, 540 F.3d at 1062.

7      The AC's alleged corrective disclosures — the "Fuzzy Panda" report and the

8  announcement by the USPS that Workhorse was not selected for the NGDV contract

9  — are not valid for purposes of pleading loss causation.  As lead plaintiff admits, the

10  "Fuzzy Panda" blog post did *not* cause the alleged stock to drop, thus there was no

11  market reaction to that news.  In any event, the Ninth Circuit has held that anonymous

12  blog posts by short-sellers cannot be corrective disclosures because the market is not

13  presumed to rely upon their credibility.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d

14  781, 1204 (9th Cir. 2020).  The market's reaction to the USPS' announcement of its

15  decision not to award the contract to Workhorse is a textbook case of the market

16  reacting to external bad news affecting a company's business, not a disclosure of "the

17  truth" about a fraud within a company.  *See Dura*, 544 U.S. at 342 (securities plaintiff

18  must plead and prove that the alleged misrepresentation caused an economic loss

19  "after *the truth* makes its way into the market") (emphasis added).[14]

20              **V.    CONCLUSION**

21      For the foregoing reasons, the Court should grant defendants' motion to dismiss

22  and dismiss the AC in its entirety.

23  Dated:  September 3, 2021        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

24                      By:  _____*/s/ John P. Stigi III*_____

25                          JOHN P. STIGI III
                          BRIDGET J. RUSSELL
26                          GIAN A. RYAN
                          Attorneys for Defendants

27  ───────────────
[14] Lead plaintiff's claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),
28  falls with his Section 10(b) claims.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d
     1046, 1052 (9th Cir. 2014).

                                    -25-