**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff Timothy M. Weis,*
*Additional Plaintiff Angelo Federico, and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM FARRAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WORKHORSE GROUP, INC., DUANE HUGHES, STEVE SCHRADER, ROBERT WILLISON, and GREGORY ACKERSON<br><br>Defendants. | Case No. 2:21-cv-02072-CJC-PVC<br><br>**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: December 6, 2021<br>Time: 1:30 p.m. |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ............................................................................3

III.    LAW & ARGUMENT ........................................................................................6

        A.    Defendants' False or Misleading Statements and Omissions ...................6

              a.    The Futile Bid for the USPS Contract.........................................6

              b.    Workhorse's Inability to Manufacture Vehicles ..................................8

              c.    The Fictitious "Backlog" of Vehicle "Orders" ...................................12

              d.    The Company's Misuse of Payroll Protection Funds .........................13

        B.    The Statements Are Not Inactionable Puffery ...........................................14

        C.    The Safe Harbor Does Not Protect Defendants' Statements ...................15

        D.    The Complaint Adequately Alleges Scienter ...........................................18

              a.    Legal Standard....................................................................................18

              b.    The AC Adequately Pleads Motive and Opportunity .........................18

              c.    The AC Pleads Actual Knowledge or Deliberate Recklessness .........20

              d.    Additional Allegations of Scienter.....................................................23

        E.    Plaintiffs Adequately Plead Loss Causation ...........................................24

IV.     CONCLUSION .................................................................................................25

TABLE OF AUTHORITIES

Case:                                                                                          page(s):

*Alphabet Sec. Litig., R.I., v. Alphabet, Inc.*

    2021 U.S. App. LEXIS 17926 (9th Cir. June 16, 2021)......................................1

*Berson v. Applied Signal Tech., Inc.*,

    527 F.3d 982 (9th Cir. 2008) ........................................................... 7, 13, 16, 22

*Hanon v. Data Prod. Corp.*,

    976 F.2d 497 (9th Cir. 1992)..............................................................14

*In re BofI Holding, Inc. Sec. Litig.*,

    977 F.3d 781 (9th Cir. 2020) ..................................................... 24, 25

*In re Ford Motor Co. Dps6 Powershift Transmission Prods. Liab. Lit.*,

    2019 U.S. Dist. LEXIS 221205 (C.D. Cal. Sep. 5, 2019) ...................................1

*In re Pixar Sec. Litig.*,

    450 F. Supp. 2d 1096 (N.D. Cal. 2006)............................................................20

*In re Quality Sys.*,

    865 F.3d 1130 (9th Cir. 2017)..................................................... passim

*In re Twitter Secs. Litig.*,

    2021 U.S. Dist. LEXIS 176814 (N.D. Cal. Sept. 14, 2021)..............................16

*Intrade Indus. v. Foreign Cargo Mgmt. Corp.*,

    2008 U.S. Dist. LEXIS 105911 (E.D. Cal. Dec. 23, 2008)..................................2

*Jones v. Bank of Am., N.A.*,

    2020 U.S. Dist. LEXIS 157887 (C.D. Cal. Mar. 16, 2020)...............................11

*Kendall v. Odonate Therapeutics, Inc.*,

    2021 U.S. Dist. LEXIS 146095 (S.D. Cal. Aug. 4, 2021)...................................7

*Kmiec v. Powerwave Techs., Inc.*,

    2013 U.S. Dist. LEXIS 153031 (C.D. Cal. Oct. 23, 2013) ........................ 18, 25

*Lamartina v. VMware, Inc.*,

    2021 U.S. Dist. LEXIS 172316 (N.D. Cal. Sept. 10, 2021)................................23

*Lorenzo v. Sec. & Exch. Comm'n*,

    139 S. Ct. 1094 (2019)........................................................................................2

*Masel v. Villarreal*,

    924 F.3d 734 (5th Cir. 2019) ..............................................................................9

*Mineworkers' Pension Scheme v. First Solar Inc.*,

    881 F.3d 750 (9th Cir. 2018) ........................................................................ 24, 25

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*

    *Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ................................. 19, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

    575 U.S. 175 (2015)..........................................................................................12

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,

    774 F.3d 598 (9th Cir. 2014).............................................................................14

*Roberts v. Zuora, Inc.*,

    2020 U.S. Dist. LEXIS 74648 (N.D. Cal. Apr. 28, 2020)........................... 11, 14

*Ronconi v. Larkin*

    253 F.3d 423 (9th Cir. 2001) .............................................................................20

*Rothman v. Gregor*,

    220 F.3d 81 (2d Cir. 2000) ................................................................................22

*Snellink v. Gulf Res., Inc.*,

    870 F. Supp. 2d 930 (C.D. Cal. 2012) ...............................................................11

*Sparling v. Daou*,

    411 F.3d 1006 (9th Cir. 2005) ...........................................................................10

*Strasburger v. Blackburne & Sons Realty Capital Corp.*,

    2020 U.S. Dist. LEXIS 194864 (C.D. Cal. June 25, 2020)...............................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

   551 U.S. 308 (2007)................................................................................................23

*Westley v. Oclaro, Inc.*,

   897 F. Supp. 2d 902 (N.D. Cal. Sept. 21, 2012).................................................17

*Yanek v. Staar Surgical Co.*,

   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..............................................................15

*Zaghian v. Farrell*,

   675 Fed. Appx. 718 (9th Cir. 2017)....................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,

   552 F.3d 981 (9th Cir. 2009)........................................................................ 10, 20

## I.   **INTRODUCTION**[1]

Plaintiffs allege two distinct, primary causes of action against Workhorse Group, Inc. ("Workhorse" or "Company"), Duane Hughes, Steve Schrader, Robert Willison, and Gregory Ackerson ("Individual Defendants"; together with Workhorse, "Defendants") for fraudulently inflating the price of Workhorse securities and causing harm to investors. First, Plaintiffs allege Rule 10b-5(a) and (c) violations for scheme liability, whereby Defendants engaged in acts or a course of business that defrauded investors into believing, among other things, that Workhorse was capable of winning a multi-billion dollar contract with the United States Postal Service ("USPS") to manufacture its new fleet of next-generation delivery vehicles ("NGDV") (the "USPS Contract"), when particularized facts supported by Company admissions, USPS statements, and well-positioned former Workhorse employees indicate that Workhorse's bid was a trojan horse used by Individual Defendants to inflate the Company's stock price to reap millions in insider profits and cash bonuses. The second claim, under Rule 10b-5(b), involves Defendants' material misrepresentations and omissions made over the course of the Class Period related to Workhorse's vehicle production, manufacturing capabilities, purchase order "backlog," and Workhorse's positioning for the USPS Contract.

