SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JOHN P. STIGI III, Cal. Bar No. 208342
BRIDGET J. RUSSELL, Cal. Bar. No. 288107
GIAN A. RYAN, Cal. Bar. No. 334599
jstigi@sheppardmullin.com
brussell@sheppardmullin.com
gryan@sheppardmullin.com
1901 Avenue for the Stars, Suite 1600
Los Angeles, California 90067
Telephone:   310.228.3700
Facsimile:   310.228.3701

Attorneys for Defendants WORKHORSE
GROUP INC., DUANE HUGHES, STEVE
SCHRADER, ROBERT WILLISON and
GREGORY ACKERSON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM FARRAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WORKHORSE GROUP, INC., DUANE HUGHES, STEVE SCHRADER, ROBERT WILLISON and GREGORY ACKERSON,<br><br>Defendants. | Case No. 2:21-cv-02072-CJC-PVC<br><br>**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS LEAD PLAINTIFF'S AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Complaint filed:  March 8, 2021<br><br>Date:    December 6, 2021<br>Time:    1:30 p.m.<br>Crtrm.:  9B<br><br>The Hon. Cormac J. Carney |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................... 1

II.   ARGUMENT .......................................................................................... 2

      A.    Lead Plaintiff Fails to State a Primary Claim for Violation of Section 10(b) and Rule 10b-5 ................................................................ 2

            1.    The Amended Complaint Asserts Claims As to Non-Actionable Statements of Optimism .............................................. 2

            2.    The Amended Complaint Asserts Claims as to Protected Forward-Looking Statements ..................................................... 4

            3.    The Amended Complaint Fails to Plead Sufficient Facts Demonstrating How Defendants' Public Statements Were Knowingly or Recklessly False or Misleading When Made ........ 6

                  a.    Defendants' Statements Regarding the USPS NGDV Bid .................................................................. 6

                  b.    Defendants' Statements Regarding the Company's Production Guidance ....................................................... 14

                  c.    Defendants' Statements Providing Updates on the Status of Its Outstanding Orders and Announcing New Orders ................................................................. 20

                  d.    Defendants' PPP Statements ............................................ 22

            4.    The Amended Complaint Fails to Plead Loss Causation .......... 22

            5.    Lead Plaintiff's Claim Under Section 10(b) and Rule 10b-5(a) and (c) Fails for The Same Reasons Detailed Above ........ 23

III.  CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Alphabet, Inc. Sec. Litig.*
  1 F.4th 687 (9th Cir. 2021).............................................................................24

*Berson v. Applied Signal Tech., Inc.*
  527 F.3d 982 (9th Cir. 2008)...........................................................................5

*In re BofI Holding, Inc. Sec. Litig.*
  977 F.3d 781 (9th Cir. 2020)....................................................................22, 23

*City of Philadelphia v. Fleming Cos.*
  264 F.3d 1245 (10th Cir. 2001)...........................................................12, 19, 22

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*
  8 F.4th 592 (7th Cir. 2021)...............................................................................2

*In re Copper Mountain Sec. Litig.*
  311 F. Supp. 2d 857 (N.D. Cal. 2004)...........................................................5, 6

*In re Cutera Sec. Litig.*
  610 F.3d 1103 (9th Cir. 2010)........................................................................3, 4

*Diaz v. N. Dynasty Mins. Ltd.*
  2018 WL 5099749 (C.D. Cal. Apr. 30, 2018)................................................17

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*
  2019 WL 6998668 (C.D. Cal. Sept. 5, 2019)..................................................24

*Kmiec v. Powerwave Techs. Inc.*
  2013 WL 12113411 (C.D. Cal. Jan. 25, 2013)..................................................3

*Lomingkit v. Apollo Educ. Grp. Inc.*,
  2017 WL 633148 (D. Ariz. Feb. 16, 2017) ......................................................2

*Lorenzo v. Sec. & Exch. Comm'n*
  139 S. Ct. 1094 (2019)...................................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*
  563 U.S. 27 (2011) ...........................................................................................8

*McIntire v. China MediaExpress Holdings, Inc.*
  927 F. Supp. 2d 105 (S.D.N.Y. 2013).............................................................17

*Miller. PCM. Inc.*,
  2018 WL 509722 (C.D. Cal. Jan. 3, 2018)......................................................17

*Mulligan v. Impax Lab'ys, Inc.*
  36 F. Supp. 3d 942 (N.D. Cal. 2014)................................................................2

-ii-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*
320 F.3d 920 (9th Cir. 2003) ........................................................................ 12, 13

*In re Pixar Sec. Litig.*
450 F. Supp. 2d 1096 (N.D. Cal. 2006) ............................................................ 13

*In re PMI Grp., Inc. Sec. Litig.*
2009 WL 1916934 (N.D. Cal. July 1, 2009) .................................................... 12

*Prodanova v. H.C. Wainwright & Co., LLC*
993 F.3d 1097 (9th Cir. 2021) ......................................................................... 12

*In re Quality Systems, Inc. Sec. Litig.*
865 F.3d 1130 (9th Cir. 2017) .................................................................... 12, 13

*Ronconi v. Larkin*
253 F.3d 423 (9th Cir. 2001) ............................................................... 13, 18, 20

*Snellink v. Gulf Resources, Inc.*
870 F. Supp. 2d 930 (C.D. Cal. 2012) ............................................................. 17

*In re Solarcity Corp. Sec. Litig.*
274 F. Supp. 3d 972 (N.D. Cal. 2017) ........................................................ 12, 22

*Wochos v. Tesla, Inc.*
985 F.3d 1180 (9th Cir. 2021) ........................................................................ 4, 5

*Zucco Partners, LLC v. Digimarc Corp.*
552 F.3d 981 (9th Cir. 2009) ........................................................... 15, 16, 17, 22

**Statutes and Rules**

Securities Exchange Act of 1934, Section 10(b)
15 U.S.C. § 78j(b) ................................................................................... *passim*

Securities & Exchange Commission Rule 10b-5
17 C.F.R. § 240.10b-5 ............................................................................. *passim*

Private Securities Litigation Reform Act of 1995
15 U.S.C. § 78u-4 ................................................................................... *passim*

Federal Rules of Civil Procedure
Rule 9(b) ............................................................................................................ 24

-iii-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

## I.   INTRODUCTION

Despite its length, the Amended Complaint is not supported by sufficient well-pleaded particularized allegations of fact.  Rather, it mirrors claim-for-claim a biased short-seller blog post by a pseudonymous blogger "Fuzzy Panda," and then points to minimal allegations attributed to four vaguely-described, unnamed former Workhorse employees.  None of these sources is itself reliable, and they do not serve to corroborate each other.  Hence, they fail to support either the falsity of any of Workhorse's public statements or a strong (*i.e.*, cogent and compelling) inference that Workhorse's management failed to disclose material facts in deliberately reckless disregard of the risk of misleading investors.  Lead plaintiff's Opposition relies heavily upon allegations of motive to allege scienter, but those allegations alone are not sufficient to plead a strong inference of scienter under Ninth Circuit law.  The Opposition's argument that loss causation has been sufficiently alleged is also without merit.  Clearly, Workhorse's stock price declined because investors were disappointed the Company was not successful in obtaining a highly valued contract with the USPS, not because of any revelation of fraud.  Finally, lead plaintiff's scheme liability claim *is* plainly duplicative of its material representation claim.  Lead plaintiff cites no caselaw supporting that it is inappropriate to address duplicative claims under all three subsections of Rule 10b-5 under a single, statutorily-mandated heightened pleading standard.

