**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SAM FARRAR, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**WORKHORSE GROUP, INC., DUANE HUGHES, and STEVE SCHRADER,**<br><br>**Defendants.** | **Lead Case No.: CV 21-02072-CJC (PVCx)**<br><br>**ORDER DENYING IN SUBSTANTIAL PART DEFENDANTS' MOTION TO DISMISS [Dkt. 65]** |

## I. INTRODUCTION

On March 8, 2021, Plaintiff Sam Farrar brought this putative securities class action against Defendants Workhorse Group, Inc. ("Workhorse"), its Chief Executive Officer, Duane Hughes, and its Chief Financial Officer, Steve Schrader. (Dkt. 1 [Complaint].) The Court then granted consolidation of this case with numerous other cases alleging similar securities violations against Defendants, and appointed Timothy M. Weis as lead Plaintiff. (Dkt. 61.) Plaintiff's First Amended Complaint alleges (1) violations of

Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, (2) violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder, and (3) violations of Section 20(a) of the Exchange Act. (Dkt. 64 [hereinafter "FAC"] ¶¶ 338–63.) Now before the Court is Defendants' motion to dismiss Plaintiff's First Amended Complaint. (Dkt. 65 [Motion, hereinafter "Mot."].) For the following reasons, Defendants' motion is **DENIED IN SUBSTANTIAL PART**.[1]

## II. BACKGROUND

Plaintiff alleges the following facts in his FAC. Workhorse makes all-electric "last mile" delivery trucks, or small to medium sized trucks that deliver packages the relatively short distance from a warehouse or fulfillment center to the end customer. (FAC ¶ 35.) In January 2015, the United States Postal Service ("USPS") announced the Next Generation Delivery Vehicle ("NGDV") project, which aimed to replace about 165,000 aging package delivery vehicles. (*Id.* ¶ 38.) The contract was reported to be worth between $6.3 and $8 billion. (*Id.*) On October 16, 2015, USPS issued a Prototype Request for Proposal to 15 prequalified suppliers, and out of these proposals 6 suppliers were chosen to create prototypes. (*Id.* ¶ 38.) Workhorse predecessor AMP Holdings, Inc. submitted a proposal to create a prototype, but the bid was rejected because Workhorse's engineers were unable to use the design software USPS required all bidders to use. (*Id.* ¶ 39.)

Workhorse then partnered with engineering company VT Hackney, which was one of the 6 suppliers chosen to create prototypes. (*Id.* ¶ 40.) VT Hackney, however,

[1] Having read and considered the papers presented by the parties, the Court finds these matters appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for December 6, 2021, at 1:30 p.m. is hereby vacated and off calendar.

dropped out, and Workhorse announced that it purchased VT Hackney's right to bid on the USPS contract for approximately $7 million. (*Id.* ¶ 41.)

In September 2017, the Workhorse/VT Hackney team delivered 6 vehicles for prototype testing in compliance with the terms of their USPS prototype contract. (*Id.* ¶ 49.) However, according to a confidential witness ("CW1"), Workhorse was not capable of producing other trucks like the prototype. (*Id.* ¶ 50.) Workhorse's prototype also experienced numerous failures during testing, including parking brake failures. (*Id.* ¶¶ 51–52.)

Nevertheless, Workhorse decided to submit a proposal for the next phase—the production phase—of the NGDV project. (*Id.* ¶ 53.) Workhorse did this even though it knew that it was not capable of mass-producing the vehicle, and even though its prototype had experienced failures during testing, making it unlikely USPS would select its prototype for production. (*Id.*) Plaintiff alleges that Workhorse did this to maintain and inflate the price of its stock. (*Id.*)

USPS sent Workhorse multiple emails identifying weaknesses in Workhorse's proposal. (*Id.* ¶¶ 54–55.) However, even though Workhorse knew the process was not going well for it, and that it could not produce anywhere near the number of vehicles needed for the USPS project, Workhorse led investors to believe it was still a viable contender for the contract, often by hiding behind the nondisclosure agreement it had signed with USPS. (*Id.* ¶¶ 56–57.)

