# JS-5

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SAM FARRAR, individually and on behalf of all others similarly situated,

　　　　　　Plaintiff,

　　v.

WORKHORSE GROUP, INC., DUANE HUGHES, and STEVE SCHRADER,

　　　　　　Defendants.

Lead Case No.: CV 21-02072-CJC (PVCx)

ORDER GRANTING LEAD PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 105]

## I.　INTRODUCTION

This is a consolidated putative securities class action brought by Plaintiff Sam Farrar against Defendants Workhorse Group, Inc. ("Workhorse"), its Chief Executive Officer, Duane Hughes, and its Chief Financial Officer, Steve Schrader. (Dkt. 64 [First Amended Complaint, hereinafter "FAC"].) After receiving competing applications, the Court appointed Timothy M. Weis as lead Plaintiff ("Lead Plaintiff") and Kahn Swick & Foti, LLC as lead counsel ("Lead Counsel"). (Dkt. 61.) The parties have now reached a

proposed settlement (the "Settlement Agreement").  Before the Court is Lead Plaintiff's motion for preliminary approval of the Settlement Agreement, certification of the class for settlement purposes, approval of Lead Counsel as class counsel, approval of Lead Plaintiff and Angelo Federico as class representatives, approval of KCC Class Action Services, LLC ("KCC") as claims administrator, and approval of a proposed notice distribution.  (Dkt. 105 [hereinafter "Mot."].)  For the following reasons, Lead Plaintiff's motion is **GRANTED**.[1]

## II.     BACKGROUND

### A.     Factual Allegations

Lead Plaintiff alleges the following facts in his FAC.  Workhorse makes all-electric "last mile" delivery trucks, or small to medium sized trucks that deliver packages the relatively short distance from a warehouse or fulfillment center to the end customer. (FAC ¶ 35.)  In January 2015, the United States Postal Service ("USPS") announced the Next Generation Delivery Vehicle ("NGDV") project, which aimed to replace about 165,000 aging package delivery vehicles.  (*Id.* ¶ 38.)  The contract was reported to be worth between $6.3 and $8 billion.  (*Id.*)  On October 16, 2015, USPS issued a Prototype Request for Proposal to fifteen prequalified suppliers, and out of these proposals 6 suppliers were chosen to create prototypes.  (*Id.* ¶ 38.)  Workhorse predecessor AMP Holdings, Inc. submitted a proposal to create a prototype, but the bid was rejected because Workhorse's engineers were unable to use the design software USPS required all bidders to use.  (*Id.* ¶ 39.)

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for February 27, 2023, is hereby vacated and removed from the calendar.

Workhorse then partnered with engineering company VT Hackney, which was one of the six suppliers chosen to create prototypes. (*Id.* ¶ 40.) VT Hackney, however, dropped out, and Workhorse announced that it purchased VT Hackney's right to bid on the USPS contract for approximately $7 million. (*Id.* ¶ 41.)

In September 2017, the Workhorse/VT Hackney team delivered six vehicles for prototype testing in compliance with the terms of their USPS prototype contract. (*Id.* ¶ 49.) However, according to a confidential witness ("CW1"), Workhorse was not capable of producing other trucks like the prototype. (*Id.* ¶ 50.) Workhorse's prototype also experienced numerous failures during testing, including parking brake failures. (*Id.* ¶¶ 51–52.)

Nevertheless, Workhorse decided to submit a proposal for the next phase—the production phase—of the NGDV project. (*Id.* ¶ 53.) Workhorse did this even though it knew that it was not capable of mass-producing the vehicle, and even though its prototype had experienced failures during testing, making it unlikely USPS would select its prototype for production. (*Id.*) Lead Plaintiff alleges that Workhorse did this to maintain and inflate the price of its stock. (*Id.*)

USPS sent Workhorse multiple emails identifying weaknesses in Workhorse's proposal. (*Id.* ¶¶ 54–55.) However, even though Workhorse knew the process was not going well for it, and that it could not produce anywhere near the number of vehicles needed for the USPS project, Workhorse led investors to believe it was still a viable contender for the contract, often by hiding behind the nondisclosure agreement it had signed with USPS. (*Id.* ¶¶ 56–57.)

After then newly-elected President Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States,

Workhorse stock jumped from $23.62 per share at open on January 25, 2021 to $27.04 per share at open on January 26, 2021—a nearly 14% increase. (*Id.* ¶ 58.) In the following days, Workhorse executive Schrader conducted several interviews in which he materially misled the market to believe that President Biden's announcement was an indication that Workhorse would be awarded the USPS NGDV contract. (*Id.* ¶ 59.) As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021—a $10 per share increase in just one week. (*Id.* ¶ 60.) However, on January 26, 2021, while Workhorse's stock price was still rising, Workhorse executives Hughes, Willison, and Ackerson, and multiple board members sold large quantities of their Workhorse stock. (*Id.* ¶¶ 61–62.)

On February 23, 2021, USPS issued a press release stating that it was awarding the NGDV contract to Oshkosh Defense. (*Id.* ¶ 64.) After this news, the price of Workhorse stock plummeted, from opening at $28.29 per share to an intra-day low of $12.50 per share, closing around $16.43 per share. (*Id.* ¶ 65.)

On May 30, 2018, Workhorse announced that it had entered into an agreement with United Parcel Service, Inc. ("UPS") for 1,000 electric package delivery vehicles (the "UPS Agreement"). (*Id.* ¶ 73.) The UPS Agreement provided for delivery of the vehicles in two phases. (*Id.* ¶ 74.) In phase one, Workhorse would provide UPS with fifty prototype vehicles as a test fleet, and in phase two, UPS would take delivery of the remaining 950 vehicles. (*Id.*) However, although UPS took delivery of the fifty prototype vehicles, it never requested delivery of the remaining 950 vehicles. (*Id.* ¶ 77.) Instead, in its 2019 Sustainability Report, UPS announced it had placed an order for 10,000 EVs from a U.K.-based startup called Arrival. (*Id.*) Nevertheless, Defendants continued representing to investors that they had a 950 vehicle "backlog," as if the UPS order was about to be fulfilled. (*Id.* ¶ 78.)

**B.      Procedural History**

In May 2021, the Court granted an unopposed motion to consolidate numerous actions alleging similar securities violations against Defendants, appointed Timothy M. Weis as lead Plaintiff, and approved Kahn Swick & Foti, LLC as lead counsel.  (Dkt. 61.)

In December 2021, the Court denied in substantial part Defendants' motion to dismiss, in which they argued that the statements upon which Lead Plaintiff relied were not material misrepresentations.  (Dkt. 74.)  The Court concluded Lead Plaintiff stated a claim upon which relief could be granted as to statements indicating Workhorse was a viable contender for the USPS contract, misrepresentations regarding Workhorse's manufacturing capability, and false representations regarding the "backlog" of vehicle orders.  (*Id.* at 7–12.)  However, the Court granted Defendants' motion as to statements that Workhorse would use Paycheck Protection Program ("PPP") funds primarily for payroll costs because Lead Plaintiff relied on a confidential witness whose reliability was uncertain, and because Lead Plaintiff did not allege that at the time Workhorse stated it would use the PPP funds for payroll costs, it actually planned to use the funds for executive bonuses.  (*Id.* at 13.)

The parties then began formal discovery.  (Mot. at 4.)  Lead Plaintiff propounded Requests for Production of Documents and Interrogatories on Defendants, and served document subpoenas on eighteen different third parties, including Workhorse's accountant and several of its customers, which led to the production of over 100,000 pages of documents.  (*Id.* at 4–5.)  Lead Plaintiff also served a deposition notice on Workhorse under Federal Rule of Civil Procedure 30(b)(6), and was preparing for depositions of several third parties.  (*Id.* at 5.)

On August 23, 2022, the Parties participated in a full-day, in-person mediation before Jed D. Melnick, Esq., of JAMS.  (Mot. at 6.)  The parties participated in this mediation with the benefit of extensive briefs setting forth their positions on the claims and defenses, the evidence adduced during discovery, damages, and other contested issues.  (*Id.*)  Although the parties did not reach a settlement at the mediation, they continued to negotiate both with and without Mr. Melnick's assistance, all while discovery continued.  (*Id.*)

After two months of continued discussions, on October 24, 2022, the parties accepted a mediator's proposal to settle the case.  (*Id.*)

## C.    Proposed Settlement Terms

Under the Settlement Agreement, Defendants will pay $35 million, which includes $15 million in cash (nearly all of their remaining insurance coverage) and $20 million in Workhorse common stock.  (Dkt. 105-2 [Settlement Agreement] at ¶¶ 1.39, 2.2.)  In return, class members will dismiss with prejudice all claims that were or could have been brought against Defendants.  (*Id.* at ¶¶ 1.34, 4.1–4.3.)  Everyone who files a valid claim will receive a *pro rata* share of the Net Settlement Fund, which consists of the $35 million minus attorney fees awarded, administration costs, taxes and tax expenses, and any other Court-approved deductions.  The shares will be distributed in some combination of cash and/or Workhorse common stock based on class members' "recognized claims," which will depend on the number of shares acquired and the dates of their purchase and sale as compared to the alleged corrective disclosure date. (*Id.* Ex. A-1 at 11–20.)

//
//

## III.    DISCUSSION

The Court analyzes (1) class certification a class for settlement purposes, (2) the fairness of the Settlement Agreement, (3) the proposed notice program, and (4) appointment of the settlement administrator.

### A.    Class Certification

When a plaintiff seeks provisional class certification for settlement purposes, courts must ensure that Federal Rule of Civil Procedure 23(a)'s four requirements and at least one Rule 23(b)'s requirements are met. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co*., 327 F.3d 938, 952–53 (9th Cir. 2003). Under Rule 23(a), the plaintiff must show that the class is sufficiently numerous, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of those of the class, and the representative parties will fairly and adequately protect the class's interests. *See* Fed. R. Civ. P. 23(a).

#### 1.  Rule 23(a) Requirements

##### a.  Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." *Id.* 23(a)(1). "No exact numerical cut-off is required; rather, the specific facts of each case must be considered." *In re Cooper Cos. Inc. Sec. Litig*., 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing *Gen. Tel. Co. of Nw., Inc. v. EEOC.*, 446 U.S. 318, 330 (1980)). "As a general matter, courts have found that numerosity is satisfied when class size exceeds [forty] members." *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc*., 311

F.R.D. 590, 602–03 (C.D. Cal. 2015); *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473–74 (C.D. Cal. 2012).

This action meets the numerosity requirement.  Given that Workhorse had between approximately 70.6 million and 123.2 million shares trading on the NASDAQ during the relevant period, the Court may easily infer that more than forty people are part of the class.  *See In re Cooper Companies Inc. Securities Litigation*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) ("The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year.").  Indeed, it is much more likely that thousands of people bought stock during the class period.  *See id.*  Such a large class size would make joinder impracticable, and proceeding as a class would promote the efficiency and economy of this action.  *See, e.g.*, *Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 398 (C.D. Cal. 2014) (finding proposed class of at least forty-seven employees in wage-and-hour action met numerosity requirement); *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006) (finding proposed class of at least one hundred employees was sufficiently numerous in overtime pay suit).

### b.  Common Questions of Law and Fact

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The plaintiff must "demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  Rather, the plaintiff's claim must depend on a "common contention" that is capable of class-wide resolution.  *Id.*  This means "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Lead Plaintiff asserts that commonality is satisfied because there are common questions of both law and fact, including "(1) whether Defendants' alleged misstatements and omissions were material, false or misleading; (2) whether Defendants possessed the requisite scienter; and (3) whether, and by how much, Workhorse's common stock was artificially inflated." (Mot. at 18.)  The Court agrees.  *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (finding commonality satisfied in securities class action and explaining, "[c]onfronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable").

### c.    Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Representative claims are "typical" if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Castillo v. Bank of America, NA*, 980 F.3d 723, 725 (9th Cir. 2020) (citation omitted).  Here, Lead Plaintiff asserts that, like all other class members, he was deceived by Defendants' false and misleading representations.  His claims are thus "reasonably co-extensive" with those of the class. *Id.*

### d.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This factor requires (1) a lack of conflicts of interest between the proposed class and the proposed representative plaintiffs and (2) representation by qualified and competent counsel that will prosecute

the action vigorously on behalf of the class. *See Staton*, 327 F.3d at 957. The focus in the context of a class action settlement is on ensuring that there is no collusion between the defendant, class counsel, and the class representatives pursuing their own interests at the expense of the interests of the class. *See id.* at 958 n.12.

There is no evidence of a conflict of interest between Lead Plaintiff and the class. His claims are identical to those of the other class members, and he has every incentive to vigorously pursue those claims. Nor is there any evidence that Lead Counsel—who are active practitioners experienced in securities litigation—will not adequately represent or protect the interests of the class.

### 2.  Rule 23(b) Requirements

In addition to the requirements of Rule 23(a), Lead Plaintiff must satisfy the requirements of Rule 23(b). Under Rule 23(b), the plaintiff must show that the action falls within one of the three authorized categories. *See id.* 23(b)(3). Here, Lead Plaintiff seeks certification under Rule 23(b)(3), which allows certification when (1) questions of law or fact common to class members predominate over questions affecting only individual members and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See id.*

### a.      Predominance

Although the predominance requirement overlaps with Rule 23(a)(2)'s commonality requirement, it is a more demanding inquiry. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013). That is, the "main concern in the predominance inquiry . . . [is] the balance between individual and common issues." *Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg. Overtime Pay*

*Litig.*), 571 F.3d 953, 959 (9th Cir. 2009).  The plaintiff must show that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

Here, the common questions regarding whether Defendants' alleged misstatements and omissions were material, false or misleading, whether Defendants possessed the requisite scienter, and whether and by how much Workhorse's common stock was artificially inflated predominate over any individual issues.  Indeed, courts often find predominance in similar securities class actions.  *See, e.g.*, *Mandalevy v. BofI Holding, Inc.*, 2022 WL 4474263, at *5 (S.D. Cal. Sept. 26, 2022) (finding predominance of common questions of "whether Defendants violated securities laws, whether they acted with the requisite scienter, and whether Defendants' conduct caused damages to Lead Plaintiff and the Settlement Class"); *Kendall v. Odonate Therapeutics, Inc.*, 2022 WL 1997530, at *4 (S.D. Cal. June 6, 2022) ("A single adjudication will resolve the central issue of the case of whether Defendants violated Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5, and there does not appear to be individualized issues that would preclude a finding of predominance.").  The Court finds the putative class is "sufficiently cohesive" and that common questions predominate.

### b.    Superiority

Class actions certified under Rule 23(b)(3) must also be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Courts consider four nonexclusive factors in evaluating whether a class action is the superior method for adjudicating a plaintiff's claims: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or

against the class, (3) the desirability of concentrating the litigation of the claims in the particular forum, and (4) the difficulties likely to be encountered in the management of a class action.  *See id.*

In this case, proceeding as a class is superior to other methods of resolving the claims.  A class action may be superior when "classwide litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  A class action may also be superior when "no realistic alternative" to a class action exists.  *Id.* at 1235.  Given the common issues presented by all class members, adjudicating these claims on an individual basis for likely thousands of potential plaintiffs would be not only inefficient but also unrealistic.  Indeed, the Ninth Circuit has recognized that class actions are a superior method of prosecuting securities fraud class actions.  *Blackie*, 524 F.2d at 903 ("The availability of the class action to redress such frauds has been consistently upheld, in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws.") (citation omitted).

Accordingly, Lead Plaintiff has satisfied the requirements of Rule 23(a) and Rule 23(b)(3).  The Court **GRANTS** provisional certification of the class for settlement purposes.

### B.     Fairness of the Proposed Settlement

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval.  Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting

settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e).  A district court may approve class action settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other. *Id.* 23(e)(2)(A–D).  In determining whether the class's relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[2]

### 1.     Adequacy of Class Representative and Class Counsel

As discussed in the above analysis of the Rule 23(a) factors, Lead Plaintiff and Lead Counsel have adequately represented the class.  There is no evidence of a conflict of interest between Lead Plaintiff and the other members of the class.  Lead Plaintiff's

---

[2] Before Congress codified these factors in 2018, the Ninth Circuit instructed district courts to apply the following factors in determining whether a settlement agreement was fair, reasonable, and adequate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement."  *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  The Court still considers these factors to the extent that they shed light on the inquiry mandated by Rule 23(e).

claims are the same as those of the other class members, and he has every incentive to vigorously pursue those claims.  Lead Counsel is likewise adequate.  They are active practitioners who are experienced in securities class actions.  (*See* Dkt. 31-5 [Lead Counsel's Resume]; Dkt. 61 [Order Appointing Lead Counsel].)  Here, they engaged in voluminous discovery, largely defeated Defendants' motion to dismiss, and participated in a private mediation that culminated in this settlement.

## 2.  Arm's Length Negotiations

The Settlement Agreement appears to be the result of arms-length negotiations between the parties.  Negotiations occurred in person before a neutral private mediator. *See Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *6 (C.D. Cal. Feb. 22, 2022) ("The parties extensively negotiated the Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before mediator Mr. Picker."); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (explaining that although the "mere presence of a neutral mediator . . . is not on its own dispositive," it is "a factor weighing in favor of a finding of non-collusiveness").  They continued those negotiations with and without the mediator for two months after the mediation while discovery continued.  The Settlement Agreement is the result of a mediator's proposal.  And it does not appear to have any of the "'subtle signs' of collusion" that courts must police.  *See SFBSC Mgmt*, 944 F.3d at 1049.  It does not have a clear sailing agreement or a reverter provision, and class counsel will only seek the 25% benchmark of fees.

//
//
//
//

### 3.  Adequacy of Relief

#### a.      Costs, Risks, and Delay of Trial and Appeal

Lead Plaintiff and the class would face significant risks in maintaining this action. Most significantly, given Workhorse's "rapidly-dwindling cash, limited insurance coverage, business uncertainties, and ongoing regulatory issues," "[i]f Lead Plaintiff had continued to litigate the case, any available funds or insurance proceeds would have been depleted, resulting a lower recovery, or likely no recovery at all." (Mot. at 11–12); *see In re Diamond Foods, Inc., Securities Litigation*, 2014 WL 106826, at *2 (N.D. Cal. Jan. 10, 2014) ("It is not unreasonable for counsel and the class representative to prefer the bird in hand, given concerns about Diamond's strained financial state and its ability to pay a judgment following further litigation.") (cleaned up); *In re Critical Path, Inc.*, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002) ("Through protracted litigation, the settlement class could conceivably extract more, but at a plausible risk of getting nothing . . . ; watching Critical Path fall into bankruptcy; and, most certainly, drying up the available insurance."). In other words, by settling now, Lead Plaintiff and the class get most of Defendants' remaining insurance proceeds rather than those proceeds being used to litigate this case and related shareholder derivative suits and governmental investigations.

Additionally, although the parties have engaged in meaningful discovery, that discovery has only just begun. Numerous depositions and additional document and other discovery would be required if the case continued. Extensive and expensive expert discovery would be necessary. There are also significant costs and risks associated with class certification, summary judgment, and trial. *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement."); *In re Netflix Privacy Litig.*,

2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement." (citation omitted)).  Notably, "Defendants advanced several potentially meritorious defenses: they disputed the falsity and materiality of their alleged misstatements; challenged whether certain alleged misstatements inflated Workhorse's stock price; and argued the requisite scienter was lacking."  (Mot. at 13.)  Each of these would have presented significant obstacles to Lead Plaintiff and the class' success at summary judgment and trial.  And even if Lead Plaintiff overcame all of these risks, it is uncertain whether they would be able to collect any jury verdict they obtained.

The Settlement Agreement eliminates these costs and risks "by ensuring [c]lass [m]embers a recovery that is 'certain and immediate, eliminating the risk that class members would be left without any recovery . . . at all.'"  *Graves v. United Indus. Corp.*, No. 17-cv-06983, 2020 WL 953210, at *7 (C.D. Cal. Feb. 24, 2020) (last alteration in original) (citation omitted); *see also In re Cobra Sexual Energy Sales Pracs. Litig.*, No. 13-cv-05942, 2021 WL 4535790, at *6 (C.D. Cal. Apr. 7, 2021).  The elimination of these costs and risks strongly suggests the adequacy of the Settlement Agreement.

The Settlement Agreement also appears reasonable when considering these costs and risks in the context of Lead Plaintiff's potential recovery.  After consulting with an economic expert, Lead Plaintiff and Lead Counsel believe a successful verdict on all claims could result in aggregated damages as high as $1.2 billion.  (Mot. at 11.)  The settlement here reflects an approximately 3% recovery on that $1.2 billion.  But a "settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Migo Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted).  Indeed, a 3% recovery is within the range of the percentages of recovery approved in other securities class action settlements.  *See, e.g., In re Broadcom Corp. Sec. Litig.*, 2005 WL 8153007, at *6 (C.D. Cal. Sept. 14, 2005)

-16-

(approving settlement representing 2.7% of damages and finding such percentage was "not [ ] inconsistent with the average recovery in securities class action[s]"); *In re LJ Int'l, Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19, 2009) (approving settlement where recovery was 4.5% of maximum damages).  Although the 3% calculation in this case includes Workhorse common stock, which may end up being worth very little, the Court remains persuaded that the relief provided by the Settlement Agreement is adequate given that Lead Plaintiff and the class will obtain most of Workhorse's remaining insurance coverage and the likelihood of recovering any more from Workhorse is extremely low.  Put simply, the fact that Lead Plaintiff and the class will recover nearly all of the value Workhorse has to give weighs in favor of finding the relief provided by the Settlement Agreement adequate.

**b.      Effectiveness of Proposed Method of Distributing Relief**

"Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id.*

Here, the relief distribution is straightforward.  Class members will be able to easily complete and submit a claim form by mail.  The claims administrator will then process claims and distribute the settlement fund (minus fees, administrative costs, and any other Court-approved deductions) to class members depending on the amount of stock purchased, when the stock was purchased, and other factors.  (Mot. at 14.)  This procedure for filing claims is not unduly demanding.

### c.      Attorney Fee Award

The next factor in the adequacy analysis consists of "the terms of any proposed award of attorney's fees."  Fed. R. Civ. P. 23(e)(2)(iii).  Central to this analysis is the extent to which the fee is "disproportionate."  *See Bluetooth*, 654 F.3d at 947.  Ordinarily, "25% of the fund [i]s the 'benchmark' for a reasonable fee award."  *Id.* at 942–43.  In deciding whether "'special circumstances' justify[ ] a departure" from the benchmark, *id.* at 942, courts typically consider (1) the results achieved, (2) the risk of litigation, (3) the skill required and the quality of work, (4) the contingent nature of the fee and the financial burden carried by the plaintiff, and (5) awards made in similar cases.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).  In addition to proportionality, courts must scrutinize an agreement for any "clear sailing arrangement, under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee," and any "'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class."  *Briseño v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1023 (9th Cir. 2021) (cleaned up).  The amended Rule 23(e) also instructs courts to consider the "timing of payment."  Fed. R. Civ. P. 23(e)(2)(C)(iii).  Even though greater skepticism is appropriate in settlements reached before formal class certification, "courts should [not] unnecessarily meddle in class settlements negotiated by the parties."  *Briseño*, 998 F.3d at 1027; *see also Staton*, 327 F.3d at 952 ("Judicial review . . . takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk.").

Lead Counsel intends to seek a fee award not to exceed 25% of the settlement fund, in the same proportion of cash and stock that class members will receive.  (Mot. at 14–15.)  As discussed, there are no markers of collusion in the Settlement Agreement. Subject to additional briefing at the final approval stage regarding the quality of work, the

result achieved, the risk taken, and counsel's lodestar calculation, the Court tentatively approves a 25% benchmark award of fees in this case.

### d.   Any Agreement Made in Connection with the Proposal

A court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The Settlement Agreement identifies a Supplemental Agreement, which allows Defendants to terminate the Settlement if Settlement Class Members possessing a certain aggregate number of securities exclude themselves from the Settlement.  (Mot. at 15.)  To protect the settlement class, the specific terms of the Supplemental Agreement are confidential "to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts." *Thomas v. MagnaChip Semiconductor Corp.*, 2017 WL 4750628, at *5 (N.D. Cal. Oct. 20, 2017).  "This type of agreement is common in securities fraud actions and does not weigh against preliminary approval." *Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *7 (C.D. Cal. Oct. 10, 2019) (citing *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (observing that the court was not troubled by the opt out deal between the parties)).

### 4.  Equitable Treatment Among Class Members

The final Rule 23(e) factor is the extent that class members are treated "equitably relative to each another." Fed. R. Civ. P. 23(e)(2)(D).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement Agreement, class members receive differing payouts depending on how much stock they bought during the class period and when they bought that stock.  Specifically, they "will receive a pro rata share of the Net Settlement Fund – determined by their Recognized Loss divided by the total Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund."  (Mot. at 16.)  This difference in treatment is appropriate and reasonable.  The release is also the same for all class members.  The Settlement Agreement therefore treats class members equitably.

## 5.  Incentive Awards

Lead Plaintiff also states that he will seek "a collective award of up to $10,000" for Lead Plaintiff and Mr. Federico.  (Mot. at 15, n.12.)  Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit.  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  Courts routinely approve this type of award to compensate representative plaintiffs for the services they provide and the risks they incur during class action litigation.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 499 (E.D. Cal. 2010).  Incentive awards in this district typically range from $3,000 to $5,000.  *See In re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (collecting cases).  A $5,000 payment is "presumptively reasonable."  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).  When evaluating the reasonableness of incentive awards, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation.  *Staton*, 327 F.3d at 977.

At this stage, the proposed incentive award of $5,000 for each class representative appears reasonable and appropriate.  Lead Plaintiff and Mr. Federico "assisted with the

investigation of the claims, reviewed the [amended complaint], provided extensive documents supporting the claims to Lead Counsel, monitored the litigation, provided input during settlement negotiations, and approved the Settlement." (Mot. at 15.) The awards are within the range of incentive awards typically approved in this district and are presumptively reasonable. *See Bellinghausen*, 306 F.R.D. at 266.

In sum, based on the Rule 23(e)(2) factors, the Court preliminarily concludes that the Settlement is "fair, reasonable, and adequate."

**C.     Proposed Class Notice Program**

For class actions certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Rule 23(e)(1) also requires the Court to "direct notice in a reasonable manner to all class members who would be bound by the proposal." *Id.* 23(e)(1)(B). When a court is presented with class notice pursuant to a settlement, the class certification notice and the notice of settlement may be combined in the same notice.

The Court finds that the proposed manner of notice is adequate. The parties' agreement provides for a notice by mail or email to shareholders of record or broker nominees. (*See* Settlement Agreement Ex. 1 ¶ 7(b).) Notice will also be published twice on a national business newswire within 21 days after distribution of the mail and email begins. (*Id.* at ¶ 7(c).)

The form of notice also meets the requirements of Rule 23(c)(2)(B). Notice to class members must "clearly and concisely state in plain, easily understood language: (i) the nature of the action[,] (ii) the definition of the class certified[,] (iii) the class

claims, issues, or defenses[,] (iv) that a class member may enter an appearance through an attorney if the member so desires[,] (v) that the court will exclude from the class any member who requests exclusion[,] (vi) the time and manner for requesting exclusion[,] and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).  The proposed notice contains this information.  (*See* Settlement Agreement Ex. 2, Ex. A-1.)

### D.   Settlement Administrator

Finally, Lead Plaintiff asks the Court to appoint KCC as the claims administrator. (Mot. at 21.)  "KCC specializes in providing administrative services in class action litigation and has extensive experience" administering class action settlements."  *Retina Associates Medical Group, Inc. v. Keeler Instruments, Inc.*, 2019 WL 13043794, at *5 (C.D. Cal. July 22, 2019).  And "[f]ederal courts in California routinely approve KCC as a class action settlement administrator."  *Id.* (citing *Tadepalli v. Uber Techs., Inc.*, 2015 WL 9196054, at *13 (N.D. Cal. Dec. 17, 2015)).  The Court appoints KCC as settlement administrator.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Lead Plaintiff's motion for preliminary approval of the settlement agreement and **ORDERS** the following:

A. The Court appoints Timothy M. Weis and Angelo Federico as Class Representatives.

B. The Court appoints Kahn Swick & Foti, LLC as Class Counsel for settlement purposes.

C. The Court appoints KCC as the Settlement Administrator.

D. The Court preliminarily approves the Settlement Agreement, (Dkt. 105-2), subject to further consideration of the terms and conditions of the settlement set forth therein at a Final Approval Hearing.

E. The Court approves the form of the notice and directs the parties and the Settlement Administrator to carry out their obligations under this Order and the Settlement Agreement.

F. The Court sets the Final Approval Hearing for **Monday, July 24, 2023, at 1:30 P.M.**

DATED:      February 14, 2023

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE