**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff Timothy M. Weis,*
*Additional Plaintiff Angelo Federico, and the Settlement Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM FARRAR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WORKHORSE GROUP, INC., DUANE HUGHES, STEVE SCHRADER, ROBERT WILLISON, and GREGORY ACKERSON <br><br> Defendants. | Case No. 2:21-cv-02072-CJC-PVC <br><br> DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS, AND APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARDS TO SETTLEMENT CLASS REPRESENTATIVES |

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................2

II.   FACTUAL SUMMARY OF PLAINTIFFS' ALLEGATIONS ...............5

III.  PROCEDURAL HISTORY ................................................................8

    A.    The Complaint and Motion to Dismiss ...................................................8

    B.    Post-Complaint Developments.................................................................9

    C.    Discovery................................................................................................10

    D.    Mediation.................................................................................................13

    E.    The Settlement and Preliminary Approval..........................................13

IV.   RISKS OF CONTINUING LITIGATION ...........................................15

    A.    Continuing Discovery ............................................................................16

    B.    Class Certification ..................................................................................17

    C.    Summary Judgment...............................................................................19

    D.    Pre-Trial..................................................................................................19

    E.    Trial ........................................................................................................20

V.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE
    SETTLEMENT CLASS AND WARRANTS FINAL APPROVAL ......22

VI.   LEAD COUNSEL'S COMPLIANCE WITH THE COURT'S
    PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE
    OF THE NOTICE.................................................................................23

VII.  ALLOCATION OF THE NET PROCEEDS OF
    THE SETTLEMENT.............................................................................25

VIII. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES
    AND REIMBURSEMENT OF LITIGATION EXPENSES IS
    REASONABLE AND SHOULD BE GRANTED ................................29

    A.    The Fee Application................................................................................30

        1.    The Favorable Outcome Achieved is the Result of the
            Significant Time and Labor Expended by Lead Counsel.........30

        2.    The Complexity of the Factual and Legal Allegations in this
            Action Supports the Requested Fee Award .............................34

        3.    The Quality of Representation and Result Obtained ...............35

        4.    Awards in Similar Cases..........................................................35

        5.    The Substantial Contingency Fee Risks Borne by
            Lead Counsel............................................................................36

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

6.    The Favorable Result Obtained for the Settlement Class.........36

7.    The Support of Settlement Class Representatives and Reaction of the Settlement Class ...............................................37

B.    Lead Counsel's Application for Reimbursement of Expenses ...........37

IX.   SERVICE AWARDS REQUESTED FOR SETTLEMENT CLASS REPRESENTATIVES .................................................................................39

X.    CONCLUSION ........................................................................................40

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

I, KIM E. MILLER, hereby declare as follows:

1.      I am a partner at Kahn Swick & Foti, LLC ("KSF"), Lead Counsel for Lead Plaintiff Timothy M. Weis ("Lead Plaintiff"), Additional Plaintiff Angelo Federico ("Additional Plaintiff" and, together with Lead Plaintiff, "Settlement Class Representatives") and the Settlement Class. I am an attorney admitted to practice in this Court. Unless otherwise indicated, the statements made in this Declaration are based upon my personal knowledge.

2.      As Lead Counsel, I led the prosecution of this Action against defendants Workhorse Group, Inc. ("Workhorse" or the "Company"), its former Chief Executive Officer Duane Hughes, its former Chief Financial Officer Steve Schrader, and its former Chief Operating Officer Robert Willison, and its former Corporate Controller (and current Chief Accounting Officer) Gregory Ackerson (collectively, "Defendants"; Hughes, Schrader, Willison, and Ackerson collectively, the "Individual Defendants"), since the time Mr. Weis was appointed Lead Plaintiff and his selection of KSF was approved as Lead Counsel on May 7, 2021. I also led, on behalf of Lead Plaintiff and the Settlement Class, the negotiations that resulted in the Settlement discussed herein.

3.      I respectfully submit this Declaration in support of Lead Plaintiff's concurrently filed motions for: (1) approval of the $35,000,000 Settlement ($15,000,000 in cash and $20,000,000 in shares of Workhorse common stock) (the "Settlement") and the proposed plan for allocating the Settlement proceeds to eligible members of the Settlement Class (the "Plan of Allocation"); and (2) Lead Counsel's application for an award of attorneys' fees of 25% of the Settlement Fund, plus interest, reimbursement of reasonable litigation expenses of $112,027.51, plus accrued interest, and compensatory awards of $5,000 each for Lead Plaintiff Timothy M. Weis and Additional Plaintiff Angelo Federico ($10,000 total), pursuant to 15 U.S.C. § 78u-4(a)(4).

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

4.      The purpose of this Declaration is to set forth the nature of the investigation, litigation, and negotiations that led to the Settlement, demonstrating why the Settlement is fair, reasonable, and adequate and should be approved by this Court, as well as why Lead Counsel's fee request, expense request, and request for service awards for Settlement Class Representatives (collectively, the "Fee and Expense Application") are reasonable and should be approved by the Court. A Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement (the "Settlement Memorandum") and a Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and Compensatory Awards for Settlement Class Representatives (the "Fee Memorandum"), are being filed contemporaneously herewith, as is the Declaration of Lance Cavallo Regarding Notice Dissemination, Publication, and Report on Requests for Exclusion Received To Date ("Cavallo Decl.").[1]

## I.   PRELIMINARY STATEMENT

5.      The proposed Settlement – which will resolve all claims against Defendants for $35 million in cash and stock – is fair, reasonable, and in the best interests of the Settlement Class.[2] The risks of prosecuting this litigation through the remainder of discovery, class certification, summary judgment, and trial would delay any recovery for years and, in fact, raise the strong likelihood of the Settlement Class recovering substantially less, or nothing at all in the future. This risk is exacerbated

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Stipulation of Settlement (ECF No. 105-2).

[2] "Settlement Class" is defined as all Persons who purchased or otherwise acquired Workhorse securities between March 10, 2020 and May 10, 2021, inclusive (the "Class Period") and were damaged thereby, excluding Defendants, officers, and directors of Workhorse, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and Persons who timely and validly request exclusion.

2                    DECLARATION OF KIM E. MILLER IN SUPPORT OF
                     FINAL APPROVAL OF SETTLEMENT
                     Case No. 2:21-CV-02072-CJC-PVC

by the Company's precarious financial position and rapidly depleting insurance coverage available to fund a settlement. The Settlement "ensur[es] [c]lass [m]embers a recovery that is 'certain and immediate, eliminating the risk that class members would be left without any recovery . . . at all.'" February 14, 2023, Order Granting Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement, ECF No. 106 (the "Preliminary Approval Order"), citing *Graves v. United Indus. Corp.*, No. 17-cv-06983, 2020 U.S. Dist. LEXIS 33781, at *21 (C.D. Cal. Feb. 24, 2020). Moreover, the Settlement was strategically structured to maximize recovery for the Settlement Class: it will receive a cash contribution of virtually all of Defendants' remaining insurance coverage ($15 million), as well as $20 million in Workhorse common stock.

6.   The settlement was only achieved after Lead Plaintiff, by and through Lead Counsel: conducted an extensive investigation involving interviews of former employees, substantial legal and factual research, and consultation with an economic expert; drafted and filed the 363-paragraph Amended Complaint; successfully defeated Defendants' motion to dismiss; propounded extensive written discovery requests, including subpoenas on 18 third-parties; engaged in numerous meet-and-confers and written exchanges with Defendants' regarding objections, the scope of document discovery, search terms, custodians and the electronically-stored information protocol; met and conferred with numerous third parties regarding the subpoenas; reviewed and analyzed more than 110,000 pages of documents produced by Defendants and third-parties; served a 30(b)(6) deposition notice on Workhorse; prepared for multiple depositions of fact witnesses; engaged in a full-day in-person mediation; and conducted ongoing settlement negotiations thereafter as discovery continued on a parallel track. The Settlement resulted from good-faith, arm's-length negotiations between experienced counsel, under the supervision of an experienced, highly-respected mediator.

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

7.    As discussed in the Fee Memorandum, Lead Counsel's request for attorneys' fees in the amount of 25% of the Settlement Fund – in the same proportion of Settlement Cash and Settlement Stock as the Settlement Class will receive – is very well justified given the facts of this case, the substantial benefits conferred on the Settlement Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed. As noted in the Preliminary Approval Order, which tentatively approved Lead Counsel's requested fee award, an award of 25% is consistent with the Ninth Circuit's "benchmark" for a reasonable fee award. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

8.    Lead Counsel also requests reimbursement of reasonable expenses incurred in connection with its prosecution and resolution of the Action in the amount of $112,027.51, plus interest, which is well within the noticed expense cap of $130,000.

9.    Lead Counsel's fee and expense request is also fully supported by Lead Plaintiff and Additional Plaintiff.

10.    Finally, Lead Counsel seeks a $5,000 service award each to Settlement Class Representatives Weis and Federico ($10,000 total), in recognition of the time and effort they have devoted to the prosecution of this Action.  As noted in the Preliminary Approval Order, these requested awards are "within the range of incentive awards typically approved in this district and are presumptively reasonable." ECF No. 106, citing *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).

11.    I respectfully submit that the Settlement, for the reasons discussed herein and in the Fee Memorandum and Settlement Memorandum, is fair, reasonable, and adequate in all respects, that the Plan of Allocation is fair, reasonable, and has a rational basis, and that the Fee and Expense Application is fair and reasonable and should be approved.

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

## II.    FACTUAL SUMMARY OF PLAINTIFFS' ALLEGATIONS

12.     In the Amended Complaint (ECF No. 64), filed July 16, 2021, Plaintiffs allege Defendants, in violation of Exchange Act §§10(b) and 20(a) and SEC Rules 10b-5(a) and (c) promulgated thereunder, perpetrated a scheme to fraudulently inflate the price of Workhorse securities by participating in (and not withdrawing from) a $6.3 billion contract bidding process to manufacture a new fleet of 165,000 United States Postal Service ("USPS") next generation delivery vehicles ("NGDV"). Workhorse and its partner VT Hackney (who later withdrew from the NGDV bid) submitted a prototype truck to the USPS for testing, however, Workhorse was not capable of producing other trucks like the prototype, which experienced numerous failures during testing, including an incident in which the parking brake failed, injuring a USPS test driver. The USPS repeatedly informed Workhorse of deficiencies in their proposal, including the failure to meet basic criteria for manufacturing capacity, design, and safety and repeated breaches of the USPS's nondisclosure agreement. Despite these facts, Workhorse did not withdraw its bid. In fact, after then newly-elected President Biden announced a goal to replace the Federal Government's fleet with electric and American-made vehicles, Defendant Schrader conducted several interviews in which he implied to shareholders that President Biden's announcement indicated that Workhorse was the frontrunner for winning the NGDV contract.

13.     Plaintiffs also allege that Defendants violated Exchange Act §§10(b) and 20(a) and SEC Rules 10b-5(b) promulgated thereunder by making a series of materially false or misleading statements and omitting material facts necessary to make their statements not misleading. Specifically, in addition to misrepresentations about the aforementioned USPS NGDV contract, Defendants represented to investors that the Company had the capacity, and indeed was on the verge of, beginning mass production of Workhorse's commercial electric "last mile" delivery truck, the C-1000. However, at the time, Workhorse was assembling trucks one at a

time on wooden benches, and had no capacity to scale up its production, especially in the time frame Defendants insisted the Company was "on track" to meet. After the Amended Complaint was filed, Workhorse (under new leadership) revealed that it had not conducted extensive durability testing, and thus would be ceasing production of the C-1000 trucks and recalling any that had previously been delivered. The Company is currently in the process of dismantling the C-1000 trucks and selling off the parts.[3]

14.    Defendants also repeatedly touted a purported "backlog" of customer orders, including a 1,000-truck order from United Parcel Service, Inc. ("UPS"). However, because the majority of these "orders" were merely non-binding agreements with no requirement that the customer actually take delivery of the trucks, the insinuation that Workhorse would be producing and delivering the trucks to fulfil these orders in the immediate future was materially false or misleading.

15.    Based on Defendants' positive portrait of the company, the stock price soared from around $2.50/share at the start of the Class Period to a high of over $40/share, *a more than 1500% increase*. With the stock price artificially inflated, the Individual Defendants, as well as members of the Workhorse Board of Directors, sold huge quantities of Workhorse stock for their personal profit.

16.    The Market began to discover the truth on October 8, 2020, when independent research firm Fuzzy Panda Research published a report entitled "The 'Brakes' Fall Off The USPS Story: Workhorse's USPS Bid has Numerous Critical Failures." The report revealed numerous true, non-public facts, that contradicted Defendants' statements, and partially revealed Defendants' scheme.  For example, Fuzzy Panda revealed that Workhorse's initial partner to the NGDV bid, VT

---

[3] *See* Workhorse Press Release dated March 1, 2023, "Workhorse Group Reports Fourth Quarter and Full Year 2022 Results," https://ir.workhorse.com/news-events/press-releases/detail/208/ workhorse-group-reports-fourth-quarter-and-full-year-2022

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

Hackney, dropped out and sold their rights to Workhorse because of, among other things, "Numerous Critical Failures" during the prototype testing, including motors breaking, safety belt problems, constant door problems, problems with the performance of the chassis, suspension problems, range problems, power problems, and "most notably," the "notorious parking brake failure resulting in a USPS employee being hospitalized." Fuzzy Panda revealed, based on its own investigator's visits to Workhorse facilities, that employees were not working on producing vehicles as the Company represented, and could not manufacture vehicles at scale. Additionally, Fuzzy Panda revealed the fictitious nature of the purported "backlog" of UPS orders, and that all the vehicles Workhorse had produced for them were simply prototypes.

17. Then, on February 23, 2021, USPS announced that it was awarding the entirety of the 10-year, multi-billion dollar NGDV contract to competing bidder Oshkosh Defense. Investors and analysts following Workhorse were "shocked" by the announcement, as, based on Defendants' representations and fraudulent conduct, they had been certain that Workhorse would be receiving at least a portion of the contract. Workhorse's stock plummeted from $31.34 per share at close on February 22, to $16.47 per close on February 23, a decline of over 47%.

18. Even though investors began questioning Defendants' representations regarding Workhorse's capabilities after the USPS announcement, the Company's stock price remained artificially buoyed, as analysts continued to emphasize the strength of Workhorse's fictitious "backlog" of vehicle orders, believing (erroneously) that the Company was just months away from producing and delivering C-1000 trucks *en masse*.

19. Then, on May 10, 2021, despite continuously emphasizing the Company's plans to "ramp-up" production, Defendants revealed Workhorse had only delivered 6 trucks in the first fiscal quarter of 2021 and had only produced 38 trucks total year-to-date, making it clear that Workhorse simply did not have the

7

capability to manufacture vehicles at any scale, that the Company's supposed manufacturing ramp-up was nowhere close to occurring, and that there was not path to achieving the Company's stated target of 1,800 trucks in 2021. Once again, Workhorse stock fell precipitously when the truth was revealed, falling 15% from the prior trading day close.

20.    Lead Plaintiff, Additional Plaintiff, and other members of the Settlement Class purchased shares of Workhorse stock while the share price was artificially inflated and suffered economic losses when the truth was revealed and the artificial inflation was removed.

## III.    PROCEDURAL HISTORY

### A. The Complaint and Motion to Dismiss

21.    On March 8, 2021, the initial complaint was filed in this Action. Three days later, a substantially similar complaint was filed in *Kinney v. Workhorse Group, Inc., et al*, No. 2:21-cv-02207-CJC (C.D. Cal.). On May 18, 2021, the Court consolidated the actions, appointed Mr. Weis as Lead Plaintiff, and approved the selection of Kahn Swick & Foti LLC ("KSF") as Lead Counsel. ECF No. 61.

22.    Following an extensive investigation involving interviews of former employees, substantial legal and factual research, and consultation with an economic expert, Lead Plaintiff filed the operative Amended Complaint on July 16, 2021, naming Mr. Federico as an Additional Plaintiff. ECF No. 64 (the "Amended Complaint"). Defendants moved to dismiss on September 3, 2021. ECF No. 65.

23.    After the matter was fully briefed, the Court substantially denied Defendants' motion to dismiss on December 2, 2021. ECF No. 74. The Court found that Plaintiffs had sufficiently alleged three categories of misrepresentations. First, the Court found that, in light of Workhorse's limited production capabilities and repeated warnings from the USPS about the deficiencies of the Company's prototype and proposal, "Defendants' statements . . . indicating optimism regarding the USPS contract were materially misleading." ECF No. 74 at 8. Second, the Court found that

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

Plaintiffs sufficiently alleged that Defendants made material misrepresentations regarding Workhorse's manufacturing capability, and that these statements were not protected by the safe harbor provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The Court also found that the statements of one of Plaintiffs' confidential witnesses regarding Workhorse's production capabilities were both credible and indicative of scienter. Third, the Court found that, in the context in which they were made, Defendants' statements regarding their "backlog" of vehicle orders were materially false or misleading. However, the Court dismissed a fourth category of statements regarding Workhorse's use of Payroll Protection Program funds.

## B. Post-Complaint Developments

24.    Plaintiffs continued to closely monitor developments about Workhorse's business even after the Amended Complaint was filed. Many of these developments strongly supported the allegations in the Amended Complaint. On July 29, 2021, the Company announced it was "withdrawing its previously stated guidance" for the fiscal year 2021 and had replaced Defendant Hughes as CEO effective August 1, 2021. Less than a month later, on August 29, 2021, the Company revealed it dramatically failed to meet its production goals and would be completely re-designing its trucks. On September 22, 2021, the Company announced an immediate suspension of vehicle deliveries and a recall because it needed to conduct "additional testing and modifications" to comply with federal safety standards. On September 30, 2021, the Company announced Defendants Schrader and Willison had left the Company. And on November 8, 2021, the Company announced it was being investigated by the SEC and the DOJ for matters relating to the allegations set forth in this Action. The DOJ investigation is still ongoing, while the SEC

9

investigation concluded recently with no enforcement action taken.[4] On December 28, 2022, the Company announced that, after "thorough" engineering review and durability testing, it had discontinued production of C1000 vehicles[5] – the same vehicles that are the subject of this litigation. On March 1, 2023, the Company announced that it "expects previously built C1000 units to be decommissioned and disassembled by the end of Q1 2023."[6]

## C. **Discovery**

25. Soon after the Court ruled on the Motion to Dismiss, the Parties began formal discovery, exchanging initial disclosures on January 14, 2022. In the ensuing months, Lead Plaintiff propounded Requests for Production and Interrogatories on Defendants. Counsel engaged in numerous meet-and-confers and exchanged extensive written correspondence regarding Defendants' objections, the scope of document discovery, search terms, custodians and electronically-stored information and other potential sources of relevant information.

26. Lead Counsel also made substantial efforts to research and locate relevant evidence that could be obtained from non-parties, and in doing so served document subpoenas on 18 third parties, including Workhorse's accountant and various companies Defendants had claimed were Workhorse customers. Specifically, Plaintiffs subpoenaed the following third parties for documents:

| Third Party | Date Served |
|---|---|
| CSIR | 5/31/22 |
| DHL | 5/9/22 |
| Edison-Coil Fund 1, LLC | 8/1/22 |

[4] *See* Workhorse 8-K filed Dec. 28, 2022, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001425287/000121390022083044/ea170910-8k_workhorse.htm.

[5] *Id.*

[6] *See* Workhorse Press Release dated March 1, 2023, "Workhorse Group Reports Fourth Quarter and Full Year 2022 Results," https://ir.workhorse.com/news-events/press-releases/detail/208/   workhorse-group-reports-fourth-quarter-and-full-year-2022

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

| EnerDell | 7/18/22 |
|---|---|
| eTrucks | 7/27/22 |
| EVFS | 7/20/22 |
| FedEx | 6/20/22 |
| Fluid Truck | 6/16/22 |
| Grant Thornton | 6/14/22 |
| Highline | 7/29/22 |
| Hitachi America | 6/3/22 |
| Prefix | 7/15/22 |
| Pride | 5/17/22 |
| Pritchard | 6/9/22 |
| Ryder | 7/14/22 |
| Simranpal Singh | 5/31/22 |
| VT Hackney | 5/10/22 |
| UPS | 5/4/22 |

27.    VT Hackney, Workhorse's initial partner in the USPS NGDV Contract that eventually backed out and sold its bidding rights to Workhorse, produced several batches of documents and, at the time the Settlement Agreement was reached, Plaintiffs were in the process of preparing to take a 30(b)(6) deposition of the company. Prefix, who built the prototype truck VT Hackney and Workhorse submitted to the USPS for testing, also made a document production with many relevant documents to the USPS prototype testing. Hitachi America, who was purportedly in a "partnership" with Workhorse to develop Workhorse's manufacturing capacity and dealership network, produced a number of documents which shed light on the status of Workhorse's production capabilities during the Class Period, and was in the process of searching for more documents. At the time the Settlement Agreement was reached, Lead Counsel was in the process of working with UPS, FedEx, Fluid Truck, and DHL – four purported customers of Workhorse – to narrow down custodians and search terms. DHL was just beginning to produce documents. Simranpal Singh, a YouTube personality who interviewed Defendant Schrader for his channel just before the USPS Contract was announced, also

11

produced documents regarding his communications with Schrader leading up to and following the interview.

28. Lead Counsel was still in the process of drafting and serving third-party subpoenas at the time the settlement was reached and intended to serve more third-party subpoenas if the negotiations had not been successful. Lead Counsel spent significant time and effort researching and deciding who to subpoena, drafting the subpoenas, meeting and conferring with the subpoenaed third parties, tracking down and following up with subpoenaed third parties who failed to respond or insufficiently responded, coordinating the production of documents, and reviewing and analyzing the subpoenaed productions in order to gather evidence in support of Plaintiffs' claims.

29. At the time of the Settlement, discovery was ongoing. Lead Counsel had reviewed and analyzed more than 110,000 pages of documents produced collectively by Defendants and third parties.

30. Lead Counsel served a 30(b)(6) deposition notice on Workhorse on October 17, 2022, after thorough consideration of the topics to be included therein. Lead Counsel also reached out to Defendants to coordinate specific dates for the depositions of Workhorse's former Director of Dealer and Support Operations and Workhorse's former Director of Business Development, individuals which Lead Counsel determined would likely have pertinent information about subjects central to Plaintiffs' claims, such as Workhorse's bid for the NGDV contract, Workhorse's production capabilities during the Class Period, the Company's purported "backlog" of customers. Lead Counsel began preparing in earnest for these depositions by closely reviewing and selecting potential documents to question the witnesses about and beginning to outline the areas of examination for each witness.

31. Lead Counsel also began preparing for the 30(b)(6) deposition of third-party VT Hackney, Workhorse's initial partner on the NGDV Contract, who had produced a number of highly relevant documents regarding the USPS contract

12

bidding process, the testing of the prototype vehicle, VT Hackney's withdrawal from the bidding process, and other key subjects central to Plaintiffs' allegations.

32.    With the benefit of this extensive investigation and discovery, Lead Counsel and Lead Plaintiff have sufficient knowledge of the strengths and weaknesses of the claims asserted in this Action, having identified specific documents that corroborate those claims. This has permitted them to fully consider and evaluate the fairness of the Settlement to the Settlement Class.

## D. Mediation

33.    The Settlement is the result of arm's-length negotiations. *See* Exhibit A (Melnick Declaration). On August 23, 2022, the Parties participated in a full-day, in-person mediation in New York City before Jed D. Melnick, Esq., of JAMS, a nationally recognized mediator. Prior thereto, the Parties exchanged extensive briefs setting forth their positions on the claims and defenses, the evidence adduced during discovery, damages, and other contested issues.

34.    No settlement was reached at the mediation and the litigation continued. Nevertheless, the Parties continued to negotiate through counsel both with and without Mr. Melnick's assistance, as discovery continued on a parallel track.

## E. The Settlement and Preliminary Approval

35.    Approximately two months after mediation, on October 24, 2022, the Parties accepted a mediator's proposal to settle the case and signed a Term Sheet. The Parties notified the Court of the Settlement on October 28, 2022. ECF No. 100. After continuing to negotiate the terms of the Settlement, which included a Settlement Stock element, the Parties signed the Stipulation of Settlement ("Stipulation") on January 13, 2023.

36.    On January 13, 2023, Lead Plaintiff filed an unopposed motion for: (i) preliminary approval of class action settlement; (ii) certification of the Class for settlement purposes; (iii) approval of Lead Counsel as Class Counsel; (iv) approval of Lead Plaintiff and Additional Plaintiff as Settlement Class Representatives; (v)

13

approval of KCC Class Action Services, LLC ("KCC") as claims administrator; and (vi) approval of proposed distribution of Notice to the Settlement Class (the "Preliminary Approval Motion"). ECF No. 105. This motion attached the Stipulation of Settlement entered into by the Parties (ECF No. 105-2), as well as the proposed Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), Proof of Claim Form, Summary Notice, and Postcard Notice (ECF No. 105-2 at Exs. A-1, A-2, A-3, and A-4).

37.     Pursuant to the Stipulation of Settlement, Defendants will pay $35 million (the "Settlement Amount") – consisting of $15 million in cash (the "Settlement Cash") and $20 million in Workhorse common stock (the "Settlement Stock"). *See* ECF No. 105-2 at ¶¶ 1.39, 2.2. The Settlement Stock will be valued based on the volume weighted average price ("VWAP") for the fifteen consecutive trading days ending the trading day immediately preceding the date the Judgment is entered. *See Id.* at ¶ 1.39. The Stipulation provides if, at market close on the trading day before the Transfer Date, the price per share deviates more than 25% above or below the VWAP, the number of shares of Settlement Stock shall be adjusted so its overall value is $20,000,000. *Id.* at ¶ 2.4. This method protects the Settlement Class by ensuring that the value of the Settlement Stock will not deviate too greatly from the intended amount.

38.     In return, Settlement Class Members will dismiss, with prejudice, all claims that were, or could have been, brought, against Defendants. *Id.* at ¶¶ 1.34, 4.1-4.3.

39.     Upon final approval of the Settlement by the Court and entry of a judgment that becomes a final judgment, and upon satisfaction of the other conditions to the Settlement, the Settlement Fund will pay for certain administrative expenses, including: (a) notice and administration expenses; (b) taxes assessed against the income earned on the Settlement Fund and related tax expenses; and (c) Lead Counsel's fees and litigation expenses and the Plaintiffs' costs and expenses,

to the extent awarded by the Court. The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed to Settlement Class Members who submit valid Proof of Claim and Release forms which demonstrate a recognized loss under the Plan of Allocation. Each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund, in some combination of cash and/or Workhorse common stock, based on their "recognized claim" – which depends on the number of shares acquired and the dates of their purchase and sale as compared to the alleged corrective disclosure date. *Id.* at Ex. A-1.

40.    On February 14, 2023, the Court entered the Preliminary Approval Order (ECF No. 106) granting Lead Plaintiff's motion, appointing Timothy M. Weis and Angelo Federico as Settlement Class Representatives, appointing KSF as Class Counsel for settlement purposes, appointing KCC as the Settlement Administrator, approving the form of the Notice, and directing Lead Counsel and KCC to carry out the plan of notice proposed in the Preliminary Approval Motion.

## IV.    RISKS OF CONTINUING LITIGATION

41.    Based on their experience and knowledge of the facts and applicable law, Lead Counsel KSF, a law firm that specializes in the prosecution of complex securities litigation, believes that the Settlement is in the best interest of the Settlement Class. Both Lead Plaintiff and Additional Plaintiff also approved the Settlement. Although Lead Counsel and Lead Plaintiff believe this Action is meritorious and that Plaintiffs would ultimately prevail in establishing liability and damages, they are aware that they would likely to face strong challenges if the case were to proceed.

42.    Defendants have expressly denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action.

43.    The $35 million settlement provides immediate and certain benefits to the Settlement Class. If the Action were to proceed, Plaintiffs would face substantial

15

risks with respect to establishing liability and damages at each future stage of the litigation. Even if Plaintiffs were successful at each stage of the litigation, proceeding through trial and possible appeals would likely take many years, significantly delaying any recovery for the Settlement Class. Moreover, as the cash portion of the Settlement represents virtually all of Defendants' remaining insurance coverage, proceeding with the Action would likely decrease the amount of funds available in the future.[7] Thus, even if Plaintiffs eventually triumphed at trial and appeals, the actual amount recovered might be substantially less than the Settlement Amount.

### A. Continuing Discovery

44.    While Lead Plaintiff and Lead Counsel believe sufficient discovery was conducted to confirm the fairness of the Settlement, the discovery process was far from complete. Defendants and the subpoenaed third parties had produced over 110,000 pages of documents, but many more relevant, responsive documents had yet to be produced. Though Lead Counsel believes the documents produced thus far strongly support Plaintiffs' claims, there is no guarantee this trend would continue, or that sufficient documents would be obtained to prove every allegation in the Amended Complaint. Additionally, Lead Counsel would have had to devote extensive time and resources to ensure the review of these documents was done in a thorough and timely manner. Similarly, some depositions had been scheduled, but none had taken at the time of the Settlement. Depositions in this action, where persons with knowledge live in cities across the United States, would likely have required Lead Counsel and Defense Counsel to travel extensively, and to

---

[7] *See Optronic Technologies, Inc., v. Ningbo Sunny Electronic Co., Ltd. et al*, No. 16-cv-6370, ECF No. 629 at 26 (N.D. Cal. Apr. 6, 2023) (Attached hereto as Exhibit C) (noting Sheppard Mullin, one of the two firms representing Defendants here, billed a client more than $9M over three years for their defense of antitrust claims, further supporting Lead Plaintiff's decision to settle now before insurance proceeds are further depleted).

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

successfully serve subpoenas for testimony from third parties and certain former employees.

45. In this complex matter, both sides likely would have retained multiple experts to support their respective positions, each of whom would have written at least one report, and some or all of whom may have been deposed. Expert discovery can be key to ensuring success at class certification, summary judgment, and trial. If Defendants were able to retain particularly strong expert witnesses, there is a risk that Plaintiffs would not have survived future stages of the litigation.

46. Further, discovery in complex class action cases often involves extensive motions to resolve disputes, which are often referred to a magistrate judge. Rarely is either party victorious on every discovery dispute. Even if Plaintiffs' discovery motions were largely granted, it can take months – even years – to resolve all discovery disputes and complete production of relevant, responsive documents.

47. Completing document production, depositions, expert discovery, and discovery motions in this case may have consumed a significant amount of Defendants' remaining insurance coverage and significantly reduced or likely eliminated the recovery available to the Settlement Class.

## B. Class Certification

48. This Action has yet to progress to the class certification stage of the litigation. While Lead Plaintiff believes that securities fraud actions such as this are appropriate for class action treatment, Lead Plaintiff is also aware that Defendants would have opposed class certification of a litigation class. Lead Plaintiff believes that the Class satisfies the requirements of Fed. R. Civ. P. 23, and that they would prevail in establishing numerosity, commonality, typicality, and predominance. Further, Lead Plaintiff believes that he and Additional Plaintiff have, and would continue to, adequately and fairly protect the interests of the Class, and thus would be named as Class Representatives. Lead Plaintiff is also aware, however, that Defendants would very likely advance arguments against and submit an expert

17

report challenging price impact, as well as potentially challenging market efficiency. Plaintiffs would have had to hire their own expert – or experts – an additional expense spared the Class by settling at this time. If the Court found Defendants' arguments persuasive, it could deny certification, which would prevent recovery for absent Class members.

49.     Further, even if a class is certified, Fed. R. Civ. P. 23(c) allows a court to decertify a class at any time. Thus, this factor supports approval of the Settlement. *See, e.g., Brooks v. Life Care Ctrs., Inc.*, No. 12-659, 2015 U.S. Dist. LEXIS 196428, at *9 (C.D. Cal. Oct. 19, 2015) (Carney, J.) (citing *McKenzie v. Federal Exp. Corp.*, No. 10-02420, 2012 U.S. Dist. LEXIS 103666, at *10-11 (C.D. Cal. July 2, 2012) (considering likelihood of decertification and appeal when granting final settlement approval)).

50.     Even if the Class was certified, Defendants could petition the Ninth Circuit for leave to appeal that decision immediately pursuant to Rule 23(f), which could result in substantial delays in the resolution of the litigation. The recent case of *In re Goldman Sachs Grp., Inc.*, No. 10-cv-3461, 2021 U.S. Dist. LEXIS 235241 (S.D.N.Y. Dec. 8, 2021), is instructive on this point. There, the district court originally granted plaintiffs' motion for class certification on September 24, 2015. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-3461, 2015 U.S. Dist. LEXIS 128856, at *25 (S.D.N.Y. Sep. 24, 2015). Thereafter, defendants appealed the district court's order to the Second Circuit twice, then to the Supreme Court, and then again to the Second Circuit – overall, taking *six years* before the class was certified. *See also In re Vivendi Universal, S.A. Sec. Litig.*, No. 11-908 (2d Cir. July 20, 2011) (denying second Rule 23(f) petition over four years after district court originally granted class certification). Thus, the danger of a protracted delay over class certification is very real.

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

## C. **Summary Judgment**

51.    If the Court granted Plaintiffs' motion for class certification, Defendants would have then presented additional arguments at summary judgment in order to defeat Plaintiffs' claims. Most notably, Defendants would likely challenge the evidence regarding falsity, scienter, damages, and loss causation, the outcome of which is difficult to predict. Defendants' arguments at summary judgment would have been informed by extensive fact discovery, which could potentially undermine Plaintiffs' allegations regarding the falsity of Defendants' statements relating to the USPS NGDV contract, Workhorse's manufacturing capabilities, and Workhorse's "backlog" of orders, thereby undercutting the elements of falsity, materiality, loss causation, and/or scienter. Even if Defendants' Motion for Summary Judgment was not granted in whole, courts in this district routinely grant summary judgment motions in part, potentially limiting the issues Plaintiffs would be able to present to a jury. *See, e.g., Hsingching Hsu v. Puma Biotechnology, Inc.*, No. 15-CV-00865-AG, 2018 U.S. Dist. LEXIS 173657, at *29 (C.D. Cal. Oct. 5, 2018) (partially granting defendants' motion for summary judgment and dismissing all claims as to one defendant for whom Plaintiff had not proven scienter); *Schulein v. Petroleum Dev. Corp.*, No. 11-CV-1891-AG, 2014 U.S. Dist. LEXIS 71236, at *29 (C.D. Cal. May 19, 2014) (partially granting defendants' motion for summary judgment as to certain claims and certain defendants). In order for the Class to recover damages at the level estimated by Plaintiffs' expert, Plaintiffs would need to prevail on each of the claims alleged, and for the entire Class.

## D. **Pre-Trial**

52.    Leading up to trial, the Parties likely would have raised challenges to each other's expert witnesses pursuant to *Daubert v. Merrell Dow Pharm., Inc.* (509 U.S. 579 (1993)). The Parties also likely would have each filed a number of motions *in limine*, asking the Court to find certain evidence inadmissible at trial. The success or failure of these motions may have significantly altered Plaintiffs' strategy at trial.

19

**E.  Trial**

53.  Even if the Action made it past the class certification and summary judgment stages, at trial, there could be no assurance that the jury would have found in Plaintiffs' favor. Securities fraud cases require plaintiffs to demonstrate falsity, materiality, scienter and loss causation. These elements can be difficult to prove (or sometimes even difficult to explain to the average juror), and Defendants in this case likely would have raised challenges to each element. While Plaintiffs believe they would have ultimately prevailed, success is far from certain.

54.  First, Plaintiffs would have been required to prove that Defendants' statements were false or misleading and/or the existence of a fraudulent scheme or course of conduct. Discovery in this case is still at a relatively stage. While Plaintiffs believe that the documents produced thus far strongly support their allegations of falsity, there is no guarantee that further documents would continue this trend. Additionally, no depositions have yet been conducted. Even with strong documentary evidence, if Lead Counsel would have failed to elicit relevant deposition testimony regarding the falsity of Defendants' statements and/or fraudulent scheme, it could have been fatal to Plaintiffs' case.

55.  Even if falsity had been established, Plaintiffs would have had to prove that Defendants' statements and/or conduct were material to a reasonable investor. Materiality is a subjective inquiry and is ordinarily determined by the jury. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1013 (9th Cir. 2018) ("Ultimately, a jury should assess materiality as a question of fact."). Even if Plaintiffs believed strongly in the materiality of the statements at issue, a jury may have found in favor of Defendants.

56.  Further, Section 10(b) cases require plaintiffs to prove scienter, in other words, that Defendants, at minimum, recklessly disregarded the truth about the alleged false or misleading statements or scheme. This is a notoriously difficult element to prove, as the evidence is often largely circumstantial, and may be

undercut by testimony from individual defendants that they did not possess the requisite state of mind. If this Action had continued, Plaintiffs faced the very real risk that the Court or the jury could have found that Defendants did not act with scienter. While the Court held Plaintiffs adequately pled scienter at the motion to dismiss stage, *see* ECF No. 74, there is no guarantee that a jury upon assessing the totality of the evidence and the credibility of witnesses would find the Defendants to have a culpable state of mind. For example, in *In re Tesla, Inc. Sec. Litig.*, despite the court granting partial summary judgment in favor of plaintiffs on falsity and scienter grounds (No. 18-cv-04865-EMC, 2022 U.S. Dist. LEXIS 88609, at *65 (N.D. Cal. Apr. 1, 2022)), after a three-week trial and only a few hours of deliberations, the jury found in favor of Tesla and CEO Elon Musk.[8] Thus, after nearly four-and-a-half years of hard-fought litigation, Tesla investors will likely receive nothing.

57.    Another major risk is Plaintiffs' ability to prove loss causation and damages. To establish these elements, Plaintiffs would have to prove that the revelation of the alleged fraud proximately caused the declines in Workhorse's stock price during the Class Period and that those fraud-related causes could be parsed out from any potential non-fraud related publicly released information. For example, Defendants in this case likely would have argued that only one of the three alleged corrective disclosures was in fact a corrective disclosure resulting in a statistically significant decline in the stock price, so any Class Period should be limited to that one drop. Plaintiffs believe that they would have brought forth sufficient evidence to defeat these arguments and support both the finding of loss causation and damages at summary judgment and trial. However, the questions of loss causation and damages often come down to a "battle of the experts." If Defendants' expert won

---

[8] *See, e.g.*, Bonnie Eslinger, *Tesla Jury Clears Musk In $12B 'Take Private' Tweet Trial*, LAW360, February 3, 2023, https://www.law360.com/articles/1572558/tesla-jury-clears-musk-in-12b-take-private-tweet-trial

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

the day, the Court or the jury may have found that Plaintiffs were entitled to significantly lower damages than anticipated – or none at all.

58.     Moreover, prevailing at trial would not necessarily result in a larger recovery. The jury could award a smaller per-share amount of damages, overall damages could be reduced during the post-verdict claims process, and/or the verdict could be appealed.  As discussed above, due to Workhorse's limited resources and insurance coverage, there are very real questions as to whether Plaintiffs could collect a greater judgment than the Settlement achieved here.

59.     Given these significant risks, the $35 million settlement is an excellent result for the Settlement Class.

## V.     THE SETTLEMENT IS IN THE BEST INTERESTS OF THE SETTLEMENT CLASS AND WARRANTS FINAL APPROVAL

60.     While Lead Plaintiff adamantly believe that the Class would have prevailed on the merits at trial, Defendants are equally adamant that Plaintiffs would not have succeeded, and thus, Plaintiffs faced a significant risk that they would not have convinced a jury that Defendants made materially false and misleading statements with the requisite state of mind and that these statements caused Plaintiffs' losses.

61.     And even if Plaintiffs prevailed at trial, post-trial proceedings or potential collectability issues could have reduced or even eliminated Plaintiffs' recovery. Workhorse continues to be a largely pre-production company with rapidly-dwindling cash, business uncertainties, and ongoing regulatory issues. The $15 million in Settlement Cash represents nearly all of Workhorse's remaining insurance coverage. As the Court noted in the Preliminary Approval Order, "by settling now, Lead Plaintiff and the class get most of Defendants' remaining insurance proceeds rather than those proceeds being used to litigate this case and related shareholder derivative suits and governmental investigations." ECF No. 106 at 15 (*citing In re Diamond Foods, Inc., Sec. Litig.*, No. 11-cv-05386, 2014 U.S. Dist. LEXIS 3252, at

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

*9 (N.D. Cal. Jan. 10, 2014) ("It is not unreasonable for counsel and the class representative to prefer the bird in hand, given concerns about Diamond's strained financial state and its ability to pay a judgment following further litigation.") (cleaned up); *In re Critical Path, Inc.*, Nos. 01-cv-00551, 01-cv-03756, 2002 U.S. Dist. LEXIS 26399, at *21 (N.D. Cal. June 18, 2002) ("Through protracted litigation, the settlement class could conceivably extract more, but at a plausible risk of getting nothing . . . ; watching Critical Path fall into bankruptcy; and, most certainly, drying up the available insurance.")).

62.    Having considered the foregoing risks and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable, and adequate, and in the best interests of the Settlement Class. Lead Plaintiff, having been informed by Lead Counsel of the foregoing risks, as well as the strengths and weakness of the case, agrees that settlement at this time is in its best interest and the best interests of the Settlement Class.

## VI. LEAD COUNSEL'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

63.    Pursuant to its Preliminary Approval Order, the Court set a Final Approval Hearing to be held on Monday, July 24, 2023, at 1:30 p.m. ECF No. 106 at ¶ 23. The Preliminary Approval Order also approved the timeline set forth in the Stipulation of Settlement and its attachments: (1) February 28, 2023, as the deadline for Lead Counsel to provide notice to the Settlement Class Members who could be identified with reasonable effort; (2) March 7, 2023, as the deadline for Lead Counsel to cause the Summary Notice to be published twice in nationally distributed, business focused newswires; (3) March 16, 2023, as the deadline to file papers in support of the Final Settlement, Plan of Allocation, and the application by Counsel for attorneys' fees or reimbursement of expenses (collectively, the "Applications");

(4) July 3, 2023, as the deadline for Settlement Class Members to file proof of claim forms or submit requests to be excluded from the Settlement Class or file any objections to the Settlement or any of the Applications; and (5) July 17, 2023, as the deadline to reply to any opposition to the Applications or any response to any objection(s) filed.

64.    In accordance with the Preliminary Approval Order, on February 28, 2023, Lead Counsel instructed KCC to email and mail copies of the Court-approved Postcard Notice (the "Postcard Notice") by first-class mail, postage prepaid, to potential members of the Settlement Class and nominees.

65.    The Postcard Notice contains, among other things, a description of the Settlement and information regarding the lawsuit and the right of Settlement Class Members to: (a) participate in the Settlement; (b) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (c) exclude themselves from the Settlement Class. The Postcard Notice also directs recipients to the Settlement Class Website, https://www.workhorsesecuritieslitigation.com/ for more complete details regarding the proposed Settlement.

66.    As set forth in the Cavallo Declaration, in accordance with the Preliminary Approval Order, KCC began the process of disseminating the Postcard Notice and Notice Packet. As of March 14, 2023, through direct mailings and mailings to brokers and nominees, KCC has mailed 5,128 copies of the Postcard Notice and three Notice Packets to potential Settlement Class Members. Cavallo Decl. at ¶ 8.

67.    In accordance with the Preliminary Approval Order, on March 7, 2023, KCC caused the Summary Notice to be published in *Business Wire* and *PR Newswire*, two national, business-oriented newswires. *Id.* at ¶ 9.

68.    Lead Counsel also directed KCC to update the previously established Settlement Class Website with information concerning the Settlement and access to

24

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

downloadable copies of the Claim Form, Notices, Stipulation, Preliminary Approval Order, and other key filings in this Action. The Settlement Class Website also allows for Settlement Class Members to complete claims electronically. Additionally, KCC maintained the previously established toll-free telephone number, 1-844-787-0160, to respond to inquiries from Settlement Class Members regarding the Settlement. *Id.* at ¶¶ 10-11.

69. As set forth above, the deadline for Settlement Class Members to request exclusion from the Settlement Class or to file an opposition to the Settlement, Plan of Allocation, and/or Fee and Expense Application is July 3, 2023. Thus, the deadline for submitting requests to be excluded from the Settlement Class or to object has not yet passed. However, as of the date of this filing, KCC has received no objections or exclusion requests (Cavallo Decl. at ¶ 12), further corroborating the reasonableness of the settlement and Lead Counsel's fee and expense applications. Lead Counsel will address any such objections, should they arise, in its reply brief.

## VII. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

70. Pursuant to the Court's Preliminary Approval Order and as set forth in the Notice, Settlement Class Members who wish to participate in the Settlement and be potentially eligible to receive a distribution from the Settlement Fund must provide a valid Proof of Claim to KCC postmarked or submitted on or before July 3, 2023. ECF No. 105-2 at 51.

71. KCC, supervised by Lead Counsel, will make all reasonable efforts to resolve any curable defects in Proof of Claim Forms to ensure that all Settlement Class members with otherwise valid Claims are not rejected and obtain their rightful compensation from the Settlement Fund. Lead Counsel has been, and will continue to be, very involved in the claims administration process, regularly communicating with KCC and Settlement Class Members and answering their questions, and ensuring the process runs smoothly and efficiently.

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

72.     Plaintiffs have proposed a plan for allocating the proceeds of the Settlement among members of the Settlement Class who submit timely and valid Proofs of Claim in connection with the Settlement. The objective of the proposed Plan of Allocation is to equitably distribute the net proceeds of the Settlement to Authorized Claimants based on their respective alleged economic losses as a result of the alleged violations of federal securities laws asserted in the Action, as opposed to losses caused by market-wide or industry-wide factors, or company-specific factors unrelated to the alleged fraud. Calculations under the Plan of Allocation are generally based upon the measure of damages set forth in Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

73.     The Plan of Allocation was prepared in consultation with an expert economics consultant. Although the Plan of Allocation is not a formal damages analysis, it reflects the informed views of Plaintiffs' economic consultant, including their review of publicly available information regarding Workhorse and a statistical analysis of the price movements of Workhorse securities during the Class Period. The Plan of Allocation is also consistent with the traditional loss calculations used in Exchange Act claims, consistent with the PSLRA. Lead Counsel believes that the Plan of Allocation is reasonable and has a rational basis and should be approved.

74.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each share of Workhorse common stock purchased or otherwise acquired during the Class Period. The calculation of the Claimants' Recognized Loss Amounts will depend upon several facts, including when the shares of Workhorse common stock were purchased or otherwise acquired during the Class Period, and in what amounts, and whether those shares were sold, and if sold, when they were sold, and for what amounts.

75.     For shares sold before the market opened February 23, 2021, the Recognized Loss for each share shall be zero, as shares purchased during the Class Period but sold prior to the first corrective disclosure did not sustain recoverable

losses under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). ECF No. 105-2 at 67 (Notice, ¶ 6.i).

76.    For shares sold from February 23, 2021, up to and including the halt of market trading on May 9, 2021, the Recognized Loss Amount for each share is the lesser of: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table 1 of the Plan of Allocation minus the amount of artificial inflation per share on the date of sale as stated in Table 1; or (ii) the purchase/acquisition price minus the sale price. ECF No. 105-2 at 67 (Notice, ¶ 6.ii).

77.    For shares sold from May 10, 2021, through and including the close of market trading on August 6, 2021, the Recognized Loss Amount for each share is the least of: (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table 1 of the Plan of Allocation; (ii) the purchase/acquisition price minus the average closing price between September 20, 2013, and the date of sale as stated in Table 2 of the Plan of Allocation; or (iii) the purchase/acquisition price minus the sale price. ECF No. 105-2 at 68 (Notice, ¶ 6.iii).

78.    For shares held as of the close of market trading on August 6, 2021, the Recognized Loss Amount for each share is the lesser of: (i) the  amount of artificial inflation per share on the date of  purchase/acquisition as stated in Table 1 of the Plan of Allocation; or (ii) the purchase/acquisition price minus $12.08, the average closing price of Workhorse common stock between May 10, 2021, and August 6, 2021, as shown on the last line of Table 2 of the Plan of Allocation. ECF No. 105-2 at 68 (Notice, ¶ 6.iv).

79.    The Plan of Allocation sets forth the estimated alleged artificial inflation in the price of Workhorse common stock during the Class Period. The computation of the estimated alleged artificial inflation in the price of Workhorse common stock during the Class Period is based on certain misrepresentations alleged by Plaintiffs in the Amended Complaint and the price change of Workhorse common stock based thereon, net of market-wide and industry-wide factors, in reaction to the

public announcements that allegedly corrected Defendants' material misrepresentations and omissions.

80.    Under the Plan of Allocation, Recognized Loss Amounts also take into account the PSLRA's statutory limitation on recoverable damages, whereby losses on eligible shares of Workhorse common stock cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the 90-day period subsequent to the end of the Class Period (*i.e.*, through August 6, 2021), and losses on eligible shares of Workhorse common stock purchased or otherwise acquired during the Class Period and sold during the 90-day period subsequent to the Class Period cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the portion of the 90-day period elapsed as of the date of sale. A table showing the average 90-day look-back price for each day of the period is attached as Table 2 to the Plan of Allocation.

81.    As further explained in the Plan of Allocation, a Claimant's "Recognized Claim" will be determined by totaling the Claimant's Recognized Loss Amounts. If a Settlement Class Member has more than one purchase/acquisition or sale of Workhorse common stock during the Class Period, all purchases/acquisitions and sales shall be matched on a First In, First Out ("FIFO") basis. Class Period sales will be matched first against any holdings at the beginning of the Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made during the Class Period. The Net Settlement Fund will be allocated on a pro rata basis to Authorized Claimants based on each Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants. ECF No. 105-2 at 69 (Notice ¶ 8). Under the Plan of Allocation, if a Claimant's pro rata payment calculates to less than $20.00, no distribution will be made to that Claimant. ECF No. 105-2 at 70 (Notice ¶ 13).

82.  Pursuant to the Plan of Allocation, any remaining funds in the Net Settlement Fund after six (6) months from the date of distribution of such Net Settlement Fund, after satisfying any remaining obligations to the Claims Administrator, shall be reallocated among and distributed to Authorized Claimants who have cashed their initial distributions and who would receive at least $20 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determine that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. Thereafter, any remaining balance shall be donated to non-sectarian 501(c)(3) non-profit organization(s) to be recommended by Lead Counsel and approved by the Court. ECF No. 105-2 at 70-71 (Notice ¶ 14).

83.  The structure of the Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund among Authorized Claimants. Lead Counsel submit that the Plan of Allocation is fair and reasonable and should be approved together with the Settlement.

84.  In addition, in response to the dissemination of 5,128 copies of the Postcard Notice to potential Settlement Class Members and nominees, to date there has been no objections to date to the proposed Plan of Allocation.

## VIII.  LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES IS REASONABLE AND SHOULD BE GRANTED

85.  In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel respectfully applies for a fee award of 25% of the value of the Settlement Amount, in equal proportion of Settlement Cash and Settlement Stock as the Settlement Class will receive, and reimbursement of reasonable litigation expenses from the Settlement Fund in the amount of $112,027.51. The legal

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

authority supporting these requests is set forth in the accompanying Fee Memorandum. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A. The Fee Application

86.    Lead Counsel are applying for a 25% fee award using the percentage-of-the-common-fund fee as compensation for the services Lead Counsel rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage-of-the fund method has been recognized as appropriate by the Supreme Court, the Ninth Circuit, and this Court for cases of this nature. *See* Fee Memorandum, Section II.A. Unlike the lodestar method, the percentage-of-the-fund method aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery, motivating counsel to achieve maximum recovery in the shortest amount of time required under the circumstances.

87.    Some of the factors considered by courts in this circuit when determining the reasonableness of fee applications are "the time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class." *See, e.g., In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2022 U.S. Dist. LEXIS 188621, at *44 (S.D. Cal. Oct. 13, 2022); *In re Yayyo, Inc. Sec. Litig.*, No. 2:20-cv-08235-SVW-AFM, 2022 U.S. Dist. LEXIS 123322, at *17 (C.D. Cal. July 12, 2022).

88.    Based on these factors, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved.

### 1. The Favorable Outcome Achieved is the Result of the Significant Time and Labor Expended by Lead Counsel

89.    Lead Counsel undertook time-consuming, challenging, and risky work to prosecute the claims against Defendants and to achieve this Settlement.

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

90.     As detailed above, Lead Counsel:

- conducted a lengthy investigation by reviewing and analyzing publicly available information regarding Defendants, including SEC filings, online and newspaper articles, YouTube videos, analyst reports, press releases, stock price movements, earnings conference call transcripts, analyst presentations, and the complaint in a federal claims case Workhorse filed against the USPS;

- consulted with a damages expert to evaluate recoverable losses;

- consulted with an investigator, who interviewed a number of former Workhorse employees;

- drafted the Amended Complaint;

- researched and drafted the opposition to Defendants' motion to dismiss the Amended Complaint;

- exchanged initial disclosures with Defendants;

- propounded Requests for Production and Interrogatories on Defendants;

- served document subpoenas on 18 third parties, including Workhorse's accountant and various purported Workhorse customers;

- engaged in numerous meet-and-confer conferences and written correspondence regarding Defendants' objections to the scope of document discovery, search terms, custodians, and electronically-stored information protocols;

- reviewed and analyzed more than 110,000 pages of documents;

- served a 30(b)(6) deposition notice on Workhorse and reached out to Defendants to coordinate on specific dates for depositions of Workhorse's former Director of Dealer and Support Operations and Workhorse's former Director of Business Development;

- began preparing for the above-referenced depositions, as well as 30(b)(6) depositions of several third parties;

31

- continued monitoring news sources, SEC Filings, and Workhorse's website for news about the Company's business and ongoing issues;

- attended a full-day in-person mediation session before Jed D. Melnick, Esq., of JAMS, a nationally recognized mediator;

- extensively briefed the issues of the case in advance of the mediation;

- further negotiated with Defendants until the $35 million Settlement was achieved;

- negotiated with Defendants to document the Settlement;

- worked with damages consultants to prepare the Plan of Allocation; and

- oversaw the distribution of the Notice of the Settlement to Settlement Class Members.

91.    Since the inception of the Action, Lead Counsel has dedicated over 3,900 hours to the investigation, prosecution, and resolution of the claims against Defendants, resulting in a lodestar of $2,789,140. The requested fee of 25% of the Settlement Fund, yields a multiplier of approximately 3.14 based on Lead Counsel's lodestar,[9] which is reasonable in light of the risks undertaken by Lead Counsel and consistent with lodestar multipliers in other securities class action cases. Recognizing the imminent need to settle in order to preserve the remaining insurance funds, Lead Counsel chose not to delay settlement negotiations, even though doing so could have increased its lodestar.

92.    Below is a schedule that indicates the amount of time spent by each attorney at KSF who worked on this Action and the lodestar calculations based on their current billing rates. This schedule was prepared from contemporaneous daily time records regularly prepared and maintained by KSF. As the partner responsible

---

[9] This multiplier has been calculated assuming Lead Counsel's fee award is valued at $8.75 million, or 25% of the Settlement Cash ($3.75 million) and 25% of the shares of Settlement Stock (valued at approximately $5 million) (*see* ¶ 37 above regarding the valuation of the Settlement Stock).

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

for supervising my firm's work on this case, I reviewed these time and expense records to prepare this Declaration. The purpose of this review was to confirm both the accuracy of the time entries and expenses and the necessity for, and reasonableness of, the time and expenses committed to the litigation. I reduced my firm's time, as appropriate, for efforts I deemed to be less than maximally efficient.

93.     Following my review and the adjustments made, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as stated in this Declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. In addition, based on my experience in similar litigation, the expenses are all of a type that would normally be billed to a fee-paying client in the private legal marketplace.

94.     My firm's rates are set based on periodic analysis of rates used by firms performing comparable work and have been approved by courts. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms.

95.     As detailed in the Fee Memorandum, the hourly rates for the attorneys included in the schedule below are commensurate with the hourly rates charged by lawyers of reasonably comparable skill, experience, and reputation and have been accepted in other securities or shareholder litigation.

96.    KSF's lodestar is set forth in the following chart:

| Staff | Total Duration | Rate* | Lodestar |
|---|---|---|---|
| Lewis Kahn (P) | 110.2 | 1200 | 132,240.00 |
| Kim Miller (P) | 460.6 | 1050 | 483,630.00 |
| Craig Geraci (P) | 148.2 | 895 | 132,639.00 |
| J Lopatka (P) | 315.3 | 895 | 282,193.50 |
| Melissa Harris (O) | 976.3 | 850 | 829,855.00 |
| Matthew Woodard (A) | 230.2 | 650 | 149,630.00 |
| Rhosean Scott (SA) | 282.3 | 550 | 155,265.00 |
| Jyoti Kehl (A) | 943.3 | 500 | 471,650.00 |
| Nikki Coulon (A) | 401.0 | 350 | 140,350.00 |
| Bronwyn Gibson (S) | 42.5 | 275 | 11,687.50 |
| **Total Duration** | **3909.9** | **Total Lodestar** | **2,789,140.00** |

(P)    Partner
(O)    Of Counsel
(A)    Associate
(SA)   Staff Attorney
(S)    Support Staff
*    Travel time is billed at 50% of each attorney's hourly rate

97.    The lodestar of attorneys who worked less than twenty (20) hours on the Action has been excluded entirely from the lodestar calculation of KSF. Additionally, no time spent on the application for attorneys' fees and expenses is included in Lead Counsel's lodestar.

98.    Furthermore, Lead Counsel's work will not end upon the filing of the motion for attorneys' fees. Lead Counsel's lodestar excludes this future work, including time spent preparing for the final approval hearing, as well as time spent after final approval relating to administration of the Settlement.

## 2. The Complexity of the Factual and Legal Allegations in this Action Supports the Requested Fee Award

99.    As detailed in the Fee Memorandum and discussed above, securities class action cases are known for their notorious complexity. This Action is no exception; it presented a number of sharply contested issues of both fact and law, and Plaintiffs faced formidable defenses to liability, loss causation and damages.

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

The allegations also involved issues regarding government bids and contracting, which are inherently complex in and of themselves, and technical issues regarding the engineering and production of electric vehicles, which likely would have required expert witness testimony to explain to a jury.

### 3. The Quality of Representation and Result Obtained

100.    The expertise and experience of counsel is an important factor in setting a fair fee. The attorneys at KSF are experienced and skilled securities class action litigators and have successful track records in securities cases throughout the country. *See* Exhibit B (KSF Firm Résumé).

101.    The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants are represented by Sheppard, Mullin, Richter & Hampton LLP and Katten Muchin Rosenman LLP, both preeminent law firms that have defended numerous securities cases resulting in favorable decisions for defendants. These large and highly capable defense firms spared no effort in the vigorous defense of their respective clients. In the face of this formidable opposition, and considering the circumstances, Lead Plaintiff and Lead Counsel developed, litigated, and successfully negotiated an excellent recovery in this Action for the Settlement Class.

### 4. Awards in Similar Cases

102.    As discussed in the Fee Memorandum, a 25% fee award is the "benchmark" in the Ninth Circuit, and has routinely been approved by this Court in other class action common fund cases. *See Becerra-South v. Howroyd-Wright Emp't Agency, Inc.*, No. 18-CV-08348-CJC, 2021 U.S. Dist. LEXIS 14633, at *14 (C.D. Cal. Jan. 25, 2021); In Re Quality Sys. Inc. Sec. Litig., 13-CV-01818-CJC, ECF No. 117 (C.D. Cal. Nov. 19, 2018); *Kimec v. Powerwave Techs. Inc.*, 12-CV-00222-CJC, ECF No. 215 (C.D. Cal. July 11, 2016). A 25% fee award is also well within the range of percentages awarded in securities class actions with comparable settlements.

### 5. The Substantial Contingency Fee Risks Borne by Lead Counsel

103.    The financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis. This litigation was undertaken by Lead Counsel on a wholly contingent basis. In doing so, Lead Counsel faced the possibility that they would invest an enormous amount of time and money to the prosecution of this complex litigation only to secure no recovery. There have been many hard-fought lawsuits where excellent professional efforts by members of the plaintiffs' bar produced no fee to counsel, even after years of litigation—sometimes even after obtaining a successful verdict at trial.

104.    The risks of contingent litigation are also highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim or a reduction in the value of a claim after a great deal of time and funds were expended on the case.

105.    Lead Counsel bore the risk that no recovery would be achieved. As discussed in the Fee Memorandum and above, this litigation presented many risks and uncertainties that could have prevented any recovery whatsoever. Despite these risks, Lead Counsel continued to litigate this Action for the benefit of the Class.

### 6. The Favorable Result Obtained for the Settlement Class

106.    Lead Plaintiff and Lead Counsel achieved an exceptional result for the Settlement Class: they were able to extract virtually all of Defendants' remaining insurance proceeds, and a sizeable amount of Workhorse common stock – for a total Settlement Fund valued at $35 million. If Plaintiffs had continued to litigate the case, any available funds or insurance proceeds would have been depleted, resulting a lower recovery, or possibly no recovery at all.

107.    After consulting with an economic expert, Lead Plaintiff and Lead Counsel believe a successful verdict on all claims could result in aggregated damages as high as $1.2 billion. However, given Workhorse's precarious financial position, the Settlement Class could have recovered nothing had litigation continued

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

while the policies quickly wasted. At any rate, taking this number at face value, the Settlement constitutes approximately 3% of maximum Class-wide damages – within the range of reasonableness and on par with comparable securities class action settlements. *See, e.g., In re Broadcom Corp. Sec. Litig.*, No. 01-275, 2005 U.S. Dist. LEXIS 41983, at *20-21 (C.D. Cal. Sept. 14, 2005) (2.7% of damages "not [] inconsistent with the average recovery in securities class action[s]").

### 7. The Support of Settlement Class Representatives and Reaction of the Settlement Class

108. An additional factor courts consider when assessing the reasonableness of the fee application is whether the class representatives approve the award. In this case, the Settlement Class Representatives approved Lead Counsel's Fee and Expense Application. Under the retainer agreements by and among Lead Plaintiff, Additional Plaintiff, and Lead Counsel, Lead Counsel agreed to litigate the Action on an entirely contingent basis, meaning that Lead Counsel would not be compensated at all, or reimbursed for any expenses it incurred on behalf of the Class, unless it obtained a recovery for the Class. The Settlement Class Representatives' support of the 25% fee request adds further support to Lead Counsel's fee request.

109. The Settlement Class Representative actively monitored the litigation and consulted with Lead Counsel over the course of this Action, as well as throughout the settlement negotiations. Lead Counsel acted under the supervision of, and negotiated within the settlement authority granted by, the Settlement Class Representatives. The Settlement Class Representatives' support of the requested attorneys' fees should be given considerable weight. In the post-PSLRA era, this is a significant consideration in determining a fair fee.

### B. <u>Lead Counsel's Application for Reimbursement of Expenses</u>

110. Lead Counsel seeks reimbursement from the Settlement Fund of $112,027.51 for expenses reasonably and actually incurred in connection with their

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

commencement, prosecution and resolution of the claims asserted in the Action, within the noticed $130,000 expense cap communicated in the Notice.

111. Lead Counsel's expenses were reasonable and necessary to the prosecution and resolution of this Action and are the type of expenses that counsel typically incur in complex litigation, and for which counsel are typically reimbursed when the litigation gives rise to a common fund.

112. From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, or at least would not recover anything until the Action was successfully resolved. It also understood that, even assuming the case was ultimately successful, reimbursement would not compensate for the lost use of the funds advanced to prosecute this Action. Thus, Lead Counsel was motivated to, and did, take significant steps to avoid unnecessary expenditures and minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

113. The expense schedule below identifies the specific categories of expenses, *e.g.*, court fees, fees for experts and consultants, discovery hosting, on-line legal and factual research, travel costs, reproduction costs, messenger and courier costs, and overnight mail costs incurred by Lead Counsel.

| Category: | Total: |
| --- | --- |
| Experts | $17,390.00 |
| Investigators and Consultants | $10,594.15 |
| Mediator | $9,788.58 |
| Discovery Platform Hosting/Storage/Document Management | $38,500.00 |
| Computerized Legal Research and Analyst Reports | $11,403.33 |
| Court Costs/Filing Fees/Transcripts | $2,478.16 |
| Messengers/Couriers/Overnight Delivery | $941.12 |
| Photocopies/Printing ($0.25/page)/Press Releases | $6,474.40 |
| Travel/Meals/Lodging | $14,457.77 |
| **Total Expenses Incurred:** | **$112,027.51** |

114. One of the larger expenses, $17,390, was for Plaintiffs' damages and loss causation expert, whose services were necessary both when pleading loss

causation and damages and to conduct an informed assessment concerning the reasonableness of the settlement and create the plan of allocation. Another large expense was $10,594 for Investigators and Consultants. The investigation conducted by these individuals provided key support for the allegations in the Amended Complaint, in fact, the Court cited the testimony of several of the Confidential Witnesses interviewed by Plaintiffs' investigator prominently in its Order Denying in Substantial Part Defendants' Motion to Dismiss. *See* ECF No. 74. Additionally, retaining a well-regarded mediator, another significant expense, was crucial to the Parties reaching an agreement to settle this case.

115. These expenses and the other expenses for which Lead Counsel seeks reimbursement (discovery document hosting, travel, photocopying, legal research, court costs, etc.) are the types of expenses that are reasonably and necessarily incurred in litigation and routinely charged to clients in non-contingency cases.

116. The expenses of Lead Counsel are also reasonable compared to expenses reimbursed in similar cases, as discussed in the Fee Memorandum.

117. The expenses requested by Lead Counsel have been approved by the Settlement Class Representatives and are within the noticed cap of $130,000.

## IX. SERVICE AWARDS REQUESTED FOR SETTLEMENT CLASS REPRESENTATIVES

118. The PSLRA allows a class representative to seek an award of reasonable costs and expenses (including lost wages) relating to its representation of the Class. 15 U.S.C. §78u-4(a)(4).

119. Settlement Class Representatives Weis and Federico respectfully request service awards of $5,000 each ($10,000 total) to compensate them for their time in representing the Settlement Class. As noted in the Preliminary Approval Order, these requested awards are "within the range of incentive awards typically approved in this district and are presumptively reasonable." ECF No. 106, citing *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).

DECLARATION OF KIM E. MILLER IN SUPPORT OF
FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC

120.   The Settlement Class Representatives worked closely with Lead Counsel to obtain a favorable result. As the Court recognized, the Settlement Class Representatives were actively involved in this case: they "assisted with the investigation of the claims, reviewed the AC, provided extensive documents supporting the claims to Lead Counsel, monitored the litigation, provided input during settlement negotiations, and approved the Settlement." *Id.* (citing Motion for Prelim. Approval at 15). Further, Lead Plaintiff monitored Lead Counsel and regularly communicated with Lead Counsel regarding the litigation, risks, and strategy. In doing so, both Settlement Class Representatives took time away from their professional and personal obligations. Given these facts, a $5,000 award for each Settlement Class Representative is warranted and should be approved.

121.   Further, these awards are within the noticed cap for service awards, and no objection to this request has been received.

**X.   CONCLUSION**

122.   For the reasons set forth above and in the accompanying motions and supporting memoranda, I respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be granted final approval; (b) the Plan of Allocation represents a fair method for allocating and distributing the Net Settlement Fund among eligible Settlement Class Members and should be approved; (c) the Fee and Expense Application should be granted; and (d) the requested service awards to Settlement Class Representatives should be granted.

I declare under penalty of perjury of the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed this 16th day of March, 2023 at Greenwich, Connecticut.

/s/ *Kim E. Miller*

Kim E. Miller

DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
Case No. 2:21-CV-02072-CJC-PVC