# JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAM FARRAR, individually and on behalf of all others similarly situated, | Lead Case No.: CV 21-02072-CJC (PVCx) |
| Plaintiff, | |
| v. | ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFFS' MOTIONS FOR FINAL SETTLEMENT APPROVAL [Dkt. 107] AND FOR ATTORNEY FEES [Dkt. 108], AND OVERRULING OBJECTIONS |
| WORKHORSE GROUP, INC., DUANE HUGHES, and STEVE SCHRADER, | |
| Defendants. | |

## I.    INTRODUCTION

Sam Farrar brought this consolidated putative securities class action in March 2021 against Defendants Workhorse Group, Inc. ("Workhorse"), Workhorse's Chief Executive Officer, Duane Hughes, and its Chief Financial Officer, Steve Schrader.  (Dkt. 64 [First Amended Complaint, hereinafter "FAC"].)  In May 2021, the Court appointed Timothy M. Weis as lead Plaintiff ("Lead Plaintiff") and Kahn Swick & Foti, LLC as lead counsel ("Lead Counsel").  (Dkt. 61.)  The FAC was also filed on behalf of Additional Plaintiff

Angelo Federico (together with Lead Plaintiff, "Plaintiffs").  After substantial motion practice and discovery, and a full-day, in-person mediation session, the parties reached a proposed settlement (the "Settlement") which provides the class with nearly all of Workhorse's remaining insurance coverage in addition to common stock.  The Court preliminarily approved the Settlement in February 2023.  (Dkt. 106 [hereinafter "Prelim. App. Order"].)  After the settlement administrator sent 851,153 notices to potential class members, there were 24,567 proof of claim forms, twelve requests for exclusion, and three objections received.  (Dkt. 117 [Reply] at 2.)  Now before the Court are Plaintiffs' motions for final settlement approval (Dkt. 107, hereinafter "Mot.") and for attorney fees (Dkt. 108, hereinafter "Fee Mot.").  For the following reasons, the motions are **GRANTED IN SUBSTANTIAL PART** and the objections are **OVERRULED**.

## II.    BACKGROUND

### A.    Factual Allegations

Plaintiffs allege the following facts in their FAC.  Workhorse makes all-electric "last mile" delivery trucks, or small- to medium-sized trucks that deliver packages the relatively short distance from a warehouse or fulfillment center to the end customer. (FAC ¶ 35.)  In January 2015, the United States Postal Service ("USPS") announced the Next Generation Delivery Vehicle ("NGDV") project, which aimed to replace about 165,000 aging package delivery vehicles.  (*Id.* ¶ 38.)  The contract was reported to be worth between $6.3 and $8 billion.  (*Id.*)  In October 2015, USPS issued a Prototype Request for Proposal to fifteen prequalified suppliers, and out of those proposals chose six suppliers to create prototypes.  (*Id.* ¶ 38.)  Workhorse predecessor AMP Holdings, Inc. submitted a proposal to create a prototype, but USPS rejected the bid because Workhorse's engineers were unable to use the design software USPS required all bidders to use.  (*Id.* ¶ 39.)

Workhorse then partnered with engineering company VT Hackney, one of the six suppliers USPS chose to create prototypes. (*Id.* ¶ 40.)  When VT Hackney dropped out, Workhorse bought its right to bid on the USPS contract for about $7 million. (*Id.* ¶ 41.)

In September 2017, the Workhorse/VT Hackney team delivered six vehicles for prototype testing in compliance with the terms of their USPS prototype contract. (*Id.* ¶ 49.)  However, according to a confidential witness, Workhorse was not capable of producing other trucks like the prototype. (*Id.* ¶ 50.)  Its prototype also experienced numerous failures during testing, including parking brake failures. (*Id.* ¶¶ 51–52.)

Nevertheless, Workhorse decided to submit a proposal for the next phase of the NGDV project, the production phase. (*Id.* ¶ 53.)  Workhorse did this even though it knew that it was not capable of mass-producing the vehicle, and even though its prototype had experienced failures during testing, making it unlikely USPS would select its prototype for production. (*Id.*)  Plaintiffs allege that Workhorse did this to maintain and inflate the price of its stock. (*Id.*)

USPS sent Workhorse multiple emails identifying weaknesses in its proposal. (*Id.* ¶¶ 54–55.)  However, even though Workhorse knew the process was not going well and that it could not produce anywhere near the number of vehicles USPS needed, it led investors to believe it was still a viable contender for the contract, often by hiding behind the nondisclosure agreement it had signed with USPS. (*Id.* ¶¶ 56–57.)

In January 2021, newly-elected President Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States. (*Id.* ¶ 58.)  In just one day, Workhorse stock value increased 14%, from $23.62 per share at open on January 25, 2021 to $27.04 per share at open on January 26, 2021. (*Id.*)  In the following days, Schrader conducted several interviews in which he materially misled the

market to believe that President Biden's announcement was an indication that Workhorse would be awarded the USPS NGDV contract. (*Id.* ¶ 59.)  As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021—a $10 per share increase in just one week. (*Id.* ¶ 60.)  However, on January 26, 2021, while Workhorse's stock price was still rising, Workhorse executives Hughes, Willison, and Ackerson, and multiple board members sold large quantities of their Workhorse stock. (*Id.* ¶¶ 61–62.)

In February 2021, USPS issued a press release stating that it was awarding the NGDV contract to Oshkosh Defense. (*Id.* ¶ 64.)  After this news, Workhorse's stock price plummeted from opening at $28.29 per share to an intra-day low of $12.50 per share, closing around $16.43 per share. (*Id.* ¶ 65.)

Separately, in May 2018, Workhorse announced an agreement with United Parcel Service, Inc. ("UPS") for 1,000 electric package delivery vehicles (the "UPS Agreement"). (*Id.* ¶ 73.)  The UPS Agreement provided for delivery of the vehicles in two phases. (*Id.* ¶ 74.)  In phase one, Workhorse would provide UPS with fifty prototype vehicles as a test fleet, and in phase two, Workhorse would deliver the remaining 950 vehicles. (*Id.*)  UPS took delivery of the fifty prototype vehicles, but it never requested delivery of the remaining 950 vehicles. (*Id.* ¶ 77.)  Instead, in 2019, UPS announced it ordered 10,000 EVs from a U.K.-based startup called Arrival. (*Id.*)  Nevertheless, Defendants continued representing to investors that they had a 950 vehicle "backlog," as if the UPS order was about to be fulfilled. (*Id.* ¶ 78.)

In the FAC, Plaintiffs allege Defendants made materially false and misleading statements in violation of Exchange Act §§ 10(b) and 20(a) and Rule 10b-5(b), and engaged in a scheme to defraud investors into believing, among other things, that Workhorse was capable of winning the NGDV Contract, in violation of Rules 10b-5(a)

and (c).  Specifically, Plaintiffs allege that four categories of statements were false or misleading: (1) Defendants' statements indicating Workhorse was still a viable contender for the USPS contract when they knew they had little to no chance of securing it, (2) Defendants' misrepresentations regarding Workhorse's manufacturing capability, including that it could produce hundreds of vehicles a year, when it plainly could not, (3) Defendants' false representations that they had a "backlog" of vehicle orders, which created the illusion of firm customer orders when they were really conditional, cancellable, or unrealistic, and (4) Defendants' false statements regarding Workhorse's use of Payroll Protection Program ("PPP") funds.  (Dkt. 64.)

### B.    Procedural History

In May 2021, the Court granted an unopposed motion to consolidate Farrar's case with another case alleging similar securities violations against Defendants, appointed Lead Plaintiff, and approved Lead Counsel.  (Dkt. 61.)

Before filing the FAC in July 2021, Lead Counsel conducted an extensive investigation involving former employee interviews, substantial legal and factual research, and consultation with an economics expert.  (Mot. at 3–4.)  In September 2021, Defendants filed a motion to dismiss the FAC, arguing that the statements Plaintiffs challenged were not material misrepresentations.  (Dkt. 65.)  The Court denied Defendants' motion in substantial part, concluding that Plaintiffs stated a claim on which relief could be granted as to statements indicating Workhorse was a viable contender for the USPS contract, misrepresentations regarding Workhorse's manufacturing capability, and misrepresentations regarding the "backlog" of vehicle orders.  (Dkt. 74 at 7–12.)  However, the Court granted Defendants' motion as to statements that Workhorse would use PPP funds primarily for payroll costs because Plaintiffs relied on a confidential witness with uncertain reliability and did not allege that Workhorse actually planned to

use the PPP funds for executive bonuses when it made the allegedly false statement that it would use them for payroll costs.  (*Id.* at 13.)

The parties then began formal discovery.  (Mot. at 4.)  Plaintiffs propounded requests for production of documents and interrogatories on Defendants and served document subpoenas on eighteen different third parties, including Workhorse's accountant and several of its customers.  (*Id.* at 4–5.)  After resolving Defendants' objections regarding the scope of discovery, search terms, custodians, and other issues, over 110,000 pages of documents were produced.  (*Id.* at 2, 5.)  Plaintiffs also served a Federal Rule of Civil Procedure 30(b)(6) deposition notice on Workhorse, began preparing for that deposition and several third-party depositions, and consulted with an economic expert.  (*Id.* at 2.)

On August 23, 2022, the parties participated in a full-day, in-person mediation before Jed D. Melnick, Esq., of JAMS.  (*Id.* at 5; Dkt. 109-1 [Declaration of Jed D. Melnick, hereinafter "Melnick Decl."] ¶ 5.)  For this mediation, the parties had the benefit of extensive discovery and briefs regarding their positions on the claims and defenses, damages, and other contested issues.  (Mot. at 5.)  Although the parties did not reach a settlement at the mediation, they continued to negotiate both with and without Mr. Melnick's assistance, all while discovery continued.  (*Id.*; Melnick Decl. ¶¶ 5, 7.)  After two months of continued discussions, on October 24, 2022, the parties accepted a mediator's proposal to settle the case.  (Melnick Decl. ¶¶ 6, 8.)

## C.    Proposed Settlement Terms

The Settlement provides that Defendants will pay $35 million, which includes $15 million in cash (nearly all of Workhorse's remaining insurance coverage) and $20 million in Workhorse common stock.  (Dkt. 105-2 [Settlement Agreement, hereinafter "SA"]

§§ 1.39, 2.2.)  In return, class members will dismiss with prejudice all claims that were or could have been brought against Defendants.  (*Id.* §§ 1.34, 4.1–4.3.)  Those who file a valid proof of claim form will receive a *pro rata* share of the Net Settlement Fund, which consists of the $35 million minus attorney fees awarded, administration costs, taxes and tax expenses, and any other Court-approved deductions.  The shares are to be distributed in some combination of cash and/or Workhorse common stock based on each class members' "Recognized Claim," which depend on the percentage of the Net Settlement Fund that each Authorized Claimant's recognized loss bears to the total of the recognized losses of all Authorized Claimants.  (*Id.* Ex. A-1 at 11–20 [Plan of Allocation].)

### D.    Notice

Workhorse gave the settlement administrator, Kurtzman Carson Consultants LLC ("KCC"), a list of 100 persons or entities who purchased Workhorse common stock between March 10, 2020 and May 10, 2021.  (Dkt. 110 [Declaration of Lance Cavallo] ¶ 3.)  On February 28, 2023, KCC mailed the postcard notice to those 100 persons or entities.  (*Id.* ¶ 3, Ex. A.)  Most of the class members, however, "are beneficial purchasers whose securities were held in 'street name' – i.e., the securities were purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers."  (*Id.* ¶ 4.)  KCC therefore also mailed notice to the 279 records it had in its proprietary Nominee Database asking the nominees to provide KCC with beneficial owners' contact information.  (*Id.* ¶¶ 4–5.)  KCC also mailed notice to the 4,440 institutions on the SEC's list of active brokers and dealers at the time of mailing.  (*Id.* ¶ 4.)  It also gave a copy of the notice to the Depository Trust Company for posting on its Legal Notice System and caused the summary notice to be transmitted over PR Newswire and Business Wire.  (*Id.* ¶¶ 6, 9.)  Between February 28, 2023, and March 14, 2023, KCC also mailed and emailed notice to additional unique names and addresses or email addresses of potential class members that it received.  (*Id.*

¶ 7; Dkt. 115 [Supplemental Declaration of Lance Cavallo, hereinafter "Supp. Cavallo Decl." ¶ 2.)  As of July 13, 2023, KCC mailed or emailed 848,168 postcard notices and 681 notice packets to potential Settlement class members or their nominees.  (Supp. Cavallo Decl. ¶ 2.)

The deadline to submit a proof of claim form, an exclusion request, or to opt out of the Settlement was July 3, 2023.  (*Id.* ¶ 12, Ex. A [Postcard Notice].)  As of July 13, 2023, there were 25,518 claims, twelve requests for exclusion, and three objections to the Settlement.  (Supp. Cavallo Decl. ¶¶ 3, 6, Ex. A; Dkt. 116 [Supplemental Declaration of Kim E. Miller, hereinafter "Supp. Miller Decl." ¶¶ 3–4, Exs. A–B.)

## III.   DISCUSSION

In deciding whether to grant the motions for final approval and attorney fees, the Court analyzes (1) whether to certify a class for settlement purposes, (2) the fairness of the Settlement, and (3) the class's response to notice of the Settlement, including the objections.

### A.   Class Certification

A plaintiff seeking class certification must satisfy two sets of requirements under Federal Rule of Civil Procedure 23: (1) Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) Rule 23(b)'s requirement that the action fall within one of the three "types" of classes described in its subsections.  In this case, Plaintiffs seek certification under Rule 23(b)(3), which allows certification if a court "finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ.

P. 23(b)(3).  The Court previously concluded that Plaintiffs presented sufficient evidence to show that the proposed class satisfies these requirements.  (*See* Prelim. App. Order at 7–12.)  Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only.  *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has changed to disturb [the court's prior] conclusion, and class certification remains appropriate.").

### B.    Fairness of the Proposed Settlement

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Rule 23(3) governs approval of class action settlements.  Courts may approve such settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). In evaluating a settlement, courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other.  *Id.* 23(e)(2)(A–D).

//

//

## 1.   Plaintiffs' and Lead Counsel's Adequacy

Plaintiffs and Lead Counsel have adequately represented the class.  There is no evidence of a conflict of interest between Plaintiffs and the class.  Their claims are identical to those of the other class members, and they have every incentive to vigorously pursue those claims.  Lead Counsel, who are active practitioners experienced in securities class actions, are likewise adequate.  (*See* Dkt. 31-5 [Lead Counsel's Resume]; Dkt. 61 [Order Appointing Lead Counsel].)  Indeed, they have ably litigated this case to date, largely defeating Defendants' motion to dismiss, obtaining voluminous discovery, and achieving this Settlement after a private mediation and months of additional discussions. Notably, after working closely with the parties and their counsel, the mediator also opined that Lead Counsel was "capable [and] experienced," and "displayed the highest level of professionalism."  (Melnick Decl ¶ 9.)

## 2.  Arm's Length Negotiations

The Settlement appears to be the result of arms-length negotiations between the parties.  Negotiations began in person before a neutral private mediator who is "an experienced complex business litigation mediator who has resolved over 1,000 disputes in his career."  *Brightk Consulting Inc. v. BMW of N. Am., LLC*, 2023 WL 2347446, at *6 (C.D. Cal. Jan. 3, 2023); (Melnick Decl. ¶¶ 2–3); *see In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (explaining that although the "mere presence of a neutral mediator . . . is not on its own dispositive," it is "a factor weighing in favor of a finding of non-collusiveness"); *see, e.g.*, *Thompson v. Transamerica Life Ins. Co.*, 2020 WL 6145105, at *3 (C.D. Cal. Sept. 16, 2020) ("The Settlement is the product of extensive negotiations between the Parties with the assistance, and direct supervision, of an experienced and highly-regarded nationally-renowned mediator . . . who conducted a full-day, in-person mediation with all Parties as well as a follow-up mediation telephone

conference with all Parties."); *Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *6 (C.D. Cal. Feb. 22, 2022) ("The parties extensively negotiated the Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before mediator Mr. Picker.").  The parties continued those negotiations with and without the mediator for two months after the mediation while discovery continued.  *See Thompson*, 2020 WL 6145105, at *3.

Further supporting a finding of arms-length negotiations is the fact that the Settlement is the result of a mediator's proposal, which reflected his assessment of the amount that "was the most that Defendants would pay, especially in light of their limited and dwindling insurance funds" and "an amount that would be fair, reasonable, and in the best interests of Plaintiffs and the Class."  (Melnick Decl. ¶ 6); *see Lusk v. Five Guys Enterprises LLC*, 2022 WL 4791923, at *9 (E.D. Cal. Sept. 30, 2022) ("The fact that the parties engaged in mediation and that the Settlement is based on a mediator's proposal further supports a finding that the settlement agreement is not the product of collusion."); *Garcia v. Schlumberger Lift Sols.*, 2020 WL 6886383, at *13 (E.D. Cal. Nov. 24, 2020), *report and recommendation adopted,* 2020 WL 7364769 (E.D. Cal. Dec. 15, 2020) (explaining that the fact that "the parties chose to accept the mediator's proposal, meaning this settlement was one that the third-party mediator proposed, rather than an amount determined through the negotiations of the parties," and "neither party agreed to settle on the terms proposed by the mediator at the mediation session but accepted the settlement terms the mediator believed were fair and reasonable . . . suggest[ed] the lack of collusion between the negotiating parties); *In re MyFord Touch Consumer Litig.*, 2019 WL 1411510, at *8 (N.D. Cal. Mar. 28, 2019) (considering the fact that settlement was based on mediator's proposal as factor in favor of finding arm's length negotiations). Moreover, before agreeing to the Settlement, Plaintiffs "conducted extensive formal and informal discovery and a thorough investigation of the claims, defenses, and underlying events and transactions that are the subject of the Action," including consulting with an

economics expert and reviewing over 110,000 pages of documents and preparing for depositions," engaged in substantial motion practice, and drafted detailed mediation statements. *See Thompson*, 2020 WL 6145105, at *3.[1]

Finally, as discussed in more detail with respect to attorney fees, the Settlement does not have any "'subtle signs' of collusion." *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021). It does not have a clear sailing agreement or a reverter provision, and class counsel seek the benchmark amount of fees, in the same proportion of cash and common stock that the class receives. The Court is satisfied that the parties negotiated the Settlement at arm's length.

### 3. Adequacy of Class Relief

In determining whether the class's relief is "adequate," courts consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[2] The Court finds the relief reflected in the Settlement to be adequate.

---

[1] The Court also notes the mediator's professional opinion, "based on [his] 18 years' experience as a mediator, [] review of the Parties' mediation briefs and other relevant documents, and [] involvement as the mediator in this case . . . that the Settlement was a product of extensive, informed, and vigorous negotiations conducted at arm's length and in good faith by the Parties." (Melnick Decl. ¶ 9.)

[2] Before Congress codified these factors in 2018, courts applied the following factors in determining whether a settlement was fair, reasonable, and adequate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton*, 327 F.3d at 959. The Court still considers these factors to the extent they shed light on the Rule 23(e) inquiry.

### a. Costs, Risks, and Delay of Trial and Appeal

The Settlement reflects a substantial outcome for class members.  The Net Settlement Amount (over $25 million) will be divided *pro rata* based on class members' Recognized Loss divided by the total Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  This is an excellent result, especially given the significant risks Plaintiffs and the class would face maintaining this action.  Most significantly, given Workhorse's "dwindling cash, business uncertainties, ongoing regulatory issues, and, particularly, rapidly depleting insurance coverage (which will be almost entirely exhausted by the proposed Settlement)," if Plaintiffs continue to litigate the case, any available funds or insurance proceeds may be depleted, resulting in a lower recovery or likely no recovery at all.  (Mot. at 1; Reply at 1); *see Gutierrez v. Amplify Energy Corp.*, 2023 WL 3071198, at *3 (C.D. Cal. Apr. 24, 2023) ("[T]he monetary relief here is a strong result for the Class in light of the costs and risks of delay of litigation, particularly given Amplify's available funds. . . . [T]he Settlement represents a large portion of the insurance funds that remain available to Amplify to pay claims—an amount that will only decrease with time as Amplify pays ongoing clean-up, litigation and other costs."); *In re Diamond Foods, Inc., Sec. Litig.*, 2014 WL 106826, at *2 (N.D. Cal. Jan. 10, 2014) ("It is not unreasonable for counsel and the class representative to prefer the bird in hand, given concerns about Diamond's strained financial state and its ability to pay a judgment following further litigation.") (cleaned up); *In re Critical Path, Inc.*, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002) ("Through protracted litigation, the settlement class could conceivably extract more, but at a plausible risk of getting nothing . . . ; watching Critical Path fall into bankruptcy; and, most certainly, drying up the available insurance."); *Stratton v. Glacier Ins. Administrators, Inc.*, 2006 WL 3388528, at *4 (E.D. Cal. Nov. 22, 2006) (considering "self-exhausting nature of defendants' insurance policies and lack of identifiable assets sufficient to satisfy judgments" under this factor to weigh in favor of granting final

approval).  In other words, by settling now, Plaintiffs and the class get most of
Defendants' remaining insurance proceeds rather than those proceeds being used to
litigate this case and related shareholder derivative suits and governmental investigations.

Significantly, the costs of additional litigation in this case would be substantial.
Although the parties have engaged in meaningful discovery, that discovery has only just
begun.  Numerous depositions and document and other written discovery would be
required if the case continued.  Extensive and expensive expert discovery would also be
necessary.  And there would be significant costs and risks associated with class
certification, summary judgment, and trial.  *See In re Portal Software, Inc. Sec. Litig.*,
2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) ("Additional consideration of
increased expenses of fact and expert discovery and the inherent risks of proceeding to
summary judgment, trial and appeal also support the settlement."); *In re Netflix Privacy
Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district
court could decertify a class at any time is one that weighs in favor of settlement."
(citation omitted)).  Notably, "Defendants did not agree that Plaintiffs would prevail on
any of their claims, particularly with respect to falsity and scienter, and there is no
question that Defendants would have raised every available argument to avoid an adverse
judgment had litigation continued."  (Mot. at 13.)  Plaintiffs concede that these defenses
"certainly had the possibility of success," and that their "success in establishing falsity
and materiality was certainly not guaranteed."  (*Id.* at 13–14.)  And even if Plaintiffs
overcame all of these risks, their ability to collect any jury verdict would be uncertain.

The Settlement removes all of these costs and risks "by ensuring class members a
recovery that is certain and immediate, eliminating the risk that class members would be
left without any recovery at all."  *Graves v. United Indus. Corp.*, 2020 WL 953210, at *7
(C.D. Cal. Feb. 24, 2020) (cleaned up); *see In re Cobra Sexual Energy Sales Pracs.
Litig.*, 2021 WL 4535790, at *6 (C.D. Cal. Apr. 7, 2021).  It also secures a settlement

now rather than imposing the delay of additional litigation, which in this case could span years—precious time given Workhorse's dwindling resources. The elimination of these costs, risks, and delay strongly suggests the Settlement's adequacy.

The Settlement also appears reasonable when considering the costs, risks, and delay in the context of Plaintiffs' potential recovery. After consulting with an economic expert, Plaintiffs and Lead Counsel believe a successful verdict on all claims could result in an aggregated damages award as high as $1.2 billion. (Mot. at 10.) The Settlement reflects an approximately 3% recovery on that $1.2 billion. But a "settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Migo Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted). Indeed, a 3% recovery is within the range of the percentages of recovery approved in other securities class action settlements. *See, e.g.*, *In re Broadcom Corp. Sec. Litig.*, 2005 WL 8153007, at *6 (C.D. Cal. Sept. 14, 2005) (approving settlement representing 2.7% of damages and finding such percentage was "not [ ] inconsistent with the average recovery in securities class action[s]"); *In re LJ Int'l, Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19, 2009) (approving settlement with recovery of 4.5% of maximum damages); *Destefano v. Zynga, Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016) (citing report indicating securities class action settlements between 2013 and 2015 involved a median recovery of 2.2% of estimated damages); (*see* Mot. at 10–11) (citing update of same report showing that median recovery in 2022 was 3.6%).

Although the 3% calculation in this case includes Workhorse common stock, which may end up being worth very little, the Court remains persuaded that the relief the Settlement provides is adequate given that Plaintiffs and the class will obtain most of Workhorse's remaining insurance coverage and the likelihood of recovering any more from Workhorse is extremely low. Put simply, the fact that Plaintiffs and the class will

recover nearly all of the value Workhorse has to give weighs in favor of finding the relief the Settlement provides adequate.  And the Court finds that it is.

**b.    Effectiveness of Proposed Method of Distributing Relief**

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id.*

Here, the relief distribution is straightforward.  To submit a claim for relief, class members were able to easily complete and submit a proof of claim form, and indeed 24,567 proof of claim forms were submitted.  The administrator will now process claims and distribute the Net Settlement Fund (the $35 million minus attorney fees and costs, administration costs, and incentive awards) to class members that submitted proof of claim forms depending on the amount of stock they purchased, when they purchased it, and other factors.  (Mot. at 14; Reply at 5–6; Plan of Allocation.)  The Settlement's claims process is not unduly demanding.

**c.    Award of Attorney Fees and Costs**

The next factor in the adequacy analysis relates to "the terms of any proposed award of attorney's fees, including timing of payment."  Fed. R. Civ. P. 23(e)(2)(iii).  In considering the proposed attorney fee award, courts must scrutinize three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the

settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class. *Briseno*, 998 F.3d at 1022.

The analysis regarding the second two factors for the Settlement is straightforward: it contains no clear sailing arrangement and no kicker or reverter clause. *See id.* The fee Lead Counsel seeks is also not "disproportionate." *See Bluetooth*, 654 F.3d at 947. Ordinarily, "25% of the fund [i]s the 'benchmark' for a reasonable fee award." *Id.* at 942–43. In deciding whether "'special circumstances' justify[ ] a departure" upward or downward from the benchmark, *id.* at 942, courts typically consider (1) the results achieved, (2) the risk of litigation, (3) the skill required and the quality of work, (4) the contingent nature of the fee and the financial burden carried by the plaintiff, and (5) awards made in similar cases. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).

Here, Lead Counsel seek a fee award of 25% of the settlement fund, or approximately $8.75 million—25% of the cash, or $3.75 million, and 25% of the common stock, valued around $5 million.[3]  (Fee Mot. at 1–2.)  The benchmark award is appropriate here. *See In re MGM Mirage Sec. Litig.*, 708 F. App'x 894, 897–98 (9th Cir. 2017) ("There were no special circumstances here indicating that the 25% benchmark award was either too small or too large.").  "The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008).  The results Lead Counsel achieved, especially largely defeating Defendants' motion to dismiss and the value of this Settlement, and also the skill required and the quality of the work, were very good, but

---

[3] Lead Counsel also requests interest on the fees awarded.  However, awarding such interest would be unfair to the class.

the size of the fund and other factors make the benchmark award appropriate.  *See In re
Apple iPhone/iPod Warranty Litig.*, 40 F. Supp. 3d 1176, 1181–82 (N.D. Cal. 2014)
("While the results counsel achieved for the class are excellent, the size of the fund is
such that applying the standard benchmark is manifestly sufficient to provide fair
compensation.").  The risk of litigation was real and substantial, and the fee was also
contingent, (Fee Mot. at 1, 12; Miller Decl. ¶ 103), but awards in other cases confirm that
the benchmark is appropriate.  *See, e.g.*, *In re Amgen Inc. Sec. Litig.*, 2016 WL
10571773, at *9 (C.D. Cal. Oct. 25, 2016) (finding benchmark award on $95 million
settlement in securities class action was reasonable) (collecting cases); (Fee Mot. at 13–
14 [collecting cases]).

A lodestar cross-check confirms the reasonableness of the benchmark percentage
award.  Courts commonly perform a lodestar cross-check to assess the reasonableness of
the percentage award.  *See In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 784
(9th Cir. 2022) ("A cross-check is discretionary, but we encourage one when utilizing the
percentage-of-recovery method."); *Vizcaino*, 290 F.3d at 1050 ("Calculation of the
lodestar, which measures the lawyer's investment of time in the litigation, provides a
check on the reasonableness of the percentage award."); *Bluetooth*, 654 F.3d at 943
(encouraging a "comparison between the lodestar amount and a reasonable percentage
award"); *see also Chambers v. Whirlpool Corp.*, 980 F.3d 645, 663 (9th Cir. 2020)
(confirming that a lodestar cross-check is "ordinarily" not required).  Lead Counsel
submit evidence of a lodestar fee of $2,789,140 based on 3,909.9 hours spent at
reasonable hourly rates between $275 and $1,200.  (Miller Decl. ¶¶ 91–96.)  This lodestar
was reached after deducting fees for attorneys who worked fewer than twenty hours on
the case and for time spent on the fee motion, and does not include future work including
preparing for the final approval hearing and settlement administration.  (*Id.* ¶¶ 97–98.)
Plaintiffs seek a 3.14 multiplier on their lodestar based on the quality of their
representation, the benefit obtained for the class, the length of the litigation, the

complexity of the issues presented, and the risk of nonpayment. *See Vizcaino*, 290 F.3d at 1051. "[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases," and "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 1051, n.6.

The Court has reviewed the information provided and concludes that the lodestar amount with the requested multiplier fairly compensates the attorneys in this case given the excellent result they achieved for the class, the very able representation of counsel (including largely defeating a motion to dismiss), and the substantial investigation and discovery performed. *See Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016) ("Counsel's lodestar yields a 3.07 multiplier, which is well within the range for reasonable multipliers.") (collecting cases); (Mot. at 19–20 [collecting cases with multipliers up to 3.65]); *see also In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained"). Lead Counsel's lodestar therefore confirms the reasonableness of the fees sought.

The Court has also reviewed Lead Counsel's request for $112,027.51 in litigation costs and the documentation supporting that request. Lead Counsel incurred these costs for experts, investigators, the mediator, an electronic discovery platform, computerized legal research, court costs including transcripts, photocopies, and travel. (Miller Decl. ¶¶ 111–14.) These are the types of expenses that are reasonably and necessarily incurred in litigation and routinely charged to paying clients in non-contingency cases. *See Bato v. Lab'y Corp. of Am. Holdings*, 2011 WL 13412376, at *17 (C.D. Cal. Mar. 14, 2011) (explaining that discovery costs, including related travel, "paved the way for settlement," and computerized legal research "was necessary to examine the legal basis for plaintiffs'

claims" and to oppose a motion to dismiss").  The amount sought is less than the $130,000 upper limit stated in the notices sent to class members.  (Miller Decl. ¶ 117.) And the Court has reviewed the supporting documentation and finds the costs to be reasonable.[4]  *See, e.g.*, *In re Carrier IQ, Inc., Consumer Priv. Litig.*, 2016 WL 4474366, at *6 (N.D. Cal. Aug. 25, 2016), *amended in part sub nom. In re Carrier Iq, Inc.,* 2016 WL 6091521 (N.D. Cal. Oct. 19, 2016) (finding litigation costs and expenses of $108,933.72 reasonable with gross settlement fund of $9 million).

KCC's costs, which Lead Counsel states will not exceed $925,000 and will likely be no greater than $902,360.47, are also reasonable and supported by evidence presented in the briefing and supporting declarations.  (*See* Dkt. 119 [Lead Counsel's Statement on Settlement Administration Costs]; Dkt. 119-1 [Declaration of Kim E. Miller Regarding Settlement Administration Costs and Attached Invoices].)  Lead Counsel explains that the high amount of settlement administration costs is attributable to factors including (1) the large number of notices sent and claims received, (2) unexpectedly high demand for mail rather than email notice (which required printing and postage expenses), including by third-party brokers and nominees on behalf of beneficial owners, and (3) the high cost of liquidating or distributing the settlement stock.  (*Id.*)  Although the estimated costs are very high, they are not unprecedented.  *See, e.g.*, *Senne*, 2023 WL 2699972, at *21 (finding adequate justification for $995,000 in settlement administration costs due to (1) high volume of class member communications, (2) complex tax reporting requirements, and (3) complex data, explaining the amount was "reasonable in light of the challenges associated with implementing such an ambitious settlement"); *In re Carrier IQ*, 2016 WL 4474366, at *6 ("[T]he Court acknowledges that the [$655,500 in settlement administration costs] is significant but that is largely a result of the cost of notice, and the cost of notice was high because of the unique circumstances in this case

---

[4] Lead Counsel also requests interest on the litigation costs awarded.  The Court will not award interest because doing so would be unfair to the class.

(*e.g.*, 30 million class members who were primarily reached through various kinds of electronic media notice).”); *Arnett v. Bank of Am., N.A.*, 2014 WL 4672458, at *14 (D. Or. Sept. 18, 2014) (approving “$630,328.15 in claim administration expenses, to cover the cost of distributing the Class Notice and administering the class to date and estimated costs for final distribution”); *see also Ko v. Natura Pet Prod., Inc.*, 2012 WL 3945541, at *7 (N.D. Cal. Sept. 10, 2012) (recognizing that $860,000 in notice costs had been incurred); *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *8 (N.D. Cal. Aug. 17, 2018) (noting that settlement administration costs had reached $23 million, or 20% of the settlement fund, largely due to postage for mailing notice); *Moore v. Verizon Commc’ns Inc.*, 2014 WL 588035, at *16 (N.D. Cal. Feb. 14, 2014) (“[T]he settlement administration costs and the costs of notice were at $5.5 million at the time of Plaintiffs’ reply brief.”).  And under the circumstances of this case, the Court concludes they are reasonable.

The Court will, however, make one change in calculating Lead Counsel’s fee: it will calculate the fees awarded by applying the benchmark percentage after deducting litigation and administration costs from the common fund.  In other words, to calculate attorney fees in this case, the Court will apply the benchmark to the amount the class recovers.  Calculating the percentage fee before deducting expenses would mean that Lead Counsel not only get reimbursed for their costs but also receive an additional 25% of those costs as a fee.  *See, e.g.*, *Smith v. Experian Info. Sols., Inc.*, 2020 WL 6689209, at *7 (C.D. Cal. Nov. 9, 2020) (calculating benchmark fees by deducting the amount of litigation costs and settlement administrator costs from the settlement amount, and taking 25% of that amount); *In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d at 1182 (same); *Kmiec v. Powerwave Techs., Inc.*, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (same); *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same).  And deducting the settlement administrator’s expenses before calculating the fee ensures that class counsel’s incentive remains keeping those costs low.

Subtracting the $112,027.51 in Lead Counsel's litigation costs and the $925,000 in KCC's settlement administration costs from the $35 million Settlement amount yields $33,962,972.49.  Applying the 25% benchmark rate to that sum yields $8,490,743.12. Accordingly, the Court will award Lead Counsel $8,490,743.12 in attorney fees, in the same proportion of cash and stock as Settlement class members.

In addition to the amount of counsel's fees and costs, the Court must scrutinize the timing of payment.  Fed. R. Civ. P. 23(e)(2)(c).  The Settlement provides that the Settlement Administrator shall pay Lead Counsel "immediately after the Court enters the Judgment and an order awarding such fees and expenses."  (*See* SA § 6.2.)  That is likely well in advance of when class members can expect to be compensated given the calculation and distribution process required before class members may be paid.  This could cast a slight shadow on the proposed fee and cost arrangements.  *See, e.g.*, *Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as class members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.").  However, especially given the strong showing of arm's length negotiation and lack of collusion in this case, the gap between payments standing alone does not appear so significant as to weigh against granting final approval of the Settlement.  *See Brightk Consulting*, 2023 WL 2347446, at *9.

### d.     Any Agreement Made in Connection with the Proposal

Courts must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The Settlement identifies a Supplemental Agreement, which allows Defendants to terminate the Settlement if class members possessing a certain aggregate number of securities exclude themselves from

the Settlement.  (SA § 7.6.)  To protect the settlement class, the specific terms of the Supplemental Agreement are confidential "to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts."  *Thomas v. MagnaChip Semiconductor Corp.*, 2017 WL 4750628, at *5 (N.D. Cal. Oct. 20, 2017).  "This type of agreement is common in securities fraud actions and does not weigh against preliminary approval."  *Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *7 (C.D. Cal. Oct. 10, 2019) (citing *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (observing that the court was not troubled by the opt out deal between the parties)).

### 4.  Equitable Treatment Among Class Members

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement, class members receive differing payouts depending on how much stock they bought during the class period and when they bought that stock.  (*See generally* Plan of Allocation.)  Specifically, they "will receive a pro rata share of the Net Settlement Fund – determined by their Recognized Loss divided by the total Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund."  (Dkt. 105 at 21.)  This difference in treatment is appropriate and reasonable.  The release is also the same for all class members.  The Settlement therefore treats class members equitably.

### 5. Incentive Awards

Plaintiffs also seek service awards of $5,000 each for Lead Plaintiff and Additional Plaintiff. (Fee Mot. at 2.) Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit. *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). Such awards "encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case." *In re Anthem*, 2018 WL 3960068, at *30. They "are fairly typical in class action cases" and are discretionary. *Rodriguez v. W. Pub. Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see also Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases and explaining that in the Ninth Circuit, $5,000 is a presumptively reasonable service award); *In re Apple Inc. Device Performance Litig.*, 50 F.4th at 787 (confirming that "[s]o long as [incentive awards] are reasonable, they can be awarded"). When evaluating the reasonableness of incentive awards, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation. *Staton*, 327 F.3d at 977.

The proposed incentive awards of $5,000 each for the two Plaintiffs are reasonable and appropriate. Plaintiffs "assisted with the investigation of the claims, reviewed the [FAC], provided extensive documents supporting the claims to Lead Counsel, monitored the litigation, provided input during settlement negotiations, and approved the Settlement." (Dkt. 105 at 21.) The proposed incentive awards are within the range of incentive awards typically approved in this district and are presumptively reasonable. *See Bellinghausen*, 306 F.R.D. at 266.

1  In sum, after examining the Rule 23(e)(2) factors, the Court concludes that the

2  Settlement is "fair, reasonable, and adequate."

3

4  **C.    Response to Notice**

5

6  As explained, KCC disseminated over 850,000 notices. (Supp. Cavallo Decl. at

7  ¶ 2.)  It also created a settlement website and a toll-free telephone number.  (*Id.* ¶¶ 4–5.)

8  KCC received 25,518 claims, and only twelve requests for exclusion and three objections

9  have been made.  (*Id.* ¶¶ 3, 6, Ex. A; Supp. Miller Decl. ¶¶ 3–4, Exs. A–B.)

10

11  These numbers indicate very strong overall support for the Settlement and weigh in

12  favor of granting final approval.  *See, e.g.*, *Kacsuta v. Lenovo (United States) Inc.*, 2014

13  WL 12585787, at *5 (C.D. Cal. Dec. 16, 2014) ("Because the reaction of the class to

14  settlement has been almost entirely positive, with only two objections, this factor favors

15  final approval."); *Hashemi*, 2022 WL 18278431, at *6 ("Very few objections and opt-

16  outs create a strong presumption that the Settlement is beneficial to the Class and thus

17  warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL

18  3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written

19  objections and requests for exclusion supported settlement approval); *National Rural

20  Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal.

21  2004) ("It is established that the absence of a large number of objections to a proposed

22  class action settlement raises a strong presumption that the terms of a proposed class

23  settlement action are favorable to the class members.").

24

25  After reviewing the objections submitted, the Court concludes that they do not

26  pose a barrier to final approval of the Settlement.  The first objection, from Gary M.

27

28

Keenan together with his request for exclusion[5], states, "I also object to this settlement. Like all other such class actions it is designed to make millions for the lawyers and a pittance for the share holders."  (Supp. Cavallo Decl., Ex. A at 29.)   The second two objections, which are identical and are from Craig Call and Patricia Call, read in full:

> We object to this settlement because we will receive NO compensation due to the terms of this settlement. We object to this settlement because it is set up to only benefit the attorneys and the shareholders holding a very large number of shares. This large payout will increase the probability of bankruptcy for the company who is trying to survive.

(Supp. Miller Decl., Exs. A, B.)

The objectors' primary concern is that the Settlement disproportionately benefits counsel over class members.  Courts must look closely at the value of a settlement to ensure that there are no signs that the fees counsel requests are unreasonably high, examining in particular the relationship between fees and the benefit to the class. *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021); *Kim v. Allison*, 8 F.4th 1170, 1179 (9th Cir. 2021).  But here, the Court is not persuaded that fees are unreasonably high or that any disproportionality should doom the Settlement.  The fees awarded are the benchmark for a reasonable fee award in the Ninth Circuit.  *Bluetooth*, 654 F.3d at 942–43.  And courts consistently conclude that there is no disproportionate distribution to class counsel when benchmark fees are awarded.  *See, e.g.*, *Lusk*, 2023 WL 4134656, at *14 ("Because the fees requested are equal to the benchmark amount set by the Ninth Circuit, the Settlement Agreement does not provide a disproportionate distribution to Class Counsel."); *Erguera v. CMG CIT Acquisition, LLC*, 2023 WL

---

[5] Mr. Keenan does not have standing to object to the Settlement because he excluded himself from it. *Dynabursky v. Alliedbarton Sec. Servs., LP*, 2016 WL 8921915, at *7 (C.D. Cal. Aug. 15, 2016). However, the Court describes his objection because it raises the same concern as the other two objections.

4108071, at *10 (E.D. Cal. June 21, 2023) (same).[6]  Moreover, Lead Counsel will receive the same proportion of cash and common stock that class members receive.

Craig Call and Patricia Call also appear to object to the Plan of Allocation, asserting that they "will receive NO compensation due to the terms of this settlement."[7] (Supp. Miller Decl. Exs. A, B.)  "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014). The Plan of Allocation—which Lead Counsel developed with Plaintiffs' economic expert's help—has a reasonable, rational basis.  (*See* Reply at 5.)  It uses a "Recognized Loss Amount" calculated for each share based on when the common stock shares were purchased or otherwise acquired during the class period, and in what amounts, and whether those shares were sold, and if sold, when they were sold, and for what amounts.

---

[6] *See also Aldapa v. Fowler Packing Co. Inc.*, 2023 WL 3853482, at *8 (E.D. Cal. June 6, 2023) ("Here, class counsel's request of $2,625,000 is approximately 33 and 1/3% of the total settlement value, placing it well within the range that the Ninth Circuit has found acceptable."); *Swain v. Anders Grp., LLC*, 2023 WL 2976368, at *9 (E.D. Cal. Apr. 17, 2023) (similar); *Baten v. Michigan Logistics, Inc.*, 2022 WL 17481068, at *6 (C.D. Cal. Dec. 6, 2022) ("The requested attorneys' fees of one-third of the Settlement does not represent a disproportionate distribution for purposes of determining collusion."); *Burnell v. Swift Trans. Co. of Arizona, LLC*, 2022 WL 1479506, at *3 (C.D. Cal. Apr. 28, 2022), *appeal dismissed sub nom. Saucillo v. Peck*, 2022 WL 16754141 (9th Cir. Oct. 4, 2022), and *aff'd sub nom. Saucillo v. Mares*, 2023 WL 3407092 (9th Cir. May 12, 2023) ("[T]he Court is approving plaintiffs' attorneys' fees equal to 25% of the Gross Settlement Amount, which is consistent with the Ninth Circuit 'benchmark' and not disproportionate to the class recovery."); *Martinez v. Semi-Tropic Coop. Gin & Almond Huller, Inc.*, 2023 WL 3569906, at *13 (E.D. Cal. May 19, 2023) (explaining that "[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark," and concluding "[b]ecause the fees requested are within the range awarded by the Ninth Circuit from the gross settlement fund, the Court finds the Settlement Agreement does not provide a disproportionate distribution to Class Counsel"); *Gonzalez v. Xtreme Mfg., LLC*, 2023 WL 3304285, at *13 (E.D. Cal. May 8, 2023) (same); *Razo*, 2023 WL 3093845, at *13 (same); *Judson v. Goldco Direct, LLC*, 2021 WL 8462049, at *6 (C.D. Cal. June 11, 2021) ("Class Counsel's request for $500,000, which represents one-third of the Gross Settlement Amount, is not disproportionate."); *Larson v. Harman-Mgmt. Corp.*, 2020 WL 3402406, at *7 (E.D. Cal. June 19, 2020) (finding no disproportion or signs of collusion when class counsel sought and court awarded 25% benchmark).

[7] According to Plaintiffs' calculations, the Calls are incorrect and "their Recognized Losses will likely amount to approximately $1,250 to $1,700 for [their] 235 shares."  (Reply at 5 n.2.)

(SA §§ 5–7.)  The Net Settlement Fund will be distributed on a *pro rata* basis according to each class member's Recognized Loss Amount.  (*Id.* § 8.)  This is reasonable, fair, and adequate.  *See Nguyen*, 2014 WL 1802293, at *8 (rejecting objection to similar allocation plan).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motions for final approval and for attorney fees and costs are **GRANTED IN SUBSTANTIAL PART**.  The objections to the Settlement are **OVERRULED**.

DATED:    July 24, 2023

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE