# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM FARRAR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WORKHORSE GROUP, INC., DUANE HUGHES, STEVE SCHRADER, ROBERT WILLISON, and GREGORY ACKERSON <br><br> Defendants. | Case No. 2:21-cv-02072-CJC-PVC <br><br> DECLARATION OF LANCE CAVALLO IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR APPROVAL OF DISTRIBUTION PLAN |

I, Lance Cavallo, declare and state as follows:

1.    I am a Vice President of Class Actions at Kurtzman Carson Consultants LLC ("KCC"). Pursuant to the Court's February 14, 2023 Order Granting Lead Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement (ECF 106) (the "Preliminary Approval Order"), the Court approved the retention of KCC as Claims Administrator in connection with the proposed Settlement of the above-captioned Action.[1] I have personal knowledge of the matters stated herein and, if called upon, could and would testify thereto.

2.    As Claims Administrator, KCC has, among other things: (i) mailed, emailed or caused to be mailed or emailed the Court-approved Postcard Notice and Notice Packet (consisting of the long-form Notice and Claim Form) to potential Settlement Class Members and nominees; (ii) created and continues to maintain the Settlement Website and toll-free telephone helpline for Claimant inquiries; (iii) published the Summary Notice; (iv) provided, upon request, additional copies of the Postcard Notice and Notice Packet to potential Settlement Class Members and nominees; and (v) received and processed Claims[2] submitted for the Settlement.

3.    On July 24, 2023, the Court entered its Order Granting in Substantial Part Plaintiffs' Motions for Final Settlement Approval and for Attorney

---

[1]    All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated January 13, 2023 (ECF 105-2) (the "Stipulation"), the Declaration of Lance Cavallo Regarding (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Establishment of the Telephone Hotline; (D) Establishment of the Settlement Website; and (E) Report on Requests for Exclusion Received to Date, dated March 15, 2023 (ECF 110) (the "Initial Mailing Declaration"), and/or the Supplemental Declaration of Lance Cavallo Regarding (A) Update on Dissemination of Postcard Notice and Notice Packet; (B) Update on Telephone Hotline and Settlement Website; and (C) Report on Requests for Exclusion Received to Date, dated July 14, 2023 (ECF 115) (the "Supplemental Mailing Declaration").

[2]    "Claim" means a paper claim submitted on a Proof of Claim Form or an electronic claim that is submitted to the Claims Administrator.

Fees, and Overruling Objections (ECF 121) (the "Order"), granting final approval of the $35,000,000 Settlement of the Action. On July 28, 2023, the Court entered Final Judgment (ECF 122). KCC has finished processing the Claims received as of January 12, 2024, in accordance with the terms of the Stipulation and Court-approved Plan of Allocation set forth in the Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for the distribution of the Net Settlement Fund to Authorized Claimants. KCC also submits this declaration in support of Lead Plaintiff's Motion for Approval of Distribution Plan.

## I.   DISSEMINATION OF NOTICE OF THE SETTLEMENT

### A.   Mailing of the Postcard Notice and Notice Packet

4.   Pursuant to the Preliminary Approval Order, and as previously described in the Supplemental Mailing Declaration, KCC mailed, emailed or caused to be mailed or emailed the Postcard Notice to 848,168 potential Settlement Class Members and nominees as of July 13, 2023. KCC also mailed, emailed or caused to be mailed or emailed the Notice Packet to 681 potential Settlement Class Members and nominees as of July 13, 2023. *See* Supplemental Mailing Decl., ¶ 2. Since then, KCC has mailed, emailed or caused to be mailed or emailed additional Postcard Notices and Notice Packets to potential Settlement Class Members and nominees upon request and/or upon receipt of updated addresses, bringing the aggregate number of Postcard Notices and Notice Packets mailed, emailed or caused to be mailed or emailed to 850,518 and 689, respectively.

### B.   Establishment of the Settlement Website and Telephone Helpline

5.   KCC established and continues to maintain the Settlement Website (www.WorkhorseSecuritiesLitigation.com) and a dedicated toll-free telephone helpline (1-844-787-0160) to assist potential Settlement Class Members in obtaining information about the Action and the Settlement. *See* Initial Mailing Decl., ¶¶ 10-11. In connection with establishing and maintaining the Settlement Website and

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

telephone helpline, KCC, among other things, formulated a system to ensure that proper responses were provided to all telephone and electronic inquiries. That work included training telephone agents to respond to inquiries specific to the Settlement; developing a series of common questions and the answers thereto; loading key documents onto the Settlement Website; and programming the Settlement Website to permit the viewing and downloading of those documents. The Settlement Website and telephone helpline have been operational since February 28, 2023.

**C.    Publication of the Summary Notice**

6.    In accordance with the Preliminary Approval Order, KCC also caused the Summary Notice to be (i) transmitted once over *Business Wire* on March 7, 2023; and (ii) transmitted once over *PR Newswire*, also on March 7, 2023. *See* Initial Mailing Decl., ¶ 9.

**II.    PROCEDURES FOLLOWED IN PROCESSING CLAIMS**

7.    Under the terms of the Preliminary Approval Order and as set forth in the notices, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to KCC a properly executed Claim, postmarked no later than July 3, 2023, together with adequate supporting documentation for the transactions and holdings reported therein. As of January 12, 2024, KCC has received and processed 33,864 Claims.

8.    In preparation for receiving and processing Claims, KCC: (i) conferred with Lead Counsel to define the guidelines for processing Claims; (ii) created a unique database ("Settlement Database") to store Claim details, images of Claims, and supporting documentation; (iii) trained staff as to project details so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' information; and (vi) developed

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

a proprietary "calculation module" to calculate Recognized Loss Amounts/Recognized Claims under the Court-approved Plan of Allocation.

9. Settlement Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims to a P.O. box address specifically designated for the Settlement, or online through the Settlement Website. Incoming mail to the P.O. box was sorted into Claims and administrative mail.[3] Postcard Notices and Notice Packets returned by the U.S. Postal Service as undeliverable were reviewed and, where available, updated addresses were obtained and new Postcard Notices and Notice Packets were mailed to the updated addresses. Administrative mail was reviewed and, where necessary, appropriate responses were provided to the senders.

**A.    Processing Paper Claims**

10. As of January 12, 2024, KCC has received 33,864 Claims from potential Settlement Class Members, of which 4,249 were submitted via postal mail ("Paper Claims"). Once received, Paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying non-conforming sized documents, sorting documents, and, where Claimant identification information was not provided on the Claim Form, copying and attaching the envelope with the return address to the file. This manual task of preparing a Paper Claim for processing is laborious and time intensive. Once prepared, Paper Claims were scanned into the Settlement Database together with all submitted documentation and assigned a unique Claim number. Once scanned, the information from each Paper Claim, including the Claimant's name and address, as well as the Claimant's relevant purchase/acquisition transactions, sale transactions,

---

[3]    Administrative mail includes all mail other than Claims and supporting documentation and responses to Notices of Rejection (*e.g.*, requests for blank Proofs of Claim, change of address notices, and questions regarding the administration process or status of the administration).

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

and holdings listed in the Claim Form, was entered into the Settlement Database. Next, the information provided by each Claimant in support of their Claim was reviewed to determine if they purchased or otherwise acquired Workhorse Group, Inc. common stock (ticker symbol "WKHS") during the period between March 10, 2020, and May 10, 2021, inclusive (the "Class Period"), and were damaged thereby, as required to be an eligible Settlement Class Member.

11.    To process the transactions detailed in the Paper Claims, KCC utilized internal Proof-of-Claim codes ("Message Codes") to classify Claims and identify any deficiency or ineligibility conditions associated with them. Appropriate Message Codes were assigned to Claims as they were processed. For example, if a Claim was submitted by a Claimant who did not purchase/acquire any WKHS common stock during the Class Period, that Claim received a "Proof of Claim-level" message code that denoted ineligibility. KCC used similar "Proof of Claim-level" ineligible Message Codes to denote other ineligible conditions, such as duplicate Claims, that indicated that the Claimant was not eligible to receive a payment from the Net Settlement Fund unless the deficiency (if curable) was cured.

### B.    Processing Web (Online) Claims

12.    Of the 33,864 Claims received as of January 12, 2024, 8,746 were submitted by Claimants via the Claim Portal on the Settlement Website ("Web Claims"). Once received, Web Claims were imported into the Settlement Database. This process included assigning a unique Claim number to each Web Claim and mapping the submission form to the Settlement Database so that entries made for WKHS common stock could be evaluated and calculated according to the Court-approved Plan of Allocation. Next, and identical to the process utilized for processing Paper Claims, the information provided by each Claimant in support of his, her, or its Web Claim was reviewed to determine whether the Claimant actually purchased or otherwise acquired WKHS common stock during the Class Period. KCC utilized the same Message Codes to identify and classify Web Claims.

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

Appropriate Message Codes were assigned to the Web Claims as they were processed.

### C.    Processing Electronically Filed Claims

13.    Of the 33,864 Claims received as of January 12, 2024, 20,869 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors who may have large numbers of relevant transactions. Rather than provide reams of paper requiring data entry, investors filing Electronic Claims either mail a computer disc or email a file to KCC, so that KCC may electronically upload all transactions to the Settlement Database.

14.    KCC's electronic filing team, which supervises the processing of all Electronic Claims, reviewed and analyzed each electronic file to identify any potential data issues or inconsistencies in the files received. After resolving any such issues with the sender, the files were then forwarded to KCC's data team with detailed loading instructions, including the number of Claims and transaction totals provided by the institution when it sent the file.

15.    After loading an electronic file, KCC's Quality Assurance ("QA") personnel reviewed it to verify that the number of Claims and transactions in the file matched the information provided by the institution. Thereafter, the Electronic Claims were coded just like the manually processed Paper and Web Claims, with appropriate Message Codes to identify and classify potential deficiency or ineligibility conditions, except that, rather than manually applying Message Codes, KCC's electronic filing team performed programmatic reviews (which were thereafter carefully reviewed and validated for accuracy) on Electronic Claims to identify potential issues (such as price-per-share validation issues, out-of-balance conditions, and transactions outside the relevant period).

16.    The review process for Electronic Claims also included flagging any Electronic Claims that lacked: (i) a signed Claim Form, which serves as a "Master Claim Form" for all accounts referenced in an electronic file; (ii) supporting

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

documentation, such as a signed or notarized letter on company letterhead attesting to the accuracy of the data submitted in the electronic file; and (iii) a notarized affidavit, or other proof, that the individual executing the Claim and submitting the electronic file has the appropriate authority to do so. KCC's QA team reviewed this information and worked with KCC's electronic filing team to contact any institutions whose electronic files lacked the required information. This process ensured that only properly completed Claims, submitted by a duly authorized representative, were found to be eligible for payment.

17.    KCC also performed various audits of Electronic Claims by contacting a number of electronic filers (including those submitting the largest Claims) and asking them to document sample transactions, selected by KCC, by providing confirmation slips or other transaction-specific supporting documentation. This random sampling and request for follow-up verification helped ensure that the electronic data supplied by Claimants was accurate.

### D.    Excluded Persons and Entities

18.    KCC also reviewed all Claims to ensure that they were not submitted by, or on behalf of, persons or entities excluded from the Settlement Class by definition, to the extent KCC could determine this from the list of Defendants and other excluded persons and entities set forth in the Stipulation, and from the Claimants' certifications on their Claims.

### III.    THE DEFICIENCY PROCESS

19.    Many Claims submitted were unsigned, not properly documented, or otherwise deficient. Here, much of KCC's claims administration efforts involved communicating with Claimants to give them an adequate opportunity to cure any curable deficiencies in their Claims. The "Deficiency Process," which involved letters and emails to, and/or telephone calls with, Claimants, sought to assist Claimants in properly completing their otherwise deficient submissions so they could participate in the Settlement (if eligible). As a result of this process, a

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

significant number of Claimants who submitted Claims with curable deficiencies are now eligible.

### A.    Emails and Calls To Class Members With Uncured Deficiencies

20.    As described above, KCC utilized internal Message Codes to identify and classify Claims, including any deficiencies. If a Claim was found to be deficient (*e.g.*, if it lacked required supporting documentation, was unsigned, did not provide enough information to calculate the Claim, was found to have no Recognized Claim under the Court-approved Plan of Allocation, or was submitted by a non-Settlement Class Member), KCC mailed the Claimant a "Notice of Rejection" letter. This letter described the defect(s) with his, her, or its Claim and, if the defect was curable, what was needed to cure it. The letter further advised the Claimant that they needed to submit any appropriate curative information and/or documentary evidence within 20 days of the letter, or KCC would recommend the Claim for rejection. KCC issued a "Notice of Rejection" in connection with approximately 20,079 Claims. Attached hereto as Exhibit A are example Notices of Rejection (redacted to protect Claimants' confidential personally identifiable information) that were sent by KCC to notify Claimants of the deficiencies in, or the ineligibility of, their Claims.

21.    KCC carefully reviewed Claimants' responses to Notices of Rejection and appropriately updated the Settlement Database if the response corrected the relevant defect(s).

22.    Each Notice of Rejection also explained that: (i) KCC's deficiency process was the Claimant's only opportunity to cure (to the extent curable) the deficiencies in their Claim; (ii) the Claimant had the right to contest KCC's determination regarding their Claim, and to ask the Court to review their Claim; and (iii) if Court review was desired, the Claimant needed to send KCC a written request for such review, within 20 days of the letter, stating the basis for their request for Court review. Here, of the 20,079 Notices of Rejection issued, KCC received twelve (12) requests for Court review ("Disputing Claimant"). To resolve these disputes,

KCC reached out to the Claimants requesting Court review in an attempt to answer all of the Claimants' questions and fully explain KCC's administrative determination of their Claims' status. As a result of the additional effort and review, all but one (1) of the requests for Court review were withdrawn. Therefore, there is one disputed Claim requiring Court review.

23.     On October 5, 2023, the Disputing Claimant contacted KCC to state that he disagreed with KCC's Notice of Rejection. The Disputing Claimant's Claim had been rejected because all transactions included in the Claim represented shares of WKHS common stock that were both purchased and sold prior to the respective dates of February 23, 2021 and May 10, 2021, which calculated to a Recognized Loss Amount of $0.00 per share pursuant to the Plan of Allocation. *See* Plan of Allocation., ¶¶ 6-7. Following multiple rounds of correspondence between KCC and the Disputing Claimant during which the Disputing Claimant's transactions were reevaluated and the Plan of Allocation was cited in detail, the Disputing Claimant stated that he wished to maintain his request for Court review. Attached hereto as Exhibit C[4] is a copy of the record of written correspondence between the Disputing Claimant and KCC.

**B.     Additional Emails and Calls To Class Members With Uncured Deficiencies**

24.     After KCC reviewed responses to Notices of Rejection, KCC emailed and/or called Claimants with still deficient (but potentially curable) Claims, and a potential Recognized Loss Amount, to provide them with a final opportunity to cure their Claims. KCC's practice is to assist Claimants with their Claims where possible, depending on the nature of the deficiency. For example, if a Claimant needed additional supporting documentation to cure their Claim, KCC explained to the Claimant the types of documentation that would render the Claim eligible, and

---

[4] Portions of Exhibit C have been redacted to protect confidential personally identifiable information.

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

advised how the Claimant could obtain it. If KCC could not reach a Claimant via email nor speak one-on-one via the telephone, KCC left a voicemail message, if possible, requesting a return call and explaining that it was calling about the possibility of curing defects in the Claimant's WKHS Claim. If, in response to such contacts, a Claimant was able to cure the deficiency, KCC updated the Settlement Database.

## IV. LATE BUT OTHERWISE ELIGIBLE CLAIMS

25.     As of January 12, 2024, KCC has received 364 Claims postmarked after the Court's July 3, 2023 claims-submission deadline. KCC has processed these 364 Claims, and 208 of these Claims have been found to be otherwise eligible, in whole or in part ("Late But Otherwise Eligible Claims"). The total Recognized Claims for these Late But Otherwise Claims represent approximately 1.4% of the total Recognized Claims for all of the Claims that KCC is recommending for acceptance. KCC has not rejected any Claim solely based on its late submission, and KCC believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent these Claims are eligible, but-for the fact that they were late, they are recommended herein for payment.

26.     However, there must be a final cut-off date after which no additional Claims will be accepted for processing so the Net Settlement Fund can be distributed. Acceptance of additional Claims or responses to Notices of Rejection now would necessarily require a delay in the distribution. Accordingly, KCC recommends that this Court order that no Claims received after January 12, 2024 ("Post-Distribution Claims") and no previously submitted Claims cured or adjusted after January 12, 2024 ("Late-Adjusted Claims") be eligible for any reason whatsoever, subject only to the provisions of ¶ 37(d) of the proposed Distribution Plan set forth below. More particularly, if the Court adopts the proposed Distribution Plan set forth below, and if Lead Counsel determines that further distributions to existing Claimants are not cost effective, then, prior to any contribution of residual

funds to non-sectarian, not-for-profit organizations (*see* ¶ 37(e) below), Post-Distribution Claims (to the extent they would have been eligible if timely received) may be paid to the extent permitted by the amount of remaining funds, on a *pro rata* basis, so as to bring them into parity with other Authorized Claimants who have cashed all of their prior distribution checks in accordance with ¶ 37(f) below. Likewise, Late-Adjusted Claims will be reevaluated upon receipt of the adjustment and, to the extent found eligible for a distribution or additional distribution, they will be treated in the same manner as Post-Distribution Claims. However, should an adjustment be received that results in a lower Recognized Loss Amount, that adjustment will be made, and the Recognized Claim reduced accordingly prior to any distribution to that Claimant.

## V.    QUALITY ASSURANCE, FRAUD PREVENTION, AND REGULATORY COMPLIANCE

27.    KCC's QA personnel worked throughout this administration to ensure that: (i) all Claims received for the Settlement were processed properly, that deficiency and ineligibility Message Codes were properly applied to Claims; (ii) Notices of Rejection were mailed to the appropriate claimants; and (iii) KCC's computer programs were operating properly.

28.    Moreover, once all Claims were processed, Notices of Rejection sent, and any responses thereto reviewed and processed, KCC's QA team performed a final project wrap-up to ensure the correctness and completeness of all Claims before KCC prepared and delivered its final reports to Lead Counsel. Here, in connection with its QA wrap-up, KCC confirmed that: (i) accepted Claims had no messages denoting ineligibility; (ii) ineligible Claims did have messages denoting ineligibility; (iii) Claims containing transactions occurring before or after the relevant time period contained appropriate ineligibility messages; and (iv) all Claims requiring Notices of Rejection were sent such letters. KCC also: (i) performed a sample review of deficient Claims; (ii) reviewed Claims with large dollar losses; (iii) sampled Claims

that had been determined to be ineligible, including those with no calculated Recognized Loss Amount under the Court-approved Plan of Allocation, to verify that all transactions had been captured correctly; and (iv) tested the accuracy of its claims calculation program.

29.    For example, the QA team tested the following programs that KCC's computer staff designed for this administration: (i) the data entry screens used to store Claim information (including transactional data) and to attach Message Codes; (ii) the programs to load and analyze transactional data submitted in Electronic Claims; (iii) the program to compare claimed transaction prices against reported market prices, to confirm that the claimed transactions were within an acceptable range of reported market prices; (iv) the program used to analyze the transactional data for all Claims, and to calculate each claimant's Recognized Claim based on the Court-approved Plan of Allocation; (v) the programs used to generate various reports throughout the administration, including lists of all eligible and ineligible Claims; and (vi) the programs used to calculate each Authorized Claimant's distribution amount (by determining the proration factor for the Settlement, and applying it to each claimant's Recognized Claim as calculated above).

30.    KCC also used a variety of fraud protection controls throughout the administration to identify potential fraudulent Claims. Searches for duplicate Claims, high-value reviews, spot reviews, and other standard audit reports, examined the information in a variety of ways, and were used during the Claims review.

31.    KCC reviewed and compared the entire Settlement Database against its proprietary "Watch List" of known potential fraudulent filers that KCC or its affiliate, Gilardi & Co. LLC, have developed over more than 30 years in the claims administration business. KCC works with law enforcement to update this Watch List with the latest information available.

32.    In accordance with the Office of Foreign Asset Control ("OFAC"), KCC will also perform searches on every check that it will issue to identify any

potential payees whose names appear on the federal government's restricted person's list, or who reside in countries to which payments are prohibited. KCC regularly monitors changes to OFAC regulations and guidelines.

## VI.    DETERMINATIONS OF CLAIMS

33.    KCC has completed the processing of the 33,864 Claims received through January 12, 2024, and has determined that: (a) 14,747 Claims are acceptable in whole or in part; and (b) 19,117 Claims should be wholly rejected because they are ineligible for recovery from the Net Settlement Fund. The 19,117 wholly rejected Claims are ineligible for the following reasons:

### Summary of Rejected Claims

| Reason for Ineligibility | Number of Claims |
| --- | --- |
| Claim Did Not Result in a Recognized Claim under the Court-approved Plan of Allocation | 10,639 |
| Claim Did Not Fit Definition of Settlement Class (e.g., Claimant's shares were not purchased/acquired during Class Period) | 2,596 |
| Deficient Claim Never Cured | 789 |
| Duplicate Claim | 188 |
| Withdrawn Claim | 18 |
| Replaced Claim[5] | 4,887 |
| **TOTAL** | **19,117** |

34.    A list of the Claims received and their ultimate disposition is contained in KCC's Claims Administrator's Report, attached at Exhibit B. Exhibit B-1, entitled "Timely Eligible Claims," lists all timely-filed, provisionally accepted Claims, and states their Recognized Claim amounts. Exhibit B-2, entitled "Late But Otherwise Eligible Claims," lists all late-filed but provisionally accepted Claims, and states their Recognized Claim amounts. Exhibit B-3, entitled "Rejected Claims," lists all

---

[5]    Replaced Claims are Claims that were re-submitted by Electronic Claim filers to correct issues with the data initially presented.

wholly rejected Claims and states the reason for ineligibility. For privacy reasons, Exhibit B provides only the Claimant's unique Claim number assigned by KCC, along with that Claim's Recognized Claim amount or Reason for Ineligibility (no names, addresses, social security or other taxpayer identification numbers are disclosed).

35.    The total Recognized Claims for all provisionally accepted Claims calculated in accordance with the Court-approved Plan of Allocation is $303,004,250.07 (the total Recognized Claims for the 14,539 Timely Eligible Claims is $298,812,975.66, and the total Recognized Claims for the 208 Late But Otherwise Eligible Claims is $4,191,274.41). Under the Plan of Allocation, each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her, or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants; except that, as also set forth in the Plan of Allocation, if an Authorized Claimant's prorated payment calculates to less than $20.00 it will not be included in the calculation and the Claimant will receive no distribution. Upon approval by the Court, KCC will prepare and mail checks (or wire transfers where applicable) to all Authorized Claimants for their *pro rata* share of the Net Settlement Fund, subject to the $20.00 threshold for payment.

## VII.   KCC'S REQUESTED FEES AND DISBURSEMENTS

36.    KCC agreed to be the Claims Administrator in exchange for the payment of its fees and expenses. Lead Counsel received reports of all of the work KCC performed with respect to the administration of the Settlement and authorized the claims administration work performed herein. To date, KCC has incurred a total of $920,828.49 for services performed in this matter and has been reimbursed this amount from the Settlement Fund in accordance with the Stipulation and Preliminary Approval Order. KCC estimates that it will incur additional fees and expenses in connection with conducting the initial distribution of the Net Settlement Fund to

Authorized Claimants ("Initial Distribution"), which will not exceed $4,171.51 (for total fees and expenses not to exceed $925,000).

## VIII.  DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

37.    Should the Court concur with KCC's determinations concerning the provisionally accepted and rejected claims, including the Late But Otherwise Eligible Claims, KCC recommends the following distribution plan ("Distribution Plan"):

(a)    KCC will conduct the Initial Distribution of the Net Settlement Fund, after deducting all payments previously approved by the Court and requested herein, the payment of any estimated taxes, the costs of preparing tax returns, and any escrow fees, as follows:

(i)    Pursuant to the Court-approved Plan of Allocation, KCC will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants.

(ii)    KCC will, pursuant to the terms of the Plan of Allocation, eliminate from the distribution any Authorized Claimant whose Distribution Amount is less than $20.00. Such Claimants will receive no payment from the Net Settlement Fund.

(iii)    After eliminating Claimants who would have received less than $20.00, KCC will recalculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $20.00 or more pursuant to the calculation described in subparagraph (a)(i) above. This *pro rata* share is the Authorized Claimant's "Distribution Amount."

(iv)    Authorized Claimants whose calculated Distribution Amount is less than $200 will be paid their full Distribution Amount in the Initial Distribution ("Claims Paid in Full") and will receive no additional funds in subsequent Distributions.

16

(v)    After the deduction of payments to Claims Paid in Full, 90% of the remaining balance of the Net Settlement Fund will be distributed *pro rata* to Authorized Claimants whose Distribution Amount calculates to $200 or more. The remaining 10% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise following the Initial Distribution. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

(vi)    KCC will then carry out the Initial Distribution of the Net Settlement Fund in accordance with the Court's order.

(b)    To encourage Authorized Claimants to cash their checks promptly, and to minimize future expenses relating to uncashed checks, all Initial Distribution checks will bear the notation: "CASH PROMPTLY. VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED 90 DAYS AFTER ISSUE DATE."6

---

6    In an effort to have as many Authorized Claimants as possible cash their checks, KCC will perform follow-up with those Authorized Claimants whose checks are initially uncashed, either because they are returned to KCC as undeliverable or because the Authorized Claimant simply did not cash the check after a period of time elapses ("Outreach Program"). For Authorized Claimants whose checks are returned as undeliverable, KCC will endeavor to locate new addresses by running the undeliverable addresses through the USPS National Change of Address database and, where appropriate, via Internet search techniques and by calling the Authorized Claimants. Where a new address is located, KCC will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. For any Authorized Claimants whose checks are not returned, but who simply do not cash their checks, KCC will use a mix of automated calls, personalized telephone calls, and emails to urge such Authorized Claimants to cash their distribution checks. In the event an Authorized Claimant loses or damages his, her, or its check, or otherwise requires a new check, KCC will issue replacement checks. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, KCC will void the initial payment prior to reissuing a payment. In order not to delay

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

(c)    Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or pursuant to further action as set forth in footnote 6, will irrevocably forfeit all recovery from the Settlement. The funds allocated to such stale-dated checks will be available for redistribution to other Authorized Claimants in a potential subsequent distribution. Similarly, Authorized Claimants who do not cash subsequent distribution checks within the time allotted or pursuant to further action as set forth in footnote 5 will irrevocably forfeit any further recovery from the Settlement.

(d)    If any funds remain in the Net Settlement Fund after the Initial Distribution because of uncashed checks or otherwise, then, after KCC has made reasonable and diligent efforts to have Authorized Claimants cash their checks (as set forth in footnote 5 above), a second distribution of any balance remaining in the Net Settlement Fund shall, six (6) months after the Initial Distribution, or as reasonably soon thereafter, if Lead Counsel and KCC determine it to be cost-effective to do so, be conducted (after payment of any amounts mistakenly omitted from the initial disbursement, in addition to payment of any unpaid fees and expenses incurred in administering the Settlement, including for such second distribution, to the extent KCC's fees do not exceed $925,000, in total, and after deductions for any unpaid estimated taxes, tax preparation fees and escrow fees) to

---

further distributions to Authorized Claimants who have timely negotiated their checks, KCC's outreach program, described in the preceding sentences, shall end 30 days after the initial void date. Authorized Claimants will be informed that, if they do not cash their distribution checks within 90 days of the mail date, or they do not cash check reissues within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than 45 days prior to any next planned distribution. Requests for reissued checks in connection with the Second Distribution, and any subsequent distributions (should such distributions occur), will be handled in the same manner.

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC

all Authorized Claimants who have cashed their Initial Distribution checks, and who would receive at least $20.00 from such distribution based on their *pro rata* share of the remaining funds (the "Second Distribution"). Additional distributions thereafter will follow deduction of costs and expenses as described and will be subject to the conditions previously noted until Lead Counsel, in consultation with KCC, determines that further distribution is not cost effective.

(e)　　At such time as Lead Counsel, in consultation with KCC, determines that the further distribution of funds remaining in the Net Settlement Fund is not cost-effective, if sufficient funds remain to warrant the processing of Post-Distribution Claims, such Claims will be processed, and any such Claims that are otherwise valid, as well as any Late-Adjusted Claims resulting in an increased Recognized Claim, will be paid in accordance with ¶ 37(f) below. Thereafter, any balance remaining in the Net Settlement Fund, after payment of such Post-Distribution and Late-Adjusted Claims, shall be contributed to non-sectarian, not-for-profit organization(s) to be recommended by Lead Counsel and approved by the Court.

(f)　　No new Claims received after January 12, 2024 may be accepted, and no further adjustments to Claims received on or before January 12, 2024, that would result in an increased Recognized Claim may be made for any reason, subject to the following exception. If Claims are received after January 12, 2024 or adjusted after January 12, 2024, that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then, at the time that Lead Counsel, in consultation with KCC, determines that further distribution is not cost-effective as provided in ¶ 37(e) above, and after deducting any additional fees and expenses incurred in connection with administering the Settlement (to the extent KCC's fees do not exceed $925,000, in total) and after deducting any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such Claimants, at the discretion of Lead Counsel, may be paid their distribution amounts

or additional distribution amounts on a pro rata basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks to the extent possible.

(g)    Unless otherwise ordered by the Court, KCC will dispose of the paper copies of Claims and all supporting documentation one (1) year after all funds have been distributed and will dispose of electronic copies of the same three (3) years after all funds have been distributed.

## IX.    CONCLUSION

38.    KCC respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting the Claims received for the Settlement, together with the proposed Distribution Plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Wantagh, NY on January 19, 2024.

Lance Cavallo

DECLARATION OF LANCE CAVALLO
CASE NO. 2:21-CV-02072-CJC-PVC