Defendants acknowledge that Plaintiffs' Complaint ("AC") alleges scheme violations under Rule 10b-5(a) and (c), but only address them in a single footnote. Def. Br. (ECF No. 65) at 8 n.6. Moving to dismiss a cause of action in a "footnote is insufficient to put this claim in issue." *In re Ford Motor Co. Dps6 Powershift Transmission Prods. Liab. Lit.*, 2019 U.S. Dist. LEXIS 221205, at \*25 (C.D. Cal. Sep. 5, 2019) (holding that "Ford Did Not Effectively Challenge [A Claim] So It Survives."). The Ninth Circuit in *Alphabet Sec. Litig., R.I., v. Alphabet, Inc.*, also recently overturned the dismissal of scheme liability claims where defendants, as

---

[1] All "¶_" references are to the AC. Plaintiffs' exhibits are referred to as "Ex. _," and Defendants' as "Defs' Ex._."

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 2:21-CV-02072-CJC-PVC

here, treated scheme liability claims as "duplicative of the claims under Rule 10b-5(b)." 2021 U.S. App. LEXIS 17926, at *44 (9th Cir. June 16, 2021). The Ninth Circuit held this argument "is foreclosed by *Lorenzo* [*v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094 (2019)]," and reversed a district court for "sua sponte dismissing [plaintiff]'s claims under Rule 10b-5(a) and (c) when [defendant] had not targeted those claims in its motion to dismiss." *Id*. at *45. Accordingly, this Court may not dismiss Plaintiffs' Rule 10b-5(a) and (c) claims, as Defendants' motion barely references the claims, much less "targets" them. Nor can Defendants attempt to address them on reply. *See Intrade Indus. v. Foreign Cargo Mgmt. Corp.*, 2008 U.S. Dist. LEXIS 105911, at *5 (E.D. Cal. Dec. 23, 2008) ("A new argument cannot be raised for the first time in a reply brief.") (citation omitted).

With respect to Plaintiffs' 10b-5(b) claims, Defendants' motion fares no better. Defendants reframe Plaintiffs' allegations as "a classic case of 'fraud by hindsight'" (Def. Br. at 16), ignoring myriad allegations supporting a strong inference that Defendants acted with scienter in misleading investors. Plaintiffs allege that Individual Defendants and other insiders suspiciously unloaded massive amounts of Company stock just prior to the USPS awarding the NGDV contract to a competitor. ¶270. Notably, Senator Sherrod Brown offered a scathing public rebuke of Workhorse, stating that "executives who make ***illegal trades*** will never be tolerated," and that "all executives who run companies — ***including Workhorse*** — should be focused on creating jobs and investing in workers, ***not padding their own pockets***." Ex. I.

Furthermore, the USPS, which had non-public access to Workhorse's operations due to the NGDV bid, corroborated Plaintiffs' allegations of falsity and scienter in a "remarkably hostile" letter explaining its bases for rejecting Workhorse's proposal. ¶16. In addition to the numerous "critical deficiencies in Workhorse's proposal," the USPS "castigated Workhorse" for its public statements (which USPS states they "closely policed") related to the NGDV program, its "lack

2

of credibility and candor," and supported its rejection of the Company's bid *by pointing to the allegations of this very litigation*, explaining that it would have denied the proposal "even if the USPS had rated its proposal the best value." *Id*.

Finally, as discussed below, Defendants' loss causation arguments directly contradict Ninth Circuit law. Defendants' motion should be denied in full.

## II.    FACTUAL BACKGROUND

In January 2015, the USPS announced it would seek bids to replace about 165,000 postal vehicles, a contract worth approximately $6.3 billion. ¶38. The USPS Solicitation made clear that "technical evaluation [took] priority," meaning factors like Design Quality and Technical Approach "would be more important than Total Cost of Ownership in ultimately calculating the best value to the USPS." ¶¶44, 48.

After Workhorse's initial bid was rejected, the Company partnered with well-established company VT Hackney, which had been selected to design and manufacture fully-functioning NGDV prototypes. ¶¶39-40. The prototype Workhorse/VT Hackney submitted experienced numerous critical failures during testing. ¶¶51-52. Among other things, due to a parking brake failure, a vehicle rolled down an incline and into a ditch, resulting in the hospitalization of a USPS employee (the "Roll-Away Incident"). Because of these failures, VT Hackney withdrew from the bidding process, and Workhorse purchased its right to bid for a mere $7 million. ¶41. According to CW1, Workhorse's prototype "was nice to look at but had very little merit for production" and was "just a way for Workhorse to demonstrate to the UPS that it had a vehicle that could fulfill USPS' requirements." ¶50.

To further present Workhorse as a legitimate contender for the USPS Contract, Defendants created the mirage that Workhorse was capable of mass production by setting impossible production targets, and repeatedly insisting it could meet those targets. On March 10, 2020, the start of the Class Period, Defendants set a target of 300-400 trucks for 2020, which they reiterated through October 2020, continually assuring investors they were "ramping up production." ¶¶162, 196, 226,

3

276. On November 9, 2020, Defendants revealed Workhorse had produced only 7 trucks for that entire quarter (for a total of only 18 trucks in 2020), but then doubled down, setting a new, equally impossible target of 1,800 trucks for 2021. ¶¶245, 248.

Additionally, Defendants created a fictitious "backlog" of purported "orders" with UPS and other companies to make it appear as if there was a high demand for Workhorse's vehicles. None of these represented binding purchase agreements, and, to date, most of these so-called "orders" remain unfulfilled. ¶¶73-89. Workhorse's sister company, Lordstown Motors ("Lordstown"), founded by former Workhorse CEO Stephen S. Burns after he left the Company in February 2019, is also now under investigation by the SEC and the Justice Department for strikingly similar reasons. ¶93. Like Workhorse, Lordstown inflated its backlog using conditional pre-orders to make the company look stable and viable. ¶91. Burns resigned after admitting the pre-sales were fraudulent and Lordstown could not produce vehicles. ¶93.

On October 8, 2020, Fuzzy Panda Research issued a report, detailing its independent investigation of Workhorse, finding that there was no automation, only a handful of employees were assembling vehicles manually, and all the vehicles Workhorse had produced for UPS (four at that time) were prototypes. ¶¶99-100. Several CW statements corroborate these allegations. CW2, Executive Director of Human Resources who reported directly to Defendant Schrader, avers Workhorse "never had" an actual manufacturing facility to produce vehicles because there was "zero automation," workers assembled vehicles by hand on picnic tables, and there were only 12 employees in the plant, including engineers (at least four of whom left during CW2's employment). ¶96. According to CW3, a Materials Manager, as of the end of 2020, there was no assembly production, each vehicle had to be made individually, there were basic design issues, and workers were "struggling to finish vehicles." ¶95. CW2 and CW4, a Buyer/Planner, both confirmed Workhorse could not produce 300-400 trucks by the end of 2020. ¶104.

On February 23, 2021, the USPS announced it was awarding the entire

4

Contract to Oshkosh Defense ("Oshkosh"). ¶64. Analysts were surprised, particularly because of President Biden's recent announcement on January 25, 2021, of his goal to replace the government's vehicles with electric vehicles assembled in the U.S., noting that the failure of Workhorse to even secure a portion of the contract "raise[d] questions about underlying issues with WKHS's product/technology." ¶299. Workhorse's stock plummeted 47%. ¶300. Even though investors were shocked by the outcome and began questioning Defendants' representations, the Company's stock price remained artificially buoyed, as analysts continued to emphasize the strength of Workhorse's fictitious "backlog" of vehicle orders, believing (erroneously) that "[t]here is still a real company here." ¶301.

But on May 10, 2021, Defendants revealed that Workhorse only delivered six trucks in 1Q:21, and had only produced 38 trucks year-to-date, nowhere close to its year-end target of 1,800 vehicles. ¶303. This revealed that, contrary to Defendants' Class Period excuses, Workhorse's 18 truck deliveries in 2020, short of its 300-400 target, was not a COVID-related anomaly, but rather a result of Workhorse's inability to manufacture trucks at any sort of scale, nor was there any real demand for them. ¶¶278, 303. Workhorse's stock dropped precipitously, prompting analysts to call out the Company for its "Elusive Ramp-Up." ¶304.

Thereafter, Workhorse's filings in its post-award bid protest (the "Protest")[2] against the USPS revealed previously undisclosed facts regarding the bid process. For example, on September 3, 2020, the USPS had sent Workhorse a Deficiency List identifying various (non-exhaustive) issues with its proposal, including its "prior performance," "ability to manufacture . . . vehicles for large-scale commercial delivery," and its "production capabilities," requiring a 99-page response from Workhorse. ¶¶54-55. Workhorse's Protest also cited a letter from the USPS, which the Company characterized as a "lengthy screed aggressively attacking Workhorse,"

---

[2] Workhorse inexplicably dismissed the Protest on September 14, 2021, the day before defendants' motions to dismiss were to be heard. Ex. L.

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 2:21-CV-02072-CJC-PVC

for its "lack of credibility and candor with the Federal government," as well as the Company's public statements, citing this securities litigation, and stating that the USPS "would *never* have selected [Workhorse] for its flagship vehicle," "even if the USPS had rated its proposal the best value." *Id*.

Defendants Hughes, Schrader, and Willison have been replaced (Exs. E, H), and the Board of Directors announced on July 29, 2021, the Company was "withdrawing its previously stated guidance." Ex. E. According to a FOIA request response from the SEC dated June 30, 2021, the FOIA officer rejected the request two days after the end of the Class Period, due to a "still active an ongoing" investigation. Ex. K. On September 1, 2021, the *Wall Street Journal* and other news outlets reported that the SEC was investigating Workhorse. Ex. J.

### III.   LAW & ARGUMENT

### A.   Defendants' False or Misleading Statements and Omissions

#### a.   The Futile Bid for the USPS Contract

As part of the bidding process, Workhorse was subject to a strict NDA with the USPS that prevented it from sharing any non-public information regarding the contract or the bidding process. ¶56. Rather than simply not discussing the contract, Defendants chose to publicly discuss Workhorse's involvement with USPS Contract, and to announce, in every earnings call from the start of the Class Period until the time the winner of the award was announced, that Workhorse was under an NDA, was only able to provide publicly-available information, would provide updates when able, and did not have any updates to share at that time. *Id.*, see also ¶¶168, 204, 251. The AC plausibly alleges these statements omitted material information and led investors to believe that Workhorse was still in the running for the USPS Contract, even though its bid was no longer viable. ¶¶169, 184, 205, 252.

Because Defendants chose to speak about the USPS Contract, they "were bound to do so in a manner that wouldn't mislead investors[.]" *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Yet, when speaking about the

6

USPS Contract, Defendants omitted material information about issues that would prevent the Company from ever securing the contract, including numerous critical failures discovered during the testing of the prototype submitted by Workhorse (such as the 2018 "Roll-Away Incident" which resulted in the hospitalization of a USPS test driver) (¶¶8, 71); USPS concerns that Workhorse was "a 'startup' company without the experience or capability to produce the NGDV" (¶71); and USPS statements that Workhorse displayed a "lack of credibility and candor with the Federal government" during the NGDV program (¶16). These critical omissions rendered Defendants' statements materially misleading, and, if known, would have significantly altered the total mix of information available to investors relating to Workhorse's bid for the USPS Contract. In fact, the USPS "castigated Workhorse" for its public statements related to its "participation in the NGDV program," accusing Workhorse of violating the NDA, and even suggested Defendants' public statements were securities law violations. ¶72.

Defendants do not challenge many of these allegations and instead argue their statements were literally true because they never claimed Workhorse was a "frontrunner," but only said it "remained a bidder for the USPS contract (which was true) and that it could not discuss any non-public information regarding the bid." Defs' Br. at 17. But "a statement that is literally true can be misleading[.]" *Kendall v. Odonate Therapeutics, Inc.*, 2021 U.S. Dist. LEXIS 146095, at \*22 (S.D. Cal. Aug. 4, 2021) (citation omitted). Defendants correctly point out that the question is whether a "reasonable investor" would have been misled by Defendants' statements. Defs' Br. at 17. Here, the AC provides *actual examples* of Defendants' statements giving investors and analysts the misleading impression that that the Company's bid continued to be viable. *e.g.*, ¶¶ 208, 217, 259, 274. Defendants cannot overcome these allegations by simply declaring (without support) that these people are merely "self-interested … outside market participants." Defs' Br. at 17.

Next, Defendants claim Plaintiffs' allegations suffer from "temporal

7

problems" because the AC does not tie each statement "to the specific circumstances that existed at the time." Defs' Br. at 18. However, Plaintiffs allege Defendants knew from the conclusion of the Prototype Phase (and even earlier), *i.e.*, before the Class Period even began, that Workhorse was not a viable contender for the Contract because it lacked necessary design and manufacturing capabilities. ¶¶54-55, 238, 252, 262, 264, 273. When circumstances changed, for example, after Workhorse's September 2020 correspondence with USPS, Plaintiffs include discussion of these updates in their reasoning. *See, e.g.*, ¶¶252, 262. Defendants also argue there is no strong inference "Workhorse knew it was no longer a legitimate candidate" for the Contract because "USPS permitted Workhorse to submit a proposal after the alleged issues with its prototype." Defs' Br. at 18-19. But "[a]ll contractors who had completed prototype testing — regardless of the results of that testing — were eligible to submit proposals." ¶53. And that Workhorse "submitted detailed responses to the claimed deficiencies" (Defs' Br. at 19) does not mean its proposal was ever viable. In fact, Workhorse acknowledged that USPS "would ***never*** have selected" Workhorse's bid for the contract. ¶14 (emphasis added).

### b.    Workhorse's Inability to Manufacture Vehicles

The AC plausibly alleges Defendants materially misrepresented the manufacturing capabilities of the Company, repeatedly emphasizing its ability to produce hundreds of vehicles a year, when it struggled to manufacture even a handful. ¶3. From March 2020 through the end of October 2020, Defendants maintained guidance that Workhorse could produce 300-400 trucks by the end of 2020, repeatedly assuring investors they were on the verge of "ramping up" production. ¶103. And, on November 9, 2020, Defendants doubled down, setting a new, equally impossible target of 1,800 trucks in 2021 (¶¶132-33), which it repeated as recently as March 1, 2021. ¶303. These statements were materially misleading.

As the CWs, Fuzzy Panda, and Defendants' own YouTube Video revealed, Workhorse *never* had the ability to even come close to this level of production during

8

this timeframe, as it used no automation and had a limited number of employees manually assembling vehicles on wooden benches. ¶¶94-101. Fuzzy Panda investigators who spoke to Workhorse employees in September 2020 confirmed no active purchase orders existed, no automation was used at the Union City facility, and no production units for customers were being made. ¶100. When asked about Workhorse's statement that it would produce 300-400 trucks by the end of 2020, CW2 stated this was an "absolute lie" and there was "no way" Workhorse could meet this target because there was "no automation." ¶104. CW4 corroborated these statements. ¶105. Workhorse's Protest Complaint also concedes that on at least two occasions during the Class Period, the USPS informed Workhorse of various issues directly relating to the "production capabilities of Workhorse's leadership and partners" (or lack thereof). ¶14. Moreover, the fact that Workhorse's former CEO engaged in a strikingly similar scheme at Lordstown, considered one of the "biggest electric vehicle scams in history," further supports the inference that Defendants' statements were misleading when made. ¶¶90-94.[3]

In addition, facts later revealed by Defendants themselves support the falsity of Defendants' statements. *See Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019) ("[E]vidence of later events can provide useful circumstantial evidence that a given representation was false when made."). Less than three weeks after Workhorse stated on October 15 and 29, 2020, that it would produce 300-400 trucks by the end

---

[3] Defendants claim the only allegation to support Workhorse's relationship with Lordstown is that its founder is a former Workhorse CEO. Defs' Br. at 5 n.3. Not so. Workhorse sold Lordstown the design for their flagship Endurance truck for a 10% equity stake in Lordstown, as well as a license fee equal to 1% of the gross sales on the first 200,000 trucks sold. ¶90. As part of this deal, Workhorse transferred roughly 6,000 pre-orders of the truck to Lordstown — orders which were later discovered to be as fake as the "backlog" in this case. *See* Amended Complaint (Dkt No. 61), *In re Lordstown Motors Corp. Securities Litigation*, 21-cv-616, N.D. Ohio (Sept 10, 2021) ¶¶73, 135, 140, 146, 174, 183, 248. Further, in addition to CEO Burns, two other defendants in *Lordstown* were former Workhorse executives. *Id.* at ¶¶51-53.

of 4Q:20, Defendants revealed that Workhorse would not meet the target and had produced only *seven trucks* during 3Q:20 (and ended up producing only *18 trucks* in 2020). ¶278. This timing is especially suspect as Schrader later admitted that Workhorse's battery supplier had informed the Company around October 1, they would not be able to supply 300-400 batteries by the end of the year — essentially making delivery of 300-400 trucks impossible — and that the outbreak of the coronavirus, which led to a worker shortage, had already begun by mid-October. ¶¶258, 266. And, only two months after Defendants touted a target of 1,800 trucks in 2021 (¶¶132-33), Defendants revealed that the Company had delivered only *six trucks* in 1Q:21 and produced only *38 trucks* year to date. ¶303. Therefore, by setting and repeatedly reaffirming unrealistic targets, while simultaneously making false and misleading statements about Workhorse's production capabilities, the AC plausibly alleges Defendants materially misled investors into believing Workhorse could produce hundreds of vehicles a year. ¶3.

Unable to challenge these stark figures, Defendants attack the reliability of the CWs and Fuzzy Panda. Each attack fails. In assessing the reliability of a CW, courts analyze "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009). Here, Plaintiffs provide each CW's job description and, for all but one, a job title;[4] each CW provides a high level of detail; and each statement is corroborated by other evidence. ¶¶50, 95-98, 104-05. Thus, at this stage, the CWs are described sufficiently to establish their reliability and personal knowledge.

Nevertheless, Defendants still question how CW2 "would have reliable first-

---

[4] Defendants complain Plaintiffs did not provide CW1's job title (Defs' Br. at 20), but Plaintiffs need only "describe his or her job description and responsibilities." *Sparling v. Daou*, 411 F.3d 1006 at 1016(9th Cir. 2005). They have done so.

10

hand knowledge of production capabilities" (Defs' Br. at 20), even though an Executive Director of H.R. is certainly qualified to speak to the number of employees and their qualifications, as well as the timeline and available resources for hiring workers necessary to increase production. ¶96.[5] Even though CW1 and CW2 left Workhorse in June 2020 (Defs' Br. at 21 n.10), the fact that CWs are not "employed at [company] during the *entire* Class Period does not in itself render their statements unreliable." *See Roberts v. Zuora, Inc.*, 2020 U.S. Dist. LEXIS 74648, at *35-36 (N.D. Cal. Apr. 28, 2020). Further, CW3 and CW4's job titles of "Materials Manager" and "Buyer/Planner" are commonly understood in the manufacturing field, not cryptic as Defendants contend (Defs. Br. at 20).

Defendants' arguments with respect to Fuzzy Panda are similarly flawed. The 53-page Report is extremely detailed, cites numerous sources, includes interviews with Workhorse employees, alleges plausible facts, and many of the details are corroborated by other sources, such as the Protest and the CWs. There is no reason to discount the Report at this stage. *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report… to allege falsity at the pleading stage.").[6]

Defendants also aver "the AC alleges no facts to support . . . that COVID-19 was not . . . a significant cause of Workhorse's inability to meet its production targets." Defs' Br. at 20-21. However, Plaintiffs allege numerous facts that even without COVID-19, Workhorse could not have produced 300-400 trucks in 2020. *See*, *e.g.*, ¶¶94-101. And even if COVID-19 were a factor, the pandemic had already

---

[5] Defendants' attack on CW2 claiming "embezzlement" (Defs' Br. at 6 n.4), runs contrary to the allegation the termination was retaliatory. ¶¶97-98. This factual dispute cannot be resolved now. *See Jones v. Bank of Am., N.A.*, 2020 U.S. Dist. LEXIS 157887, at *12 (C.D. Cal. Mar. 16, 2020).

[6] Defendants refer to "temporal problems" with the Fuzzy Panda report, noting it was based upon visits to the production facility in September 2020 and reflects a "mere snapshot in time." Defs' Br. at 5, 21 n.10. But logically if there was no automation in September 2020, there was no automation earlier, either.

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 2:21-CV-02072-CJC-PVC

begun affecting the U.S. by March 2020, the start of the Class Period. Indeed, Hughes mentions supply chain issues due to the "novel coronavirus" in the March 10, 2020 earnings call. ¶160. Moreover, Schrader continued to reiterate the 300-400 truck target even after learning 36% of Workhorse's employees were unable to work due to the virus (¶¶130, 230, 235), and then in November 2020 Workhorse raised its guidance for 2021 to an incredible 1,800 trucks. ¶245.

Finally, Defendants argue "the AC does not allege facts showing that it was not Workhorse's actual plan and intention to meet its target when the target was made," but "[a reasonable investor] expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Any reasonable investor viewing Workhorse's "target when the target was made" would have understood it to mean that the target could be achieved. But here, the AC plausibly alleges the targets were an impossibility — particularly when Defendants continued to reaffirm those targets with the target deadline around the corner. ¶¶230-31, 235-36. And the argument that Workhorse "never claimed its production was fully automated or that certain changes would not need to be implemented to ramp up production to meet its target for 2020" (Defs' Br. at 21) is irrelevant because Plaintiffs allege these were a few of the undisclosed reasons *why* Defendants could never meet their targets. ¶6.

### c.    The Fictitious "Backlog" of Vehicle "Orders"

Throughout the Class Period, what Defendants represented as firm customer orders were nothing more than non-binding expressions of interest. ¶89. Defendants used these fictitious "orders" to inflate Workhorse's "backlog" and create the illusion of strong demand for its product as part of their fraudulent scheme to make Workhorse appear to be a legitimate contender for the USPS Contract. ¶¶73-89.

The most egregious example is the UPS Contract, the entirety of which Defendants included in Workhorse's backlog and repeatedly represented to investors

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 2:21-CV-02072-CJC-PVC

was on the verge of being filled. ¶142. These statements were misleading because UPS was not obligated to take delivery of the trucks, gave no indication it would do so, and has still not chosen to take delivery of them. ¶138. In fact, UPS reported that it had partnered with Arrival, a rival electric vehicle manufacturer. ¶141. Defendants made similar misrepresentations with respect to Workhorse's conditional agreements with Pride and Pritchard (¶¶147-49, 152-53), and with eTrucks, which appears to be an entity created by an associate of Defendant Willison solely to place a fictitious order to inflate Workhorse's backlog. ¶146. Moreover, CW4 stated the Company "booked numbers they didn't have." ¶105. Thus, despite choosing to "tout the company's backlog," Defendants failed "to do so in a manner that wouldn't mislead investors." *Berson*, 527 F.3d at 990.

That Defendants attached a copy of the UPS Contract to a May 30, 2018 Form 8-K does not mean their statements were not misleading. Defs' Br. at 22. Defendants repeatedly gave misleading updates regarding the Contract *after* May 30, 2018, including "we are beginning to deliver" units and "we've already got sales out there from UPS." (¶¶166, 192, 247).[7] These statements were misleading. ¶167.[8]

### d.   The Company's Misuse of Payroll Protection Funds

Plaintiffs plausibly allege Defendants made false statements regarding the Company's use of the Payroll Protection Program funds. In its Q1:20 Form 10-Q, Defendants stated the Company would use the $1.4 million it received "primarily for payroll costs," but CW2 stated the funds were used primarily for executive bonuses instead. ¶¶185-86. Defendants argue (in a footnote) there is not a sufficient

---

[7] And that Plaintiffs do not allege the contracts have been "canceled" (Defs' Br. at 22) is a red herring. Since the contracts do not create any obligation for the buyers, why would they need to cancel?

[8] The same can be said of the Pride order — the fact that Defendants disclosed the Pride order was "subject to various production and delivery conditions" does not render their statements not misleading, especially considering later statements that, because of this order, Workhorse's backlog had grown to 8,000 vehicles. *See* ¶281.

13

basis for these allegations because CW2 is alleged not to have knowledge regarding payroll or accounting practices. Defs' Br. at 6 n.4. This is wrong, as CW2 merely stated he did not personally "do payroll." ¶98. It is not unreasonable to infer that an Executive Director of H.R. would know about payroll practices. ¶186.

**B.    The Statements Are Not Inactionable Puffery**

"Statements . . . capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). "[T]he question is whether a reasonable investor could understand [statements], in context, to communicate only a general optimism, or a factual representation about the actual condition of [the business] and [its] capabilities." *Cutler*, 696 Fed. Appx. at 814. Further, "projections and general expressions of optimism may be actionable" when not "genuinely believed," lacking a "reasonable basis," or the speaker is "aware of any undisclosed facts tending to seriously undermine the[ir] accuracy." *Zuora,* 2020 U.S. Dist. LEXIS 74648, at *32 (citing *Hanon v. Data Prod. Corp.*, 976 F.2d 497, 501 (9th Cir. 1992)).

Defendants selectively quote from their statements, but when read in their entirety and in context, Defendants either make objectively verifiable representations, had no reasonable basis to make them, or were aware of undisclosed facts undermining their accuracy. For example, statements Workhorse had made "meaningful progress in [its] transition from a development-stage company to a production-focused enterprise" (¶160), was "ramping up" production capabilities (¶¶192, 277, 226-27), and could "consistently ship product" (¶224) were objectively verifiable and had no reasonable basis. *See, e.g.,* ¶¶161, 193, 228, 278.

Defendants' statements touting Workhorse's relationship with UPS, its "backlog" (¶¶177, 222, 247, 192), and the "orders" from eTrucks (¶¶189, 202) were statements of current or historical fact; they had the backlog and orders, or they did not. *See In re Quality Sys.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (statements about current and past state of defendant's "pipeline" not puffery); *Zaghian v. Farrell*, 675

14

Fed. Appx. 718, 720-21 (9th Cir. 2017). These statements lacked a reasonable basis because the purported "backlog" did not consist of actual orders. ¶¶178, 193, 223, 247. Similarly, Defendants' statements that the Company had experienced "supply chain disruptions" as a result of the pandemic, but was "cautiously optimistic that we are moving past the disruptions to our supply chain" because our vendors "seem to have weathered the storm" (¶179), were objectively verifiable and had no basis in fact because Workhorse's production difficulties resulted from its lack of manufacturing capabilities, not from the COVID-19 pandemic. ¶180.[9]

Finally, Defendants' statements noting their "ongoing participation" in the bidding for the USPS Contract and President Biden's touting of electric vehicles, which they used to imply they were still in the running for the Contract (¶¶168, 204, 237, 251, 261, 263, 272) were not mere corporate optimism, because Defendants omitted material facts and either knew or should have known that they would not be securing the Contract based on the critical failures, including the Roll-Away Incident, as well as Workhorse's lack of production capabilities. ¶¶169, 205, 252.

## C.    The Safe Harbor Does Not Protect Defendants' Statements

The PSLRA safe harbor protects forward-looking statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1122 (C.D. Cal. 2005). Neither statements "about current or past facts" nor "non-forward looking portions of mixed statements" fall within the safe harbor. *Quality Sys.*, 865 F.3d at 1142. Many of the statements detailed in the AC are either not forward-looking or are mixed statements of present, future, and even past.[10] While Defendants characterize their statements

---

[9] Indeed, Workhorse continued to blame issues with suppliers for the rest of 2020 (¶¶187, 242), which demonstrates there was no basis for those statements.

[10] *See*, *e.g.*, ¶160 (Company "*made* meaningful progress"); ¶162 ("[W]e *have* the internal capacity to produce two C Series trucks per day…"); ¶164 ("[W]e *don't*

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 2:21-CV-02072-CJC-PVC

as "regarding Workhorse's plans or objectives for future production, orders, and order fulfillment" (Defs' Br. at 13-14), "[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegations of falsehood relates to non-forward looking aspects of the statement." *Quality Sys.*, 865 F.3d at 1142-44.

Similarly, here, Defendants' statements about Workhorse's manufacturing capabilities are actionable because they were predicated on statements regarding the Company's *past* and *present* manufacturing capabilities (such as false representations of how many trucks Workhorse could produce in a day, *see* ¶¶162, 181), relationship with Lordstown, purported existing orders, and backlog.[11] *See Quality Sys.*, 865 F.3d at 1142-44 (statements that "current state of … pipeline was consistent with, or better than" previous quarters' pipeline were not forward-looking because they "provided a concrete description of the past and present state of the pipeline"); *In re Twitter Secs. Litig.*, 2021 U.S. Dist. LEXIS 176814, at *12 (N.D. Cal. Sept. 14, 2021) (statement "trend had already turned around" actionable because "it reflected something concrete that had already happened").

Moreover, the statements lack meaningful cautionary language. For

---

need to really any [sic] additional CapEx…"; ¶166 (UPS "*ha[s]* 1,060 units on order that we *are* beginning to deliver"; ¶177 ("[W]e *have the backlog* . . . with UPS…"); ¶181 (*We're fully staffed with the current staff* that could still meet that two units per day); ¶183 ("*[I]t's a similar supply chain* that . . . would supply a post office vehicle."); ¶192 ("We *are actually making*, . . . trucks right now. . . and *we also have a backorder* of 1,100 [] vehicles…"); ¶198 and ¶212 (facility "*has*" or "*used to*" "put out 60,000 chassis…"); ¶230 ("Workhorse *had* a 1,100-1,200 vehicle *backlog*…"); ¶235 ("[W]e've got everything in place *right now,* so *we've got* the labor and materials *coming in*"); ¶ 242 ("We *always have* a backup [battery] supplier") (emphases added); *see also* ¶¶166, 168, 179, 189, 201-02, 204, 211, 222, 230, 235, 247, 251, 281-82.

[11] The Ninth Circuit has held a statement regarding backlog is not forward-looking because it "isn't a 'projection' of earnings or a 'statement' about 'future economic performance,'" but, instead, is "a snapshot of how much work the company has under contract right now." *Berson*, 527 F.3d at 990 (citation omitted).

cautionary language to be "meaningful," it must "relate directly to the forward-looking statements at issue . . . general language not pointing to specific risks is insufficient." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 919 (N.D. Cal. Sept. 21, 2012) (citation omitted). For a mixed statement of future and present circumstances, "language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1148. Where purported cautionary language was provided, Defendants claim it "specifically cautioned of the risk that Workhorse might not be able to ramp up production as intended due to a variety of factors," and that "the market . . . might not accept Workhorse's prototypes." Defs' Br. at 15. But the language identified by Defendants could apply "to *any* business that sells products to consumers." *Yanek*, 388 F. Supp. 2d at 1123 (emphasis in original). The language does not relate specifically to the statements at issue and does not convey meaningful information about the non-forward-looking portions. For example, "risks associated with "obtaining orders and executing upon such orders" (Defs' Exs. A, E, G, H, K, L, N, P, & Q) does not disclose that the orders are not real, or the backlog is fictitious. *See Quality Sys.*, 865 F.3d at 1148 (regarding non-forward-looking statements about the state of the company's pipeline, "virtually no cautionary language short of an outright admission . . . would have been adequate."); *Rodriguez v. Gigamon Inc.,* 325 F. Supp. 3d 1041, 1054 (N.D. Cal. 2018) ("potential failure to 'close' transactions not meaningful warning about existing orders or backlog). And several statements, including the October 15 and 29 statements reaffirming production targets, were made in online interviews with *no cautionary language at all*. ¶¶192, 211-12, 230, 235, 256. At any rate, if there is a "legitimate factual dispute as to whether [ ] cautionary language is sufficient, [ ] dismissal is not warranted." *Oclaro*, 897 F. Supp. 2d at 920 (citation omitted).

### D.    The Complaint Adequately Alleges Scienter

#### a.    Legal Standard

For the scienter inquiry, "the complaint is considered in its entirety." *Kmiec v. Powerwave Techs., Inc.,* 2013 U.S. Dist. LEXIS 153031, at *6-7 (C.D. Cal. Oct. 23, 2013) (Carney, J.) (citation omitted). "[T]he scienter standard is not insurmountable and plaintiffs need not prove [the] case at the outset." *Strasburger v. Blackburne & Sons Realty Capital Corp.*, 2020 U.S. Dist. LEXIS 194864, at *12 (C.D. Cal. June 25, 2020) (Carney, J.) (citation omitted).

#### b.    The AC Adequately Pleads Motive and Opportunity

The AC provides particularized and compelling motives for Defendants to materially mislead and defraud investors, including unusual and suspicious stock sales (¶¶308-317), and Defendants' incentive compensation, which was specifically tied to, among other things, "how well the stock performed." ¶320 n.31.

Insider sales: "Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter." *Quality Sys.*, 865 F.3d at 1146 (citation omitted). In evaluating such sales, three factors must be considered: "(1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) consistency with prior trading history." *Id*. Here, the Individual Defendants' Class Period sales were not only large in absolute terms — collectively 850,000 shares for proceeds of over $21.5 million — but they were also inconsistent with their selling activity outside the Class Period. ¶¶310-16. All of these sales took place during a short period when the stock price was over $15/share; no sales happened before the Class Period or from the time the price crashed in late February 2021 (when the USPS Contract award was announced) to the end of the Class Period; and the only sales between February 2021 and the filing of the AC were on July 1, 2021, when the stock price rose due to the Reddit community. *Id*. Further, Hughes and Willison sold nearly half their stock just days before the USPS Contract award was to be announced, when the stock was over $28/share. ¶270.

18

This insider trading gives rise to a strong inference of scienter. *See Quality Sys*, 865 F.3d at 1146 (defendant's "massive and uncharacteristic sale…near the apogee of [company's] stock price" gave rise to strong inference of scienter); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938-41 (9th Cir. 2003) (insider sales constituting 88-100% of holdings, near the stock's peak price, where no sales occurred for twenty months before or four months after class period gave rise to strong inference of scienter). If Hughes and Willison had believed Workhorse might get the USPS Contract, why would they have sold nearly half their stock just days before the award announcement?

Defendants do not dispute Plaintiffs' allegations of the Individual Defendants' stock sales, but instead wonder why some of them did not "sell more at more opportune times," Defs' Br. at 24-25. They claim Schrader's sales do not "immediately proceed [sic] or follow any statements by him or anyone else," and that his sale on December 4, 2020, was after Workhorse announced it was not meeting its 2020 target, which they claim caused the stock to go down. Defs' Br. at 24 n.13. In reality, the stock went up after the announcement because Defendants blamed the miss on COVID-19, announced the Pritchard "order," and set an 1,800 truck goal for 2021. ¶¶240-42, 245, 254. Schrader's January 8, 2021 sale followed Workhorse's announcement of its "order" from Pride on January 4, 2021, which was publicized by news outlets later that week. ¶¶152, 156. Neither Ackerson's nor Willison's sales occurred in a "dead zone," as Defendants contend. Defs' Br. at 24 n.13. Rather, Ackerson sold on July 1, 2020, the day after Workhorse got $70 million in new financing (¶188); Ackerson and Willison sold on January 8, 2021, after the announcement of the Pride "order" (¶152); and Willison sold on July 15, 2020, the day after Workhorse announced Ryder would be offering Workhorse trucks to lease and they had already delivered the first two, raising the stock price 10% (Ex. D). Further, that Ackerson and Willison sold in response to the President's statements (Defs' Br. at 24 n.13) does not negate scienter; if they believed Workhorse could

19

win the USPS Contract, they would have held their stock.

Finally, Defendants' citations to *Ronconi v. Larkin* and *In re Pixar Sec. Litig.* (Defs' Br. at 24) are unavailing. In *Ronconi*, only one insider engaged in suspicious stock sales. 253 F.3d 423, 435 (9th Cir. 2001). Here, many executives and board members engaged in suspicious sales. ¶¶62, 112, 156. And in *Pixar*, the court found no scienter because "the insiders retained over 99 percent of their total holdings." 450 F. Supp. 2d 1096, 1105-06 (N.D. Cal. 2006). The Individual Defendants here sold between 34% and 257% of their shares during the Class Period. ¶¶312-15.

Incentive compensation: The AC also alleges that Workhorse's executive compensation plans incentivized Defendants to mislead investors. In 2020, Defendants Hughes and Willison made incentive-based cash bonuses of 81% and 22.5% of their salaries, respectively. ¶320. 40% of these bonuses was tied to "how well the stock performed." ¶320 n.31, Ex. B. Courts routinely find bonuses tied to a specific goal, such as stock price, can be indicative of scienter. *See, e.g., Am. W. Holding*, 320 F.3d at 944 (inference of scienter where eligibility for executive bonuses was "based principally on the company's financial performance").[12]

### c.      The AC Pleads Actual Knowledge or Deliberate Recklessness

The Complaint also adequately alleges Defendants made false statements or omitted material information knowingly, intentionally, or with deliberate recklessness regarding: (1) the USPS Contract; (2) Workhorse's production goals and capabilities; (3) Workhorse's purported backlog and actual orders; and (4) the

---

[12] Defendants suggest Plaintiffs are required to compare previous years' compensation, (Defs' Br. at 23 (citing *Zucco*, 552 F.3d at 1005)), but in *Zucco*, there was only a "bare assertion that executive-level bonuses were 'based in part' on financial performance." Here, Plaintiffs provide extensive details about the incentive compensation program (¶319), and at any rate, Hughes and Willison's 2020 incentive-based cash bonuses ($384,750 and $101,250) were more than double that of 2019 ($132,500 and $42,000, respectively). Exs. A (2019 10-K), B (2020 10-K).

Company's use of PPP funds. ¶¶160-284.[13]

The USPS Contract: Defendants' misleading statements surrounding the USPS Contract were made with scienter. Workhorse conceded that the USPS knew from the time of the Roll-Away Incident forward that it "would *never* have selected [Workhorse's NGDV] for its flagship vehicle." ¶14 (emphasis added). Defendants were also aware of the Roll-Away Incident and the other critical failures during testing, and therefore, by the end of testing, Defendants knew or should have known that Workhorse was no longer in the running for the contract. *Id.* Defendants continued, however, to fraudulently represent that Workhorse's bid was viable. *e.g.,* ¶¶168, 173, 204, 213, 237, 251, 261. USPS, who had access to nonpublic information concerning Workhorse and its bid and "closely policed Workhorse's public statements," effectively accused Workhorse of making misleading statements to the public. ¶16. Even if Defendants didn't (or couldn't) know they were no longer in the running at that time, because Defendants admittedly knew of these material incidents and failures, but never disclosed them when publicly discussing the contract, a reasonable juror could nevertheless infer Defendants omitted material information knowingly, intentionally, or with deliberate recklessness. ¶14-15. Either way, scienter is adequately alleged.[14]

Production Goals and Capabilities: With respect to Workhorse's production goals and capabilities, Plaintiffs plainly allege scienter. At each point in time when Defendants made statements regarding their production targets, Defendants would have known whether these goals were achievable. By their own admission, Defendants knew how many trucks Workhorse could allegedly produce on daily and

---

[13] Defendants Hughes, Schrader, and Ackerson each signed all the Form 10-K and 10-Q filings throughout the Class Period. ¶325. Defendants Hughes and Schrader signed Sarbanes-Oxley certifications, attached to the 10-K and 10-Q filings. ¶325.

[14] The AC also alleges that Willison was the Chief Engineer during the Prototype Phase (¶27), and Hughes was the main contact for the initial USPS proposal (¶39), so both would have been in positions to know that Workhorse's bid was not viable.

21

monthly basis (*e.g.*, ¶¶162, 181), so Defendants would have been able to easily verify (using simple math) whether a certain target was achievable.[15] Additionally, by his own later admissions, Defendant Schrader actually knew the 300-400 production target impossible when he affirmed it on October 15 and 29, 2020, because around October 1, Workhorse's battery manufacturer told Workhorse it would not be able to produce 300 batteries before year's end, so even if Workhorse could build the 300-400 trucks, they would not have been able to complete and deliver them. ¶258.[16]

Purported Backlog and Actual Orders Received: The AC adequately alleges scienter for Defendants' statements about Workhorse's purported "backlog" and "orders." The AC plausibly alleges that Defendants misleadingly referred to non-binding expressions of interest as "orders" or "backlog." ¶¶166, 177, 192, 201, 230, 256, 282. For example, Hughes, who signed and was intimately familiar with the details of the UPS Contract, stated on November 9, 2020, "We will be delivering new vehicles [to UPS]." ¶247. But, as of that time, UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2021 — or ever. *Id*. In fact, in its 2019 Sustainability Report, UPS removed mention of Workhorse and announced it had placed an order for 10,000 EVs from Arrival. ¶77. The AC raises a strong inference that Defendants intentionally omitted this information, making it appear that these orders were on the precipice of being fulfilled and that the Company was legitimate and stable.

---

[15] Even if Defendants had met their loftiest goal at the time (which was producing 100 trucks per month, or about 3 trucks per day (¶¶196, 256), Workhorse would have been unable to make enough trucks meet the target. ¶¶231 (On Oct. 15, 5 trucks/day necessary to meet target); 236 (As of Oct. 29, 6 trucks/day necessary to meet target).
[16] Moreover, the sheer magnitude by which Defendants missed their targets (¶¶248, 303), and the temporal proximity between Defendants' reaffirmations of their production targets and Defendants' revelation that Workhorse would miss these targets (*e.g.,* ¶243), further bolster the inference of scienter. *See Berson,* 527 F.3d at 988 n.5 ("[T]he 'temporal proximity' of the misleading statement and the subsequent disclosure 'bolster[s]' the inference [of scienter]."); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("magnitude" of write-off supported inference of scienter).

The Company's Use of PPP Funds: On May 6, 2020, Workhorse announced it received PPP funds to be used "primarily for payroll costs." ¶185. CW2 stated that the PPP funds were instead used to pay executive bonuses. ¶186. Because Defendants would certainly know if they received bonuses, Defendants were hands-on managers at a small company and purported to have extensive knowledge about Workhorse's finances and operations (¶¶323, 326), and CW2 reported directly to Schrader (¶96), Defendants would or should have had knowledge of these matters.

### d.    Additional Allegations of Scienter

Numerous events that occurred after the filing of the AC further bolster the inference scienter. For example, Hughes suddenly departed on August 1, 2021, on the day Workhorse "withdr[ew] its previously stated guidance" (Ex. E) and shortly after Workhorse revealed it had only delivered 14 trucks in 2Q:21 (Ex. F) and had suspended production for additional testing (Ex. G). The SEC's investigation into Workhorse and the recent terminations of Schrader and Willison also contribute to the inference of scienter. Ex. J, K and H. *See Lamartina v. VMware, Inc.*, 2021 U.S. Dist. LEXIS 172316, at \*45 (N.D. Cal. Sept. 10, 2021) (exec resignation in proximity to SEC investigation "add[s] a piece to the scienter puzzle").

Defendants also had a history of partnering with companies such as CSIR Group, who was charged with fraud by the SEC in a "fraudulent stock promotion scheme" "hir[ing] writers…to publish dozens of bullish articles on its clients." ¶158. This supports Plaintiffs' allegations that Defendants knowingly used YouTube "influencers" to disseminate misinformation to inflate the stock price for their own gain. ¶¶158, 324. Notably, Defendants ignore this fact in their motion.

In sum, accepting the facts alleged in the AC as true, and drawing all reasonable inferences in Plaintiffs' favor, the AC's allegations of scienter are at least as compelling as the competing inferences urged by Defendants, which simply cannot be plausibly "draw[n] from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

**E.      Plaintiffs Adequately Plead Loss Causation**

Defendants' arguments that Plaintiffs fail to plead loss causation evince a misunderstanding of controlling law, which rejects Defendants' position that "a plaintiff must plead a 'corrective disclosure'" that specifically and fully "revealed the fraud." Def. Br. at 2. The Ninth Circuit has made clear that "plaintiffs need only show a 'causal connection' between the fraud and the loss," and need not allege a corrective disclosure at all, as "'[d]isclosure of the fraud is not a sine qua non of loss causation.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) (citations omitted). Thus, pleading loss causation "should not prove burdensome." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

Here, Plaintiffs adequately allege that Defendants' scheme and their misstatements and omissions artificially inflated the stock price to a high of $42.96 per share, and that inflation dissipated partially when the USPS awarded the contract to a competitor, and then when the Company disclosed its severe shortcomings in vehicle production and deliveries, dropping the stock to a mere $8.20 per share. ¶¶285-306. At this stage, Plaintiffs need only "give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind,'" thus Plaintiffs readily meet their pleading burden. *BofI*, 977 F.3d at 794.

Although Plaintiffs need not even plead a corrective disclosure, Defendants' contention that two of the corrective disclosures "are not valid" is still wrong. Defs' Br. at 25.[17] First, regarding Fuzzy Panda, Defendants incorrectly argue "the Ninth Circuit has held anonymous blog posts by short-sellers cannot be corrective disclosures," Def. Br. at 25, citing *BofI*. The Ninth Circuit in *BofI* categorically rejected this "bright-line rule," and, to the contrary, emphasized that "[a] corrective disclosure can instead come from any source, including . . . investigative reporters." 977 F.3d at 790. Nevertheless, contrary to the blog posts in *BofI*, the Fuzzy Panda

---

[17] Defendants do not address the May 10, 2021 disclosure, *see* ¶303, and therefore concede loss causation for this disclosure.

24

report is based on non-public information, cites numerous non-anonymous sources, and contains no statement disclaiming the accuracy of its representations. *Compare id.* at 797 with ¶¶99-102. In fact, Fuzzy Panda represents: "To the best of their ability and belief, all information contained in their reports is accurate and reliable[.]" Ex. C at 53. Defendants' argument that Plaintiffs "admit" the Fuzzy Panda report did not cause Workhorse's stock to decline (Defs' Br. at 25), is simply not true. *See* ¶295 (Fuzzy Panda report "had an immediate negative impact on Workhorse's stock").

Second, Defendants' argument that the USPS' Contract announcement was merely "external bad news," Defs' Br. at 25, is the same as arguing a corrective disclosure must mirror the misrepresentations. But a corrective disclosure "need not… consist of an admission of fraud, . . . reveal the full scope of defendants' fraud in one fell swoop, . . . [nor] precisely mirror the earlier misrepresentation." *BofI*, 977 F.3d at 790. In fact, Plaintiffs can "prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d at 754. Here, as analysts noted, the failure of Workhorse to secure even a portion of the contract "raise[d] questions about underlying issues with WKHS's product, technology" and its "track record of manufacturing," the very things Defendants misrepresented throughout of the Class Period. ¶¶298-99. Nothing more is required.[18]

## IV.   CONCLUSION

Defendants' motion to dismiss should be denied in its entirety. In the event the Court finds Plaintiffs fail to adequately plead their claims, Plaintiffs respectfully request leave to amend.

Dated: October 18, 2021

**KAHN SWICK & FOTI, LLC**

By: /s/ *Kim E. Miller*

Kim E. Miller (SBN 178370)
*Counsel for Plaintiffs and the Class*

---

[18] Because Plaintiffs sufficiently allege § 10(b) claims, their § 20(a) claim should also survive dismissal. *See Kmiec*, 2013 U.S. Dist. LEXIS 153031, at *13.

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 2:21-CV-02072-CJC-PVC