If the Court were to grant lead plaintiff leave to amend, it should require that lead plaintiff plead its claims in a more organized, less prolix fashion.  As it currently stands, the Amended Complaint is "puzzle-pled."  The Court should instruct lead plaintiff to follow the strictures of the PSLRA as to each statement alleged to be false or misleading, by alleging for each, perhaps in a chart:  (1) when the statement was made; (2) who made the statement; (2) why it is false or misleading; (3) all facts demonstrating how it was false or misleading when made; (4) all facts supporting a strong inference that the maker of the statement knew or was deliberately reckless as

-1-

DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S CLASS ACTION COMPLAINT

to its falsity and the risk of misleading investors when it was made; and (5) the specific public statement that serves as a "corrective disclosure" of any so-called fraud associated with the statement.

## II.    ARGUMENT

### A.    Lead Plaintiff Fails to State a Primary Claim for Violation of Section 10(b) and Rule 10b-5

#### 1.    The Amended Complaint Asserts Claims As to Non-Actionable Statements of Optimism

Defendants' Motion established that several of the statements alleged in the Amended Complaint are non-actionable puffery. (Mot. at 12:5-12:11.) In response, the Opposition argues that Workhorse selectively quoted these statements and that when taken "in context" they do not qualify as puffery because they are objectively verifiable or lack a reasonable basis. (Opp. at 14:16-14:19.) Lead plaintiff's assertion as to why that is so misses the mark.

For example, lead plaintiff argues that the following statements were objectively verifiable and thus not actionable: (1) Workhorse had made "meaningful progress in [its] transition from a development stage company to a production focused enterprise" (AC ¶ 160) and (2) it was "ramping up" production capabilities (*Id.* ¶¶ 192, 277, 226-27). (Opp. at 14:22-14:23.) However, statements such as "meaningful progress" and "ramping up" are exactly the type of puffery caselaw holds to be not actionable. *See e.g.*, *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *16 (D. Ariz. Feb. 16, 2017) (phrases such as "meaningful progress . . . are classic examples of corporate puffery because they do not provide any objective understanding into what they describe"). How exactly would someone go about objectively measuring whether the Company's progress was "meaningful" or it was sufficiently "ramping up"? Such statements are "so amorphous as to be immaterial." *See Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *see also City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (Easterbrook, J.) (statement "progressing as planned" was non-

-2-

actionable puffery because it "did not make any concrete assertion; it expressed only vague optimism").

The remainder of lead plaintiff's objections are issues of its own making. In filing an Amended Complaint that totals 127 pages and 363 paragraphs, and failing to specify exactly *which* portions of the ten months of block-quoted statements they allege are misleading, a large amount of extraneous matter was included. When citing to a paragraph, defendants' Motion did not intend to assert that the entire paragraph cited was non-actionable puffery. Defendants' Motion alleged that the highlighted statements within that paragraph, such as, for example, "we're seeing customers very positive about our trucks" and "the actual business what I'll call . . . the non-post office business we think is great" (AC ¶¶ 177, 192), were non-actionable puffery. None of the caselaw or arguments in the Opposition detracts from defendants' argument that these types of statements qualify as non-actionable, vague statements of corporate optimism. *See*, *e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."). The same is true of statements that the company was "cautiously optimistic" that its supply issues were behind it. (AC ¶ 179.) The fact that, as lead plaintiff argues, the supply issues it turned out were not yet behind it (Opp. at 15:25-26) does not render defendants' statement actionable. The question is whether informing investors that one is "cautiously optimistic" offers any "specific details or forecasts regarding [the Company's] performance." *See Kmiec v. Powerwave Techs. Inc.*, 2013 WL 12113411, at *4 (C.D. Cal. Jan. 25, 2013) (Carney, J.). It does not.

Finally, lead plaintiff disputes that statements that the NGDV contract was a "huge fleet opportunity" and that President Biden's comments were "positive" and "meaningful" are non-actionable corporate optimism. Lead plaintiff argues that these statements do not qualify as vague corporate optimism because there was no basis to believe Workhorse would secure the contract. (Opp. at 15:9-15.) However, as

-3-

detailed at length in the Motion and herein, the Amended Complaint contains no facts supporting plaintiff's allegation that defendants' knew Workhorse would not secure the contract.  In that light, these statements qualify as non-actionable statements of corporate optimism.  *See*, *e.g.*, *Cutera*, 610 F.3d at 1111.

**2.    The Amended Complaint Asserts Claims as to Protected Forward-Looking Statements**

Defendants' Motion also established that the Amended Complaint includes various forward-looking statements regarding Workhorse's future plans, and the assumptions underlying said plans, which are both protected under the safe harbor provisions of the PSLRA.  (Mot. at 12:27-14:28.)  The Opposition argues to the contrary that the statements are actionable because they are:  (1) not-forward looking or mixed statements of present, future and even past and (2) not accompanied by meaningful cautionary language.  (Opp. at 15:22-17-3.)  Both arguments lack merit.

In the first instance, again, defendants' Motion did not assert that the entire paragraph it cited qualified as a forward-looking statement, only the highlighted statement so identified.  Thus, lead plaintiff's citation to various statements in the same paragraphs that are not forward-looking is a red herring.  (*See* Opp. at 15:27-28, 16:19-25.)

Lead plaintiff's argument regarding statements predicated upon past and present manufacturing capabilities also misses the mark.  The Ninth Circuit's recent decision in *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021), is directly on point. In *Wochos*, the plaintiff alleged the defendants made various statements that Tesla was "on track" to meet its production goal of 5,000 vehicles per week and that "there are no issues" that "would prevent" Tesla from achieving the goal.  *Id.* at 1192.  The plaintiff argued that these statements fell outside the definition of forward-looking because they contained assertions regarding Tesla's current ability to perform on its goal.  *Id.*  The Ninth Circuit disagreed.  It first reiterated that, in order to establish that a challenged statement contains non-forward-looking features that avoid the forward-

-4-

looking statement definition, a plaintiff "must plead sufficient facts to show that the statement goes *beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact[].'" *Id.* at 1191 (citation omitted). In contrast to "assumptions" about future events, "a concrete factual assertion about a specific present or past circumstance goes beyond the assertion of a future goal, and beyond the articulation of predicate assumptions, because it describes specific, concrete circumstances that have already occurred." *Id.* The Ninth Circuit held that Tesla's statements that it was "on track" to achieve its production targets merely reaffirmed the objective itself and was therefore protected as a forward-looking statement. *Id.*

Under *Wochos*, defendants' statements here are similarly protected as forward-looking. Contrary to lead plaintiff's argument, it is irrelevant if the statements also include the predicate assumptions regarding Workhorse's production capabilities, because those assumptions underly its plans and projections. Defendants' unadorned statements that Workhorse was "on track" to meet its guidance are also considered forward-looking under *Wochos*. Moreover, contrary to plaintiff's assertion (Opp. at 16:6-16), only one of the statements identified by defendants deals with the backlog. However, the statement in paragraph 279 that Workhorse planned to ship UPS trucks to California first is not a statement about the backlog, it is statement about *future* plans to deliver items in its backlog. Thus, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008), is inapposite.

Finally, lead plaintiff's argument that Workhorse's cautionary language was not sufficiently meaningful (Opp. at 17:7-21) is belied by Workhorse's filings. First, "The PSLRA does not require a listing of all factors that might make the results different from those forecasted. Instead, the warning must only mention important factors of similar significance to those actually realized." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004). Here, lead plaintiff cherry picks factors, but there are *several* in Workhorse's filings that are relevant to the production-

-5-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

related forward-looking statements at issue. (Mot. 15:1-21.) Lead plaintiff contends without any analysis that the language does not relate to the statements at issue, but this is simply untrue. The risks that Workhorse might not ramp up production as intended or obtain necessary capital infusions are *directly relevant* to the statements regarding Workhorse's production plans. Moreover, although lead plaintiff attempts to argue that the single statement related to the backlog lacks cautionary language because the backlog is itself false, he fails to adequately show that the relevant statement was "knowingly false," as required. *See Copper Mountain*, 311 F. Supp. 2d at 883. As detailed in the Motion and herein, the Amended Complaint does not allege facts supporting literal falsity *or* a strong inference of actual knowledge on the part of any of the defendants.[1] Thus, the projections are all protected as forward-looking statements that are accompanied by adequate cautionary warnings.

### 3. The Amended Complaint Fails to Plead Sufficient Facts Demonstrating How Defendants' Public Statements Were Knowingly or Recklessly False or Misleading When Made

#### a. Defendants' Statements Regarding the USPS NGDV Bid

Defendants' Motion established, and lead plaintiff does not dispute, that the Amended Complaint does not actually allege that defendants made any literally false statements regarding the USPS bid process. (*See* Mot. at 17:14-22; Opp. at 7:19-21.) The Opposition instead argues that defendants' statements were misleading because they "omitted material information and led investors to believe that Workhorse was still in the running for the USPS Contract," even though defendants "knew or should have known that Workhorse was no longer in the running for the contract." (Opp. at

---

[1] Lead plaintiff argues that two statements lacked cautionary language. (Opp. at 17:21-26.) However, lead plaintiff fails to rebut the Motion's argument that those statements are protected under the second prong of the PSLRA's forward-looking statement analysis, because the Amended Complaint does not allege facts supporting that Schrader knew the statements at issue were false when made. (Mot. at 15:22-16:26.)

-6-

6:23-25, 21:5-10.)  This conclusion, however, lacks sufficiently particularized and reliable factual support.

The Opposition specifically asserts that defendants omitted the following:  (1) in Spring 2018 there was a roll-away incident with the Workhorse prototype; (2) on September 3, 2020, the USPS sent Workhorse a "Deficiency List" identifying various alleged "weaknesses"; (3) Workhorse at the time lacked the design and manufacturing capabilities to manufacture the thousands of the NGDV vehicles the contract would require in the future; (4) the USPS's alleged concern that Workhorse was a startup company without the experience or capability to produce the NGDV; and (5) the USPS's statements that Workhorse displayed a lack of credibility and candor with the Federal government during the NGDV program.  (*See* Opp. at 7:5-8, 8:2-7.)

In the first instance, contrary to lead plaintiff's assertion (Opp. at 7:15), defendants' Motion challenged *all* of lead plaintiff's allegations regarding why defendants' USPS bid statements were misleading, *i.e.*, the roll-away incident, the deficiency list and the Company's alleged inability at the time to mass-produce thousands of trucks.[2] (Mot. at 18:4-19:5.)  The other two claimed omissions were *not* included in lead plaintiff's allegations as to why any specific statement regarding the USPS bid was misleading, as evidenced by lead plaintiff's paragraph citations.  (*See* Opp. at 7:5-8.) Instead, these new alleged omissions — which as detailed below are temporally irrelevant — were referenced only in the preamble to lead plaintiff's claims.  As noted above, this of course is among the problems with lead plaintiff's prolix, puzzle style of pleading.  Again, to the extent the Court grants lead plaintiff leave to amend, lead plaintiff should succinctly allege which statements it contends are misleading, which defendant made the statement, the facts supporting why such statement is misleading

---

[2] None of the paragraphs cited by lead plaintiff reference a lack of design capabilities. There are no such allegations in the Amended Complaint.

-7-

and the facts supporting a strong inference that when making the statement the defendant knew or was deliberately reckless to the risk he was misleading investors.

In any event, putting aside the fact that Workhorse would have violated its non-disclosure agreement ("NDA") with the USPS had it disclosed the details of the proto-type testing, the USPS's communications with Workhorse relating to the Company's proposal or Workhorse's plan for revamping its manufacturing capabilities to fulfill the USPS contract, lead plaintiff fails to identify any duty to disclose this information. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information"). In light of the circumstances under which Workhorse's general statements regarding the Company's continued participation in the USPS bid process were made, it was simply not necessary to specifically disclose any of this information to investors in order to render the Company's statements not misleading. *See id.* As lead plaintiff readily acknowledges, the Company's USPS bid statements that the Amended Complaint challenges all took the same format: they were made at the start of earnings calls, and followed by a comment that Workhorse was under an NDA so it could not provide updates. (Opp. at 6:17-22.) As noted in defendants' Motion, a reasonable investor would not have viewed these statements as misleading in light of the alleged issues with Workhorse's bid that lead plaintiff claims defendants failed to disclose, because the statements objectively *did not* provide investors with any update regarding the status of the bid process or make any claims as to the strength of Workhorse's bid. (Mot. at 17:10-18:3.)

The Opposition agrees that the standard the Court must employ in determining whether a statement is misleading is whether under the circumstances an objectively reasonable investor would have been misled by the statement in light of the allegedly undisclosed material facts. (*See* Opp. at 7:21-22.) However, the purported "actual examples" of alleged reasonable investor impressions cited by lead plaintiff do not support that an objectively reasonable investor would have been misled by

-8-

DEFENDANTS' REPLY ISO MOTION TO DISMISS LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

Workhorse's statements. (Opp. 7:23-25.)  For example, one analyst reported that "the USPS update was boilerplate" but that it was reported elsewhere that one of the bidders had backed out of the process "*leaving just 3 finalists including WKHS.*"  (AC ¶ 208 (emphasis in original).)  Clearly the analyst was not misled, and perfectly under-stood that Workhorse's statement regarding the bid process was nothing more than "boilerplate"; its update and positive outlook regarding the bid process was the result of information reported elsewhere.   Similarly, another analyst reported he was "shocked" that Workhorse was not awarded any part of the USPS contract, but specifically noted that this "shock" was based upon "the administration's stance around government fleets being zero emission," not any specific statements by Workhorse about the strength of its bid.  (*Id.* ¶ 274.)  The Court should give no credence to the objectively unreasonable "interpretations" of Workhorse's statements by YouTube commentators, *e.g.*, based upon Schrader's "demeanor" in a YouTube interview he must have known positive news (*id.* ¶ 217) and based upon his appearance in another YouTube interview, in which lead plaintiff does not allege the USPS bid was even mentioned, Workhorse "definitely" won the USPS contract. (*Id.* ¶ 259.)  Workhorse had no obligation to police the comment sections of YouTube to rebut the fanciful interpretations and wishful thinking of outside observers.

Nor does the Amended Complaint sufficiently allege that *any* of the alleged omissions actually rendered Workhorse's bid unviable, let alone that Workhorse's management knew or were deliberately reckless to that possibility.  The Amended Complaint admits that Workhorse was permitted to submit a proposal after the roll-away incident and that USPS continued to engage with Workhorse regarding its pro-posal.  (Mot. at 18:22-19:7.)  The Opposition's rebuttal that all bid contestants were permitted to submit proposals (Opp. at 8:11-14) does not support an inference that the bid was doomed after the prototype phase, and certainly does not support a strong inference of the individual defendants' knowledge of or deliberate recklessness as to the risk the bid was doomed.  Nor has Workhorse conceded that the Company's bid

-9-

was no longer viable after the roll-away incident.  (Opp. at 21:3-5.)  The Amended Complaint cites to Workhorse's Federal Claims Complaint ("FCC') for this assertion, but it references only statements *made by the USPS* in an adversarial March 22, 2021 letter to Workhorse, sent in response to Workhorse's formal filing of a disagreement with the contract award.  (Reply Request for Judicial Notice ("RRJN"), Ex. A, ¶¶ 5, 6, 11, 75-77.)  These *ex post* statements by the USPS should not be given deference, and in any event the Amended Complaint alleges no facts contradicting Workhorse's showing that the statements made by the USPS were ever previously communicated to Workhorse.

Lead plaintiff also admits that Workhorse responded to the USPS's September 2020 letter identifying (correctible) deficiencies. (Opp. at 8:11-13.)[3]  Indeed, far from supporting an inference of scienter, Workhorse's response supports the counter-inference that management believed the response would sufficiently address the USPS's concerns, thus confirming the bid's continued viability.[4]  Based upon the limited facts alleged, the Amended Complaint simply does not support a strong inference that the receipt of the deficiency list itself was known to be fatal to Workhorse's bid.  Moreover, with respect to the third alleged omission (lack of then-contemporaneous mass-production capabilities), lead plaintiff fails even to address defendants' argument that Workhorse did not need the existing manufacturing capability necessary to manufacture a bespoke USPS vehicle in order to render its participation in the bidding process non-fraudulent; Oshkosh also lacked existing capabilities. (Mot. at 19:8-15.)

[3] The temporal problems in the Amended Complaint remain.  Beyond the roll-away incident, the only facts alleged supporting that Workhorse's USPS bid was not viable relate to Workhorse's receipt of the deficiency letter. (Mot. at 18:12-19.)  All of the paragraphs cited by lead plaintiff in rebuttal (AC ¶¶ 54-55, 238, 252, 262, 264, 273) reference the deficiency letter.  Again, these allegations cannot support falsity or scienter prior to September 2020.

[4] The Opposition ignores defendants' argument that lead plaintiff fails to allege that Oshkosh and the other bidders were not also provided similar deficiency lists.

-10-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

The remaining arguments in the Opposition as to falsity and scienter specific to defendants' USPS statements, improperly (and misleadingly) rely upon allegations in the FCC. (*See* Opp. at 7:5-8, 7:11-14, 8:13-16, 21:10-13.) First, lead plaintiff argues that defendants' USPS statements during the class period were misleading because defendants should have disclosed that the USPS was concerned Workhorse was a startup and thought it displayed a lack of credibility and candor during the bid process. Those were assertions that the USPS made for the first time in its March 22, 2021 letter, in response to the prospect of litigation over the bid process. (RRJN, Ex. A, ¶¶ 75-76, 82-89.) Again, the Amended Complaint contains no allegations that they were ever made to Workhorse previously. Defendants' statements cannot be deemed misleading for failure to disclose later-acquired information. Second, lead plaintiff cites the USPS's attack on Workhorse's public statements and the USPS's claim that Workhorse was in violation of the NDA, both made in that same March 22, 2021 letter (*id.*), as support of its conclusion that Workhorse's USPS updates were intentionally or recklessly misleading. The Court should not infer falsity and scienter based upon these *ex post* accusations by a litigation adversary.

Defendants do not dispute that the scienter inquiry considers a complaint in its entirety; however, that does not absolve lead plaintiff of its obligation to set forth sufficient facts supporting that the individual defendants knew the statements at issue were false when they made them or recklessly disregarded the possibility of misleading shareholders when they failed to disclose allegedly material facts. (*See* Mot. 23:3-15.) Here, as detailed above, the Amended Complaint fails in that task. Again, lead plaintiff fails to allege facts supporting that, even if they knew about the information lead plaintiff claims they intentionally omitted,[5] the individual defendants were reckless regarding the risk that investors *would be misled* if Workhorse did not violate the

---

[5] Lead plaintiff argues knowledge, not based upon any allegations showing each statement makers' specific access to said information, but upon a "core operations" theory, *i.e.,* that based on the position of the individual defendants and the importance

-11-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

NDA and disclose, along with its boilerplate USPS update, that there had been a single incident with Workhorse's prototype (the only failure lead plaintiff alleges occurred during testing), that the USPS had sought further information from Workhorse related to certain claimed deficiencies with Workhorse's proposal and that Workhorse intended to revamp its manufacturing facilities to meet the demands of the USPS contract. *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001).

Under these circumstances, none of the other generalized scienter allegations are sufficient to support a cogent and compelling inference of scienter. First, it is well-settled that in the Ninth Circuit, motive and opportunity alone cannot give rise to a strong inference of scienter. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021); *see, e.g.*, *In re PMI Grp., Inc. Sec. Litig.*, 2009 WL 1916934, at *10 (N.D. Cal. July 1, 2009) (allegations regarding bonus plan and stock sales insufficient on their own to support a strong inference of scienter). As lead plaintiff acknowledges, his arguments regarding stock sales and incentive compensation fall into this category. (Opp. at 18:9-20:16.) The two cases cited by lead plaintiff for his argument that the alleged insider trading nonetheless gives rise to a strong inference of scienter — *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017), and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) — are distinguishable. In *Quality Systems*, the Court held that a strong inference of scienter was established based upon

---

of the USPS contract they must have known. (*See* Opp. at 21:27-28.) The Amended Complaint's allegation that Willison and Hughes were involved in the initial portions of Workhorse's bid are insufficient to support that this is the "rare circumstance" in which it would be "absurd" to suggest that the individual defendants as a whole had no knowledge of specific issues with the USPS bid. *See generally In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1013 (N.D. Cal. 2017). The only CW who makes allegations regarding the USPS bid is CW1, who ceased his employment just three months into the class period (June 2020). (AC ¶ 50.) Even if his allegations were reliable, they are time-limited and do not support knowledge of his allegations by Workhorse's management. His complaints aside, he even admits that Workhorse "had a vehicle that could fulfill the USPS requirements." (*Id.*)

-12-

allegations from CWs with personal knowledge. *Quality Sys.*, 865 F.3d at 1145-46. The alleged stock sales merely "reinforced" the already strong showing of scienter. *Id.* Similarly, in *America West*, the stock sales were combined with other proffered evidence of scienter to create a strong inference of scienter. *America West*, 320 F.3d at 942. The Opposition also cites *American West* in support of its argument that the executive bonus structure provided a further motive to two of the individual defendants, Hughes and Willison. However, again, the Ninth Circuit held the scienter allegations in *American West* were sufficient on their own, without the plaintiff's additional motive allegations. *Id.*

Importantly, the Opposition impliedly concedes that the only sales by Ackerson, Willison and Schrader that related temporally to Workhorse's USPS bid were Ackerson's and Willison's sale after President Biden's statements generally touting the EV industry. (*See* Opp. at 19:10-20:1.) Although lead plaintiff argues that "if they believed Workhorse could win the USPS contract, they would have held their stock" (*id.*), this is disingenuous. They could have believed strongly in Workhorse's bid and still understood the odds Workhorse would win the contract were still one in three. Selling some stock following the price spike caused by the President's comments is not facially suspicious.[6]

Finally, none of the additional scienter allegations lead plaintiff makes for the first time in the Opposition add meaningfully to the scienter analysis. As lead plaintiff admits, the resignation of an executive in proximity to an SEC investigation adds

---

[6] The Opposition's attempt to distinguish *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001), and *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105-06 (N.D. Cal. 2006), is unpersuasive. The Amended Complaint references a few sales by insiders (several in response to the President's comments), but does not provide evidence of their prior trading history or the percentage of their stock sold and retained. Absent such details, their sales cannot as a matter of law be deemed indicative of scienter. *See Quality Sys.*, 865 F.3d at 1146. Moreover, in arguing that Schrader, Willison and Ackerson did sell following misleading statements (Opp. at 19:10-26), the Opposition again highlights that the Amended Complaint is pled in an indecipherable manner, as none of the cited statements are alleged as misleading in the Amended Complaint's section entitled "Defendants' Materially False and Misleading Statements and Omissions."

-13-

merely a "piece" to the scienter puzzle. (Opp. at 23:13-17.)  Here, it is even less than that.  Hughes departed after Workhorse withdrew its 2021 guidance.  That, coupled with the disappointing failure to land the USPS contract, would provide an obvious alternative business rationale for Hughes' departure.  Finally, lead plaintiff's allegation that Workhorse's alleged "partnering" with companies that have engaged in stock promotion schemes supports an inference that defendants knowingly used "influencers" to disseminate misinformation (Opp. at 23:18-23) is nothing but pure conjecture.  Neither paragraphs 158 nor 324 of the Amended Complaint contain any reliable alleged facts in support of lead plaintiff's speculation.  Paragraph 158 relies upon the unreliable, admittedly biased Fuzzy Panda blog post, while paragraph 324 offers no particularized factual allegations in support of such an inference.

In sum, the facts alleged in the Amended Complaint more strongly support an inference that Workhorse fought hard to be awarded the USPS contract, timely and fully responding to any issue and concerns that the USPS raised and defendants believed that the Company's bid was more than viable.  It is more cogent and compelling that Workhorse made their statements confirming the Company's participation in the bid process and noting they were subject to an NDA, merely to forestall analyst questions regarding the bid that Workhorse would be unable to answer due to the NDA.

### b.    Defendants' Statements Regarding the Company's Production Guidance

As detailed in defendants' Motion, the only facts alleged in support of lead plaintiff's assertion that Workhorse's statements regarding the Company's production capability and targets were false when made are unreliable, anonymous sources.  Those allegations, even if believed, do not support the broad conclusions of falsity and scienter lead plaintiff attributes to them.  (Mot. at 16:5-18, 19:16-22:5, 20:24-21:3.)  In response, the Opposition makes two arguments:  (1) the Amended Complaint's and Fuzzy Panda's anonymous sources should be believed; and (2) the fact

-14-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

that Workhorse did not ultimately achieve its targeted production numbers supports a strong inference that it never intended to achieve those targeted production numbers. Neither has merit.

*The Anonymous Sources Are Unreliable.* As detailed at length in defendants' Motion, under *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), allegations attributed to anonymous sources are only reliable if (1) the anonymous source is "described with sufficient particularity to establish their reliability and personal knowledge" and (2) the allegations themselves are indicative of scienter. *Id.* at 995. Lead plaintiff makes light of these requirements, with a single sentence that the Amended Complaint satisfies *Zucco* because it includes job titles for most of the unnamed, former employee sources, job descriptions for all of them, detailed allegations and supposedly corroborating evidence. (Opp. at 10:21-11:10.) However, this argument is entirely unsupported by the paragraphs in the Amended Complaint (AC ¶¶ 50, 95-98, 104-105) lead plaintiff cites in support.

The only CW who is provided a job description of sorts is CW1, although he is not given a job title. (AC ¶ 50.) Meanwhile, there are *zero* job descriptions provided for CW2, CW3, CW4; they are only identified by generic titles, such as executive director of human resources, materials manager and buyer/planner. (*Id.* ¶¶ 95-98, 104-105.)[7] Moreover, the CW allegations themselves are not lengthy or detailed.

---

[7] Lead plaintiff's argument that titles such as materials manager and buyer/planner are commonly understood in the manufacturing field (Opp. at 11:8-10) is not the point. These titles provide no basis from which the Court may conclude it is probable that their job positions render them capable of having personal knowledge of the facts they allege. This is important because, even if these employees were involved in production, the Court cannot give credence to CW3's claim that there were design issues unless CW3 is qualified to opine as to design or other facts are alleged to support he or she would have been in a position to obtain information regarding said design issues. The Court cannot accept CW4's personal belief that Workhorse did not have the capacity to produce 300-400 trucks by the end of 2020 unless CW4 is qualified to make that conclusion, or other facts are alleged to support how he or she reached that conclusion based upon personal knowledge and not idle speculation.

-15-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

CW3's allegations form a single paragraph regarding Workhorse's lack of an assembly line and design issues. (*Id.* ¶ 95.) CW4 alleges only one thing: that he or she did not believe — without reference to when or why — that Workhorse had the capacity to produce 300-400 trucks by the end of 2020 and thus that the Company "booked numbers they didn't have." (*Id.* ¶ 105.) CW1 alleges that in his or her opinion Workhorse's prototype fulfilled the USPS's requirements, but did not merit production, and that Workhorse did not seem to have details regarding the prototype design. (*Id.* ¶ 50.) CW2 alleges that Workhorse's factory was not automated, that it had few employees with no plan or ability to hire more, and then contradicts that assertion by alleging that to fix the issue they hired temporary staffers at exorbitant rates, and that the Company used PPP funds to pay executive bonuses. (*Id.* ¶¶ 96-98, 207.)[8]

Contrary to lead plaintiff's argument, there are no reliable corroborating factual allegations in the Amended Complaint. Some of the allegations have no corroboration, such as the PPP allegations, the USPS prototype allegations and the allegations regarding paying exorbitant rates for temporary employees. The only purported corroboration of the CW allegations related to Workhorse's production capabilities comes from the Fuzzy Panda report, which, as detailed in defendants' Motion (Mot. at 21:4-11) and below similarly fails to satisfy *Zucco*, and is thus itself unreliable.

Lead plaintiff's failure to plead sufficient facts supporting the personal knowledge of the CWs is particularly troubling in light of the broad scope of the CW allegations and lead plaintiff's reliance thereon. Lead plaintiff's attempt to respond to defendants' arguments on this point misses the mark. (*See* Opp. at 10:25-11:10.) Defendants do not dispute that an executive director of human relations would be expected to have personal knowledge of basic facts such as the number employees

---

[8] As noted in defendants' Motion, and unrebutted by plaintiff, none of these allegations is indicative of scienter because, at best, only two of the CWs ever met with one of the individual defendants, and only one time at that. (*See* Mot. at 20:24-21:3).

-16-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

and their qualifications. However, lead plaintiff pleads no facts supporting the inference that this employee would have knowledge of the Company's finances so as to opine as to the available resources for hiring more employees. Nor does lead plaintiff allege any facts supporting the inference that this former employee would have sufficient technical knowledge to conclude how many workers would be necessary to increase production. Such additional particularized factual allegations are required under Ninth Circuit authority. *See Zucco*, 552 F.3d at 995.[9]

With respect to the reliability of the Fuzzy Panda blog post, lead plaintiff cites *Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930 (C.D. Cal. 2012), in support of its argument that the Court can accept the allegations in the Fuzzy Panda report at the pleading stage. (*See* Opp. at 11:11-17.) However, as the court noted in *Diaz v. N. Dynasty Mins. Ltd.*, 2018 WL 5099749, at *7 (C.D. Cal. Apr. 30, 2018), the short-seller report in *Snellink* only satisfied the PSLRA because "it disclosed its sources" and "the information was publicly available or verifiable." *Id.* at *7; *see also McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 114-16 (S.D.N.Y. 2013) ("Allowing counsel to rely on confidential witness statements recounted" in a separate document whose authors had "significant motive and opportunity . . . to misuse or mischaracterize confidential witness statements . . . would provide the Court little assurance that the factual contentions have any evidentiary support."). Here, the Fuzzy Panda report does *not* disclose the names of the employees that allegedly spoke to its "investigator" who also is unnamed. As noted in defendants' Motion (at 21:4-11), the Fuzzy Panda blog post therefore fails to meet *Zucco*'s requirements by failing to provide any job titles or descriptions for the employees it allegedly interviewed.

---

[9] Moreover, the fact that CW2 ceased his employment at Workhorse just three months into the class period (June 2020) surely limits his personal knowledge of Workhorse's production capabilities to a certain time frame.

-17-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

*See Miller. PCM. Inc.*, 2018 WL 509722 at *9 n.6 (C.D. Cal. Jan. 3, 2018) (applying Ninth Circuit standard for CWs to anonymous blog posts).[10]

*Fraud-by-Hindsight Arguments Fail.* Lead plaintiff makes two arguments in its attempt to brush off defendants' showing that the Amended Complaint's unnamed sources do not allege facts to support the Amended Complaint's broad conclusion that it was not Workhorse's plan and intention to meet its target guidance when the targets were made. First, lead plaintiff argues that Hughes' statement on November 9, 2020 regarding COVID-19-related worker shortages and Schrader's statement on November 14, 2020 regarding battery supplier issues support that Schrader's statements in October 2020 that Workhorse would meet its guidance were false and made with scienter. (Opp. at 9:16-10:14, 22:2-7.) Second, lead plaintiff argues that even if defendants believed that Workhorse could meet its 2020 guidance, the guidance was false *ab initio* because, as defendants' should have known, it was impossible for Workhorse to meet its 2020 guidance, and thus defendants' statements confirming the guidance were made with scienter. (Opp. at 11:18-12:20, 21:19-2.)

Lead plaintiff makes a fraud-by-hindsight argument that is rejected in this Circuit, plaintiff's out-of-Circuit caselaw notwithstanding. *See, e.g., Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001) (temporal proximity of the positive statements to disclosure of bad news, in and of itself, is insufficient to give rise to a strong inference of scienter). Schrader and Hughes' *ex post* statements that Workhorse knew there was a battery supplier issue as of October 1, 2020 and a worker shortage issue as of mid-October 2020 do not render Schrader's failure to revise Workhorse's guidance in his October 15 and 29, 2020 statements misleading. There are no allegations in the

---

[10] The fact that the report is lengthy is irrelevant. The portions regarding Workhorse's production capabilities only take up four pages, and consist entirely of supposed conversations with unnamed employees. (*See* Dkt. No. 71-3.) Moreover, again, because the Fuzzy Panda article describes visits in September 2020, even if it were otherwise reliable, it cannot support falsity as to any statements *after* September 2020, as lead plaintiff appears to concede. (*See* Opp. at 22:23-38.)

-18-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

Amended Complaint that at that time Workhorse was not working to find a back-up battery supplier that might have solved the issue, and that it then promptly disclosed — on November 9, 2020 — that it would not meet its prior guidance once it was determined this would not be feasible.  Similarly, there are no allegations in the Amended Complaint that Workhorse was not trying to develop novel solutions to solve its worker-shortage issues in the intervening weeks before revising guidance.

In such circumstances, the question becomes one of scienter.  Again, "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud."  *City of Philadelphia*, 264 F.3d at 1260.  The question is whether Schrader, in his October 15 and 29, 2020 statements, meant to deceive investors, and lead plaintiff alleges no facts supporting that he did, as opposed to the more plausible inference (considering he has admitted prior knowledge) that Workhorse tried to solve these issues and then promptly disclosed that it would not meet guidance when it was determined it could not.

As to lead plaintiff's second argument, much like the Amended Complaint, the Opposition contends that it would be impossible for defendants to meet prior guidance, but without pleading facts showing *why*.  The paragraphs of the Amended Complaint that lead plaintiff cites in the Opposition (AC ¶¶ 230-32, 235-36) only support the inference that by October 2020 Schrader should have known that Workhorse would not be able to meet its 2020 guidance because of battery issues and COVID-19-related worker shortages.[11]  In so doing, lead plaintiff impliedly admits

---

[11] The Opposition argues that even without the worker shortages Workhorse would not have been unable to meet its 2020 guidance. (Opp. at 11:18-12:6.)  But where are the supporting factual allegations?  Even assuming that the CW allegations lead plaintiff relies upon were true, again, the Amended Complaint does not plead facts supporting that a lack of automation was fatal to Workhorse's guidance.  Moreover,

-19-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

that the only statements regarding production targets that are really at issue are Schrader's October 2020 statements.  Again, as noted above, with respect to those statements, lead plaintiff alleges no facts supporting a strong inference that in failing to disclose these negative developments a couple weeks earlier Schrader was intending to deceive investors.[12]

In sum, the facts alleged in the AC more strongly support an inference that management worked to ramp up production of their trucks in the face of a once-in-a-century global pandemic. As the Ninth Circuit has observed, "[p]roblems and difficulties are the daily work of business people.  That they exist does not make a lie out of any of the alleged false statements."  *Ronconi*, 253 F.3d at 435.  Nor can lead plaintiff rely on his motive and opportunity allegations here, because the Amended Complaint contains no allegations that Schrader received stock price-based bonuses or sold stock after his October 15 and 29, 2020 statements.

**c.    Defendants' Statements Providing Updates on the Status of Its Outstanding Orders and Announcing New Orders**

Defendants' Motion established that the Amended Complaint fails to allege any facts supporting that Workhorse's statements with respect to its new and outstanding orders were false or misleading or made with scienter.  The Opposition fairs no better.  Lead plaintiff's entire claim with respect to these statements is that defendants represented the orders as firm customer orders, when defendants knew they were

---

lead plaintiff's fallback argument that Workhorse should have better predicted the ravages of COVID-19 is lackluster at best.  Workhorse should not be held to task for failing to predict the fall 2020 COVID-19 surge, or that the outbreak of variant strains would extend the worker shortage even further.  Nor is its decision to announce increased guidance for 2021 rendered false or misleading by the mere fact that COVID-19 remained a concern.  Lead plaintiff alleges no facts supporting that Workhorse could not meet its 2021 guidance if its plans to do so came to fruition.

[12] Lead plaintiff's argument that the allegations regarding Lordstown support *falsity* are puzzling.  (*See* Opp. at 9:12-15.)  Lead plaintiff fails to explain how former employees who committed a fraudulent scheme at another company after leaving Workhorse supports a strong inference that Workhorse's production statements and targets a year and a half later were false or misleading.

-20-

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

actually non-binding expressions of interest. (*See* Opp. at 12:22-26, 22:8-20.) However, this conclusory statement does not rebut the Motion's argument that Workhorse fully disclosed the orders at issue (like any purchase order) were not guaranteed and subject to conditions. (Mot. at 22:6-18.) Nor does lead plaintiff point to any facts supporting the allegation that these contracts have been canceled or will not be fulfilled in the ordinary course.[13] Instead, lead plaintiff argues that regardless of Workhorse's disclosure of the contract terms, the updates themselves were misleading. (Opp. at 13:12-16.) However, the paragraphs lead plaintiff cites in the Amended Complaint contain allegations that lack any factual support. For example, where are the factual allegations supporting the notion that "UPS had neither requested delivery of the trucks nor given Workhorse any indication that it would be requesting the trucks in 2020 — or ever"? There are none.

The Opposition's argument as to scienter with respect to these statements is entirely lacking. Lead plaintiff argues that UPS has not required delivery of trucks or given any indication it would be requesting the trucks. But again, lead plaintiff alleges no facts supporting this allegation in the Amended Complaint; the paragraph lead plaintiff cites (AC ¶ 247) alleges as much, but it provides no source supporting this speculation. Moreover, the fact that Workhorse ceased to be mentioned in UPS' sustainability report (Opp. at 22:16-18) (which the Amended Complaint does not allege any individual defendant had knowledge of) only supports, at best, that Workhorse had not yet fulfilled UPS's order — exactly what one would understand from the term "backlog." More to the point, even if the stall in fulfilment was from UPS rather than Workhorse, there are no allegations supporting the inference that

---

[13] Lead plaintiff's assertion that the contracts do not create any binding obligations because the buyers can later cancel is a red herring. (Opp. at 13:24-35.) The fact that purchase orders routinely permit cancellation or return under certain defined circumstances does not render them "fake." Similarly, regardless of the size of the Pride order (Opp. at 13:26-28), because Workhorse disclosed that it was subject to conditions, lead plaintiff cannot argue that the fact that it was subject to conditions renders Workhorse's inclusion of it in its backlog misleading.

-21-

Hughes or any other individual defendant was privy to any such communications with UPS. Lead plaintiff again attempts to invoke a "core operations" theory to bridge this knowledge gap. However, there are no allegations in the Amended Complaint that support that the UPS contract qualifies as the "rare circumstance" in which it would be "absurd" to suggest that the individual defendants lacked knowledge of all of its day-to-day intricacies. *See generally Solarcity*, 274 F. Supp. 3d at 1013.

Either way, lead plaintiff fails to allege facts supporting that even if they knew, the individual defendants were reckless regarding the risk that investors would be misled if Workhorse did not disclose more details regarding the status and purchase order conditions of the various orders in the backlog. *See City of Philadelphia*, 264 F.3d at 1260. Absent such allegations, lead plaintiff's opportunity and motive allegations are insufficient to give rise to a strong inference of scienter.

### d.     Defendants' PPP Statements

The Opposition "doubles down" on the Amended Complaint's allegations related to Workhorse's use of its PPP loans. However, as detailed above, the only factual allegations supporting lead plaintiff's assertion that the PPP loans were not used as disclosed by Workhorse is the statement of CW2. The question is not whether it is "unreasonable to infer" that an executive director of human resources "would know about payroll practices," as argued by lead plaintiff. (Opp. at 14:3-4.) The question is whether sufficient facts are alleged to make it probable that *this CW* was privy to the information alleged. *Zucco*, 552 F.3d at 995.

### 4.     The Amended Complaint Fails to Plead Loss Causation

Defendants' Motion established that lead plaintiff failed to plead loss causation. (Mot. at 24:15-25:19.) The Opposition's argument in response is without merit. First, the Fuzzy Panda blog post was not written by an "investigative reporter." (Opp. at 24:24-26.) It was written by a short seller, that specifically informs its readers that it is biased because it benefits if the stock prices of the companies it attacks drop. (Dkt. No. 71-3, at p.53.) Second, contrary to lead plaintiff's argument (Opp. at 24:26-25:4),

-22-

SMRH:4865-3733-6578.6

DEFENDANTS' REPLY ISO MOTION TO DISMISS
LEAD PLAINTIFF'S CLASS ACTION COMPLAINT;

the Fuzzy Panda blog post *does* mirror the short seller blog posts in *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020).  In *BofI*, "[t]he posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.'" *Id.* at 797.  Here, the same is true.  The Fuzzy Panda blog post is authored by a pseudonymous short-seller, it fully discloses it is biased towards convincing others to sell and it "make[] no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information." (Dkt. No. 71-3, at 53.)  Moreover, the fact that the market did not trust the speculation of the Fuzzy Panda author is evident by the fact that Workhorse's initial stock price decline had all but evaporated by the close the market the same day the report was posted.  (AC ¶ 295.)  Third, it is not just the fact that the USPS contract announcement was external bad news that renders it an insufficient "corrective disclosure" for purposes of pleading loss causation, it is the fact that the market reaction to the news was entirely *unrelated* to any revelation of alleged fraud.[14]

### 5.    Lead Plaintiff's Claim Under Section 10(b) and Rule 10b-5(a) and (c) Fails for The Same Reasons Detailed Above

As explained in defendants' Motion, because the Amended Complaint relies upon the same allegedly false and misleading statements to support its claims under 10b-5(b) and its claim under 10b-5(a) and (c), defendants analyzed the deficiencies in those claims together.  Section IV.A of defendants' Motion specifically states that "lead plaintiff fails to state a primary claim for violation of Section 10(b) and Rule 10b-5"; it is *not* limited to lead plaintiff's claims purportedly under Rule 10b-5(b).

---

[14] Lead plaintiff alleges that a third corrective disclosure was in play:  the May 10, 2021 disclosure that Workhorse was not on target to meet its 2021 guidance.  (Opp. at 24:27-28.)  This limited disclosure related only to Workhorse's 2021 guidance; clearly it was not corrective of any fraud in connection with statements about the USPS contract.

-23-

(Mot. at 11:17-18.)  Thus, defendants did not relegate their motion to dismiss lead plaintiff's Rule 10b-5(a) and (c) claim to a footnote, as argued in the Opposition (*see* Opp. at 1:19-25).  Rather, defendants' addressed it in over 15 pages of argument.  The footnote in the legal standards section of defendants' Motion merely noted that, because lead plaintiff's claim under Rule 10b-5(a) and (c) relies entirely upon the same alleged false and misleading misstatements, to survive dismissal that claim must satisfy the *same* pleading standards applicable to lead plaintiff's claims under Rule 10b-5(b) — which, as detailed at length, it fails to do.  The holding in the non-securities class action decision cited by lead plaintiff, *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, 2019 WL 6998668 (C.D. Cal. Sept. 5, 2019), is thus inapposite.

Nor does lead plaintiff's citation to *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021), rebut defendants' argument that, regardless of whether alleged in support of a Rule 10b-5(b) or Rule 10b-5(a) and (c) claim, to be actionable, an allegedly false or misleading statement must satisfy the same, well-known pleading requirements.  Lead plaintiff miscites *Alphabet*'s holding.  The Ninth Circuit did not reverse the district court's dismissal of the plaintiffs' scheme liability claims because the defendants "treated [the] scheme liability claims as 'duplicative of the claims under Rule 10b-5(b).'"  (Opp. at 1:25-2:2.)  Rather, the Ninth Circuit reversed the dismissal of the plaintiffs' scheme liability claims because the district court dismissed them *sua sponte* without addressing them.  *See Alphabet*, 1 F.4th at 709.

Here, defendants do not dispute that it is possible for a Rule 10b-5(a) and (c) claim to overlap with a Rule 10b-5(b) claim under *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094 (2019).  Defendants' argument, however, is that (1) the only misconduct alleged in support of lead plaintiff's Rule 10b-5(a) and (c) claim is the making of false or misleading statements under Rule 10b-5(b) (Mot. at 8:22-28); and (2) *all* of lead plaintiff's Section 10(b) and Rule 10b-5 claims under each subsection of Rule 10b-5 fail under Rule 9(b) and the heightened pleading requirements of the PSLRA.

-24-

(*Id.* at 11:17-25:19). *Alphabet* is in complete agreement on this point. *See Alphabet*, 1 F.4th at 699 (holding that all Section 10(b) claims "based on material misrepresentations or omissions" must satisfy the same pleading standards, with the only distinction post-*Lorenzo* being that, to be liable under Rule 10b-5(b), a defendant must "make," as narrowly-defined by the case law, a false or misleading statement with scienter, but opening up the possibility that to be liable under Rule 10b-5(a) and (c) a defendant need instead only "disseminate" said false or misleading statement with scienter).

## III.   CONCLUSION

For the foregoing reasons, and those detailed in defendants' Motion, the Court should grant defendants' Motion to Dismiss and dismiss the Amended Complaint in its entirety.

Dated:  November 12. 2021     SHEPPARD. MULLIN. RICHTER & HAMPTON LLP

By: _____ */s/ John P. Stigi III*
JOHN P. STIGI III
BRIDGET J. RUSSELL
GIAN A. RYAN
Attorneys for Defendants

-25-