After then newly-elected President Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States, Workhorse stock jumped from $23.62 per share at open on January 25, 2021 to $27.04 per share at open on January 26, 2021—a nearly 14% increase. (*Id.* ¶ 58.) In the

following days, Workhorse executive Schrader conducted several interviews in which he materially mislead the market to believe that President Biden's announcement was an indication that Workhorse would be awarded the USPS NGDV contract. (*Id.* ¶ 59.) As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021—a $10 per share increase in just one week. (*Id.* ¶ 60.) However, on January 26, 2021, while Workhorse's stock price was still rising, Workhorse executives Hughes, Willison, and Ackerson, and multiple board members sold large quantities of their Workhorse stock. (*Id.* ¶¶ 61–62.)

On February 23, 2021, USPS issued a press release stating that it was awarding the NGDV contract to Oshkosh Defense. (*Id.* ¶ 64.) After this news, the price of Workhorse stock plummeted, from opening at $28.29 per share to an intra-day low of $12.50 per share, closing around $16.43 per share. (*Id.* ¶ 65.)

On May 30, 2018, Workhorse announced that it had entered into an agreement with United Parcel Service, Inc. ("UPS") for 1,000 electric package delivery vehicles (the "UPS Agreement"). (*Id.* ¶ 73.) The UPS Agreement provided for delivery of the vehicles in two phases. (*Id.* ¶ 74.) In phase 1, Workhorse would provide UPS with 50 prototype vehicles as a test fleet, and in phase 2, UPS would take delivery of the remaining 950 vehicles. (*Id.*) However, although UPS took delivery of the 50 prototype vehicles, it never requested delivery of the remaining 950 vehicles. (*Id.* ¶ 77.) Instead, in its 2019 Sustainability Report, UPS announced it had placed an order for 10,000 EVs from a U.K.-based startup called Arrival. (*Id.*) Nevertheless, Defendants continued representing to investors that they had a 950 vehicle "backlog," as if the UPS order was about to be fulfilled. (*Id.* ¶ 78.)

//

//

## III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's claims. The issue on a motion to dismiss for failure to state a claim is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must contain well-pleaded factual allegations, not legal conclusions, that "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV. ANALYSIS

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Under this rulemaking authority, the SEC promulgated Rule 10b-5, which makes it unlawful "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5. To state a claim for a violation of Rule 10b-5, a plaintiff must allege "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

Claims brought under Section 10(b) are subject to the heightened pleading requirements set forth in the Private Securities Litigation Reform Act ("PLSRA"). *See* 15 U.S.C. § 78u-4(b)(2)(A). "Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'" *See In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999). Accordingly, in securities fraud cases, plaintiffs are required to plead both falsity and scienter with particularity. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). This means that "a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Plaintiff alleges that four categories of statements were false or misleading: (1) Defendants' statements indicating Workhorse was still a viable contender for the USPS contract when Defendants knew they had little to no chance of securing it, (2) Defendants' misrepresentations regarding Workhorse's manufacturing capability, including that Workhorse could produce hundreds of vehicles a year, when it plainly could not, (3) Defendants' false representations that they had a "backlog" of vehicle orders, which created the illusion of firm customer orders when they were really conditional, cancellable, or unrealistic, and (4) Defendants' false statements regarding Workhorse's use of Payroll Protection Program funds. (Dkt. 70 [Opposition, hereinafter "Opp."] at 7–13.) The Court addresses each category of alleged misrepresentations in turn.

### A. Statements Indicating Workhorse Was A Viable Contender for the USPS Contract

Plaintiff alleges that Defendants' statements indicating Workhorse was still a viable contender for the USPS contract were misleading because Defendants knew they had little to no chance of securing the contract, given their inability to manufacture a large volume of vehicles and the fact that their prototypes had suffered numerous failures during testing, including parking brake failures. For example, Plaintiff alleges that on October 29, 2020, when asked about the status of the USPS NGDV Contract, Schrader explained he was limited by the nondisclosure agreement, but stated, "the Post Office is bidding out 165,000 vehicles, so it's a huge fleet opportunity, and I think from our standpoint it would be transformative, right?" (FAC ¶ 237.) Plaintiff has sufficiently alleged a misrepresentation in this regard.

"[A] projection or statement of belief may be actionable to the extent that one of three implied factual assertions is inaccurate: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992). Plaintiff plausibly alleges sufficient facts indicating that Defendants could not have genuinely or reasonably believed that Workhorse had a real chance at securing the USPS contract, or that Defendants were aware of undisclosed facts tending to seriously undermine their ability to secure that contract. (*See* FAC ¶¶ 109, 252, 262.) First, Plaintiff alleges that an undisclosed parking brake failure during prototype testing caused Workhorse's prototype vehicle to roll down an incline and into a ditch, resulting in the hospitalization of a USPS driver who was forced to jump from the runaway vehicle. (*Id.* ¶¶ 8, 14, 51–52, 111, 291.) Second, Plaintiff alleges that Defendants knew Workhorse was not capable of producing trucks on the scale required to win the contract. (*Id.* ¶¶ 13, 37 [noting that Workhorse's

production facility "has no automation or assembly line capabilities that one would traditionally expect to find in a factory"], 53, 101–02, 264.) Indeed, a confidential witness ("CW2") stated that Workhorse's claims that it would be able to produce 300-400 trucks by the end of 2020 was an "absolute lie," as there was "no way" Workhorse would have been able to meet this target because there was "no automation, zero automation." (*Id.* ¶¶ 96, 104.) Third, Plaintiff alleges that on September 3, 2020, USPS sent Workhorse an undisclosed "deficiency list" identifying various "questions and weaknesses" with Workhorse's proposal, with questions regarding its "prior performance" including the "roll-away incident," its "ability to manufacture efficient and sustainable all-electric vehicles for large-scale commercial delivery," its "production capabilities," and its "cost breakdown." (*Id.* ¶¶ 14–15, 54, 238, 252, 262.) And fourth, Plaintiff alleges that on October 21, 2020, USPS sent Workhorse another email with another list of issues related to Workhorse's proposal. (*Id.* ¶¶ 55, 238, 252, 262.) Taking all of these alleged facts together, Plaintiff plausibly alleges that Defendants' statements, as late as October 29, 2020, indicating optimism regarding the USPS contract were materially misleading. *See Hanon*, 976 F.2d at 501.

### B. Misrepresentations Regarding Workhorse's Manufacturing Capability

Next, Plaintiff alleges that Defendants made material misrepresentations regarding Workhorse's manufacturing capability. Specifically, Defendants misrepresented that Workhorse had the capacity to meet the production requirements of the USPS contract, and stated that they would be able to produce 300 to 400 trucks in 2020. (FAC ¶¶ 125–26, 237.) These statements also sufficiently allege misleading representations.

The facts on which Plaintiff alleges that "Defendants knew or should have known that it did not have the skill and production capacity necessary to design and manufacture a 165,000-truck order from the USPS" are as follows. (FAC ¶ 109.) Plaintiff alleges that

Workhorse produced only 7 trucks in the third quarter of 2020, 18 trucks for the whole year of 2020, and 38 trucks year-to-date by May 10, 2021. (*Id.* ¶¶ 13, 106, 114, 278.) Despite these low numbers, Workhorse claimed over and over that it would be able to produce 300-400 trucks by the end of 2020. (*Id.* ¶¶ 104, 125–28.) As explained, CW2 stated that this claim was an "absolute lie," as there was "no way" Workhorse would have been able to meet this target because there was "no automation." (*Id.* ¶ 104; *see id.* ¶¶ 99–100.) Indeed, "[w]orkers assembled vehicles one at a time on wooden workbenches using basic hand tools that could be purchased at any hardware store." (*Id.* ¶ 127; *see id.* ¶ 95.) When asked if there was a timeline for hiring the workers necessary to increase production, CW2 responded, "hell no," and even if there had been, Workhorse had "no cash flow" with which to perform such hiring. (*Id.* ¶¶ 96, 127.)

Defendants argue that their statements regarding manufacturing capability "are uniformly forward-looking statements that are protected under the PSLRA's safe harbor." (Mot. at 19.) The Court disagrees. "Under the PLSRA's safe harbor provision, false or misleading forward-looking statements are actionable if (1) not accompanied by meaningful cautionary language; and (2) defendants had actual knowledge that the statements were false or misleading." *Kmiec v. Powerwave Techs. Inc.*, 2013 WL 12113411, at *5 (C.D. Cal. Jan. 25, 2013) (citing U.S.C. § 78u–5(c)(1); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1113 (9th Cir. 2010)). Plaintiff plausibly alleges that the statements regarding Workhorse's manufacturing capabilities were not accompanied by meaningful cautionary language and that Defendants had actual knowledge that their statements regarding manufacturing capability were false or misleading. *See id.* Specifically, Plaintiff alleges that based on Workhorse's production numbers up to that time, and the unautomated state of their manufacturing facility, Defendants knew that there was absolutely no way Workhorse could possibly have met the stated projections. Indeed, Plaintiff alleges that Hughes stated on a March 10, 2020 investor call that as of that day, Workhorse could produce 2 trucks per day, and hoped to increase that number

to 5 and then 10 trucks per day. (FAC ¶ 162.) By May 6, 2020, Hughes stated that Workhorse was still working at a rate of 2 trucks per day. (*Id.* ¶ 181.) Nevertheless, Schrader was assuring the public that Workhorse was on track to meet its 300-400 vehicle target as late as October 29, 2020, at a time when fewer than 18 trucks had been made that year. (*Id.* ¶¶ 114, 126, 278); *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015) (explaining that an investor expects that the issuer believes the statements he makes, and also that the statements "fairly align[ ] with the information in the issuer's possession at the time). Defendants' alleged statements regarding manufacturing capability are therefore not protected by the safe harbor provision of the PSLRA.

Defendants also argue that CW2's statements supporting the alleged misrepresentation regarding manufacturing capabilities should not be considered because they are unreliable. (Mot. at 19–20; Dkt. 72 [Reply] at 15–17.) A complaint relying on confidential witness statements must pass two hurdles to satisfy the PSLRA pleading requirements: (1) the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge, and (2) those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Plaintiff has sufficiently alleged both prongs. Specifically, Plaintiff alleges that CW2 was Executive Director of Human Resources from December 2019 through June 2020, which explains how he or she would have personal knowledge regarding Workhorse's hiring timeline. (FAC ¶¶ 96, 127.) It is also plausible that an Executive Director of Human Resources would have a basic knowledge of whether Workhorse's manufacturing facility had automation or not, given that the person would be familiar with the qualifications needed for various positions within the company. As to the second prong, the statements CW2 relays are indicative of scienter,

because they tend to show that Workhorse and its executives knew they did not have the manufacturing capability to meet their production projections or the touted demand for their vehicles.

### C. False Representations Regarding A "Backlog" Of Vehicle Orders

Next, Plaintiff challenges Defendants' false representations that Workhorse had a "backlog" of vehicle orders, which created the illusion of firm customer orders when they were really non-binding expressions of interest. (FAC ¶ 89.) For example, Plaintiff alleges that Hughes told an analyst on March 10, 2020 that UPS "had 1,060 units on order that we are beginning to deliver in anticipation in late Q2 or Q3 this year," even though he knew that Workhorse did not have the capacity to produce that many vehicles, and that UPS had not actually requested delivery of the vehicles. (*Id.* ¶¶ 142, 166–67.) Similarly, Plaintiff alleges that on March 1, 2021, Workhorse announced that it received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises, raising the backlog to 8,000 vehicles. (*Id.* ¶¶ 281–82.) These statements too sufficiently allege misrepresentations.

Defendants argue that Plaintiff fails to allege that the challenged statements were false or misleading when made, as Workhorse disclosed the fact that the backlog orders were subject to conditions and not guaranteed. (Opp. at 22.) Plaintiff alleges that Workhorse attached the UPS Agreement to its Form 8-K, and that the agreement states that UPS could cancel the balance of the order. (FAC ¶ 138.) Similarly, Plaintiff alleges that Workhorse publicly stated that an order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises was "subject to various production and delivery conditions." (*Id.* ¶¶ 152, 283.)

"[A]n issuer's public statements cannot be analyzed in complete isolation." *In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 512 (9th Cir. 1991). Instead, a plaintiff must allege "that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.* Plaintiff sufficiently alleges that Defendants' statements, even taken with the caveats presented, were misleading when made. Plaintiff alleges that after the caveats were published, Defendants repeatedly referenced their growing backlog as an indicator that they were a strong, growing company that was able to meet increasing demand. (FAC ¶¶ 136, 143, 285.) Plaintiff alleges that although UPS announced in its 2019 Sustainability Report that it had placed an order for 10,000 electric vehicles from Arrival, making it unlikely that UPS would take delivery of the remaining 950 Workhorse vehicles, Schrader acted as if fulfilling the UPS order was still likely, stating on a March 1, 2021 earnings call that he believed UPS would probably take delivery of their Workhorse trucks in California. (*Id.* ¶ 279.) Plaintiff further alleges that Defendants' announcements of the orders increasing their backlog affected analyst opinions regarding the value of Workhorse stock. (*Id.* ¶¶ 143, 150.) These allegations are sufficient to state a claim. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (explaining that "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of").

**D. False Statements Regarding Workhorse's Use Of Paycheck Protection Program Funds**

Finally, Plaintiff challenges Defendants' false statements regarding Workhorse's use of Paycheck Protection Program ("PPP") funds. Plaintiff alleges that on May 6, 2020, Defendants filed a Form 10-Q stating that Workhorse received $1.4 million in PPP funds, which would be used "primarily for payroll costs." (FAC ¶ 185.) Plaintiff alleges

that this statement was "materially false and misleading when made" because CW2 stated the funds were used to pay executive bonuses. (*Id.* ¶ 186.)

As to these statements, Defendants argue that CW2's statement that the PPP funds were used to pay executive bonuses is unreliable because Plaintiff alleges that CW2 "didn't do payroll." (Mot. at 6 n.4; Reply at 15–16; FAC ¶ 98.) "The first prong of th[e] two-part confidential witness test analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Zucco*, 552 F.3d at 995. Because Plaintiff expressly alleges that CW2 "didn't do payroll," it is unclear how CW2 could have personal knowledge regarding the fact that PPP funds were used to pay executive bonuses. *See id.* (explaining that "the complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report"). The FAC alleges no other reason or fact supporting the idea that Defendants' statement regarding PPP funds was false other than CW2's statement.

Moreover, Plaintiff fails to allege facts showing that Workhorse's statement that PPP funds would be used primarily for payroll costs was false or misleading when made. In other words, Plaintiff does not allege that at the time Workhorse stated it would use the PPP funds for payroll costs, it actually planned to use the funds for executive bonuses. Accordingly, the Court will dismiss Plaintiff's claims insofar as they rely on the allegation that these statements were false or misleading. Because it is possible that Plaintiff could cure the pleading deficiencies by amendment, the Court will grant Plaintiff leave to amend.

//

//

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED IN SUBSTANTIAL PART.** Plaintiff's claims are **DISMISSED WITH LEAVE TO AMEND** insofar as they rely on the allegation that Workhorse would use PPP funds primarily for payroll costs. If Plaintiff wishes to file an amended complaint, he must do so by **December 16, 2021.** If Plaintiff does not file an amended complaint, Defendants shall file an answer to the FAC by **December 30, 2021.**

DATED: December 2, 2021

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE